

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TURLINGTON HOMES, INC., ET AL.,

    Plaintiffs,

v.

RYAN R. SINWELSKI, ET AL.,

    Defendants.

Case No. 1:26-cv-02390

Hon. April M. Perry



FILED    MPV

7/13/2026

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**DEFENDANT RYAN R. SINWELSKI'S COMPILATION OF EXHIBITS IN SUPPORT OF HIS REPLY BRIEF (EXHIBITS A THROUGH K2)**

**INDEX OF EXHIBITS**

| Exhibit Designation | Document Description |
|---|---|
| **Exhibit A** | **Order of Dismissal, Lento v. Lewis, E.D. Mich. (June 11, 2024)** |
| **Exhibit D** | **Certified Verbatim Transcript of YouTube Live Broadcast (February 24, 2026)** |
| **Exhibit E1** | **New Jersey Insurance Fraud Investigative Article** |
| **Exhibit E2** | **J. Groff Comprehensive Background Report** |
| **Exhibit F1** | **Investigative News Article: *Nava v. Lento* (New Jersey)** |

1

| Exhibit Designation | Document Description |
|---|---|
| Exhibit F2 | Pennsylvania Supreme Court Disciplinary Board Report and Order |
| Exhibit F3 | New Jersey Disciplinary Review Board Administrative Decision (2016) |
| Exhibit F4 | Virginia State Bar Disciplinary Order |
| Exhibit F5 | Verified Screenshot of Virginia Supreme Court Active Status Portal |
| Exhibit G1 | Wyoming Secretary of State Business Detail Registry |
| Exhibit G2 | Illinois Secretary of State Articles of Incorporation for Turlington Homes |
| Exhibit H | Certified Statement of Wyoming Registered Agent Resignation |
| Exhibit I1 | Domain Marketing and Digital Capture Data for LLG |
| Exhibit I2 | Compiled Website Captures and Digital Evidence for Turlington Homes |
| Exhibit J1 | City of Harvey Official Minutes and Signed Turlington Redevelopment Agreement (October 27, 2025) |
| Exhibit J2 | City of Harvey Council Meeting Agenda Packet |

| Exhibit Designation | Document Description |
|---|---|
| Exhibit J3 | Public Comments Record: Colby Facebook Informational Post |
| Exhibit K1 | *Harvey World Herald* Investigative Article regarding Turlington Project |
| Exhibit K2 | *Daily Southtown* Groundbreaking Event News Report |

# **Exhibit A**

Ex. A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LENTO LAW GROUP, P.C.,

      Plaintiff,

                                            Case No. 24-10031

v.

                                            Hon. George Caram Steeh

LADEL LEWIS, LINDA ANN
POHLY, FLORENDA LEE-HALL,
JOYCE ANN WILSON, and VEDA
DIANE BALLA,

      Defendants.
_____/

OPINION AND ORDER GRANTING DEFENDANTS'
<u>MOTIONS TO DISMISS (ECF NOS. 13, 17)</u>

Plaintiff Lento Law Group, P.C., a law firm, is suing five Flint residents

for comments they posted on the Flint Politics Facebook group page.

Defendants Ladel Lewis and Linda Ann Pohly have filed motions to dismiss

the claims against them pursuant to Rule 12(b)(6).

<u>BACKGROUND FACTS</u>

Lento Law Group, P.C. ("Lento") represents clients in the city of Flint,

Michigan. For marketing purposes, Lento purchased a booth at the 2023

Flint Northern Alumni Tailgate and Health Fair. Two Flint council members,

Jerri Winfrey-Carter and Tonya Burns, bought Lento polo shirts and wore

- 1 -

them at the fair. Days later, Defendant Lewis, who is also a member of the Flint City Council, posted a photo of Winfrey-Carter and Burns wearing their Lento Law shirts on Facebook. The post included citations to Michigan statutes (M.C.L. § 4.414, § 15.342) and the Flint Charter, which prohibit gifts worth more than $25 to public employees. Lewis captioned the Facebook post as follows:

> According to the 6th Ward's post defining gifts, it appears that these fancy personalized Lento shirts qualify. Were they more than $25? Can you represent the city and the law firm in litigation with the city at the same time? Is that affecting their votes? Is this why they are not voting to give the residents ARPA dollars? Looks like they are more loyal to Lento than the residents of the City of Flint.

ECF No. 1 at ¶ 20. Lento contends that this post is defamatory because it suggests that it "has or has attempted to, bribe and/or influence Councilwomen Winfrey-Carter and Burns's voting on the Flint City Council." *Id.* at ¶ 21.

On September 4, 2023, another post was made on the Flint Politics Facebook group involving Lento. The original post referred to a lawsuit against Lewis that was filed in this court in August 2023. Beverly Biggs-Leavy, who is represented by the Lento Group, alleged that Lewis improperly removed her from a City Council meeting in violation of her First

Amendment rights.[1] *See* E.D. Mich. Case No. 23-12123. Rennie Lee and Linda Pohly commented on the post, as follows:

> **Rennie Lee**: So is the Lento Group attending Flint Council meetings looking for ways to set themselves the ability to sue the city? It's sad that [City council member] Eric Mays is using his go fund me money to pay attorneys to sue Flint. That's just grimy. I'm praying they request attorneys fees and court cost[s] for these frivolous lawsuits[.]
> > **Linda Pohly**: **Rennie Lee** yes, that is why they are there.
> > We don't know for sure who is funding these lawsuits, but from looking at the Go Fund Me account, there is not enough money to pay for all of this litigation. I am sure at least some of the money is coming from somewhere else.

ECF No.1 at ¶ 26. Lento contends that this post is defamatory because it is "factually inaccurate and explicitly imputes deceptive, underhanded, or unprofessional conduct on the part of Plaintiff." *Id.* at ¶ 52. It further asserts that Lento "represents Flint City Councilman Eric Mays, and therefore, said attorneys attend the Flint City Council meetings to ensure that he is being treated fairly in said meetings and that his political opponents on the Council, such as Defendant Lewis, are not infringing upon his rights." *Id.* at ¶ 53.

---

[1] The complaint was dismissed pursuant to Rule 12(b)(6) on March 15, 2024. Case No. 23-12123, ECF No. 18.

The complaint alleges claims of defamation per se, false light defamation, and tortious interference with business expectancy. Although it also alleges that New Jersey law applies, Plaintiff concedes in its briefing that Michigan law is applicable. Plaintiff further accepts dismissal of its false light claim.

### LAW AND ANALYSIS

To survive a motion to dismiss, the plaintiff must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level" and to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint "must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 319 (6th Cir. 1999) (internal quotation marks omitted).

The elements of a defamation claim are as follows: "(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special

harm caused by publication." *Smith v. Anonymous Joint Enter.*, 487 Mich. 102, 113 (2010). Plaintiff relies upon a defamation *per se* theory. *See* M.C.L. § 600.2911(1); *Cetera v. Mileto*, 342 Mich. App. 441, 452 (2022). The question of whether a statement has defamatory meaning is one for the court. *Fisher v. Detroit Free Press, Inc.*, 158 Mich. App. 409, 413 (1987).

"To be considered defamatory, statements must assert facts that are 'provable as false.'" *Ghanam v. Does*, 303 Mich. App. 522, 545 (2014). A statement of opinion "may be defamatory when it implies assertions of objective facts." *Smith*, 487 Mich. at 129. However, "rhetorical hyperbole" or mere exaggerations "that cannot be interpreted as stating actual facts" cannot serve as the basis for a defamation claim. *Ghanam*, 303 Mich. App. at 545-46. The court must consider a statement in context when determining whether it is defamatory. *Smith*, 487 Mich. at 129. Actual accusations of criminal activity are considered defamation *per se. Ghanam*, 303 Mich. App. at 545. "However, not all statements that can be read as accusations of a crime or misconduct should be considered assertions of fact." *Id.*

> Such statements include the usual rhetorical hyperbole and imaginative expression often found in satires, parodies, and cartoons. This is true even when the statements are designed to be highly offensive to the

person criticized, and even if, when read literally, the statements can be interpreted as accusations of criminal activity. Terms such as "blackmailer," "traitor," "crook," "steal," and "criminal activities" must be read in context to determine whether they are merely exaggerations of the type often used in public commentary. . . . If a reasonable reader would understand these epithets as merely "rhetorical hyperbole" meant to express strong disapproval rather than an accusation of criminal activity or actual misconduct, they cannot be regarded as defamatory.

*Id.* at 545-46 (citations omitted). *See also Anders v. Cuevas*, 984 F.3d 1166 (6th Cir. 2021).

The forum in which the statements are made is also relevant. "Courts that have considered the matter have concluded that Internet message boards and similar communication platforms are generally regarded as containing statements of pure opinion rather than statements or implications of actual, provable fact." *Ghanam*, 303 Mich. App. at 547. Facebook posts made by individuals are on the low end of the reliability scale of sources on the internet. *Id.* "Blogs and chat rooms tend to be vehicles for the expression of opinions; by their very nature, *they are not a source of facts or data upon which a reasonable person would rely.*" *Id.* (citation omitted, emphasis in original).

Plaintiff's claim against Pohly is based upon her statement in response to the question "So is the Lento Group attending Flint Council meetings looking for ways to set themselves the ability to sue the city?"

- 6 -

10

Pohly responded, "yes, that is why they are there." Plaintiff argues that the accusation that they are "looking to ways" to sue the city is defamatory. The court disagrees. Based upon the forum (Facebook) and the context of the discussion, it is clear that Pohly is merely expressing an opinion, rather than a provable fact. Statements of opinion are incapable of defamatory meaning and are not actionable.

Similarly, Plaintiff's defamation claim against Lewis is based upon her Facebook post of a photo of two council members wearing Lento Law shirts. Lewis suggested that the shirts were "gifts" from Lento and questioned whether Lento was influencing the council members' votes:

> According to the 6th Ward's post defining gifts, it appears that these fancy personalized Lento shirts qualify. Were they more than $25? Can you represent the city and the law firm in litigation with the city at the same time? Is that affecting their votes? Is this why they are not voting to give the residents ARPA dollars? Looks like they are more loyal to Lento than the residents of the City of Flint.

ECF No. 1 at ¶ 20. Plaintiff argues that the "only reasonable implication" of this post is that Lento "engages in bribing members of the Flint City Council." However, viewing the post as a whole, Lewis is providing her interpretation of a photo and statutes prohibiting gifts, while criticizing the ethics of fellow council members. This type of "personal interpretation of the available information constitutes . . . opinion, and this opinion is not

- 7 -

11

actionable as defamation." *Knutson v. Gassert*, 2023 WL 5988457, at *5 (Mich. App. Sept. 14, 2023) (citing *Sarkar v. Doe*, 318 Mich. App. 156, 190 & n.18 (2016)). As the court stated in *Sarkar*, "when a speaker outlines the factual basis for his conclusions, his statement is protected by the First Amendment." *Sarkar*, 318 Mich. App. at 190.

Moreover, Lewis's assumption that Lento gifted shirts to council members cannot reasonably interpreted as an actual accusation of bribery, which requires corrupt intent. *See* M.C.L. § 750.117. The suggestion that a council member could be bribed by a free polo shirt falls into the category of "rhetorical hyperbole," "meant to express strong disapproval rather than an accusation of criminal activity or actual misconduct." *Ghanam*, 303 Mich. App. at 545. Because Lewis's statements cannot be interpreted as an actual accusation of a crime, Plaintiff has not stated a claim for defamation *per se. See Cetera,* 342 Mich. App. at 452 (holding that under Michigan law, actions for defamation *per se* are "limited to those in which the false and defamatory statements regard criminality and lack of chastity," not "statements that concern a party's business, profession, or employment").

To plead a defamation claim, Plaintiff must allege a "defamatory statement" and "either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by

- 8 -

12

publication." *Smith*, 487 Mich. at 113. Pohly and Lewis's statements are contextually presented as opinions rather than as stating facts, and neither statement qualifies as defamation *per se*. In addition, Plaintiff has not alleged "special harm" resulting from the publication of these statements. For these reasons, Plaintiff has failed to plausibly allege all of the required elements of a defamation claim against either Pohly or Lewis.

With respect to its tortious interference claim, Plaintiff must plead "(1) a valid business relationship or expectancy; (2) knowledge of that relationship or expectancy on the part of the defendant; (3) an intentional interference by the defendant inducing or causing a breach or termination of that relationship; and (4) resulting damage to the plaintiff." *Auburn Sales, Inc. v. Cypros Trading & Shipping, Inc.*, 898 F.3d 710, 715 (6th Cir. 2018) (applying Michigan law). The third element requires a showing that "the interference with a business relationship" is "improper in addition to being intentional." *Id.* (citation omitted).

Plaintiff's allegations in support of its tortious interference claim are entirely conclusory. *See* ECF No. 1 at ¶¶ 89-94 ("[U]pon information and belief, a significant number of potential customers were, or could have been, turned away from Plaintiff's business as a direct and proximate result of Defendants' false and defamatory post, thus causing Plaintiff to incur

- 9 -

damages in the form of lost business."). Plaintiff does not allege that a specific business relationship or expectancy was terminated as a result of Lewis's or Pohly's comments, that Defendants intentionally interfered with a business relationship or expectancy, or that it suffered damages. *See* ECF No. 1 at ¶ ¶ 89-94. Moreover, expressions of opinion "are protected from defamation actions, including actions alleging interference with business." *Lakeshore Cmty. Hosp., Inc. v. Perry*, 212 Mich. App. 396, 402 (1995) (citations omitted). Plaintiff has failed to allege sufficient facts in support of a plausible tortious interference claim.

## ORDER

For these reasons, IT IS HEREBY ORDERED that Lewis and Pohly's motions to dismiss (ECF No. 13, 17) the claims against them are GRANTED.

Dated: June 11, 2024

s/George Caram Steeh
HON. GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on June 11, 2024, by electronic and/or ordinary mail.

s/LaShawn Saulsberry
Deputy Clerk

# N.J. Man Sentenced to 7 Years in State Prison

September 25, 2003 / By

New Jersey Attorney General Peter Harvey announced that a Camden County resident who reportedly coordinated an elaborate scheme to "stage" automobile accidents, obtain official police reports, submit phony insurance claims and attempt to collect nearly $100,000 in illegal payments from insurance companies has been sentenced to seven years in state prison.

According to Vaughn McKoy, Director, Division of Criminal Justice and Insurance Fraud Prosecutor Greta Gooden Brown, John Groff, 32, of Camden County, was sentenced on Sept. 19 to seven years in state prison by Camden County Superior Court Judge William Cook. Groff will not be eligible for parole for at least three and one-half years.



**AM Best
Information Services**
Financial Data, Insurance
News and Thought Leadership
Solutions for Business

Learn more or request a demo.

AM
**BEST**
SINCE 1899 ®

Gooden Brown noted that Groff plead guilty to charges in a July 27, 2001 State Grand Jury indictment. The indictment charged Groff with conspiracy to commit theft by deception and attempted theft by deception contained. On Sept. 25, 2002, Groff entered a guilty plea before Judge Cook.

At the guilty plea hearing, Groff reportedly admitted that he recruited 28 other individuals to participate in the business of "staging" automobile accidents in the Camden County area. The "staged" hit-and-run accidents were reported to the Pennsauken, Voorhees, Cherry Hill, Bellmawr, Camden and Gloucester Township Police Departments.

The Division of Criminal Justice – Office of Insurance Fraud Prosecutor's investigation determined that Groff and 28 other defendants staged seven automobile accidents on June 2, 1996; June 20, 1996; June 26, 1996; July 13, 1996; July 14, 1996; July 24, 1996; and Aug. 1, 1996. As a result of the "staged" accidents, $96,842 in fraudulent insurance claims were submitted to five insurance carriers – Allstate Insurance Company, State Farm Insurance Company, Liberty Mutual Insurance Company, Prudential Insurance Company, and Material Damage Adjustment Corporation.

Gooden Brown noted that the Office of Insurance Fraud Prosecutor has realized a 143 percent increase in indictments; a 91 percent increase in defendants charged; a 79 percent increase in convictions (trial convictions and guilty pleas); and a 60 percent increase in civil sanctions during calendar year 2002. The Office of the Insurance Fraud Prosecutor charged 225 defendants in 2002, versus 118 defendants in 2001.

Additionally, the Office of Insurance Fraud Prosecutor imposed sanctions in 3,723 civil fraud cases in 2002, compared to 2,063 civil sanctions obtained in 2001. The Office of Insurance Fraud Prosecutor collected $20.6 million in penalties in 2002, up from $15.8 million last year.



## Popular Today

- **Stellantis Recalls Diesel Cars in Europe Over Camshaft Chain Issue**

- **The Fallout of The Tariff Wave on Auto Parts**

- **Deadly Floods Reinforce Texas' Challenge as Crisis Epicenter**

- **Deadly Texas Flash Floods Cause $18 to $22 Billion in Damage, AccuWeather Says**

## Popular This Month

- **U.S. Homeowners Insurance Rates Rose 40.4% in Six Years,**

**LendingTree Report Shows**

- **What Claims Managers Need to Know About AI And Cyber Risks**

- **Homes With Toxic Smoke Damage Deepen Insurance Nightmare in LA**

- **The Fallout of The Tariff Wave on Auto Parts**

© 2025 Claims Journal

Home | Contact | Subscribe

Privacy Policy | Terms of Use


COURT REPORT FOR

# John E Groff

## Basic Info

| | |
|---|---|
| AGE : | 54 |
| DOB : | 8/71 |
| LOCATION : | Mercer County, NJ |
| RECORDS UPDATED : | 2025-10-08 |

## County Court Details Account 1

| | |
|---|---|
| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | 54 |
| DOB : | August, 1971 |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 94000803 |
| DISPOSITION : | GUILTY |

## County Court Details Account 2

| | |
|---|---|
| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John Groff |
| AGE : | 54 |
| DOB : | August, 1971 |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 94003866 |
| DISPOSITION : | GUILTY |

## County Court Details Account 3

| | |
|---|---|
| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |

| FULL NAME : | John Groff |
| AGE : | 54 |
| DOB : | August, 1971 |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 94003866 |
| DISPOSITION : | TRUE BILL COMPLT |
| DISPOSITION DATE : | 28 September 1994 |

Ex. E2

## County Court Details Account 4

| CHARGE : | THEFT BY DECEPTION-FALSE IMPRE |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John Groff |
| AGE : | 54 |
| DOB : | August, 1971 |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | THEFT BY DECEPTION-FALSE IMPRE |
| CASE NUMBER : | 94003866 |
| DISPOSITION : | UNKNOWN |

## County Court Details Account 5

| CHARGE : | THEFT BY DECEPTION |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | 54 |
| DOB : | August, 1971 |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | THEFT BY DECEPTION |
| CASE NUMBER : | 92000327 |
| DISPOSITION : | UNKNOWN |

## County Court Details Account 6

| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | 54 |
| DOB : | August, 1971 |

| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 92000327 |
| DISPOSITION : | UNKNOWN |
| DISPOSITION DATE : | 10 September 1992 |

Ex. E2

## County Court Details Account 7

| CHARGE : | THEFT BY DECEPTION |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | 54 |
| DOB : | August, 1971 |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | THEFT BY DECEPTION |
| CASE NUMBER : | 92000327 |
| DISPOSITION : | UNKNOWN |

## County Court Details Account 8

| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | 54 |
| DOB : | August, 1971 |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 94000290 |
| DISPOSITION : | DOWNGRADE CHARGE |

## County Court Details Account 9

| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | 54 |
| DOB : | August, 1971 |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |

21

CASE NUMBER :        92000327                Ex. E2
DISPOSITION :        GUILTY

# County Court Details Account 10

CHARGE :                    THEFT BY DECEPTION
RECORD DATE :               UNKNOWN
FULL NAME :                 John E Groff
AGE :                       54
DOB :                       August, 1971
COUNTY NAME :               Mercer County
SOURCE :                    NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION :       THEFT BY DECEPTION
CASE NUMBER :               92000327
DISPOSITION :               UNKNOWN

# County Court Details Account 11

CHARGE :                    NOT SPECIFIED
RECORD DATE :               UNKNOWN
FULL NAME :                 John E Groff
AGE :                       54
DOB :                       August, 1971
COUNTY NAME :               Mercer County
SOURCE :                    NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION :       NOT SPECIFIED
CASE NUMBER :               92000327
DISPOSITION :               UNKNOWN
DISPOSITION DATE :          10 September 1992

# County Court Details Account 12

CHARGE :                    THEFT BY DECEPTION
RECORD DATE :               UNKNOWN
FULL NAME :                 John E Groff
AGE :                       54
DOB :                       August, 1971
COUNTY NAME :               Mercer County
SOURCE :                    NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION :       THEFT BY DECEPTION
CASE NUMBER :               92000327
DISPOSITION :               UNKNOWN

# County Court Details Account 13

CHARGE :                     THEFT BY DECEPTION
RECORD DATE :                UNKNOWN
FULL NAME :                  John E Groff
AGE :                        54
DOB :                        August, 1971
COUNTY NAME :                Mercer County
SOURCE :                     NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION :        THEFT BY DECEPTION
CASE NUMBER :                92000327
DISPOSITION :                UNKNOWN

# County Court Details Account 14

CHARGE :                     THEFT BY DECEPTION-FALSE IMPRE
RECORD DATE :                UNKNOWN
FULL NAME :                  John E Groff
AGE :                        54
DOB :                        August, 1971
COUNTY NAME :                Mercer County
SOURCE :                     NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION :        THEFT BY DECEPTION-FALSE IMPRE
CASE NUMBER :                94000290
DISPOSITION :                UNKNOWN

# County Court Details Account 15

CHARGE :                     NOT SPECIFIED
RECORD DATE :                UNKNOWN
FULL NAME :                  John E Groff
AGE :                        54
DOB :                        August, 1971
COUNTY NAME :                Mercer County
SOURCE :                     NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION :        NOT SPECIFIED
CASE NUMBER :                94000290
DISPOSITION :                TRUE BILL COMPLT
DISPOSITION DATE :           29 September 1994

# County Court Details Account 16

CHARGE :                     NOT SPECIFIED

| | |
|---|---|
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | 54 |
| DOB : | August, 1971 |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 92000327 |
| DISPOSITION : | UNKNOWN |
| DISPOSITION DATE : | 10 September 1992 |

Ex. E2

## County Court Details Account 17

| | |
|---|---|
| CHARGE : | BAD CHECKS-NO ACCOUNT |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | 54 |
| DOB : | August, 1971 |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | BAD CHECKS-NO ACCOUNT |
| CASE NUMBER : | 94000290 |
| DISPOSITION : | UNKNOWN |

## County Court Details Account 18

| | |
|---|---|
| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | 54 |
| DOB : | August, 1971 |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 92000327 |
| DISPOSITION : | UNKNOWN |
| DISPOSITION DATE : | 10 September 1992 |

## County Court Details Account 19

| | |
|---|---|
| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |

| | |
|---|---|
| AGE : | 54 |
| DOB : | August, 1971 |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 94000290 |
| DISPOSITION : | TRUE BILL COMPLT |
| DISPOSITION DATE : | 29 September 1994 |

## County Court Details Account 20

| | |
|---|---|
| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | 54 |
| DOB : | August, 1971 |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 92000327 |
| DISPOSITION : | UNKNOWN |
| DISPOSITION DATE : | 10 September 1992 |

## County Court Details Account 21

| | |
|---|---|
| CHARGE : | ACCOMPLICE LIABILITY-2ND DEGRE |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John Groff |
| AGE : | 54 |
| DOB : | August, 1971 |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | ACCOMPLICE LIABILITY-2ND DEGRE |
| CASE NUMBER : | 01004807 |
| DISPOSITION : | UNKNOWN |

## County Court Details Account 22

| | |
|---|---|
| CHARGE : | THEFT BY DECEPTION-VALUE $500- |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John Groff |
| AGE : | 54 |
| DOB : | August, 1971 |

| | |
|---|---|
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | THEFT BY DECEPTION-VALUE $500- |
| CASE NUMBER : | 95005171 |
| DISPOSITION : | UNKNOWN |
| FINES : | 12419 |

## County Court Details Account 23

| | |
|---|---|
| CHARGE : | BAD CHECKS, MONEY ORDERS OR EL |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John Groff |
| AGE : | 54 |
| DOB : | August, 1971 |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | BAD CHECKS, MONEY ORDERS OR EL |
| CASE NUMBER : | 94003866 |
| DISPOSITION : | UNKNOWN |

## County Court Details Account 24

| | |
|---|---|
| CHARGE : | POSSESSION OF WEAPONS FOR UNLA |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John Groff |
| AGE : | 54 |
| DOB : | August, 1971 |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | POSSESSION OF WEAPONS FOR UNLA |
| CASE NUMBER : | 93002918 |
| DISPOSITION : | UNKNOWN |

## County Court Details Account 25

| | |
|---|---|
| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John Groff |
| AGE : | 54 |
| DOB : | August, 1971 |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |

# County Court Details Account 26

CHARGE :                NOT SPECIFIED
RECORD DATE :           UNKNOWN
FULL NAME :             John Groff
AGE :                   54
DOB :                   August, 1971
COUNTY NAME :           Mercer County
SOURCE :                NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION :   NOT SPECIFIED
CASE NUMBER :           01004807
DISPOSITION :           UNKNOWN

# County Court Details Account 27

CHARGE :                CRIMINAL ATTEMPT, UNCODED CHAPTER NO
RECORD DATE :           UNKNOWN
FULL NAME :             John E Groff
AGE :                   54
DOB :                   August, 1971
COUNTY NAME :           Mercer County
SOURCE :                NEW Jersey Department OF Corrections
OFFENSE DESCRIPTION :   CRIMINAL ATTEMPT, UNCODED CHAPTER NO
OFFENSE CODE :          2C:5-1*2
OFFENSE DATE :          08 April 1997
CASE NUMBER :           UNKNOWN
DISPOSITION :           UNKNOWN

# County Court Details Account 28

CHARGE :                2C:5-1*2 CRIMINAL ATTEMPT, UNCODED CHAPTER NO /2
RECORD DATE :           UNKNOWN
FULL NAME :             John E Groff
AGE :                   54
DOB :                   August, 1971
COUNTY NAME :           Mercer County
SOURCE :                NEW Jersey Department OF Corrections
OFFENSE DESCRIPTION :   2C:5-1*2 CRIMINAL ATTEMPT, UNCODED CHAPTER NO /2
OFFENSE DATE :          08 April 1997
CASE NUMBER :           S-43-07-01

DISPOSITION :     UNKNOWN

## County Court Details Account 29

| | |
|---|---|
| CHARGE : | 2C:5-1*2 CRIMINAL ATTEMPT, UNCODED CHAPTER NO /2 |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | 54 |
| DOB : | August, 1971 |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Department OF Corrections |
| OFFENSE DESCRIPTION : | 2C:5-1*2 CRIMINAL ATTEMPT, UNCODED CHAPTER NO /2 |
| OFFENSE DATE : | 08 April 1997 |
| CASE NUMBER : | S-43-07-01 |
| DISPOSITION : | UNKNOWN |

## County Court Details Account 30

| | |
|---|---|
| CHARGE : | BAD CHECKS-VALUE $1,000-<$75,0 |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | BAD CHECKS-VALUE $1,000-<$75,0 |
| CASE NUMBER : | 08005784 |
| DISPOSITION : | UNKNOWN |

## County Court Details Account 31

| | |
|---|---|
| CHARGE : | THEFT BY DECEPTION-FALSE IMPRE |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | THEFT BY DECEPTION-FALSE IMPRE |
| CASE NUMBER : | 08005784 |
| DISPOSITION : | UNKNOWN |

## County Court Details Account 32

| | |
|---|---|
| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 08005784 |
| DISPOSITION : | ADMIN DISMISS/DISP |
| DISPOSITION DATE : | 15 January 2009 |

## County Court Details Account 33

| | |
|---|---|
| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 08005784 |
| DISPOSITION : | ADMIN DISMISS/DISP |
| DISPOSITION DATE : | 15 January 2009 |

## County Court Details Account 34

| | |
|---|---|
| CHARGE : | THEFT OF SERVICES-KNOW SERVICE |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | THEFT OF SERVICES-KNOW SERVICE |
| CASE NUMBER : | 08005784 |
| DISPOSITION : | UNKNOWN |

## County Court Details Account 35

| | |
|---|---|
| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |

| | |
|---|---|
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 08005784 |
| DISPOSITION : | ADMIN DISMISS/DISP |
| DISPOSITION DATE : | 15 January 2009 |

## County Court Details Account 36

| | |
|---|---|
| CHARGE : | FUGITIVE FROM JUSTICE |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | FUGITIVE FROM JUSTICE |
| CASE NUMBER : | 94001432 |
| DISPOSITION : | UNKNOWN |

## County Court Details Account 37

| | |
|---|---|
| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 94001432 |
| DISPOSITION : | ADMIN DISMISS/DISP |
| DISPOSITION DATE : | 14 June 1994 |

## County Court Details Account 38

| | |
|---|---|
| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |

| | |
|---|---|
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 95001031 |
| DISPOSITION : | MUNIC REMAND/DOWNGR |
| DISPOSITION DATE : | 02 June 1995 |

Ex. E2

## County Court Details Account 39

| | |
|---|---|
| CHARGE : | THEFT BY DECEPTION |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | THEFT BY DECEPTION |
| CASE NUMBER : | 95001031 |
| DISPOSITION : | UNKNOWN |

## County Court Details Account 40

| | |
|---|---|
| CHARGE : | FORGERY |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | FORGERY |
| CASE NUMBER : | 95007804 |
| DISPOSITION : | UNKNOWN |

## County Court Details Account 41

| | |
|---|---|
| CHARGE : | CREDIT CARD CRIMES |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |

OFFENSE DESCRIPTION :      CREDIT CARD CRIMES      Ex. E2
CASE NUMBER :              95007804
DISPOSITION :              UNKNOWN

# County Court Details Account 42

CHARGE :                   CREDIT CARD CRIMES
RECORD DATE :              UNKNOWN
FULL NAME :                John E Groff
AGE :                      UNKNOWN
DOB :                      UNKNOWN
COUNTY NAME :              Mercer County
SOURCE :                   NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION :      CREDIT CARD CRIMES
CASE NUMBER :              95007804
DISPOSITION :              UNKNOWN

# County Court Details Account 43

CHARGE :                   NOT SPECIFIED
RECORD DATE :              UNKNOWN
FULL NAME :                John E Groff
AGE :                      UNKNOWN
DOB :                      UNKNOWN
COUNTY NAME :              Mercer County
SOURCE :                   NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION :      NOT SPECIFIED
CASE NUMBER :              95007804
DISPOSITION :              MERG W OTHR CHARGE
DISPOSITION DATE :         04 January 1996

# County Court Details Account 44

CHARGE :                   CREDIT CARD CRIMES
RECORD DATE :              UNKNOWN
FULL NAME :                John E Groff
AGE :                      UNKNOWN
DOB :                      UNKNOWN
COUNTY NAME :              Mercer County
SOURCE :                   NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION :      CREDIT CARD CRIMES
CASE NUMBER :              95007804
DISPOSITION :              UNKNOWN

# County Court Details Account 45

CHARGE : FORGERY
RECORD DATE : UNKNOWN
FULL NAME : John E Groff
AGE : UNKNOWN
DOB : UNKNOWN
COUNTY NAME : Mercer County
SOURCE : NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION : FORGERY
CASE NUMBER : 95007804
DISPOSITION : UNKNOWN

# County Court Details Account 46

CHARGE : FORGERY
RECORD DATE : UNKNOWN
FULL NAME : John E Groff
AGE : UNKNOWN
DOB : UNKNOWN
COUNTY NAME : Mercer County
SOURCE : NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION : FORGERY
CASE NUMBER : 95007804
DISPOSITION : UNKNOWN

# County Court Details Account 47

CHARGE : CREDIT CARD CRIMES
RECORD DATE : UNKNOWN
FULL NAME : John E Groff
AGE : UNKNOWN
DOB : UNKNOWN
COUNTY NAME : Mercer County
SOURCE : NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION : CREDIT CARD CRIMES
CASE NUMBER : 95007804
DISPOSITION : UNKNOWN

# County Court Details Account 48

CHARGE : FORGERY
RECORD DATE : UNKNOWN

| | |
|---|---|
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | FORGERY |
| CASE NUMBER : | 95007804 |
| DISPOSITION : | UNKNOWN |

## County Court Details Account 49

| | |
|---|---|
| CHARGE : | THEFT BY DECEPTION-FALSE IMPR-VALUE $500-74999/MV ETC |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | THEFT BY DECEPTION-FALSE IMPR-VALUE $500-74999/MV ETC |
| CASE NUMBER : | 094000290 |
| DISPOSITION : | COUNT DM ON PROS MOT |
| DISPOSITION DATE : | 23 January 1995 |

## County Court Details Account 50

| | |
|---|---|
| CHARGE : | BAD CHECKS-VALUE $200-<$1,000 |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | BAD CHECKS-VALUE $200-<$1,000 |
| CASE NUMBER : | 094000290 |
| DISPOSITION : | DEFN PLEAD DP/LESSER |
| DISPOSITION DATE : | 23 January 1995 |

## County Court Details Account 51

| | |
|---|---|
| CHARGE : | BAD CHECKS-VALUE $200-<$1,000 |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |

DOB : UNKNOWN

COUNTY NAME : Mercer County

SOURCE : NEW Jersey Administrator OF The Courts

OFFENSE DESCRIPTION : BAD CHECKS-VALUE $200-<$1,000

CASE NUMBER : 094000803

DISPOSITION : GUILTY PLEA AS CHARG

DISPOSITION DATE : 27 June 1995

# County Court Details Account 52

CHARGE : NOT SPECIFIED

RECORD DATE : UNKNOWN

FULL NAME : John E Groff

AGE : UNKNOWN

DOB : UNKNOWN

COUNTY NAME : Mercer County

SOURCE : NEW Jersey Administrator OF The Courts

OFFENSE DESCRIPTION : NOT SPECIFIED

CASE NUMBER : 91001068

DISPOSITION : MUNIC REMAND/DOWNGR

DISPOSITION DATE : 28 May 1991

# County Court Details Account 53

CHARGE : BAD CHECKS, MONEY ORDERS OR EL

RECORD DATE : UNKNOWN

FULL NAME : John E Groff

AGE : UNKNOWN

DOB : UNKNOWN

COUNTY NAME : Mercer County

SOURCE : NEW Jersey Administrator OF The Courts

OFFENSE DESCRIPTION : BAD CHECKS, MONEY ORDERS OR EL

CASE NUMBER : 91001068

DISPOSITION : UNKNOWN

# County Court Details Account 54

CHARGE : NOT SPECIFIED

RECORD DATE : UNKNOWN

FULL NAME : John E Groff

AGE : UNKNOWN

DOB : UNKNOWN

COUNTY NAME : Mercer County

SOURCE :                          NEW Jersey Administrator OF The Courts

OFFENSE DESCRIPTION :   NOT SPECIFIED

CASE NUMBER :              92002765

DISPOSITION :                 MUNIC REMAND/DOWNGR

DISPOSITION DATE :        18 November 1992

# County Court Details Account 55

CHARGE :                          NOT SPECIFIED

RECORD DATE :              UNKNOWN

FULL NAME :                    John E Groff

AGE :                              UNKNOWN

DOB :                              UNKNOWN

COUNTY NAME :              Mercer County

SOURCE :                        NEW Jersey Administrator OF The Courts

OFFENSE DESCRIPTION :   NOT SPECIFIED

CASE NUMBER :              92002765

DISPOSITION :                 MUNIC REMAND/DOWNGR

DISPOSITION DATE :        18 November 1992

# County Court Details Account 56

CHARGE :                          TERRORISTIC THREATS

RECORD DATE :              UNKNOWN

FULL NAME :                    John E Groff

AGE :                              UNKNOWN

DOB :                              UNKNOWN

COUNTY NAME :              Mercer County

SOURCE :                        NEW Jersey Administrator OF The Courts

OFFENSE DESCRIPTION :   TERRORISTIC THREATS

CASE NUMBER :              92002765

DISPOSITION :                 UNKNOWN

# County Court Details Account 57

CHARGE :                          NOT SPECIFIED

RECORD DATE :              UNKNOWN

FULL NAME :                    John E Groff

AGE :                              UNKNOWN

DOB :                              UNKNOWN

COUNTY NAME :              Mercer County

SOURCE :                        NEW Jersey Administrator OF The Courts

OFFENSE DESCRIPTION :   NOT SPECIFIED

| | |
|---|---|
| CASE NUMBER : | 93001622 |
| DISPOSITION : | COUNT DM ON PROS MOT |
| DISPOSITION DATE : | 30 March 1993 |

Ex. E2

## County Court Details Account 58

| | |
|---|---|
| CHARGE : | THEFT OF SERVICES-KNOW SERVICE |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | THEFT OF SERVICES-KNOW SERVICE |
| CASE NUMBER : | 93001622 |
| DISPOSITION : | UNKNOWN |

## County Court Details Account 59

| | |
|---|---|
| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 93001693 |
| DISPOSITION : | TRUE BILL COMPLT |
| DISPOSITION DATE : | 26 July 1993 |

## County Court Details Account 60

| | |
|---|---|
| CHARGE : | THEFT BY DECEPTION |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | THEFT BY DECEPTION |
| CASE NUMBER : | 93001693 |
| DISPOSITION : | UNKNOWN |

# County Court Details Account 61

CHARGE : THEFT BY DECEPTION
RECORD DATE : UNKNOWN
FULL NAME : John E Groff
AGE : UNKNOWN
DOB : UNKNOWN
COUNTY NAME : Mercer County
SOURCE : NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION : THEFT BY DECEPTION
CASE NUMBER : 93001900
DISPOSITION : UNKNOWN

# County Court Details Account 62

CHARGE : NOT SPECIFIED
RECORD DATE : UNKNOWN
FULL NAME : John E Groff
AGE : UNKNOWN
DOB : UNKNOWN
COUNTY NAME : Mercer County
SOURCE : NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION : NOT SPECIFIED
CASE NUMBER : 93001900
DISPOSITION : TRUE BILL COMPLT
DISPOSITION DATE : 26 July 1993

# County Court Details Account 63

CHARGE : MANU/DIST/DISP - CDS/ANALOG
RECORD DATE : UNKNOWN
FULL NAME : John E Groff
AGE : UNKNOWN
DOB : UNKNOWN
COUNTY NAME : Mercer County
SOURCE : NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION : MANU/DIST/DISP - CDS/ANALOG
CASE NUMBER : 93002918
DISPOSITION : UNKNOWN

# County Court Details Account 64

CHARGE : DIST PERSON < 18 YRS, ENH

| RECORD DATE : | UNKNOWN |
| --- | --- |

RECORD DATE : UNKNOWN
FULL NAME : John E Groff
AGE : UNKNOWN
DOB : UNKNOWN
COUNTY NAME : Mercer County
SOURCE : NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION : DIST PERSON < 18 YRS, ENH
CASE NUMBER : 93002918
DISPOSITION : UNKNOWN

## County Court Details Account 65

CHARGE : COMPOUNDING-PAYMENT TO NOT REP
RECORD DATE : UNKNOWN
FULL NAME : John E Groff
AGE : UNKNOWN
DOB : UNKNOWN
COUNTY NAME : Mercer County
SOURCE : NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION : COMPOUNDING-PAYMENT TO NOT REP
CASE NUMBER : 93002918
DISPOSITION : UNKNOWN

## County Court Details Account 66

CHARGE : NOT SPECIFIED
RECORD DATE : UNKNOWN
FULL NAME : John E Groff
AGE : UNKNOWN
DOB : UNKNOWN
COUNTY NAME : Mercer County
SOURCE : NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION : NOT SPECIFIED
CASE NUMBER : 93002918
DISPOSITION : TRUE BILL COMPLT
DISPOSITION DATE : 01 July 1994

## County Court Details Account 67

CHARGE : NOT SPECIFIED
RECORD DATE : UNKNOWN
FULL NAME : John E Groff
AGE : UNKNOWN

DOB :                       UNKNOWN

Ex. E2

| | |
|---|---|
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 93002918 |
| DISPOSITION : | COUNT DM ON PROS MOT |
| DISPOSITION DATE : | 13 October 1995 |

## County Court Details Account 68

| | |
|---|---|
| CHARGE : | THEFT BY UNLAWFUL TAKING/DISPO |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | THEFT BY UNLAWFUL TAKING/DISPO |
| CASE NUMBER : | 93003191 |
| DISPOSITION : | UNKNOWN |

## County Court Details Account 69

| | |
|---|---|
| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 93003191 |
| DISPOSITION : | MUNIC REMAND/DOWNGR |
| DISPOSITION DATE : | 18 January 1994 |

## County Court Details Account 70

| | |
|---|---|
| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |

40

| | |
|---|---|
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 93003191 |
| DISPOSITION : | MUNIC REMAND/DOWNGR |
| DISPOSITION DATE : | 18 January 1994 |

## County Court Details Account 71

| | |
|---|---|
| CHARGE : | THEFT OF SERVICES-KNOW SERVICE |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | THEFT OF SERVICES-KNOW SERVICE |
| CASE NUMBER : | 93003191 |
| DISPOSITION : | UNKNOWN |

## County Court Details Account 72

| | |
|---|---|
| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 93003343 |
| DISPOSITION : | MUNIC REMAND/DOWNGR |
| DISPOSITION DATE : | 28 January 1994 |

## County Court Details Account 73

| | |
|---|---|
| CHARGE : | BAD CHECKS-NO ACCOUNT |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | BAD CHECKS-NO ACCOUNT |

93003343
DISPOSITION :  UNKNOWN

Ex. E2

## County Court Details Account 74

| | |
|---|---|
| CHARGE : | THEFT BY UNLAWFUL TAKING |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | THEFT BY UNLAWFUL TAKING |
| CASE NUMBER : | 93003385 |
| DISPOSITION : | UNKNOWN |

## County Court Details Account 75

| | |
|---|---|
| CHARGE : | BAD CHECKS, MONEY ORDERS OR EL |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | BAD CHECKS, MONEY ORDERS OR EL |
| CASE NUMBER : | 93003385 |
| DISPOSITION : | UNKNOWN |

## County Court Details Account 76

| | |
|---|---|
| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 93003385 |
| DISPOSITION : | MUNIC REMAND/DOWNGR |
| DISPOSITION DATE : | 16 February 1994 |

# County Court Details Account 77

| | |
|---|---|
| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 93003385 |
| DISPOSITION : | MUNIC REMAND/DOWNGR |
| DISPOSITION DATE : | 16 February 1994 |

# County Court Details Account 78

| | |
|---|---|
| CHARGE : | BAD CHECKS, MONEY ORDERS OR EL |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | BAD CHECKS, MONEY ORDERS OR EL |
| CASE NUMBER : | 94000803 |
| DISPOSITION : | UNKNOWN |

# County Court Details Account 79

| | |
|---|---|
| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 94000803 |
| DISPOSITION : | TRUE BILL COMPLT |
| DISPOSITION DATE : | 18 January 1995 |

# County Court Details Account 80

| CHARGE : | BAD CHECKS, MONEY ORDERS OR EL |
|---|---|
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | BAD CHECKS, MONEY ORDERS OR EL |
| CASE NUMBER : | 94001361 |
| DISPOSITION : | UNKNOWN |

## County Court Details Account 81

| CHARGE : | NOT SPECIFIED |
|---|---|
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 94001361 |
| DISPOSITION : | TRUE BILL COMPLT |
| DISPOSITION DATE : | 03 June 1994 |

## County Court Details Account 82

| CHARGE : | CREDIT CARD CRIMES |
|---|---|
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | CREDIT CARD CRIMES |
| CASE NUMBER : | 95005171 |
| DISPOSITION : | UNKNOWN |

## County Court Details Account 83

| CHARGE : | NOT SPECIFIED |
|---|---|
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |

| | |
|---|---|
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 95005171 |
| DISPOSITION : | DISMISS PLEA BARG |
| DISPOSITION DATE : | 21 November 1997 |

Ex. E2

## County Court Details Account 84

| | |
|---|---|
| CHARGE : | THEFT BY DECEPTION |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | THEFT BY DECEPTION |
| CASE NUMBER : | 95005171 |
| DISPOSITION : | UNKNOWN |

## County Court Details Account 85

| | |
|---|---|
| CHARGE : | FORGERY |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | FORGERY |
| CASE NUMBER : | 95005171 |
| DISPOSITION : | UNKNOWN |

## County Court Details Account 86

| | |
|---|---|
| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |

SOURCE :                            NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION :    NOT SPECIFIED
CASE NUMBER :                  95005171
DISPOSITION :                     DISMISS PLEA BARG
DISPOSITION DATE :            21 November 1997

# County Court Details Account 87

CHARGE :                           NOT SPECIFIED
RECORD DATE :                  UNKNOWN
FULL NAME :                       John E Groff
AGE :                                UNKNOWN
DOB :                                UNKNOWN
COUNTY NAME :                  Mercer County
SOURCE :                          NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION :    NOT SPECIFIED
CASE NUMBER :                  95005171
DISPOSITION :                     DISMISSED MOT PROS
DISPOSITION DATE :            13 October 1995

# County Court Details Account 88

CHARGE :                           FORGERY
RECORD DATE :                  UNKNOWN
FULL NAME :                       John E Groff
AGE :                                UNKNOWN
DOB :                                UNKNOWN
COUNTY NAME :                  Mercer County
SOURCE :                          NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION :    FORGERY
CASE NUMBER :                  95005171
DISPOSITION :                     UNKNOWN

# County Court Details Account 89

CHARGE :                           NOT SPECIFIED
RECORD DATE :                  UNKNOWN
FULL NAME :                       John E Groff
AGE :                                UNKNOWN
DOB :                                UNKNOWN
COUNTY NAME :                  Mercer County
SOURCE :                          NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION :    NOT SPECIFIED

CASE NUMBER :           95005171               Ex. E2
DISPOSITION :           DISMISS PLEA BARG
DISPOSITION DATE :      21 November 1997

# County Court Details Account 90

CHARGE :                THEFT BY DECEPTION
RECORD DATE :           UNKNOWN
FULL NAME :             John E Groff
AGE :                   UNKNOWN
DOB :                   UNKNOWN
COUNTY NAME :           Mercer County
SOURCE :                NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION :   THEFT BY DECEPTION
CASE NUMBER :           95005171
DISPOSITION :           UNKNOWN

# County Court Details Account 91

CHARGE :                NOT SPECIFIED
RECORD DATE :           UNKNOWN
FULL NAME :             John E Groff
AGE :                   UNKNOWN
DOB :                   UNKNOWN
COUNTY NAME :           Mercer County
SOURCE :                NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION :   NOT SPECIFIED
CASE NUMBER :           95005171
DISPOSITION :           DISMISSED MOT PROS
DISPOSITION DATE :      13 October 1995

# County Court Details Account 92

CHARGE :                FORGERY
RECORD DATE :           UNKNOWN
FULL NAME :             John E Groff
AGE :                   UNKNOWN
DOB :                   UNKNOWN
COUNTY NAME :           Mercer County
SOURCE :                NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION :   FORGERY
CASE NUMBER :           95005171
DISPOSITION :           UNKNOWN

# County Court Details Account 93

| | |
|---|---|
| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 95005171 |
| DISPOSITION : | DISMISSED MOT PROS |
| DISPOSITION DATE : | 13 October 1995 |

# County Court Details Account 94

| | |
|---|---|
| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 95005171 |
| DISPOSITION : | DISMISSED MOT PROS |
| DISPOSITION DATE : | 13 October 1995 |

# County Court Details Account 95

| | |
|---|---|
| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 95005171 |
| DISPOSITION : | ADMIN DISMISS/DISP |
| DISPOSITION DATE : | 10 February 1998 |

# County Court Details Account 96

CHARGE : NOT SPECIFIED
RECORD DATE : UNKNOWN
FULL NAME : John E Groff
AGE : UNKNOWN
DOB : UNKNOWN
COUNTY NAME : Mercer County
SOURCE : NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION : NOT SPECIFIED
CASE NUMBER : 95005171
DISPOSITION : DISMISS PLEA BARG
DISPOSITION DATE : 21 November 1997

## County Court Details Account 97

CHARGE : NOT SPECIFIED
RECORD DATE : UNKNOWN
FULL NAME : John E Groff
AGE : UNKNOWN
DOB : UNKNOWN
COUNTY NAME : Mercer County
SOURCE : NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION : NOT SPECIFIED
CASE NUMBER : 95005171
DISPOSITION : TRUE BILL COMPLT
DISPOSITION DATE : 20 November 1996

## County Court Details Account 98

CHARGE : NOT SPECIFIED
RECORD DATE : UNKNOWN
FULL NAME : John E Groff
AGE : UNKNOWN
DOB : UNKNOWN
COUNTY NAME : Mercer County
SOURCE : NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION : NOT SPECIFIED
CASE NUMBER : 95005171
DISPOSITION : DISMISSED MOT PROS
DISPOSITION DATE : 13 October 1995

## County Court Details Account 99

CHARGE : FORGERY

| | |
|---|---|
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | FORGERY |
| CASE NUMBER : | 95005171 |
| DISPOSITION : | UNKNOWN |

## County Court Details Account 100

| | |
|---|---|
| CHARGE : | CREDIT CARD CRIMES |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | CREDIT CARD CRIMES |
| CASE NUMBER : | 95005171 |
| DISPOSITION : | UNKNOWN |

## County Court Details Account 101

| | |
|---|---|
| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 95005171 |
| DISPOSITION : | DISMISS PLEA BARG |
| DISPOSITION DATE : | 21 November 1997 |

## County Court Details Account 102

| | |
|---|---|
| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |

| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 95005171 |
| DISPOSITION : | DISMISS PLEA BARG |
| DISPOSITION DATE : | 21 November 1997 |

## County Court Details Account 103

| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 95005171 |
| DISPOSITION : | DISMISSED MOT PROS |
| DISPOSITION DATE : | 13 October 1995 |

## County Court Details Account 104

| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 95005171 |
| DISPOSITION : | DISMISS PLEA BARG |
| DISPOSITION DATE : | 21 November 1997 |

## County Court Details Account 105

| CHARGE : | THEFT BY DECEPTION |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |

| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | THEFT BY DECEPTION |
| CASE NUMBER : | 95005171 |
| DISPOSITION : | UNKNOWN |

# County Court Details Account 106

| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 95005171 |
| DISPOSITION : | DISMISSED MOT PROS |
| DISPOSITION DATE : | 13 October 1995 |

# County Court Details Account 107

| CHARGE : | CREDIT CARD CRIMES |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | CREDIT CARD CRIMES |
| CASE NUMBER : | 95005171 |
| DISPOSITION : | UNKNOWN |

# County Court Details Account 108

| CHARGE : | FORGERY |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | FORGERY |

CASE NUMBER :        95005171
DISPOSITION :        UNKNOWN

Ex. E2

## County Court Details Account 109

CHARGE :                        CREDIT CARD CRIMES
RECORD DATE :                   UNKNOWN
FULL NAME :                     John E Groff
AGE :                           UNKNOWN
DOB :                           UNKNOWN
COUNTY NAME :                   Mercer County
SOURCE :                        NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION :   CREDIT CARD CRIMES
CASE NUMBER :                   95005171
DISPOSITION :                   UNKNOWN

## County Court Details Account 110

CHARGE :                        NOT SPECIFIED
RECORD DATE :                   UNKNOWN
FULL NAME :                     John E Groff
AGE :                           UNKNOWN
DOB :                           UNKNOWN
COUNTY NAME :                   Mercer County
SOURCE :                        NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION :   NOT SPECIFIED
CASE NUMBER :                   95005171
DISPOSITION :                   DISMISS PLEA BARG
DISPOSITION DATE :              21 November 1997

## County Court Details Account 111

CHARGE :                        THEFT BY DECEPTION
RECORD DATE :                   UNKNOWN
FULL NAME :                     John E Groff
AGE :                           UNKNOWN
DOB :                           UNKNOWN
COUNTY NAME :                   Mercer County
SOURCE :                        NEW Jersey Administrator OF The Courts
OFFENSE DESCRIPTION :   THEFT BY DECEPTION
CASE NUMBER :                   95005171
DISPOSITION :                   UNKNOWN

# County Court Details Account 112

| | |
|---|---|
| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 95005171 |
| DISPOSITION : | DISMISS PLEA BARG |
| DISPOSITION DATE : | 21 November 1997 |

# County Court Details Account 113

| | |
|---|---|
| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 95005171 |
| DISPOSITION : | DISMISS PLEA BARG |
| DISPOSITION DATE : | 21 November 1997 |

# County Court Details Account 114

| | |
|---|---|
| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 95005171 |
| DISPOSITION : | DISMISSED MOT PROS |
| DISPOSITION DATE : | 13 October 1995 |

# County Court Details Account 115

| CHARGE : | NOT SPECIFIED |
|---|---|
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 95005171 |
| DISPOSITION : | DISMISS PLEA BARG |
| DISPOSITION DATE : | 21 November 1997 |

## County Court Details Account 116

| CHARGE : | NOT SPECIFIED |
|---|---|
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 95005171 |
| DISPOSITION : | DISMISS PLEA BARG |
| DISPOSITION DATE : | 21 November 1997 |

## County Court Details Account 117

| CHARGE : | NOT SPECIFIED |
|---|---|
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 95005172 |
| DISPOSITION : | TRUE BILL COMPLT |
| DISPOSITION DATE : | 10 January 1996 |

## County Court Details Account 118

| CHARGE : | NOT SPECIFIED |
|---|---|

| | |
|---|---|
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 95005184 |
| DISPOSITION : | COUNT DM ON PROS MOT |
| DISPOSITION DATE : | 21 June 1996 |

Ex. E2

## County Court Details Account 119

| | |
|---|---|
| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 95007253 |
| DISPOSITION : | MERG W OTHR CHARGE |
| DISPOSITION DATE : | 31 January 1996 |

## County Court Details Account 120

| | |
|---|---|
| CHARGE : | THEFT BY DECEPTION |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | THEFT BY DECEPTION |
| CASE NUMBER : | 95007253 |
| DISPOSITION : | UNKNOWN |

## County Court Details Account 121

| | |
|---|---|
| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |

| | |
|---|---|
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 95007254 |
| DISPOSITION : | ADMIN DISMISS/DISP |
| DISPOSITION DATE : | 05 March 1996 |

Ex. E2

## County Court Details Account 122

| | |
|---|---|
| CHARGE : | THEFT BY DECEPTION |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | THEFT BY DECEPTION |
| CASE NUMBER : | 95007551 |
| DISPOSITION : | UNKNOWN |

## County Court Details Account 123

| | |
|---|---|
| CHARGE : | NOT SPECIFIED |
| RECORD DATE : | UNKNOWN |
| FULL NAME : | John E Groff |
| AGE : | UNKNOWN |
| DOB : | UNKNOWN |
| COUNTY NAME : | Mercer County |
| SOURCE : | NEW Jersey Administrator OF The Courts |
| OFFENSE DESCRIPTION : | NOT SPECIFIED |
| CASE NUMBER : | 95007551 |
| DISPOSITION : | MERG W OTHR CHARGE |
| DISPOSITION DATE : | 04 January 1996 |

Ex. E2

†  None of the information offered by Spokeo is to be considered for purposes of determining or making a decision about a person's eligibility for credit, insurance, employment, housing (tenant screening), or for any other purposes covered under the Fair Credit Reporting Act (FCRA). Spokeo is not a consumer reporting agency and does not offer consumer reports. Spokeo gathers information from public sources, which may not be complete, comprehensive, accurate, or up-to-date, so do not use this service as a substitute for your own due diligence, especially if you have concerns about a person's criminal history. Spokeo does not verify or evaluate each piece of data, and makes no warranties or guarantees about any of the information offered.

COPYRIGHT © 2006-2025 SPOKEO, INC.





Subscribe

**Summer Sale - Start Today for $1 - Expires 7/31/25**

**NEWS**

# N.J. law firm manager sexually harassed, preyed on mass shooting survivors, suit says

Published: Sep. 25, 2018, 2:15 p.m.



A memorial grows outside the Pulse Nightclub in Orlando after the June 12, 2016 mass shooting.  (Getty Images)

    

By **Anthony G. Attrino | NJ Advance Media for NJ.com**

Two men who survived the Pulse nightclub shooting in Florida have sued a New Jersey law firm claiming they were sexually harassed by the firm's office manager and were used to recruit survivors of other mass shootings.

Javier Nava and Brian Nunez allege John Groff of the Conrad Benedetto firm in Voorhees Township contacted them immediately after the June 12, 2016 shooting that left 49 dead and 58 wounded.

Groff, who is the firm's office and marketing manager, told Nava and Nunez "they had viable legal causes of action based on their presence" at the club during the shooting, according to a lawsuit filed Friday in Camden County.

Nava and Nunez claim Groff created the Facebook group "Survivors of Mass Shootings" that held itself out as a support group but was really used to find other shooting survivors as clients for the Benedetto law firm.

"Groff gained access for Benedetto (to) a database of vulnerable victims," the suit states.

Almost immediately after Nava and Nunez agreed to become clients, Groff began texting them for "personal relationships and to groom them" for sexual harassment, the suit states.

In two statements Monday, Groff and Benedetto denied allegations in suit.

The lawsuit claims when a gunman opened fire on concert-goers in Las Vegas, Groff asked Nava and Nunez to accompany him to Nevada and California to meet with other shooting survivors and convince them to retain the Benedetto law firm.

Groff said the firm would pay for all Nava and Nunez's expenses, according to the suit.

Nava and Nunez "believed the trips would be somewhat therapeutic, a way for shooting victims to connect and share their respective stories," the lawsuit says.

However, "Groff sought to use the trip as a way to sexually solicit shooting survivors, including but not limited to (Nava and Nunez)," the suit claims.

They claim when they rejected Groff's sexual advances - Nunez in Nevada and Nava in California - Groff "threatened to withhold money for lodging, transportation and food."

Throughout the trip, Groff sent the men "sexually explicit text messages and pornographic images in attempts to entice (the men) to enter into a sexual relationship with him," the lawsuit states.

The suit contains several screenshots of text message exchanges between Groff and the two men.

Ex. F1

Text message contained in the suit.

In one, Groff says tells Nava wants to get his nails done "so when I am relaxing you and you go crazy you can't scratch me."

"OMG you crazy," Nava responds.

In another to Nava, he allegedly wrote, "Come on pa, just once, between us. Confidential just want to satisfy both of us."

"I'm not asking for a relationship at all, I would never!" he allegedly wrote in another text. "I'm just asking for a little fun."

Groff, reached by phone Monday, called the allegations in the suit "absurd" and sent NJ Advance Media a text message he said he received from Nunez.

"Hey John, again thank you for the great trip and opportunity to get away," reads the text from January. Nunez appears to ask about how to meet other survivors of mass shootings.

In a statement, Groff said:

"I worked with Javier Nava and Brian Nunez to give them an opportunity to find healing with other people who were the victims of mass shootings. At no point during our interactions -- which were always friendly and informal -- did Javier or Brian give me any sense that they had a problem. I believe this legal complaint is full of incorrect facts and serves as nothing more than an attempt to destroy my professional reputation. I look forward to the opportunity to correct the record and prove that this lawsuit has no merit."

Nava and Nunez claims include sexual harassment, discrimination, retaliation, fraud and negligent hiring, training and supervision of Groff.

Groff claims he received this text from Brian Nunez.

In addition to Groff, the lawsuit names Conrad J. Benedetto.

The Benedetto law firm released its own statement Monday, saying the lawsuit contains "factual inaccuracies" and "takes communications out of context."

Benedetto also claims that one of the lawyers who filed the suit represents a survivor from the October 2017 mass shooting in Las Vegas.

Matthew Luber, one of the attorneys who filed the suit, did not return a message asking if his firm represents a Vegas shooting victim.

This isn't the first time Groff has been sued while working for Benedetto.

In December 2015, a lawsuit filed against the law firm alleged Groff used his position to keep a client out of jail in exchange for sex with the man and his girlfriend on multiple occasions.

## RECOMMENDED

## N.J. Transit detective faced years of racial discrimination, lawsuit says Jul. 8, 2025, 9:06 a.m.

*Anthony G. Attrino may be reached at tattrino@njadvancemedia.com. Follow him on Twitter @TonyAttrino. Find NJ.com on Facebook.*

**If you purchase a product or register for an account through a link on our site, we may receive compensation. By using this site, you consent to our User Agreement and agree that your clicks, interactions, and personal information may be collected, recorded, and/or stored by us and social media and other third-party partners in accordance with our Privacy Policy.**



▸ **About Us**

▸ **Subscriptions**

▸ **Already a Subscriber**

▸ **NJ.com Sections**

▸ **Contribute to NJ.com**

▸ **Follow Us**

▸ **More on NJ.com**

▸ **Newspaper stories and photos**

▸ **Mobile**

<u>Privacy Policy</u>  |  <u>User Agreement</u>  |  ▷<u>Ad Choices</u>

# ADVANCE LOCAL

Use of and/or registration on any portion of this site constitutes acceptance of our <u>User Agreement</u>, (updated 8/1/2024) and acknowledgement of our <u>Privacy Policy</u>, and <u>Your Privacy Choices and Rights</u> (updated 7/1/2025).

© 2025 Advance Local Media LLC. All rights reserved (<u>About Us</u>).
The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Advance Local.

<u>Community Rules</u> apply to all content you upload or otherwise submit to this site.

**YouTube's privacy policy** is available <u>here</u> and **YouTube's terms of service** is available <u>here</u>.

▷<u>Ad Choices</u>

**IN THE SUPREME COURT OF PENNSYLVANIA**

| | | |
|---|---|---|
| OFFICE OF DISCIPLINARY COUNSEL, | : | No. 3063 Disciplinary Docket No. 3 |
| | : | |
| Petitioner | : | No. 80 DB 2022 |
| | : | |
| v. | : | Attorney Registration No. 208824 |
| | : | |
| JOSEPH D. LENTO | : | (Philadelphia) |
| | : | |
| Respondent | : | |

**ORDER**

**PER CURIAM**

**AND NOW,** this 19th day of November, 2024, upon consideration of the Report and Recommendations of the Disciplinary Board, Respondent's Petition for Review and Application for Relief, the Application for Relief is denied, and Joseph D. Lento is suspended from the Bar of this Commonwealth for five years. Respondent shall comply with the provisions of Pa.R.D.E. 217 and pay costs to the Disciplinary Board pursuant to Pa.R.D.E. 208(8).

A True Copy Nicole Traini
As Of 11/19/2024

Attest: _Nicole Traini_
Chief Clerk
Supreme Court of Pennsylvania

68

BEFORE THE DISCIPLINARY BOARD OF THE
SUPREME COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| OFFICE OF DISCIPLINARY COUNSEL | : | No. 80 DB 2022 |
| Petitioner | : | |
| | : | |
| v. | : | Attorney Registration No. 208824 |
| | : | |
| JOSEPH D. LENTO | : | |
| Respondent | : | (Philadelphia) |

REPORT AND RECOMMENDATIONS OF
THE DISCIPLINARY BOARD OF THE
SUPREME COURT OF PENNSYLVANIA

TO THE HONORABLE CHIEF JUSTICE AND JUSTICES
OF THE SUPREME COURT OF PENNSYLVANIA:

Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania ("Board") herewith submits its findings and recommendations to your Honorable Court with respect to the above-captioned Petition for Discipline.

I.      FINDINGS OF FACT

The Board makes the following factual findings:

Background: Respondent, Respondent's Law Firms, Respondent's Employees

1.      Respondent, Joseph D. Lento, was born in 1977 and was admitted to practice law in the Commonwealth on October 23, 2008. (Stip B)

2.      Pursuant to Pa.R.D.E. 201(a)(1), Respondent is subject to the disciplinary jurisdiction of the Disciplinary Board of the Supreme Court of Pennsylvania. (Stip D)

69

3. Respondent is the managing attorney of the Lento Law Firm located at 1500 Walnut Street, Suite 500, Philadelphia, PA 19102.

    a. Respondent is the only employee at Lento Law Firm (NT III, 398); and

    b. Respondent's 1500 Walnut Street office is a "virtual office" that "you rent by the hour or the day or the month" and use "when you need an office to see somebody, but it's not there on an everyday basis." (NT II, 39-41)

4. Respondent had a "working relationship" with Keith Altman, Esquire, but Mr. Altman was not an employee of Lento Law Firm. (NT IV, 377)

5. Respondent does not maintain an electronic case management system at the Lento Law Firm, but maintains email files and paper files. (NT III, 397-398)

6. Respondent does not take notes when he speaks with clients, but claims he "recollects as needed in a given case to address a matter accordingly." (NT III, 260) That said, Respondent was often unable to recollect conversations with his clients. *See, e.g.,* NT III, 260, 267, 319; NT IV, 59, 139, 160, 343.

7. Respondent intentionally does not enter his appearance in a case where he has been retained, so that he is "not attached on the case." (NT IV, 245, 246)

8. Respondent explained that he operates a "pragmatic practice of sorts" (NT IV, 145) and that "in the pragmatic practice of law, certain things may not be done as may be required." (*Id.* at 158)

9. Respondent is also the managing attorney at Lento Law Group, formerly Optimum Law Group (Stip 26), located at 300 Atrium Way, Suite 200, Mt. Laurel, New Jersey 08054. Respondent explained the purpose of Lento Law Group in that he wanted to expand and wanted to take on a role of overseeing other attorneys where other

2

attorneys would handle the legal work. (NT IV, 383,384)

    a.    The Lento Law Group is a professional corporation, Respondent is the majority shareholder, and Wayne Pollock, Esquire, is a minority shareholder. (NT V, 60-61)

    b.    All persons who worked for Lento Law Group were independent contractors and received IRS 1099 forms. (NT IV, 377-378).

    c.    Respondent's attorneys would "come and go" and Respondent could not recall the names of prior associates employed in 2019. (NT V, 61)

10.    Respondent was responsible for the conduct of the lawyers who worked for Lento Law Group. (NT IV, 384)

11.    Respondent did not have written policies in place for the filing and service of complaints at Lento Law Group until "possibly the spring of 2020." (NT V, 62-63)

12.    With respect to filings and motions, Respondent was responsible for:

    a.    filing of motions and complaints, checking the filings of motions and complaints, and enforcing the policies and procedures of the firm (NT V, 64, 66); and

    b.    "following the Court Rules and Code of Professional Responsibility [sic], ultimately the conduct of all employees at both the Lento Law Group and the Lento Law Firm." (*Id.* at 67)

13.    John Edward Groff was a paralegal and the office manager at Optimum, Lento Law Group, and the Lento Law Firm. (NT II, 15; NT V, 61)

14.    Mr. Groff had been an office manager at another law firm before becoming Lento Law Group's Office Manager. (Stip 55)

15.    The support staff at Lento Law Group consisted of paralegals and secretaries. (NT II, 30)

3

71

16.     Steven C. Feinstein, Esquire, was an attorney employed by Optimum from April 2019 to November 27, 2019. (NT II, 7-8, 57) Mr. Feinstein was a credible witness.

17.     Mr. Feinstein explained that Optimum was a "decentralized office where there was maybe one or two attorneys at a central location and all of the other attorneys affiliated with the firm would work out of whatever offices they worked out of, their homes . . . etc." (NT II, 34)

18.     While Mr. Feinstein was employed at Optimum, he:

a.     observed "there was a high turnover with regard to attorneys" (NT II, 22);

b.     did not know where the other attorneys were admitted to practice law (*id*);

c.     received his assignments from Mr. Groff "99 percent of the time" (*id.* at 23);

d.     had "no idea" who reviewed his completed legal work (*id*);

e.     did not know if anyone reviewed his completed legal work (*id*);

f.     received edits from another attorney on his legal work on only one occasion (*id.* at 43-44);

g.     never gave his legal work to Respondent for review (*id* at 23, 137);

h.     had never been asked by Respondent to review Mr. Feinstein's legal work (*id*); and

i.     "[n]o, not once" received feedback from Respondent about Mr. Feinstein's legal work. (*Id.*)

19.     While Mr. Feinstein was employed at Optimum:

a.     he would give his legal work to the support staff or Mr. Groff for proofreading and editing before filing (NT II, 30-31);

b.     the support staff was responsible for obtaining the process servers (*id.* at 31);

4

c.    he was not always told when there were changes in the support staff to whom he would give his work, resulting in Mr. Feinstein's sending work to the email address of a secretary who had been terminated (*id.* at 31-32);

d.    there was an online case management system known as CLIO. However, Mr. Feinstein had not received any training on how to use it; attorneys were responsible for uploading documents for their cases; and the support staff would save final documents (*id.* at 33);

e.    there were occasions when documents were not uploaded to CLIO and Mr. Feinstein had to go to court without a file (*id.* at 38); and

f.    Mr. Feinstein had never been to Optimum's New Jersey office and did not know if there were hard copies of files maintained at that office. (*Id.* at 39)

20.    While Mr. Feinstein was employed at Optimum, he alerted Respondent to ethical issues regarding the firm's operation, including:

a.    in ***Mitchell v. Wawa***, Mr. Feinstein advised Respondent that Optimum had failed to inform the client (Mitchell) that her case had been referred to Optimum from another attorney and obtain Mitchell's consent to the referral (NT II, 25-27);

b.    in ***United States v. Anna Molina***, after Mr. Feinstein discovered that Respondent had been communicating with the Assistant U.S. Attorney about Ms. Molina's case, Mr. Feinstein warned Respondent "that he cannot touch anything in the Eastern District at all" (*id.* at 28); and

c.    concerns about the way "the clients were being represented, the fact that paperwork wasn't being done properly in terms of transferring files. . . and there were very lax, in my opinion, ethical standards." (*Id.* at 125)

21.    Mr. Feinstein was not promised any favorable treatment or perceived he would receive any favorable treatment for his cooperation with Office of Disciplinary Counsel and testimony at Respondent's disciplinary hearing. (NT II, 122)

22.    Joan A. Feinstein, Esquire, a psychologist, and an attorney with a related interest in disability matters (ODC-42/Bates 345, p. 25) (Stip 52), was employed as a

5

73

consultant at Optimum/Lento Law Group from approximately late 2018 to December 2021. Mr. Feinstein and Ms. Feinstein are not related.

23.     During Ms. Feinstein's employment, she had some concerns about how the practice was being operated and asked Respondent to meet with outside counsel and express those concerns. (NT II, 222-223)

24.     Ms. Feinstein's concerns included: she "was being asked to do things under pressure"; the "management was by crisis"; she was "getting information on a need-to-know instead of the whole picture"; and Mr. Groff "could get very nasty." (*Id.* at 223)

25.     On May 29, 2020, Ms. Feinstein, Respondent, and Respondent's father had a consultation with outside counsel about the management of Optimum, during which time (NT II, 224):

    a.     Respondent and his father went to the office of outside counsel and first met privately with counsel (*id.*);

    b.     Ms. Feinstein subsequently joined the consult by telephone (*id.*);

    c.     Ms. Feinstein and Respondent did not discuss any specific case (*id.* at 226); and

    d.     there was a discussion concerning how to better manage Respondent's law firm. (*Id.* at 227)

26.     Ms. Feinstein continued to have concerns after the May 29, 2020 meeting about the operation of Respondent's law firm and discussed her continuing concerns with Respondent (NT II, 245), during which time, Respondent said Ms. Feinstein:

    a.     was "repetitive" and he "had things under control" (*id.* at 245); and

    b.     was being a "Girl Scout" and "neurotic." (*Id.*)

27.     By emails to Respondent with a copy to Mr. Altman dated August 22 and

24, 2020 (ODC-137/Bates 951), Ms. Feinstein memorialized her concerns about Respondent's law firm, including:

a. the expectation that she would sign things without being given an opportunity to discuss whether she was willing to take on a particular matter;

b. her role at Lento Law Group was unclear;

c. being ridiculed;

d. stating she cannot jump and do things hastily if there is a crisis; and

e. not being paid for her services.

28. Ms. Feinstein was not promised any favorable treatment or perceived she would receive any favorable treatment for her cooperation with Office of Disciplinary Counsel and testimony at Respondent's disciplinary hearing.

29. Ms. Feinstein cooperated with Office of Disciplinary Counsel because "[i]t's the right thing to do. I wanted to come and tell what happened." (NT II, 280)

## Respondent's Misconduct

### John Gardner Matter

30. On December 21, 2016, John Gardner was arrested and charged with (Stip 1):

a. Disorderly Conduct, (Summary), 18 Pa.C.S.A. § 5503(a)(4);

b. Recklessly Endangering Another Person, (M-2), 18 Pa.C.S.A. § 2705;

c. Marijuana-Small Amount, (M), 35 Pa.C.S.A. § 780-113(a)(31)(i); and

d. Use/Possession of Drug Paraphernalia, (M), 35 Pa.C.S.A. § 780-113(a)(32).

7

31. Pursuant to a negotiated guilty plea, on January 25, 2017, Mr. Gardner agreed to plead guilty to Disorderly Conduct and the Luzerne County District Attorney's Office agreed to dismiss the pending misdemeanor charges. (ODC-3/Bates 133, Stip 2)

32. Mr. Gardner testified that in August 2018, he did a Google search, Respondent's name "popped up," and Mr. Gardner contacted Respondent about expunging his criminal record. (NT I, 125)

33. During Mr. Gardner's telephone conversation with Respondent, Mr. Gardner told Respondent what had occurred on December 21, 2016, and that he wanted (NT I, 126):

    a.    "it expunged";

    b.    his criminal "record, everything that happened that day to be gone off [his] record like that day never happened"; and

    c.    "all the charges" expunged, including his summary conviction and the misdemeanor charges that were withdrawn as part of his guilty plea.

34. While Mr. Gardner was on the telephone with Respondent, Respondent reviewed Mr. Gardner's criminal record and read all the charges. (NT I, 127-128)

35. In response to Mr. Gardner's request for Respondent to expunge Mr. Gardner's entire criminal record, Respondent advised that (NT I, 129):

    a.    "Absolutely he could do it, that he could get rid of everything";

    b.    It would take "six to nine months on the long-side"; and

    c.    "[I]t's something he can handle and he can take care of for" Mr. Gardner.

36. Title 18 Pa.C.S.A. § 9122(b)(3)(i) provides, in pertinent part, that criminal history record information may be expunged when "an individual who is the subject of the information petitions the court for the expungement of a summary offense and has been free of arrest or prosecution for five years following the conviction for that offense." (ODC-5/Bates138, Stip 5) (The Expungement Statute)

37. In *Commonwealth v. Lutz*, 788 A.2d 993, 1000 (Pa. Super. 2001), the Superior Court quoting from the trial court, wrote that "where charges are dismissed pursuant to a plea agreement, those charges are not eligible for expungement, as to destroy them would obscure the true circumstances under which the [defendant] has been convicted." *Accord Commonwealth v. Troyer*, 262 A.3d 543 (Pa. Super. 2021); *Commonwealth v. Hanna*, 964 A.2d 923 (Pa. Super. 2009).

38. When Mr. Gardner finished his conversation with Respondent, it was Mr. Gardner's understanding that Respondent could expunge his entire criminal record. (NT I, 130)

39. Respondent failed to explain to Mr. Gardner that the Expungement Statute has a five-year waiting period to expunge summary convictions and Mr. Gardner would have to wait until January 2022 to expunge his entire criminal record. (NT I, 129)

40. Respondent testified that he did not know about *Commonwealth v. Lutz*, (NT III, 284-285, 288)

41. Thereafter, on August 14, 2018 (Stip 4):

   a. Respondent gave Mr. Gardner an Engagement Letter for "an expungement of the applicable charges" for a fee of $1,500 plus filing fees and costs (ODC-4/Bates 136);

   b. Mr. Gardner signed the Engagement Letter; and

9

    c.      Respondent received $1,500 for the representation.

42.    Respondent's Engagement Letter failed to define "applicable charges" or state that Mr. Gardner's summary conviction was not an "applicable charge" and could not be expunged. (NT III, 263, 264, 273, 380-381)

43.    Mr. Gardner understood that "applicable charges" in the Engagement Letter referred to "[e]verything that happened that day he [Respondent] was to get rid of" (NT I, 134), including Mr. Gardner's summary conviction. (*Id.* at 135)

44.    Respondent failed to:

    a.    act with the competence necessary for the representation as 18 Pa.C.S.A. § 9122(b)(3)(i) provides that Mr. Gardner would not be eligible to apply for expungement of his summary Disorderly Conduct conviction until 2022;

    b.    undertake any research to determine whether Mr. Gardner's misdemeanor charges could be expunged as they were withdrawn as part of a guilty plea (NT III, 272);

    c.    explain to Mr. Gardner, to the extent necessary for Mr. Gardner to make an informed decision regarding the representation, that Respondent could not expunge Mr. Gardner's summary Disorderly Conduct conviction in 2018 as Pennsylvania's Expungement Statute required an individual to be free of arrest or prosecution for five years following the summary conviction (18 Pa.C.S.A. § 9122(b)(3)(i)) (NT I, 129);

    d.    explain to Mr. Gardner that the case law in Pennsylvania prohibited the expungement of charges that were withdrawn as part of a guilty plea agreement prior to five years from the date of conviction associated with the withdrawn charges (NT III, 288); and

    e.    act with the diligence necessary for the representation in that Respondent failed to promptly ascertain that since Mr. Gardner was convicted in 2017, Mr. Gardner must wait until 2022 before he would be eligible to have his criminal conviction expunged.

45. Respondent failed to recognize his wrongdoing and blamed "the attorneys at Dilworth that put this unfortunate idea into [Mr. Gardner's] head that we were doing something that could not be done with the summary offense." (NT III, 276)

46. Had Respondent informed Mr. Gardner at the outset of the representation that the Expungement Statute in fact required Mr. Gardner to wait five years from the date of his conviction, Mr. Gardner testified that he would have:

    a.    "absolutely not" retained Respondent (NT I, 129); and

    b.    waited until 2022 to expunge his entire criminal record as he had "no choice." (*Id.* at 130).

47. Respondent was not a credible witness. In the Gardner matter, he testified that Mr. Gardner elected to proceed with the expungement of his three withdrawn misdemeanor charges knowing that his summary disorderly conduct conviction could not be expunged until 2022 (NT III, 255-257). This is not credible.

48. In Respondent's Answer to the Petition for Discipline (ODC-2, ¶ 9/Bates 77) Respondent falsely stated (NT 1, 133-134):

    a.    "Mr. Gardner did not seek to expunge his Disorderly Conduct Charge";

    b.    "Mr. Gardner did not seek to expunge his Disorderly Conduct Charge because he knew that he did not qualify"; and

    c.    "Mr. Gardner opted to proceed knowing that the underlying summary offense could not be expunged while the underlying misdemeanors could potentially be expunged."

49. From time to time after Respondent was retained, Mr. Gardner, Mrs. Gardner, and Respondent exchanged emails. (Stip 6)

50. Respondent informed Mr. Gardner that Respondent was handling his legal matter. (Stip 7)

11

51. On October 17, 2018, Respondent filed a Petition for Expungement Pursuant to Pa.R.Crim.P. 790 in the Court of Common Pleas of Luzerne County (ODC-6/Bates 141) seeking to expunge Mr. Gardner's arrest on the following charges, all of which had been dismissed: Recklessly Endangering Another Person; Marijuana-Small Amount; and Use/Possession of Drug Paraphernalia. *Commonwealth v. John E. Gardner*, CP-40-MD-0001427-2018. (ODC-7/Bates 149, Stip 8)

52. Respondent never filed this Petition for Expungement as Mr. Gardner's attorney, but rather filed it as a Pro Se petition, and further failed to:

   a. have Mr. Gardner review the Expungement Petition before it was filed (NT III, 302);

   b. provide Mr. Gardner with a copy of the Expungement Petition before or after it was filed (NT I, 136; NT III, 300);

   c. obtain Mr. Gardner's permission to sign his name to the Petition (*id.* at 137, NT III, 302); and

   d. enter his appearance in Mr. Gardner's legal matter. (*Id.* at 306)

53. On December 10, 2018, Deputy District Attorney Chester F. Dudick, Jr., Luzerne County, submitted the Commonwealth's Response to the Expungement Petition, objecting to the expungement "as any dismissal of charges was in consideration for a guilty plea and thus defendant was not entitled to expungement." (ODC-8/Bates 151, Stip 9) (*See Commonwealth v. Lutz*)

54. By email to Tara Gardner, wife of Mr. Gardner, sent at 5:50 a.m. on December 21, 2018 (ODC-9/Bates 152), Respondent advised that (Stip 10):

   a. the Commonwealth had objected to the Expungement Petition;

   b. Respondent was attaching the Commonwealth's response;

12

80

c.     Respondent could challenge the Commonwealth's response by filing a formal motion with the Court and having a contested hearing on the motion; and

d.     Mr. Gardner should let Respondent know how he wished to proceed.

55.     Respondent wrote that the DA's "argument is disingenuous" and "may/most likely can be defeated." (ODC-9; Bates 000152)

56.     Respondent's email was deceitful in that after receiving the DA's objections, Respondent failed to undertake any research to determine the legal basis for the objections and ascertain the likelihood that a contested hearing would be successful. (NT III, 314-315, 328-29, 340)

57.     Mr. Gardner had received the DA's response, "skimmed it," "didn't' read through it," and "didn't really care" (NT I, 139) as he understood that the remedy to challenge the DA's objection was to go to court and have a hearing in front of a judge. (Id. at 140)

58.     By responsive email to Respondent sent the following day at 4:04 p.m., Mr. Gardner wrote that he "would like to proceed" and to let him know the "next step." (ODC-9/Bates 152, Stip 11)

59.     Mr. Gardner promptly replied to Respondent's email with the expectation that Respondent would act promptly on his case. (NT I, 141)

60.     On or before January 21, 2019, Respondent spoke to Mr. Gardner regarding seeking a hearing to challenge the District Attorney's Office's objection to the expungement and Mr. Gardner authorized payment of Respondent's $7,500 fee to handle the expungement. (ODC-10/Bates 153, ODC-11/Bates 155)

61.     During Respondent's conversation with Mr. Gardner about the DA's objection, Respondent failed to explain that he had only sought an expungement of the

13

dismissed misdemeanor charges and had not sought an expungement of Mr. Gardner's summary conviction. (NT I, 139-140)

62. Had Respondent informed Mr. Gardner that he could not expunge his disorderly conduct charge because the expungement statute had a five-year waiting period, Mr. Gardner would not have paid Respondent an additional $7,500 to file an appeal. (NT I, 142-143)

63. By email sent at 8:55 p.m. on March 20, 2019, Respondent contacted Deputy District Attorney Chester F. Dudick, Jr., about Mr. Gardner's "partial expungement/redaction of certain charges." (ODC-12/Bates 155, Stip 13)

64. By emails to Mrs. Gardner sent on March 26 and April 9, 2019, Respondent asked Mr. Gardner to explain "the exact reasons why [Mr. Gardner's] current record is causing issues for you/exact issues caused." (ODC-13/Bates 156, Stip 14)

65. Mr. Gardner testified that he understood his "current record" to be everything that "happened that day," his entire record, both the summary as well as misdemeanors. (NT I, 146-147)

66. Respondent did not explain to Mr. Gardner that he wanted the exact reasons that Mr. Gardner's criminal record was "causing issues" so that Respondent could use these issues in negotiating with the District Attorney's Office. (NT I, 173, 175-176)

67. On April 16, 2019, Mr. Gardner sent an email to Respondent explaining that Mr. Gardner sought expungement because he: (1) wanted to travel to Canada to fish with his children as his father had done with him; (2) would like to buy his son his first hunting rifle as they had both completed the hunter safety course at the Game Commission; and (3) had done nothing wrong. (ODC-15/Bates 160)

14

82

68. By email to Mrs. Gardner sent at 7:40 p.m. on April 9, 2019 (ODC-13/Bates 156), Respondent attached his Engagement Letter (ODC-14/Bates 158), that due to "oversight," he had omitted from his prior email. (NT III, 380)

69. Respondent's Engagement Letter provided that (Stip 15):

    a. Respondent had agreed to represent Mr. Gardner "in connection with seeking a hearing to request that the applicable charges be expunged from [his] criminal record";

    b. Respondent's fee for legal services was $7,500; and

    c. Mr. Gardner had paid Respondent's fee in full.

70. Respondent's Letter of Engagement failed to define "applicable charges" so that Mr. Gardner could make an informed decision regarding the scope of representation. (NT III, 380)

71. Mr. Gardner thought that "applicable charges" in the Engagement Letter included "[a]ll the charges from that day, everything, [to] make that day go away." (NT I, 145; see also, NT I, 170)

72. Respondent's Engagement Letter failed to explain that Respondent would not be seeking to expunge Mr. Gardner's summary conviction. (ODC-14/Bates 158)

73. In Respondent's email exchanges with Mr. Gardner, Respondent failed to apprise Mr. Gardner that he would not be seeking an expungement of Mr. Gardner's Disorderly Conduct conviction. (NT I, 146)

74. After Respondent did not acknowledge his receipt of Mr. Gardner's two emails providing the reasons for wanting his "current record" expunged (NT I, 149), at 4:23 p.m. on April 24, 2019, Mr. Gardner inquired whether Respondent had received his earlier email. (ODC-15/Bates 160)

75. By responsive email to Mr. Gardner sent at 8:21 p.m. on April 24, 2019, Respondent advised Mr. Gardner that he would "continue to work on things" and to "let [Respondent] know if [Mr. Gardner] has any question or concerns in the meantime." (ODC-15/Bates 160, Stip 17)

76. Respondent did not undertake any legal research to ascertain why Mr. Gardner's criminal record prevented Mr. Gardner from travelling to Canada and buying a gun for his son. (NT III, 390-391)

77. Respondent did not communicate further with Mr. Gardner about his legal matter. (Stip 18)

78. Mr. Gardner became concerned that his expungement matter "wasn't progressing," he "wasn't hearing any news" from Respondent, so he decided it was time to "bring in some help." (NT I, 150)

79. On or before May 29, 2019, Mr. Gardner contacted Thomas Biemer, Esquire, from the law firm of Dilworth Paxson, to handle his expungement matter. (NT I, 150)

80. During Mr. Gardner's first conversation with Mr. Biemer about seeking an expungement of his criminal record (NT I, 154):

    a.    Mr. Gardner explained to Mr. Biemer what "had happened" on the day of his arrest, what he "was trying to do," that Mr. Gardner had "hired an attorney" who "was working on it (his expungement)," and Mr. Gardner was concerned "something is wrong" (NT I, 151);

    b.    Mr. Gardner asked Mr. Biemer to "join the team," "check up on" Respondent, and "see what was going on"(id.);

    c.    Mr. Biemer then "got all the charges" against Mr. Gardner and "figured out everything that happened that day" (id.); and

16

84

d. Mr. Biemer advised Mr. Gardner that he would "help" him expunge his criminal record, "but [Mr. Gardner would] have to wait five years." (*Id.* At 151-152)

81. Mr. Gardner's conversation with Mr. Biemer was the "very first time" that Mr. Gardner learned he would have to wait five years from the date of his summary conviction, until January 2022, to expunge his criminal record. (NT I, 152-153)

82. After Mr. Gardner learned that Respondent had failed to tell him that he must wait five years from the date of his conviction to expunge his criminal conviction, Mr. Gardner relayed that he was "very mad":

> [b]ecause he felt used, lied to. I felt like he stole my money. I mean it couldn't have been any clearer from the beginning what I wanted and what we agreed to and I paid him a lot of money to do it, and then I come to find out from this other attorney that it can't even be done. I mean it's ridiculous.

(NT I, 152)

83. Mr. Gardner's criminal trial counsel had never informed Mr. Gardner that he must wait five years after his guilty plea to expunge his criminal record. (NT I, 160)

84. Mr. Gardner did not retain his criminal trial counsel to file an Expungement Petition because Mr. Gardner wanted to hire someone who specialized in expungements. (NT I, 167)

85. On May 29, 2019, Mr. Biemer informed Respondent that Mr. Gardner had retained him to handle his expungement matter. (Stip 19)

86. By email to Mr. Biemer sent at 5:56 p.m. on May 29, 2019, Respondent advised that he was involved in ongoing negotiations with the Luzerne County District Attorney's Office about Mr. Gardner's expungement, attached a copy of the

Commonwealth's December 10, 2018 response to the Expungement Petition, and attached a draft Petition to Redact. (ODC-16/Bates 161, Stip 20)

87.     Respondent's draft Petition to Redact contained numerous mistakes, including incorrect date of guilty plea, charges that were withdrawn, disposition date of charges, and date of draft petition. (Bates 162, 163, 164; NT IV, 12-16)

88.     Although Respondent knew that Mr. Gardner had retained another lawyer to handle his legal matter, Respondent did not promptly refund the unearned portion of his $9,000 legal fee upon Mr. Gardner's termination of Respondent's representation.

89.     On September 24, 2020, Mr. Gardner filed a Statement of Claim with the Pennsylvania Lawyers Fund for Client Security (Fund). (ODC-18/Bates 172, Stip 23)

90.     Mr. Gardner wrote in his Statement of Claim (ODC-18/Bates 172) that:

   a.     Respondent "was hired to get my prior conviction expunged, but the conviction was too recent to be expunged, which should have been obvious from my first consultation" (¶ 2); and

   b.     "I learned of my loss when my current counsel . . . informed me that I was ineligible for expungement at this point in time, and even a basic amount of research into the issue would have revealed this."

91.     Mr. Gardner explained that he had filed a Claim "[b]ecause it wasn't right. In my opinion, he [Respondent] was not being honest." (NT I, 154)

92.     The Fund notified Respondent of Mr. Gardner's Statement of Claim. (Stip 24)

   a.     By letter to Mr. Gardner dated June 28, 2021, Respondent enclosed a check written from the Operating Account of Lento Law LLC and Joseph D. Lento, Esq., to James Gardner, in the amount of $3,500, with the notation "partial refund" in the memorandum portion of the check. (ODC-19/Bates 178, Stip 25)

18

86

93. Respondent failed to possess the competence necessary for the representation in that he did not know:

    a.    whether the Pennsylvania expungement statute permits partial expungement or partial redactions (NT III, 231);

    b.    did not know whether he had ever done a partial expungement or redaction in Luzerne County (id.);

    c.    did not know until the Luzerne County D.A.'s Office objected to the expungement of Mr. Gardner's criminal record that Mr. Gardner's misdemeanor charges were withdrawn as part of a guilty plea agreement (id. At 251);

    d.    was not aware of Commonwealth v. Lutz, which prohibits the expungement of charges withdrawn as part of a guilty plea agreement (id. At 284, 288); and

    e.    failed to do any legal research to determine whether there was a legal basis for the D.A. Office's objection. (Id. At 314, 328, 350-341)

94. Respondent denied that he mishandled Mr. Gardner's legal matter. (NT III, 34-35)[1]

Conduct Before Judge Robreno

Red Wine Restaurant Case

95. Mr. Eduardo Rosario retained Respondent's law firm to represent him in a claim against Red Wine Restaurant. (NT V, 123)

96. On or before May 8, 2019, Mr. Groff assigned Mr. Feinstein to handle Mr. Rosario's legal matter and requested that Mr. Feinstein draft a civil complaint on behalf

---

[1] There is no credible evidence to support Respondent's testimony that he "has successfully resolved matters dealing with the expungement in favor of clients in such situations," or that if he had, that it was done lawfully. Respondent had a duty to fully inform his client of the of law as it applied to his case. The evidence is clear that he failed to do so.

19

of Mr. Rosario under the Americans with Disability Act of 1990, as amended, 42 U.S.C. § 12101 et seq. (ADA). (NT II, 41-42) Mr. Feinstein testified that he was directed to sue the property owner and promoter and was given a sample complaint.

97. After reviewing the ADA, Mr. Feinstein concluded it was "expansive." (NT II, 42)

98. Mr. Feinstein drafted a complaint (Stip 29):

    a.    on behalf of Mr. Rosario, who requires a wheelchair at all times;

    b.    against Alex Torres Productions, Inc., a Florida-based promoter that provides entertainers to various venues;

    c.    against La Guira, Inc. d/b/a Red Wine Restaurant, a restaurant that sold Mr. Rosario a ticket to a comedy show promoted by Alex Torres Productions, Inc.; and

    d.    that alleged Defendants failed to make Red Wine Restaurant accessible to a person in a wheelchair.

99. After drafting the complaint, Mr. Feinstein sent it to Optimum for filing and service. (NT II, 42-43)

100. Mr. Feinstein did not know whether anyone at Optimum reviewed the complaint after it was drafted. (NT II, 43)

101. Respondent did not know if Mr. Feinstein conducted any independent research before drafting the complaint and did not review the complaint prior to Optimum filing it. (NT III, 43)

102. As the managing attorney at Optimum with direct supervisory authority over Mr. Feinstein, Respondent failed to make reasonable efforts to ensure that Mr. Feinstein

had reasonably concluded that there was a legally supportable basis for bringing a claim under the ADA against Alex Torres Production, Inc.

103. On May 20, 2019, Optimum filed a civil complaint in the EDPA. (*Red Wine Restaurant* case) (ODC-20/Bates 182, Stip 31):

    a.    The EDPA docketed the *Red Wine Restaurant* case at No. 2:19-2222-ER (E.D.PA) (ODC-21/Bates 201); and

    b.    Mr. Feinstein subsequently entered his appearance on behalf of Mr. Rosario.

104. After the civil complaint was filed, notices from the federal district court in the *Red Wine Restaurant* case were sent to various emails addresses: Mr. Feinstein at two different email addresses; Mr. Groff at the Optimum Court Notices (Notices) email address; and a secretary employed by the Respondent. (NT II, 45-46)

105. The Notices mailbox was monitored by Mr. Groff and court notices were placed on the law firm's calendar. (NT V, 125) Respondent also had access to the Notices email. (NT V, 151-152)

106. Red Wine Restaurant failed to file an answer to the complaint and Alex Torres Productions did not comply with discovery requests. (ODC-22/Bates 205, 23, Stip 33)

107. On October 31, 2019, the Honorable Eduardo C. Robreno scheduled a pretrial conference in the *Red Wine Restaurant* case for 10:00 a.m. on December 20, 2019. (ODC-24/Bates 207, Stip 34)

108. The EDPA sent notice of the December 20, 2019 prehearing conference to the email addresses of Optimum and its employees. (Stip 35)

109. Optimum and employees of Optimum received notice from the EDPA of the December 20, 2019 pretrial conference and should have put the pretrial conference on the firm's calendar. (NT V, 126-127)

110. Although Respondent received notice of the pretrial conference, Respondent failed to put the conference date on his calendar, did not confirm that it was on the firm's calendar (NT V, 152), and does not "know or believe" it was on the firm's calendar. (*Id.* at 154)

111. By email dated October 31, 2019, Mr. Feinstein forwarded the EDPA's notice to Ms. Jones (ODC-24, p. 2/Bates 208); by email dated November 12, 2019, Mr. Feinstein advised Mr. Groff of the December 20, 2019 pretrial conference. (ODC-31, p. 2/Bates 259)

112. When Mr. Feinstein received notice of the December 20, 2019 prehearing conference, he did not put it on his personal calendar "[b]ecause [he] knew it was on Optimum's calendar." (NT II, 56)

113. On November 27, 2019, Mr. Feinstein ceased his employment at Optimum. (NT II, 57)

114. By email sent by Respondent to Mr. Feinstein at 11:14 a.m. on November 27, 2019 (ODC-25/Bates 209), Respondent instructed (Stip 38):

    a.    Mr. Feinstein "not to act on behalf of Optimum"; and

    b.    Mr. Haislip [at Optimum] to "Suspend all [computer access] credentials until [Mr. Feinstein] meets with us."

115. After Mr. Feinstein left his employment at Optimum, Mr. Feinstein:

    a.    was locked out of Optimum's calendar, documents, and CLIO system (NT II, 82);

22

90

b. was blocked from access to his Optimum email account and online case management system, which included Mr. Feinstein's case management calendar with court notices. (Stip 40); and

c. was instructed "on two separate occasions, 'do not talk to our clients' and 'do not do any work on any files.'"(NT II, 57)

116. By reply email from Mr. Feinstein sent at 12:03 p.m. on November 27, 2019, to Respondent and copied to the following at optimumlawgroup.com: tmorphew; dhaislip; and jedwards (ODC-25/Bates 209), Mr. Feinstein wrote (Stip 39/Bates 209):

a. "Please remove me from the Optimum website immediately"; and

b. "substitute my appearance in any case that is filed in my name. I have changed my credentials for the EDPA and Philadelphia."

117. Mr. Feinstein reasonably believed that Respondent would substitute Mr. Feinstein's appearance on Optimum's cases, as "[t]hey were their [Optimum's] clients." (NT II, 59)

118. Mr. Feinstein made "two subsequent requests to [Respondent and Optimum to] substitute" his appearance on all Optimum's cases (NT II, 77-81) -- on December 19, 2019 (ODC-26/Bates 210), and again on December 26, 2019 (ODC-28/Bates 230).

119. At the time Mr. Feinstein requested that Optimum substitute his appearance, Mr. Feinstein was not aware that Respondent's law firm had no other attorneys admitted to practice in the United States District Court for the Eastern District of Pennsylvania. (NT II, 89)

120. In Respondent's Answer to the Petition for Discipline, ¶ 88 (ODC-2/Bates 84), Respondent falsely stated:

a. "to his knowledge, Mr. Feinstein sent a single notice to Respondent's firm on November 27, 2019 that related to the filing of substitution of counsel," and

23

b. Mr. Feinstein was aware that "Respondent's firm had no attorneys admitted to the United States District Court for the Eastern District of Pennsylvania."

121. Mr. Feinstein did not immediately file a withdrawal of appearance "since they [Optimum] were representing the client and [he] wasn't." (NT II, 65)

122. By email dated December 19, 2019, from Mr. Feinstein to Respondent, JEdwards, and Conrad Benedetto, Esquire, Mr. Feinstein wrote: "Please substitute my appearance in all of the Optimum cases. If I am held accountable on files in which I am no longer representing the clients or have access to the files, I will hold Optimum responsible." (ODC-26/Bates 210, Stip 41)

123. Respondent received Mr. Feinstein's email and knew that Mr. Feinstein requested that Optimum file substitutions of appearance on all of Mr. Feinstein's cases that originated with Optimum. As the managing attorney, it was Respondent's duty, after firing Mr. Feinstein, to ensure that each client matter that Mr. Feinstein was working on was reassigned and that all deadlines and hearings would be covered. Respondent's DB-7 Answer (ODC-111, ¶16/Bates 791), in which Respondent writes he "was not aware of that December 20, 2019 conference," is evidence that he mismanaged the practice. Furthermore, under the circumstances, it is not credible.

124. Optimum employees Mr. Groff, Terri Morphew, and David Haislip received Mr. Feinstein's email and knew or should have known that Mr. Feinstein requested that Optimum file substitutions of appearance on all of Mr. Feinstein's cases that originated with Optimum.

125. After Mr. Feinstein left Optimum, Respondent failed to take any action to protect Mr. Rosario's interest in the *Red Wine Restaurant* case, such as ensuring Mr. Feinstein's court dates were placed on the law firm's calendar, arranging for Mr. Feinstein

to appear, getting another lawyer in the firm admitted to the EDPA, finding substitute counsel to attend the December 20, 2019 prehearing conference, contacting Judge Robreno before the hearing to alert him to the situation, requesting a continuance to obtain substitute counsel, or making a limited appearance at the prehearing conference to explain Respondent's efforts to find substitute counsel. (NT V, 130, 155-156, 162, 166, 171)

126. Respondent falsely testified that "Mr. Feinstein had indicated that he would be in attendance at the December 20th court date on more than one occasion to Ms. Terri Morphew and Mr. Groff." (NT V, 130). No credible evidence was offered to support this claim. Moreover, Respondent's testimony:

    a.    is inconsistent with Mr. Feinstein's testimony, and is not confirmed in writing by either Respondent's law firm or Mr. Feinstein (id. at 130-131, 162);

    b.    is inconsistent with Mr. Feinstein's emails to substitute his appearance on all his cases;

    c.    is contrary to Respondent's November 27, 2019 instruction, which Respondent had not retracted in writing or verbally to Mr. Feinstein (id. at 135-138);

    d.    is inconsistent with Respondent's DB-7 Answer; and

    e.    is not credible.

127. At 10:28 a.m. on December 20, 2019, a pretrial conference was held before Judge Robreno, during which time defendant Alex Torres appeared pro se and Mr. Feinstein did not appear to represent Mr. Rosario. (ODC-27/Bates 211, Stip 45)

128. Mr. Feinstein explained that he did not attend the prehearing conference because he was instructed by Respondent's office "'do not touch my files. . . . How can I go? And what happens if something I say prejudiced the plaintiff's case at the Rule 16

Conference, and what's my exposure with regard to that? He's not my client, Counselor." (NT II, 160-161)

129. When Mr. Feinstein failed to appear to represent Mr. Rosario, Judge Robreno called Mr. Feinstein on the telephone and had a telephonic prehearing conference, during which time (Stip 46):

a. Mr. Feinstein stated that he had instructed Respondent and other Optimum employees to substitute his appearance in all his cases (ODC-27/Bates 211, p. 4);

b. Judge Robreno found it was "troublesome" that Mr. Feinstein did not do any research concerning whether Mr. Rosario could sue the promoter (*id.* at pp. 8-9; *see also* pp. 17-18);

c. Judge Robreno noted that it was an unfair burden on Mr. Torres to have driven from Florida and there was no one in the courtroom to represent the plaintiff (*id.* at p. 16); and

d. Judge Robreno stated that he would dismiss the *Red Wine Restaurant* case without prejudice for failure to prosecute and the Court would retain jurisdiction to consider the imposition of sanctions. (*Id.* at pp. 8, 16)

130. Respondent did not advise Mr. Rosario, in writing, that his case had been dismissed. (NT V, 175)

131. Promptly after the prehearing conference, Mr. Feinstein notified Respondent what occurred before Judge Robreno. (NT II, 84-85; Bates 254)

132. Respondent failed to promptly file a substitution of Mr. Feinstein's appearance. (NT II, 85)

133. By email from Mr. Feinstein on December 26, 2019, to Respondent, Mr. Groff, and Mr. Haislip, Mr. Feinstein wrote: "Again, I need you to have someone substitute for my appearance." (ODC-28)

26

94

134. By Order dated January 13, 2020 (ODC-29/Bates 232), Judge Robreno (Stip 48):

    a.    dismissed the *Red Wine Restaurant I* case without prejudice for failure to prosecute (*id.* at n. 2);

    b.    stated that "[i]f the complaint is refiled, it shall include legal authority for the proposition that a promoter may be held liable under the circumstances presented in this case" (*id.* at p. 1, n. 2);

    c.    retained jurisdiction over the case for 90 days to consider referring Respondent for disciplinary action (*id.* at pp. 1-2); and

    d.    issued a Rule to Show Cause against Respondent, Mr. Feinstein, and Optimum as to why sanctions should not be imposed. (*Id.* at p. 2)

135. On February 6, 2020, Mr. Feinstein filed a response to the Court's Rule to Show Cause Order (ODC-30/Bates 234, Stip 49) and withdrew his appearance. (NT II, 86)

136. On February 10, 2020, Respondent filed an answer to the Court's Rule to Show Cause Order (ODC-31/Bates 258); in Respondent's Answer, Respondent wrote, "[i]f Optimum Law Group and Mr. Lento decide to refile the Complaint, they will provide a legal basis to justify why they believe there would be a viable cause of action. If after reviewing the law, they conclude there is not, then no further Complaint will be filed." (*Id.* at p. 6, ¶ 5) (Stip 50)

137. By Order dated February 11, 2020 (ODC-32/Bates 267), Judge Robreno (Stip 51):

    a.    found that it appeared the *Red Wine Restaurant* case was filed "without research or investigation"; and

    b.    referred Respondent's handling of the *Red Wine Restaurant* case to the Disciplinary Board for investigation, and if necessary, prosecution.

138.     Respondent argues, at page 49 of his Memorandum, that "the genesis of the Rule violations [in the Robreno matters] stem from Steven Feinstein's failure to appear at a December 20, 2019 pretrial conference." In fact these Rule violations stem directly from Respondent's own conduct and failures as described in this Report, which he refuses to accept to this day.

### Red Wine Restaurant NJ Case

139.     Ms. Feinstein is "a counseling psychologist with an active practice seeing kids and families." (NT II, 189)

140.     Ms. Feinstein received her Ph.D. in psychology in 1985 and her law degree in 1995. (NT II, 189)

      a.     Ms. Feinstein explained she decided to go to law school because "a lot of mental health problems are entangled with some legal problems, and I felt I could be a better advocate." (*id.* at 189-190); and

      b.     Ms. Feinstein never intended to be a practicing lawyer. (*Id.* at 190)

141.     Ms. Feinstein is not an experienced attorney and did not:

      a.     know how to draft legal documents (NT II, 190);

      b.     know how to complete coversheets for documents to be filed in federal court (*id.*);

      c.     ever act as a trial lawyer in state or federal court (*id.* at 190-191); and

      d.     do legal work for any law firm. (*Id.* at 191)

142.     Keith Altman, Esquire, is an attorney licensed to practice law in California and Michigan, who assisted Respondent on assorted legal matters. (Stip 54)

28

96

143. In late 2018, Respondent contacted Ms. Feinstein about being a consultant on mental health issues at his law firm. (NT II, 192)

    a. Ms. Feinstein told both Respondent and Mr. Groff that she does not "practice law in any capacity" and has no experience going to court and preparing documents. (*Id.* at 195)

144. Ms. Feinstein agreed to be a consultant on matters at Optimum (ODC-42, p. 25); Ms. Feinstein did not:

    a. meet with clients regarding legal matters (NT II, 195);

    b. represent clients in court (*id.* at 195-196);

    c. handle any legal cases (*id.*); and

    d. ever get paid for any legal work. (*Id.*)

145. Respondent testified that "[t]hrough the winter/spring/summer of 2020, [Ms. Feinstein] would be involved in . . . trying to settle certain cases, lesser personal injury cases, talking to adjusters, in addition to more run-of-the-mill kind of matters, custody, criminal." (NT III, 61) Respondent's testimony about Ms. Feinstein's involvement in legal matters during that time is not credible.

146. While acting as a consultant at Optimum, Ms. Feinstein:

    a. "tried to report to Joe (Respondent), but I was often directed to John (Groff)" because Respondent would say, "I really don't want to hear that. You have to go to John" (NT II, 196; *see also* NT II, 197, 199);

    b. would get her assignments from Mr. Groff (*id.*);

    c. did not "know that anybody really reviewed" her assignments" (*id.*); and

    d. was "not usually" asked any questions by Respondent about an assignment. (*Id.*)

147. When Ms. Feinstein spoke to Respondent, it was about "personal things," such as him going to the gym and women he might be dating. (NT II, 200)

148. Respondent told Ms. Feinstein that "he'd like to step back from the everyday practice of law." (*Id.* at 201)

149. After Mr. Feinstein left Optimum, Respondent requested the assistance of three other attorneys to handle the *Red Wine* case, including offering $20,000 to $30,000 to his "ethics" counsel (D-15, p. 2), but all refused. (NT V, 183-186)

150. In late December 2019 or early January 2020, Mr. Groff asked Ms. Feinstein if she was a member of the United States District Court for the Eastern District of Pennsylvania (EDPA), Ms. Feinstein stated that she was not admitted, Mr. Groff asked if Ms. Feinstein could get admitted, Ms. Feinstein agreed to apply, and the EDPA admitted Ms. Feinstein. (NT II, 206)

151. After Ms. Feinstein was admitted to the EDPA, Mr. Groff asked Ms. Feinstein to sign documents for two cases, one of which was the *Red Wine Restaurant* case. (NT II, 206-207)

152. At the time Ms. Feinstein was asked to sign for the *Red Wine Restaurant* case, Ms. Feinstein had never worked on an ADA matter, had never completed a Cover Sheet for a federal case; had never filed a federal civil complaint, and had never signed a *Pro Hac Vice* application (NT II, 207). Ms. Feinstein:

   a. explained her concerns that she had "no experience" to Mr. Groff (*id.* at 208); and

   b. Mr. Groff replied that he would find a "substitute" for Ms. Feinstein and her "involvement was just to sign the signature page, minimal involvement." (*Id.*)

153. On or before March 24, 2020, Respondent and Ms. Feinstein discussed complainant Alex Torres's legal matter (ODC-42, p. 25/Bates 345), during which time (Stip 56):

    a.    Respondent asked Ms. Feinstein whether she "would be involved in the case" (*id.* at 26/Bates 346);

    b.    Respondent explained that she "would have a minimal role and they would bring in another attorney at some point" (*id.*); and

    c.    Under those circumstances, Ms. Feinstein agreed to sign the complaint prepared by Respondent's law firm. (*Id.*)

154. Ms. Feinstein agreed to help with the *Red Wine Restaurant* case because Respondent was her "friend," "a lot of attorneys walked out" of Respondent's firm, and it would be "harmful" to Respondent if she did not sign. (NT II, 210-211)

155. Respondent testified that Ms. Feinstein's testimony was "inaccurate" and that Ms. Feinstein's involvement in the case "was not simply for her to sign the complaint and just that would be the extent of it." (NT V, 194-195) In contrast, Ms. Feinstein testified that her role was to sign-off on the complaint and that two other attorneys would come in and do the day-to-day work. (NT II, 301) Respondent's testimony regarding Ms. Feinstein's involvement in the *Red Wine Restaurant* case is not credible.

156. At the time Ms. Feinstein agreed to help with the *Red Wine Restaurant* case, Respondent failed to inform Ms. Feinstein:

    a.    of the legal and procedural background of the case (NT II, 212), including that the *Red Wine Restaurant* case had been previously filed (*id.* at 225-227);

    b.    that Mr. Feinstein had been previously assigned to the case (*id.* at 292);

    c.    that the *Red Wine Restaurant* case had been dismissed because Mr. Feinstein failed to appear for the prehearing conference (*id.* at 211);

    d.    there was a prior Order in the case by a judge (*id.* at 212); and

e.     the judge had referred Respondent to Office of Disciplinary Counsel (*id.* at 226-227).

157.    As set forth in ODC-33/Bates 271, on March 24, 2020, Mr. Groff and Mr. Altman exchanged emails, with copies to Ms. Feinstein and Ms. Morphew, about filing a complaint in the *Red Wine Restaurant* matter. (Stip 57)

a.    If the exchanged emails had attached a copy of the complaint, Respondent failed to include the attachment as an exhibit. (NT II, 297-299)

158.    The foregoing emails do not request Ms. Feinstein to review, revise, or approve the *Red Wine Restaurant* complaint, which had been previously filed, but only requested Ms. Feinstein to sponsor Mr. Altman's *Pro Hac Vice* application. (NT II, 214-215, 218)

159.    On May 15, 2020, Ms. Feinstein signed the signature page of a civil complaint identical to the civil complaint dismissed by Judge Robreno in the *Red Wine Restaurant* case. (ODC-34/Bates 273, Stip 58) Ms. Feinstein could not identify her signature on the complaint at the hearing. (NT II, 234)

160.    At the time that Ms. Feinstein was asked to sign the civil complaint (ODC-34/Bates 273), Ms. Feinstein was only given the signature page of the complaint (NT II, 235); she had never seen the complaint prior to Office of Disciplinary Counsel showing it to her. (*Id.* at 236-237) At the time that Ms. Feinstein was asked to sign the signature page, Ms. Feinstein believed she was only "holding a place in the Eastern District until another local attorney could be found." (NT II, 235)

161.    On June 4, 2020, Respondent's office mistakenly filed the civil complaint signed by Ms. Feinstein in the United States District Court for the District of New Jersey (the *Red Wine Restaurant NJ* case). (ODC-35/Bates 289, Stip 59)

a.   The caption of the case identified the court as "In the United States Court for the Eastern District of Pennsylvania"; and

b.   The District of New Jersey docketed the *Red Wine Restaurant NJ* complaint at No. 1:20-cv-06824-RMB-JS.

162.   Respondent failed to review the civil complaint before it was filed. (NT V, 216)

163.   Later that same day, the Clerk's Office entered a Quality Control message (ODC-35/Bates 289) informing Respondent that the complaint (Stip 60):

a.   "contains an improper signature" and to "PLEASE RESUBMIT THE DOCUMENT WITH A PROPER ELECTRONIC SIGNATURE" (capital letters in original); and

b.   contained "deficiencies," including:  (1) the "Caption, Party Information is to be entered in CAPITAL LETTERS"; and (2) "Defendants added to the docket do not reflect the alias information listed in the caption of the complaint."

164.   On June 8, 2020, Respondent's office filed a "Voluntary Stipulation of Dismissal Without Prejudice" with the Clerk's office (ODC-36/Bates 291), which (Stip 61):

a.   requested that the *Red Wine Restaurant NJ* complaint be dismissed without prejudice because the complaint "was filed in error and should have been filed in the Eastern District of Pennsylvania";

b.   failed to contain any signature on the signature line; and

c.   contained the name "Denise Stone, paralegal to Joseph Lento, Esquire," under the blank signature line.

165.   On June 9, 2020, the Clerk's Office entered a Quality Control message that stated the notice of voluntary dismissal "submitted by JOSEPH D. LENTO on 6/8/2020 did not contain a proper electronic signature" and requested that Respondent resubmit the signature page with the correct electronic signature. (ODC-35/Bates 289, Stip 62)

166. On June 9, 2020, Respondent signed and filed a "Notice of Dismissal Without Prejudice" requesting that the *Red Wine Restaurant NJ* complaint be dismissed without prejudice because the complaint "was filed in error and should have been filed in the Eastern District of Pennsylvania." (Stip 63)

167. On June 9, 2020, the District Court of New Jersey terminated the *Red Wine Restaurant NJ* case. (Stip 64)

168. On June 15, 2020, Respondent filed a letter with the Clerk (ODC-38/Bates 293) that stated (Stip 65):

    a.    on June 4, 2020, Respondent's "secretary erroneously filed a complaint" in the United States District Court, District of New Jersey;

    b.    admitted that the "complaint should have been filed in the United States District Court for the Eastern District of Pennsylvania"; and

    c.    requested that his law "firm be refunded $400 for the incorrect filing" in the *Red Wine Restaurant NJ* case.

169. In response, on June 15, 2020, the Clerk entered a Quality Control message advising that Respondent's letter "was submitted incorrectly" and instructing Respondent to resubmit a letter using the Application for Refund of Fees. (ODC-35/Bates 289, Stip 66)

170. Subsequently on June 15, 2020, Respondent submitted the correct application for a refund to the Clerk's Office. (Stip 67)

    a.    On June 26, 2020, the Clerk's Office signed an order refunding Respondent's filing fee.

171. Respondent admitted that he and his support staff made multiple mistakes in the filing of the Red Wine Restaurant NJ case. (NT V, 197, 199, 200, 202, 204)

*Red Wine Restaurant II Case*

34

102

172.     On June 19, 2020, Respondent's office filed a civil complaint (ODC-39/Bates 316) with a Civil Cover Sheet (JS 44), Designation Form, and Case Management Track Designation Form in the EDPA. (Stip 74)

     a.    The EDPA docketed the civil complaint, hereinafter the *Red Wine Restaurant II* case, at No. 20-2966. (ODC-41/Bates 340)

173.     The civil complaint was:

     a.    identical to the civil complaint dismissed by Judge Robreno in the *Red Wine Restaurant* case (Stip 70); and

     b.    failed to include any "legal authority for the proposition that a promoter may be held liable under the circumstances presented in this case," as was specifically ordered by Judge Robreno on January 13, 2020.

174.     Respondent knew about all the previous mistakes in the filing of the *Red Wine Restaurant I* and *Red Wine Restaurant NJ* cases. (NT V, 219)

175.     Respondent failed to review the complaint filed on June 19, 2020 in the *Red Wine Restaurant II* case before it was filed. (NT V, 214, 216; 220) The failure of the complaint to contain legal authority "only came to [Respondent's] attention at a later point in time." (*Id.* at 214)

176.     Local Federal Rule of Civil Procedure 40.1(b)(3) requires counsel at the time of filing a civil action to "indicate on the appropriate form whether the case is related to any other pending or within one (1) year previously terminated action of this court." (ODC-40/Bates 335, Stip 72)

177.     Local Federal Rule of Civil Procedure 40.1(c)(1) provides, in pertinent part, that "[i]f the fact of the relationship is indicated on the appropriate form at the time of filing, the assignment clerk shall assign the case to the same judge to whom the earlier numbered related case is assigned." (ODC-40/Bates 335, Stip 73)

35

103

178.  On the Civil Cover Sheet (JS 44) prepared by Respondent's legal assistant, Ms. Stone, Ms. Stone (Stip 75):

a.  in Section V., "Origin," placed an X in the box indicating that the *Red Wine Restaurant II* case was an "Original Proceeding";

b.  did not make any mark next to the box "Reinstated or Reopened"; and

c.  left blank Section VIII, "Related Case(s) if any."

179.  The initial "J," purporting to be Ms. Feinstein's signature, appeared on the attorney signature line of the Civil Cover Sheet. (Stip 76)

180.  Ms. Feinstein (NT II, 238):

a.  was not asked by anyone to complete the Civil Cover Sheet;

b.  did not review the Cover Sheet after it was completed;

c.  could not identify her signature/initials on the signature line; and

d.  did not authorize anyone to put her signature/initials on the signature line.

181.  On the Designation Form (Bates 318) prepared by Ms. Stone, Ms. Stone incorrectly marked "No" in answer to Question 2 inquiring, "Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?" (Stip 77)

182.  The initial "J," purporting to be Ms. Feinstein's signature, was placed on the attorney signature line of the Designation Form certifying "that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in the court." (Stip78)

183.  Ms. Feinstein did not authorize anyone to put her signature/initials on the signature line of the Designation Form. (NT II, 239)

36

104

184.	As a result of the information contained on the Designation Form, on or before June 26, 2020, the Clerk's Office assigned the *Red Wine Restaurant II* case to the Honorable Mitchell S. Goldberg. (Stip 79)

185.	On the Case Management Track Designation Form (Bate 319) prepared by Ms. Stone, Ms. Feinstein did not (NT II, 240):

a.	write the date, Ms. Feinstein's email address at Lento Law Group, telephone number, and fax number; and

b.	authorize anyone to sign her name/initial to the Case Management Form.

186.	Ms. Feinstein was unable to identify her signature/initial on the signature page of the *Red Wine Restaurant II* civil complaint (Bate 334) and recalled signing only a "placeholder" document in the case. (NT II, 241)

187.	At the time Ms. Feinstein was asked to sign the signature page, Ms. Feinstein was given no information, from any source, that the *Red Wine Restaurant* complaint had been filed previously. (NT II, 230-231)

188.	In Respondent's Answer to the PFD (ODC-2, ¶ 72(b)/Bates 089), Respondent wrote: (1) "Respondent had multiple conversations with Ms. Feinstein during which they discussed the prior dismissal" of the *Red Wine Restaurant* case; (2) "at all pertinent times, Ms. Feinstein was aware of and knew about the dismissal" of the *Red Wine Restaurant* case; and (3) "Ms. Feinstein consulted with an attorney to determine whether re-filing [*Red Wine Restaurant* case] would raise any ethical concerns." These Petition for Discipline Answers by Respondent are false. (NT II, 229)

189.	Other than signing the signature page of a document, Ms. Feinstein was not asked to do any legal work on the *Red Wine Restaurant II* case. (NT II, 245)

37

105

190.    Respondent was the managing attorney at Lento Law Group, P.C., with direct supervisory authority over Ms. Feinstein and his nonlawyer assistants. (Stip 80)

191.    As the managing partner at Lento Law Group, P.C., with direct supervisory authority over Ms. Feinstein and his nonlawyer assistants, Respondent's failure to inform Ms. Feinstein and Ms. Stone about Judge Robreno's prior dismissal of the complaint in the *Red Wine Restaurant* case resulted in Ms. Stone's completing and Ms. Feinstein's (or someone else) initialing of incorrect forms and the EDPA's assignment of the *Red Wine Restaurant II* case to Judge Goldberg.

192.    Even though Respondent knew there were issues with the *Red Wine Restaurant I* complaint, Respondent failed to review the *Red Wine Restaurant* complaint before it was filed in New Jersey and refiled in the EDPA. (NT III, 67-68; NT V, 214, 216, 220)

193.    At the time the *Red Wine Restaurant II* case was filed, Mr. Altman and Respondent were discussing Mr. Altman becoming an associate "with the Lento Law Group on a fairly systematic basis." (ODC-42/Bates 345, p. 9, Stip 81)

194.    In or around March 2020, Lento Law Group contacted Mr. Altman about being co-counsel with Ms. Feinstein in representing Mr. Rosario in the *Red Wine Restaurant II* case. (Stip 82)

195.    Ms. Feinstein had never done a *Pro Hac Vice* application and had some concerns about signing Mr. Altman's *Pro Hac Vice* application without first interviewing Mr. Altman. (NT II, 220)  Local Rule of Civil Procedure in the U.S. Court for the Eastern District of Pennsylvania 83.5.2 (b) requires that the sponsor attest, under the penalty of perjury, to personal knowledge (or after reasonable inquiry) that the *Pro Hac Vice* applicant's private and personal character is good.

38

106

196. When Ms. Feinstein told Respondent that she wanted to interview Mr. Altman before signing the application, Respondent told Ms. Feinstein, "[I]t wasn't necessary and I worry too much." (NT II, 221)

197. Ms. Feinstein then sought the advice of counsel regarding her request to interview Mr. Altman. (NT II, 221-222) Respondent was aware that Ms. Feinstein had consulted with counsel and "he would tease [her] about it." (*Id.* at 222)

198. Ms. Feinstein interviewed Mr. Altman, during which time (NT II, 230-231):

   a. Mr. Altman never told Ms. Feinstein that the *Red Wine Restaurant* case had been previously filed (*id.* at 230);

   b. Mr. Altman explained that Ms. Feinstein's role would be limited to her signing the signature page of the complaint until the firm could find substitute counsel (*id.* at 232); and

   c. there was no expectation that Ms. Feinstein would provide any legal assistance. (*Id.* at 232)

199. After completing the interview, Ms. Feinstein was satisfied that she could sponsor his *Pro Hac Vice* application. (NT II, 220, 232-233)

200. On June 26, 2020, Respondent's office filed Ms. Feinstein's application for Mr. Altman's *Pro Hac Vice* admission (ODC-136/Bates 946), which Judge Goldberg granted the same day. (Stip 83) Ms. Feinstein did not sign the *Pro Hac Vice* admission form. (NT II, 244)

201. On August 20, 2020, Mr. Altman filed a Request for Default against Alex Torres Productions, Inc., for failure to appear, plead, or otherwise defend. (Stip 84) The Court granted Mr. Altman's request the same day.

202. On November 5, 2020, Judge Goldberg referred the *Red Wine Restaurant II* case to Magistrate Judge David R. Strawbridge for settlement purposes. (Stip 85)

203. On July 21, 2021, in accordance with Local Civil Rule 40.1(c)(2), the Clerk of Court ordered that the *Red Wine Restaurant II* case be "directly reassigned from the calendar of the Honorable Mitchell S. Goldberg, to the calendar of the Honorable Eduardo C. Robreno, as related to" the *Red Wine Restaurant* case. (ODC-43/Bates 389, Stip 86)

204. By Order dated September 30, 2021 (ODC-44/Bates 390), Judge Robreno (Stip 87):

    a.    held that "in light of the multiple irregularities present in this case," Mr. Altman and Ms. Feinstein must show cause why they "should not be sanctioned for their: (1) failure to accurately certify that there were no related cases in violation of RPC 3.3(a); and (2) failure to provide authority in the complaint regarding promoter liability as ordered by the Court on January 13, 2020" in the *Red Wine Restaurant* case;

    b.    instructed Ms. Feinstein and Mr. Altman to file a response to the Rule to Show Cause no later than October 25, 2021; and

    c.    ordered that the Rule was "answerable <u>in person</u>" (underlining in original) in his courtroom on November 10, 2021.

205. By text message dated October 4, 2021, from Respondent to Ms. Feinstein and Mr. Altman, Respondent requested a three-way telephone conversation with Ms. Feinstein and Mr. Altman. (ODC-138)

206. Ms. Feinstein subsequently spoke to Respondent and Mr. Altman (NT II, 259), during which time:

    a.    Ms. Feinstein was advised that there was a problem with the filing of the *Red Wine Restaurant* complaint (*id.*);

    b.    Mr. Altman minimized what had occurred and stated its "not a big deal" (*id.* at 260);

    c.    Mr. Altman explained that the problem was the secretary had checked the wrong box and filed the complaint in New Jersey, but New Jersey rejected the complaint and refunded the money (*id.* at 261);

d. Respondent complained that he has "bad luck with these things," such as the "Disciplinary Board, judges coming on him," claimed that he was "unjustly accused in 2013," and "very upset that it became reciprocal in Jersey" (*id.* at 263-264); and

e. Ms. Feinstein was told she was asking too many questions, which caused her to become upset. (*Id.* at 260).

207. Ms. Feinstein was never told by Respondent (NT II, 262) that:

a. the *Red Wine Restaurant* case was originally dismissed in the Eastern District of Pennsylvania (*id.*);

b. the court ordered that if the case was re-filed, it must include legal authority on promoter liability (*id.*); and

c. there was a prior complaint filed before the same judge who would be conducting the conference. (*Id.* at 265)

208. Ms. Feinstein was told that the Court had ordered an Answer to be filed by October 25, 2021, and Mr. Altman would be responsible for writing the Answer. (NT II, 265)

209. Mr. Altman did not discuss the proposed Answer with Ms. Feinstein or give Ms. Feinstein the Answer to review. (NT II, 266)

210. By text message dated October 23, 2021 (ODC-138, pp. 4-5/Bates 955-956), Mr. Altman informed Ms. Feinstein that she needed to be in federal court on November 10, 2021. (NT II, 267) At the time Ms. Feinstein was told she needed to be in court, Ms. Feinstein still had not told that *Red Wine Restaurant* case had been dismissed by Judge Robreno. (*Id.* at 269)

211. On the morning of November 10, 2021, Respondent scheduled a meeting with Ms. Feinstein, Mr. Altman, and Ms. Stone at Respondent's Philadelphia law office "to prepare [their] testimony in front of Judge Robreno" at the Rule to Show Cause hearing (NT II, 270), during which time:

41

a. Ms. Feinstein, Mr. Altman, and Ms. Stone went to Respondent's office to meet with Respondent (*id.* at 271);

b. Respondent contacted Ms. Stone and said that he would not be meeting with them (*id.*); and

c. Respondent also spoke to Ms. Feinstein and informed her that he would not be attending the scheduled meeting or appearing at the Rule to Show Cause hearing. (*Id.* at 271-272).

212. Respondent did not provide counsel to represent his employees and others whom he supervised at the Rule to Show Cause hearing. (NT II, 272)

213. At 2:00 p.m. on November 10, 2021, a Show Cause hearing was held before Judge Robreno, at which Mr. Altman, Ms. Feinstein, and John J. Griffin, Esquire, counsel for defendant La Guira, Inc., were in attendance. (ODC-42/Bates 345, Stip 88)

214. During the November 10, 2021 hearing (ODC-42/Bates 345, Stip 89):

a. Judge Robreno explained the "relatedness rule" that required Ms. Feinstein to identify that the *Red Wine Restaurant II* case was related to the *Red Wine Restaurant* case that Judge Robreno had dismissed on January 13, 2020 (ODC-42/Bates 345, p. 13);

b. Mr. Altman stated that "the individuals who were involved in actually preparing and filing the instant case [*Red Wine Restaurant II* case] were just unaware that it [*Red Wine Restaurant* case] had been filed before" (*id.* at p. 14) and there was a "lapse of time and change of personnel" (*id.* at 16);

c. Mr. Altman acknowledged that the *Red Wine Restaurant* case was "accidentally filed in the District of New Jersey" (*id.* at 13);

d. Mr. Altman revealed that the first time he had heard about Judge Robreno's January 13, 2020 Order was when he was before Judge Goldberg (*id.* at 19);

e. Mr. Altman blamed the Lento Law Group and Ms. Feinstein for preparing an incorrect Civil Docket Sheet and incorrect Designation Form filed with the complaint (*id.* at 21);

42

110

f.  Ms. Feinstein admitted she had never met Mr. Rosario and had "relied on the firm's judgment" when she signed the complaint (*id.* at 26);

g.  Mr. Altman noted that "the firm itself, somebody knew the case was being refiled, but somehow that message did not get to the people who actually executed it months later" (*id.* at 29);

h.  Judge Robreno stated that "there is no question at all that serious violations of both our local rules and perhaps the Rules of Professional Conduct were implicated in this case," he was "pretty troubled that no one seems to . . . take responsibility and take charge," and "[m]aybe this Lento Firm may be the one" (*id.* at 31); and

i.  Mr. Altman agreed that "clearly, the firm is responsible for not communicating to the people that had to execute." (*Id.* at 32).

215.  The Rule to Show Cause hearing was the first time Ms. Feinstein heard that:

a.  she had signed the same complaint that had previously been dismissed by Judge Robreno (NT II, 273); and

b.  Judge Robreno had entered an order that if the *Red Wine Restaurant* case was ever refiled, it must include law of promoter liability. (*Id.* at 272)

216.  On November 16, 2021, Mr. Altman filed a Response to Order to Show Cause alleging that when the *Red Wine Restaurant II* case was filed, "neither the paralegal who prepared the documents nor the attorney who signed the documents was aware the case had been previously filed." (ODC-45/Bates 392, Stip 90)

217.  By Order dated November 23, 2021 (ODC-46/Bates 404), Judge Robreno held (Stip 91):

a.  The Lento Law Group and Ms. Feinstein are barred from further representation of Mr. Rosario (ODC-46/Bates 404, p. 2);

b.  Mr. Altman's *pro hac vice* status is revoked (*id.*);

43

c. the default judgment entered against Alex Torres Production, Inc., is stricken (*id.* at 3);

d. Ms. Feinstein, Mr. Altman, Respondent, and the Lento Law Group are referred to the Pennsylvania Disciplinary Board (*id.*);

e. Respondent has supervisory or managerial authority over Lento Law Group (*id.* at 4); and

f. "the conduct of Joan Feinstein, Keith Altman, Joseph Lento, and the Lento Law Group may constitute violations of Pennsylvania Rules of Professional Conduct 1.1, 1.3, 3.1, 3.3, 4.1, or 5.1." (*Id.* at p. 4)

218. Respondent received a copy of Judge Robreno's November 23, 2021 Order. (Stip 92)

219. After Ms. Feinstein received a copy of the Order referring her to ODC for possible RPC violations, she felt "horrible" and called Respondent (NT II, 276); during Ms. Feinstein's conversation with Respondent:

a. Ms. Feinstein explained she was "upset," was "trying to help a friend," and "was just disappointed" (*id.*); and

b. Respondent failed to take any responsibility for what had occurred and blamed Mr. Altman. (*Id.* at 277)

220. Although Ms. Feinstein had agreed to be removed from the case at the Rule to Show Cause hearing, Ms. Feinstein did not know how to remove herself. (NT II, 277)

221. When Ms. Feinstein contacted Respondent for assistance in getting removed, Respondent told her to contact Mr. Groff, who told Ms. Feinstein she was "an idiot" and the judge had removed her. (NT II, 278)

222. Ms. Feinstein then contacted outside counsel who taught her how to go on PACER and "to make sure that everything was off." (NT, II, 278)

223. On December 22, 2021, Mr. Altman filed a Notice of Appeal of Judge Robreno's November 23, 2021 Order imposing sanctions to the Third Circuit Court of

44

112

Appeals. (Stip 93) The Third Circuit docketed the appeal at No. 21-3337. (ODC-47/Bates 408) The Third Circuit Court of Appeals subsequently dismissed the appeal, see page 20, paragraph 138 of Respondent's Memorandum.

224. On May 3, 2022, Mr. Altman filed Concise Summary of the Case identifying the issues to be raised on appeal. (ODC-48/Bates 412, Stip 94)

225. Respondent admitted that in the *Red Wine Restaurant* cases, he failed to:

    a.    properly supervise his employees in their handling of the pleadings (NT V, 222); and

    b.    have safeguards in place to prevent all the mistakes that had occurred. (*Id.* at 223)

226. In answer to counsel's prompting Respondent, "[d]o you express any remorse or regret with respect to the mistakes that were made in connection with the Rosario litigation," Respondent stated he regretted "the mistakes that were made" and that Judge Robreno's and the District Court of NJ's "time and resources were unnecessarily used to address these issues." (NT III, 134) Respondent failed to express any remorse or recognition of the harm his reckless conduct inflicted on his client, his colleagues, and the profession.

### The Watsons Matter

227. On or before July 31, 2019, Optimum assigned Mr. Feinstein to represent Conrad J. Benedetto in a breach of contract, confession of judgment, and unjust enrichment matter. (Stip 95)

    a.    Mr. Benedetto had retained Respondent's law firm and Mr. Benedetto was Respondent's client. (NT V, 58); and

b. "Mr. Feinstein was an associate with the [ ] Optimum Law Group" and Respondent was the "supervising and managing attorney" for the firm. (*Id.* at 59)

228. Mr. Feinstein testified that he drafted a civil complaint (NT II, 92; ODC-49/Bates 419, Stip 96):

a. on behalf of Plaintiff, Mr. Benedetto;

b. against Defendants, Raheem Watson, and Christy Laverne Watson (the Watsons); and

c. alleging that Plaintiff loaned $10,000 to Defendant Raheem Watson pursuant to a promissory note and Defendant Raheem Watson had not made any payments in accordance with the terms of the promissory note.

229. After Mr. Feinstein drafted the complaint, he gave the complaint to one of the secretaries for filing. (NT II, 92)

230. No other attorney reviewed the complaint before it was filed. (NT V, 71)

231. Mr. Feinstein did not give the complaint to Respondent to review because "I don't know that Mr. Lento does anything at the firm, so it would have been useless to ask him to review it." (NT II, 137)

232. Mr. Feinstein was not involved in filing the complaint, service of the complaint, or uploading documents from the case into the CLIO system. (NT II, 92-93)

233. On July 31, 2019, Optimum filed the complaint in the Court of Common Pleas of Philadelphia County (First Judicial District). *Benedetto v. Watson et al.*, No. 190704102. (ODC-50/Bates 424, Stip 97)

234. Although Respondent's law firm had a case management system, after investigation, Respondent was unable to determine who filed the complaint (NT V, 73, 76) and who made the arrangements to have the complaint served on the defendants. (*Id.* at 79-80)

46

114

a. Respondent's law firm had a "general problem" of employees not entering information into the case management system. (NT V, 77)

b. As the supervising lawyer, it was Respondent's responsibility to review the case management system and determine that his employees were doing things in a timely and proper manner. (*Id.*, 86)

235. On or before August 6, 2019, Optimum retained the services of Russell R. D'Alonzo to make service of process of the civil complaint on the Watsons.

236. At 6:55 p.m. on August 6, 2019, Mr. D'Alonzo made service of process of the civil complaint by handing a copy of the complaint to Makayla Daniels, the Watsons' daughter, at 1013 Pennsylvania Avenue, Havertown, PA 19083. (ODC-51/Bates 432, Stip 99)

237. Pa.R.Civ.P. 400.1 provides that in an action commenced in the First Judicial District, service of original process shall be made (Stip 100):

a. in the First Judicial District, by the sheriff or a competent adult, Pa.R.Civ.P. 400.1(a)(1); and

b. in any county other than the First Judicial District, by the sheriff of the other county who is deputized by the sheriff of the First Judicial District, Pa.R.Civ.P. 400.1(a)(2).

238. The Watsons did not reside in the First Judicial District. (Stip 101) The Watsons resided in Delaware County.

239. Russell R. D'Alonzo is not the sheriff of Delaware County. (Stip 102)

240. As the managing attorney at Optimum with managerial authority over lawyers and nonlawyer assistants, Respondent failed to make reasonable efforts to ensure that employees of Respondent's law firm acted with competence and have policies and procedures in place to ensure that service of original process of a complaint that had been filed in the First Judicial District against residents of Delaware County was

47

115

served by the Delaware County sheriff who had been deputized by the sheriff of the First Judicial District. (PFD ¶ 106 and PFD Answer ¶ 106; NT V, 81-82)

241. On August 12, 2019, Optimum filed Affidavits of Service establishing proof of service of the complaint on the Watsons, albeit not service in the manner authorized by Pa.R.Civ.P. 400.1. (Stip 104)

242. The Watsons did not file an answer to the complaint within 30 days of service. (Stip 105)

243. Mr. Groff instructed Mr. Feinstein to draft a Praecipe to Enter a Default Judgment (Praecipe) against the Watsons. (NT II, 106-107, 137)

244. At the time Mr. Groff instructed Mr. Feinstein to draft the Praecipe, Mr. Feinstein "asked him [Mr. Groff] if a 10-day notice was sent, and he [Mr. Groff] said 'yes.'" (NT II, 106, 107)

245. The clerical staff was responsible for sending out the 10-day notice. (NT V, 90-91) Neither a copy of the 10-day notice or confirmation of its mailing to the Watsons was uploaded to the CLIO system. (NT V, 92-93)

246. By email to JEdwards and LJones on October 23, 2019, Mr. Feinstein attached a draft Praecipe to Enter Default Judgment (Praecipe) and wrote: "Here is the default judgment, anything in red has to be changed to reflect the correct date, the docket number has to be put in and this should be good to go." (ODC-52/Bates 434, Stip 106)

247. Mr. Feinstein sent the email with the draft Praecipe to Mr. Groff and Ms. Jones and "highlighted certain areas of the draft because the dates were wrong, so I wanted to make sure that those were corrected to the correct date and to put the correct docket number on the corrected docket." (NT II, 104)

48

248. The date that the Notice of Intent to Take Default Judgment was sent was one of the dates that Mr. Feinstein highlighted to be corrected as the draft Praecipe (D-26) date is April 24, 2018. (NT 101-102, 109-112)

249. By email exchange between Mr. Feinstein and Ms. Jones on October 28, 2019 (ODC-53/Bates 435, Stip 107):

    a.    at 4:13 p.m., Ms. Jones wrote: I am working on getting this filed today. I do not see Notice of Intent to Default that is Exhibit B. Can you please let me know where I can find this so we can file this?; and

    b.    at 4:16 p.m., Mr. Feinstein replied: I have no idea. John said it was sent."

250. Mr. Feinstein stated that (NT II, 107):

    a.    a 10-day notice was not uploaded onto the CLIO system; and

    b.    Mr. Feinstein was not given the praecipe to proofread after Ms. Jones typed it, added the dates, and finalized the pleading.

251. At 1:59 p.m. on October 29, 2019, Optimum filed a Certification of Service stating that copies of Notice of Intent to Take Default judgment were mailed to the Watsons on September 11, 2019. (ODC-54/Bates 0437)

252. The Praecipe to Enter Default Judgment (Praecipe) against the Watsons (Stip 109):

    a.    stated the Notice of Intent was mailed to the Watsons, via first class mail, postage prepaid, on October 28, 2019;

    b.    attached as Exhibit B an unfiled "Important Notice," dated September 11, 2019, informing the Watsons that they had failed to enter a written appearance and unless they act within 10 days from the date of the Notice, a judgment may be entered against them; and

    c.    affixed the signature of Mr. Feinstein.

253. The Praecipe contained contradictions regarding the date the 10-day notice was mailed to the Watsons. (NT V, 98)

49

117

a.   If Optimum had mailed the Notice of Intent on September 11, 2019, then Optimum's Praecipe wrongly stated that the Notice of Intent was mailed to the Watsons on October 28, 2019.

254.   At 2:06 p.m. on October 29, 2019, the Praecipe against the Watsons was filed. (ODC-55/Bates 438, Stip 111)

255.   Mr. Feinstein did not review the Praecipe before it was filed. (NT II, 107)

256.   As the managing attorney at Optimum with managerial authority over lawyers and nonlawyer assistants, Respondent failed to ensure that documents prepared on behalf of an attorney are reviewed and proofread by an attorney prior to filing with the Court.

257.   On October 29, 2019, the Court granted the Praecipe and entered a Judgment by Default against the Watsons. (Stip 113)

258.   On November 11, 2019, the Watsons filed a Petition to Strike Entry of Default Judgment (Petition) (ODC-56/Bates 451, Stip 114):

a.   admitting that the Watsons had been personally served with the Complaint on August 12, 2019;

b.   admitting that on November 1, 2019, the Watsons received notice via certified mail that Plaintiff had requested a judgment by default on October 29, 2019;

c.   alleging that prior to November 1, 2019, the Watsons had not received any other notices of intent to take default for failing to file an answer to the Complaint;

d.   noting that the Praecipe is dated and signed on October 28, 2019;

e.   explaining that Pa.R.Civ.P. 237.1(2) states, in pertinent part, that:

[N]o judgment by default for failure to plead shall be entered by the prothonotary unless the praecipe for entry includes a certificate that a written notice of intention to file the praecipe was mailed or delivered . . . at least ten [10] days prior to the date of the filing of the praecipe to the party against whom

50

118

judgment is to be entered and to the party's attorney of record, if any.;

f.      alleging that Plaintiff and Mr. Feinstein "have perpetrated a fraud on this court" by having the Court issue an "unjust default judgment against Defendants"; and

g.      requesting that Plaintiff's Praecipe for Entry of Default be stricken.

259.    By Order docketed on December 5, 2019, the Honorable Edward C. Wright issued a Rule to Show Cause as to why the relief requested in the Watsons' Petition should not be granted, scheduled a Rule Returnable Hearing for January 9, 2020, and ordered that any written response to the Petition should be filed no later than 5 days before the January 9, 2020 hearing. (Stip 115)

260.    Mr. Feinstein received the Petition to Strike and was "mortified by what was filed over [his] name." (NT II, 113)

261.    By email sent on December 19, 2019, from Mr. Feinstein to Respondent, JEdwards, and Mr. Benedetto (ODC-26/Bates 210), Mr. Feinstein (Stip 116):

a.      attached the Rule to Show Cause that was served on him by certified mail that day;

b.      requested that someone substitute their appearance "per the letter I got from Joe Lento to immediately stop any work on Optimum cases"; and

c.      reminded the email recipients to substitute his appearance in all Optimum cases.

262.    Respondent received notice of the January 9, 2020 hearing. (NT V, 101-102; ODC-26/Bates 210)

263. Although Mr. Benedetto was a client of Respondent's law firm (NT V, 100), Respondent failed to act with the competence and diligence necessary for the representation and filed a substitution of appearance for Mr. Feinstein. (NT II, 114)

264. On January 2, 2020, Mr. Feinstein filed Plaintiff's Response to Defendants' Petition to Strike Default Judgment (ODC-57/Bates 468, Stip 117):

    a.    claiming that the Praecipe to Enter Default Judgment, which states that the Notice of Intent to Take Default was mailed on October 28, 2019, "appears to be a clerical error";

    b.    alleging that the Notice of Intent to Take Default Judgment was mailed on September 11, 2019;

    c.    attaching a Certificate of Service for Notice of Intent to Take Default Judgment that was filed on October 29, 2019; and

    d.    failing to attach any proof that a Notice of Intent to Take Default Judgment was mailed on September 11, 2019, such as a: mail receipt; copy of envelope to the Watsons; Affidavit from the individual(s) who drafted the Notice of Intent, addressed the envelope to the Watsons, placed the Notice of Intent in an envelope, and mailed the Notice of Intent; certificate of service filed on or about September 11, 2019; or cover letter for Notice of Intent.

265. Mr. Feinstein explained that he filed the Response because he had "waited a period of time to see if [Respondent was] going to answer the petition. . . So when it got to January and they still had not entered their appearance and a response to the petition had to be filed, I didn't want to have any concerns—I didn't want to have a rerun of what happened in the Eastern District by not responding to the motion." (NT II, 114-115; *see also* NT II, 116-117)

266. Mr. Feinstein obtained Mr. Benedetto's authorization to file the Response. (NT II, 117)

267. By email exchange dated January 3, 2020, between Mr. Feinstein and JEdwards (Mr. Groff) (ODC-58/Bates 478, Stip 118):

a. JEdwards inquired whether Mr. Feinstein was taking the Watsons' matter on behalf of Conrad or should Optimum substitute Mr. Feinstein's appearance;

b. Mr. Feinstein replied:

i. "You failed to substitute anyone in for my appearance. As a favor to Conrad I filed a response"; and

ii. "I have not agreed to handle the case for Conrad, but I was not going to commit malpractice."

268. On January 9, 2020, Judge Wright held a Rule Returnable Hearing on the Watsons' Petition to Strike (ODC-59/Bates 480), during which time (Stip 119):

a. Mr. Watson was in attendance;

b. Mr. Watson provided the Court with green card receipts showing that Optimum had notice of the Rule Returnable Hearing;

c. Mr. Watson explained that he did not receive the required 10-day Notice of Intent to Take Default Action that Optimum purportedly had sent on September 11, 2019, until Optimum mailed the Praecipe on October 28, 2019; and

d. requested that the default judgment entered against the Watsons be stricken.

269. Although Mr. Benedetto did not discharge Respondent's law firm and Respondent did not withdraw from the representation, no one from Respondent's law firm appeared to represent Mr. Benedetto. (NT V, 105-106, 110) Respondent failed to act with the competence and diligence necessary for the representation and assign another attorney to substitute his appearance for Mr. Feinstein and attend the January 9, 2020 hearing. (*Id.* at 114)

270. By Order docketed on January 10, 2020, Judge Wright granted Defendants' Petition to Strike Default Judgment. (ODC-50/Bates 424, Stip 120)

271. Respondent admitted that his supervisory and managerial duties in his handling of the Watsons matter fell below the standards mandated by the Rules of Professional Conduct. (NT V, 121-122)

### American Club of Beijing Matter

272. On September 13, 2019, Mr. Feinstein filed a civil complaint on behalf of American Club of Beijing and against Board of Governors AME in the Court of Common Pleas of Philadelphia County. *American Club of Beijing v. Board of Governors AME*, No. 19091807. (American Club) (ODC-60/Bates 489, Stip 121)

273. On January 7, 2020, Respondent filed a Praecipe for Entry of Appearance on behalf of American Club. (ODC-61/Bates 500, Stip 122)

274. On January 8, 2020, Mr. Feinstein filed a Withdrawal of Appearance on behalf of American Club. (ODC-61/Bates 500, Stip 123)

275. By email dated April 3, 2020, from Ms. Stone to Mr. Groff with a "cc" to Respondent, Ms. Stone (D-29):

    a.    attached a draft *Pro Hac Vice* motion for the admission of Anthony Scordo, which was to be signed and verified by Respondent; and

    b.    explained that she would re-type the motion, but "need[ed] the corrections first...."

276. Respondent received the draft *Pro Hac Vice* motion from Ms. Stone. (NT III, 137)

277. Respondent failed to act with reasonable diligence and review and correct the *Pro Hac Vice* motion after it was received. (NT III, 137; NT V, 12, 13, 14)

278. On May 19, 2020, the Honorable Gary Glazer transferred *American Club* to Commerce Court. (Stip 124)

54

279. On May 27, 2020, Ms. Stone filed a Motion for *Pro Hac Vice* Admission to Commerce Court (Motion). (ODC-62/Bates 515, Stip 125)

280. The Motion (Stip 126):

   a. states that Respondent moves for the *pro hac vice* admission of Anthony Scordo, Esquire, an attorney in good standing in New Jersey and an associate at Lento Law Group, P.C.;

   b. contains the signature of Joseph D. Lento and is dated May 26, 2020; and

   c. attaches Verification of Joseph D. Lento, Esquire, In Support of Motion for Admission *Pro Hac Vice* (Verification).

281. The Verification, which Respondent signed and dated May 26, 2020, stated Respondent (Stip 127):

   a. declares, "under penalty of perjury that the foregoing is true and correct";

   b. "understand[s] that false statements made herein are subject to the penalties of 18 Pa.C.S.A. § 4904 relating to unsworn falsification to authorities";

   c. is the President of Lento Law Group, P.C. (¶ 1); and

   d. is "a member in good standing of the Pennsylvania Bar, I presently am not, and have never been, the subject of any disbarment or suspension proceeding before this or any Court" (¶ 3).

282. Respondent's Verification was incorrect in that (Stip 128):

   a. by Order dated July 17, 2013, the Pennsylvania Supreme Court granted the Joint Petition in Support of Discipline on Consent and suspended Respondent from the practice of law for one year, followed by a one-year period of probation with conditions;

   b. by Order dated April 26, 2017, the Supreme Court of New Jersey entered an Order of reciprocal discipline suspending Respondent from the practice of law;

   c. by Order dated September 13, 2013, the Eastern District of Pennsylvania entered an Order of reciprocal discipline suspending

55

123

Respondent from the practice of law for one year, effective thirty days from the date of its Order; and

d. Respondent has not been granted reinstatement to the practice of law in the Eastern District of Pennsylvania.

283. Respondent testified that he did not know the requirements for filing a *Pro Hac Vice* motion until the summer of 2022. (NT V,11) Respondent failed to possess the competence necessary for the representation.

284. On June 1, 2020, Defendants William L. Rosoff, Timothy P. Stratford, and James M. Zimmerman (Defendants) filed a Response and New Matter in Opposition to Plaintiff's Motion for Admission *Pro Hac Vice* (Response). (ODC-63/Bates 531, Stip 129)

285. The Response (Stip 130):

a. alleges that Respondent misstated his disciplinary history as the Pennsylvania Supreme Court suspended Respondent from the practice of law for one year, followed by a one-year period of probation with conditions;

b. alleges that as a result of Respondent's misstatement and other reasons set forth in the Defendants' Response, good cause exists to deny Respondent's Motion; and

c. requests that, pursuant to the Court's inherent powers to govern the conduct of attorneys, the Court enter a Rule to Show Cause as to why sanctions should not be imposed.

286. Although Respondent did not know the legal requirements for filing a *Pro Hac Vice* motion and failed to correct the false statements in the draft motion that was sent to him for review (NT V, 11, 13), Respondent requested that Ms. Stone "send a letter informing all necessary parties that it (the motion) was a clerical error." (D-30) Respondent reasoned that "[i]t was deemed [to] be the appropriate way to address the matter." (NT V, 22)

287. On June 4, 2020, Respondent filed a Praecipe to Attach Certification of Denise Stone and the Certification of Denise Stone (Certification). (ODC-64/Bates 599, Stip 131)

288. Ms. Stone's Certification stated that she (Stip 132):

    a.    was a paralegal at Lento Law Group, P.C.;

    b.    "inadvertently stated that Joseph Lento, Esquire has 'never' been the subject of 'any' suspension proceedings in 'any' Court";

    c.    had filed the Motion;

    d.    apologized for her mistake; and

    e.    requested permission to withdraw the Motion and file a "corrected" motion.

289. Respondent testified that he did not know who prepared Ms. Stone's Certification or how it was prepared. (NT V, 25, 26)

290. On June 15, 2020, Defendants filed a Praecipe to Supplement and Response to Ms. Stone's Certification requesting the denial of the *Pro Hac Vice* Motion and the award of sanctions. (ODC-65/Bates 603, Stip 133)

291. In support of its request, Defendants allege, among other reasons, that (Stip 134):

    a.    Respondent's signed Verification "egregiously misstated Mr. Lento's disciplinary history" (p. 1);

    b.    Ms. Stone's Certification compounds Respondent's misconduct because he failed to properly supervise Ms. Stone and review the Certification before it was filed (pp. 3-4); and

    c.    Mr. Scordo was not a member of the Pennsylvania Bar at the time he co-signed the Complaint in *American Club* as "Attorney for Plaintiff seeking admission *Pro Hac Vice*." (p. 5)

292. On June 26, 2020, Respondent filed a response to Defendants' Response (ODC-66/Bates 619) alleging, in pertinent part, that (Stip 135):

    a.    "[i]t is highly unlikely that such a minor issue relating to [Respondent's] disciplinary record would result in the denial of *Pro Hac Vice* admission of Mr. Scordo" (p. 2);

    b.    Respondent "never attempted to hide" his disciplinary record (p. 4); and

    c.    Respondent's paralegal's error "was a mere oversight." (p. 5)

293. By Order dated July 14, 2020 (ODC-67/Bates 633), the Honorable Ramy I. Djerassi ordered that Respondent's motion for Mr. Scordo's *pro hac vice* admission be denied (Stip 136):

> without prejudice to a refiling that complies in all respects with applicable rules under Pa.R.Civ.P. 1012.1 and disclosure of movant's disciplinary history. The proposing attorney shall sign the motion and verification.

294. Judge Djerassi's order placed Respondent on notice to comply with Pa.R.Civ.P. 1012.1, disclose his disciplinary history, and to sign the motion and verification. (NT V, 31)

295. Respondent and Ms. Stone drafted the Second Motion for Admission *Pro Hac Vice*. (NT V, 31)

296. By email exchange between Respondent and Mr. Scordo on August 11, 2020 (ODC-68/Bates 634), with the subject line "Pro Hac" (Stip 137):

    a.    Respondent wrote at 8:12 a.m.: "Anthony, would you agree the one with just the PA consent suspension is sufficient? No need to get into NJ or Eastern District reciprocal right?;

    b.    Mr. Scordo wrote at 9:42 a.m.: "Joe, With these clowns on the other side, it might be worth just putting in a short one-sentence reference as part of the same paragraph without going into detail;

c.     Respondent wrote at 10:23 a.m., "Is this one OK? I basically put that NJ initially recommended a reprimand (Attorney Ethics and NJ DB) but NJ Supreme Court basically was like we're just going to retro reciprocal because it took them 4 years to get around to it. NJ basically said I got farked in PA with the suspension but was going to just do the reciprocal"; and

d.     Mr. Scordo wrote at 10:24 a.m.: "Looks fine."

297.    Respondent also spoke to Mr. Groff, who was not a lawyer, to determine which draft of the Second Motion was most appropriate to file. (NT V, 38; D-71)

298.    By Order dated August 13, 2020, Judge Djerassi sustained Defendants' Preliminary Objections, which had been filed on May 11, 2020, and dismissed the Complaint against Defendants. (Stip 138)

299.    On August 14, 2020, Respondent filed a second Motion for Admission *Pro Hac Vice* and attached a Verification of Joseph D. Lento, Esquire, In Support of Motion for Admission *Pro Hac Vice* (Second Verification). (ODC-69/Bates 635, Stip 139)

300.    In the Second Verification, Respondent states (Stip 140):

a.     "under penalty of perjury that the foregoing is true and correct";

b.     Respondent "understand[s] that false statements made herein are subject to the penalties of 18 Pa.C.S.A. § 4904 relating to unsworn falsification to authorities";

c.     Respondent is the President of Lento Law Group, P.C. (¶ 1);

d.     Respondent's law license was suspended for one-year in Pennsylvania and Respondent was reciprocally disciplined in New Jersey (¶ 3);

e.     "I presently am not the subject of any disbarment or suspension proceedings before this or any Court" (¶ 3); and

f.     "I believe that Anthony Scordo, Esquire is reputable and competent (¶ 6)."

59

127

301. Respondent signed the Motion as Joseph D. Lento. (Stip 141)

302. Respondent's Second Verification did not (Stip 142):

    a.    include Respondent's disciplinary history in the United States District Court for the Eastern District of Pennsylvania (¶ 3(a));

    b.    comply with Pa.R.Civ.P. 1012.1(b), in that it failed to state that the information required by IOLTA regulations had been provided to the IOLTA Board (¶ 4(a)); and

    c.    comply with Pa.R.Civ.P. 1012.1(d)(2)(iii), in that it failed to state that any proceeds from a settlement will be handled in accordance with RPC 1.15. (¶ 4(b)).

303. Respondent admitted that his Second Motion failed to fully disclose Respondent's disciplinary history (NT V, 32) and comply with Judge Djerassi's order. (*Id.* at 33)

304. Respondent also failed to disclose his suspension from the EDPA on his Pennsylvania annual attorney registration statements from 2015-2021. (ODC-122-128/Bates 917-925) (NT V, 48)

    a.    Respondent continued to file false attorney registration statements after Judge Djerassi dismissed his false *Pro Hac Vice* motions (NT V, 50); and

    b.    Respondent explained that it was his "misunderstanding" of the attorney registration statement and Respondent not doing his "diligence in understanding" the question. (NT V, 49)

305. Respondent knew that his first motion had failed to comply with Pa.R.Civ.P. 1012.1 and Respondent testified that his failure to comply with Pa.R.Civ.P. 1012.1 in his Second Motion "was an error and oversight."[2] (NT V, 51-52)

---

[2] Respondent contends that he did not intentionally intend to deceive the Court in the *American Club* matter. The evidence is that Respondent was not candid to the Court in his second verification, and chose to not fully disclose his disciplinary record. Respondent asked his colleague *before* he filed the second verification whether there was a "need" to be fully candid to the Court, and reference his *ongoing* suspension in the Eastern District of PA in his sworn verification. He chose to not fully disclose.

306. On August 23, 2020, Defendants attempted to file a Response to Plaintiff's Second Motion for Admission *Pro Hac Vice* (Second Response), but the Prothonotary's office rejected the filing as Defendants had been dismissed from the *American Club* case. (Stip 143)

307. By email to Judge Djerassi dated August 26, 2020, with a copy to Respondent (ODC-70/Bates 650), Defendants stated that they (Stip 144):

    a.    had attempted to file their Second Response, but it was rejected by the Prothonotary;

    b.    viewed Respondent's Second Motion as being noncompliant with the Court's July 13, 2020 Order in that Respondent failed to disclose his full disciplinary record and comply with Pa.R.Civ.P. 1012.1;

    c.    "believe[d] we are duty bound to bring this matter to the Court's attention"; and

    d.    attached Defendants' Second Response.

308. In pertinent part, the Second Response alleged Respondent's Second Motion failed to (Stip 145):

    a.    include Respondent's disciplinary history in the Eastern District of Pennsylvania (¶ 3(a));

    b.    comply with Pa.R.Civ.P. 1012.1(b), in that it failed to state that the information required by IOLTA regulations had been provided to the IOLTA Board (¶ 4(a)); and

    c.    comply with Pa.R.Civ.P. "1012.1(d)(2)(iii)," in that it failed to state any proceeds from a settlement would be handled in accordance with RPC 1.15. (¶ 4(b)).

309. Judge Djerassi, by Order docketed on September 1, 2020 (ODC-71/Bates 663), ruled that upon consideration of the Second Response to Plaintiff's Second Motion for Admission *Pro Hac Vice*, that within twenty days, Respondent should (Stip 146):

a.  either file a written reply explaining why the Court should not deny with prejudice Respondent's Second Motion for Mr. Scordo's *pro hac vice* admission; or

b.  file a praecipe before the twentieth day of its Order, withdrawing Respondent's Second Motion and seek the assistance of another Pennsylvania attorney to move for Mr. Scordo's admission.

310. Judge Djerassi also "encouraged [Respondent] to exercise caution" as "Rules of Professional Responsibility may be implicated here and full disclosure is the essence of a successful *pro hac vice* application." (Stip 147)

311. On September 18, 2020, Respondent withdrew his appearance on behalf of American Club of Beijing. (Stip 148)

312. Having failed twice to file a correct *Pro Hac Vice* motion and having twice failed to fully disclose his disciplinary hearing, Respondent assigned Scott Wiggins, Esquire, an associate with Lento Law Group, P.C., to do so. (NT V, 52)

313. As the supervising attorney for Mr. Wiggins, Respondent failed to explain to Mr. Wiggins "what would be needed to make sure that [the *Pro Hac Vice* motion] was done in full compliance." (NT V, 54)

314. On September 22, 2020, Mr. Wiggins filed a Motion for Admission *Pro Hac Vice* seeking to admit Mr. Scordo to handle *American Club*. (ODC-72/Bates 664, Stip 149)

315. Mr. Wiggins' Motion for Admission *Pro Hac Vice* failed to comply with Pa.R.Civ.P. 1012.1(b)(1)(i), (c)(1)(i) and (ii), and (d)(2)(i) and (iii). (Stip 150)

316. By Order dated October 19, 2020, Judge Djerassi, pursuant to Pa.R.Civ.P. 1012.1(e)(7) and (8), denied Mr. Wiggins' Motion for failing to comply with Pa.R.Civ.P. 1012.1(b)(1)(i), (c)(1)(i) and (ii), and (d)(2)(i) and (iii). (ODC-73/Bates 681, Stip 151)

130

317. Respondent testified that he was "mistaken" in his first filing, he "was trying in good faith" in the second filing, and "the ball was dropped" in the third filing. (NT III, 146)

318. Respondent admitted that his conduct in handling the *Pro Hac Vice* applications demonstrated a lack of competence in violation of RPC 1.1. (NT V, 55-56)

319. Respondent admitted that as the managing partner of Lento Law Group, P.C., with supervisory authority over his law firm's attorneys and support staff, Respondent violated RPC 5.1 and RPC 5.3 when he failed to make reasonable efforts to ensure that his law firm's employees acted with competence in drafting and filing motions. (NT V, 56)

320. Respondent admitted that the totality of his conduct in handling the *Pro Hac Vice* admission of Mr. Scordo was prejudicial to the administration of justice in violation of RPC 8.4(d) in that it needlessly expended the limited time and resources of the court system. (NT V, 57)

321. While Respondent admitted his misconduct, his testimony in certain key respects is not credible, and Respondent failed to express sincere remorse for his misconduct and recognize that his misconduct had a negative impact on the public and profession.

<u>Renee Dougalas Matter</u>

322. Renee Dougalas is a "recovering pharmacist" (NT I, 24) with an active pharmacy license in Texas and an inactive pharmacy license in Pennsylvania. (NT I, 22, 31)

323. Ms. Dougalas currently practices at a sterile compounding pharmacy and at an independent pharmacy, works with a doctor platform managing the pharmacies that

dispense for them, and owns a compliance company that ensures pharmacies stay compliant with state laws and helps them through pharmacy audits and credentialling. (NT I, 22-23)

324.    Ms. Dougalas is a recovering drug addict who over 20 years ago stole her daughter's father's prescription pad, forged prescriptions for Vicodin (a Schedule III controlled substance at that time, which is now Schedule II), and "wrote and falsified controlled substance prescriptions." (NT I, 27)

325.    Renee Dougalas (Stip 154):

    a.    was convicted in the following criminal matters in Pennsylvania (ODC-74/Bates 683):

        1.    *Commonwealth v. Renee Dougalas*, No. CP-40-CR-0001221-1995 (on 9/25/1996, convicted of Knowing Possession of a Controlled Substance (M), 35 Pa.C.S. § 780-113(a)(16));

        2.    *Commonwealth v. Renee Dougalas*, No. CP-40-CR-0002286-1996 (on 1/30/1997, convicted of Acquisition of a Controlled Substance by Misrepresentation (F), 35 Pa.C.S. § 780-113(a)(12) (two counts); and Knowing Possession of a Controlled Substance (M) (two counts)); and

        3.    *Commonwealth v. Renee Dougalas*, No. CP-40-CR-0002631-1998 (on March 31, 1998, convicted of Acquisition of a Controlled Substance by Misrepresentation (F), 35 Pa.C.S.A. § 780-113(a)(12) (eleven counts).

    b.    had an inactive criminal case docketed at MJ-1102-CR-000005-1999 charging purchase of drug-free urine (M) in violation of 18 Pa.C.S.A. § 7509(a); and

    c.    had a disposed case docketed at CP-40-MD-0001614-1999, under the Uniform Criminal Extraditions Act, 42 Pa.C.S.A. § 1921 (S).

326.    On June 25, 1999, Ms. Dougalas was convicted in the following criminal matter in New Jersey: (ODC-75/Bates 702, Stip 155)

    a.    *State of New Jersey v. Renee Dougalas*, Indictment No. 99-06-0558 (Mercer County, New Jersey) of Eluding Police, NJ 2C:29-2b (3rd degree), and Possession Controlled Substances, NJ 2C:35-10a(1) (3rd degree).

327.    In 2004, Ms. Dougalas entered drug treatment and attained her sobriety (NT I, 29); thereafter, Ms. Dougalas petitioned for reinstatement of her pharmacy license in Pennsylvania, had a hearing, and was granted reinstatement in 2010. (*Id.*)

328.    Ms. Dougalas subsequently relocated to Texas (NT I, 21) and decided she wanted to expunge or seal her criminal records in Pennsylvania and New Jersey. (Stip 156)

329.    Ms. Dougalas had done some legal research and "felt that [she] needed some good legal advice about the Clean Slate Act and if there was anything [she] could do about old felonies." (NT I, 91)

330.    On February 19, 2020, Ms. Dougalas left a message on a Clean Slate lawyer website (NT 1, 33, 95; ODC-76/Bates 703):

    a.    explaining that she had criminal convictions that were "20 plus years old";

    b.    stating that she wanted "to apply for clean slate"; and

    c.    inquiring whether Respondent could "help" her.

331.    At the time Ms. Dougalas left the message, she:

    a.    "absolutely knew the difference between a felony and a misdemeanor conviction" (NT I, 34);

    b.    "absolutely knew [she] had thirteen felony convictions" (*id.*);

    c.    knew how to use the Unified Judicial System portal to obtain a record of her convictions (*id.*); and

    d.    knew she had written a prescription for Vicodin, which was then a Schedule III controlled drug. (*Id.*)

332. Respondent called Ms. Dougalas in response to the message she had left on the website, during which time, Ms. Dougalas advised Respondent she:

 a. had "felony and misdemeanor convictions" (NT I, 96, 97);

 b. was considering a real estate license and her felony convictions come up as a background issue (*id.* at 35);

 c. had researched the difference between New Jersey and Pennsylvania Clean Slate laws (*id.*);

 d. had contacted New Jersey and was told she could file the expungement papers herself (*id.*);

 e. was "confused" whether she qualified in Pennsylvania "because of the time span." (*id.*);

 f. explained that her "main concern was the felony convictions because they follow [her] around anywhere" (*id.* at 36); and

 g. wanted to know if she qualified for Clean Slate to clean up her record. (*Id.*)

333. The Clean Slate Limited Access Act (Clean Slate Act), 18 Pa.C.S. § 9122.2 *et. seq.* (ODC-81/Bates 711), provides for granting limited access to criminal history record information for some misdemeanor convictions, summary offenses, pardons, and dispositions other than convictions. (Stip 165)

334. Section 9122.3 of the Clean Slate Act (ODC-82/Bates 713) lists exceptions to granting limited access to criminal records as follows (Stip 166):

 (a) Limited access for records under section 9122.2(a)(1) (relating to clean slate limited access) shall not be granted for any of the following:

  (1) An individual who at any time has been convicted of:

   (i) a felony;

       (ii)      two or more offenses punishable by imprisonment of more than two years;

       (iii)     four or more offenses punishable by imprisonment of one or more years.

335. While on the telephone with Respondent, Ms. Dougalas sent Respondent the dockets from her Pennsylvania and New Jersey cases. (NT I, 36-38); *See* ODC-77/Bates 704-705, ODC-78/Bates 706, ODC-130/Bates 933; ODC-131/Bates 934)

336. Respondent did not take any notes of his conversation with Ms. Dougalas. (NT IV, 55)

337. Respondent failed to recall:

    a.    looking at Ms. Dougalas' criminal dockets (NT IV, 166, 185);

    b.    asking Ms. Dougalas the schedule of the drug for which she was convicted of forging prescriptions (*id.* at 64, 68);

    c.    asking Ms. Dougalas if she had any felony convictions. (*id.* at 58, 59, 61, 105, 139, 160, 161); and

    d.    Ms. Dougalas informing Respondent of her felony convictions. (*Id.* at 62, 63, 66, 101, 106)

338. Respondent's testimony that he did not communicate with Ms. Dougalas regarding the felony convictions is not credible, given that the reason for the retention concerned the extent of her criminal record.

339. In Respondent's Answer to the Petition for Discipline, Respondent:

    a.    falsely claimed that Ms. Dougalas had never informed him that she had felony convictions that were over 20-years old (ODC-2, ¶161(A)/Bates 108) (NT I, 53); and

    b.    falsely claimed that during the initial call, Ms. Dougalas did not advise Respondent she had any prior felony convictions (ODC-2, ¶ 161(G)/Bates109). (NT I, 54)

67

135

340. Ms. Dougalas credibly testified that all of Respondent's Petition for Discipline Answers in which Respondent claims that Ms. Dougalas never informed him that she had prior felony convictions are "not true." (NT I, 55)

341. At no time during Respondent's conversation with Ms. Dougalas, did Respondent:

      a.      inform Ms. Dougalas that her felony convictions could not be sealed (NT I, 41); and

      b.      explain to Ms. Dougalas that the Clean Slate Act prohibited the sealing of her felony convictions. (*Id.* at 42)

342. Respondent advised Ms. Dougalas that his total legal fee would be $5,500 plus filing fees (Stip 158(f)).

343. Ms. Dougalas agreed to have Respondent represent her and emailed Respondent all her contact information. (Stip 158(g))

344. Had Respondent informed Ms. Dougalas that the Clean Slate Act prohibited the sealing of Ms. Dougalas' thirteen felony convictions, Ms. Dougalas would not have continued her conversation about retaining Respondent because "if it's still there, it still follows me. It's a bad investment. Why would I do it?" (NT I, 42)

345. Ms. Dougalas reiterated that had Respondent informed her that her felony convictions did not "qualify for anything," it would have been the "[e]nd of the conversation right there." (NT I, 113)

346. The criminal dockets revealed that Ms. Dougalas was arrested and held over for trial on felony charges. (ODC-133/Bates 936-37)

347. Respondent knew the criminal dockets he received from Ms. Dougalas did not contain the grading for all her convictions. (NT III, 164)

68

136

348. Respondent failed to possess the competence necessary for the representation in that:

    a.    Respondent was only concerned about the inactive case on the dockets and not concerned about Ms. Dougalas' ungraded convictions (NT IV, 154, 157); and

    b.    prior to December 2020, Respondent failed to read Ms. Dougalas' criminal dockets in detail. (*Id.* at 200)

349. Although Respondent knew the criminal dockets that he received from Ms. Dougalas did not contain the grading for all her convictions, by email to Ms. Dougalas sent at 5:59 p.m. EST on February 19, 2020, Respondent wrote explaining his scope of work and fee (ODC-78/Bates 706, D-38, Stip 160); Respondent wrote that:

    a.    he would "be seeking a record sealing of the 3 applicable cases in Luzerne County and an expungement of the 2 applicable cases in Luzerne County";

    b.    he would "also be seeking an expungement of the applicable New Jersey case";

    c.    Respondent's reduced fee would be $5,500, plus fees and costs; and

    d.    Respondent would get started working with an initial payment of $2,500 and the balance paid over the course of the next several weeks.

350. "[B]ased upon the dockets that [Ms. Dougalas] sent [Respondent]," Ms. Dougalas assumed that "three applicable" and "two applicable" referred to her misdemeanor and felony cases. (NT I, 57)

351. At 6:19 p.m. EST on February 19, 2020, Ms. Dougalas attached her PA dockets again and replied: "Atty Lento please see attached. Isn't it PA: 4 CP and 2 MJ cases." (ODC-78/Bates 706, 130/Bates 932, Stip 161) At 7:46 a.m. on February 20, 2020, Respondent confirmed, "I understand." (ODC-79/Bates 707)

352. On February 20, 2020, at 6:18 a.m. EST, Respondent sent an email to Ms. Dougalas that (Stip 162):

a. requested Ms. Dougalas to provide him with a detailed autobiography and character letters so that Respondent "can provide positive information and character letters to the Luzerne County District Attorney's Office/Mercer County Prosecutor's Office in an effort to get them to agree to our request" (ODC-79/Bates 707); and

b. attached an Engagement Letter for Ms. Dougalas to sign, date, and return to Respondent's office. (ODC-80/Bates 709)

353. Respondent's Engagement Letter (ODC-80/Bates 709) provided:

a. Respondent would "be seeking a record sealing of the 3 applicable Luzerne County, PA cases, and expungement of the 2 applicable Luzerne County PA cases, and an expungement of the Mercer County, NJ case";

b. noted that Ms. Dougalas' case docketed at MJ-11102-CR-0000005-1999 was listed as "inactive" and Respondent needed to follow up on this case;

c. Respondent's legal fee was $5,500 plus filing fees and costs; and

d. Respondent received $2,500 from Ms. Dougalas as of the date of the Engagement Letter.

354. The five cases that Respondent referenced in his email included all the felony and misdemeanor convictions that Ms. Dougalas was seeking to seal under the Clean Slate Act, including thirteen felonies. (NT I, 60, 62)

355. Later that same day, Respondent and Ms. Dougalas signed and dated Respondent's Engagement Letter. (Stip 164)

356. Respondent's Engagement Letter acknowledged Ms. Dougalas' payment of $2,500 and provided that the balance of the fee was to be paid upon the request of the Lento Law Firm. (NT I, 64)

70

138

357. Nowhere in Respondent's email or Engagement Letter did Respondent write that he cannot seal Ms. Dougalas' thirteen felony convictions. (NT I, 62)

358. Respondent failed to inform Ms. Dougalas that "he cannot do anything about [her] felony convictions until a year later approximately." (NT I, 62)

359. Ms. Dougalas would not have agreed to pay Respondent $5,500 if she knew that her felony convictions could not be sealed and "could have put the money somewhere else." (NT I, 63)

360. By email to Respondent sent at 4:07 p.m. on February 20, 2020, Ms. Dougalas provided Respondent with most of the information and documents that Respondent had requested in his morning email, including her "autobiography." (ODC-83/Bates 714, Stip 167)

361. Ms. Dougalas provided Respondent with all the information he had requested within four days of Respondent's request. (NT I, 65)

362. By email to Ms. Dougalas sent at 6:14 a.m. on March 24, 2020, Respondent advised Ms. Dougalas that her New Jersey expungement was almost complete. (Stip 168)

363. From time to time thereafter, Ms. Dougalas wrote emails to Respondent inquiring about the status of all her legal matters. (ODC-84/Bates 719-725) See, e.g., emails sent at (Stip 169):

    a.    10:37 a.m. on May 15, 2020;

    b.    1:24 p.m. on July 20, 2020;

    c.    11:15 a.m. on August 21, 2020;

    d.    12:46 p.m. on September 4, 2020;

    e.    10:08 a.m. on October 16, 2020;

71

139

f.     6:12 p.m. on December 4, 2020; and

g.     12:56 p.m. on January 25, 2021.

364.   At no time during the foregoing email correspondence did Respondent inform Ms. Dougalas that her Luzerne County felony convictions were not eligible for Clean Slate limited access as they were listed as specific exceptions under the Act. (Stip 170)

365.   Except for Ms. Dougalas' inactive Luzerne County case, Respondent did not raise any concerns about sealing Ms. Dougalas' criminal records. (NT I, 70)

366.   At no time after Respondent's initial conversation with Ms. Dougalas, did Respondent inform Ms. Dougalas that:

a.     her criminal dockets were unclear regarding the grading of her offenses (NT I, 67, 100); and

b.     he needed to obtain the State Police records because the grading of her convictions was not clear. (*Id.* at 67, 100)

367.   Respondent's "attorney helper," Marco J. Capone, Esquire, advised Respondent on March 18, 2020, that Ms. Dougalas' convictions were so old he could not ascertain the grading of her convictions and complete the petitions for expungement. (D-39, -40, -41; NT III, 176; NT IV, 205),

368.   After receiving Mr. Capone's email, Respondent did not ask Ms. Dougalas if she had any information about the grading of her convictions as "it wasn't a question in his mind." (NT IV, 210)

369.   Respondent did not order the State Police records to ascertain the grading of Ms. Dougalas' convictions until mid to late October 2020. (NT III, 183; NT IV, 119, 212-213)

a.   Respondent failed to act with reasonable diligence and promptly obtain the State Police records.

b.   Respondent failed to possess the competence necessary for the representation and do anything prior to October 2020 to ascertain the grading of Ms. Dougalas' convictions.

370.   Ms. Dougalas had been making periodic payments to Respondent, and prior to July 20, 2020, Ms. Dougalas had not received any bills or correspondence from Respondent about money owed. (NT I, 169)

371.   Respondent's Letter of Engagement provides that payment of the balance of his legal fee is due upon request. (ODC-80/Bates 709) Prior to July 20, 2020, Respondent did not make any requests for payment of the balance of his fee. (NT I, 69)

372.   After learning on July 20, 2020, that Respondent was waiting for payment of the balance of his fee, Ms. Dougalas promptly paid the balance. (NT I, 69-70)

373.   Respondent admitted that he did not request the balance of Ms. Dougalas' legal fee until Ms. Dougalas inquired about the status of her case. (NT III, 181)

374.   Respondent's Petition For Discipline Answer, ¶ 157 (ODC-2/Bates 107) and testimony (NT III, 77), claiming that Respondent's receipt of Ms. Dougalas' background check information was delayed because Ms. Dougalas did not timely pay his fee, is false.

375.   By emails to Assistant District Attorney Chester Dudick, Luzerne County, on September 28, and October 19, 2020 (ODC-85/Bates 726), Respondent (Stip 171):

a.   advised that Respondent was working on "several expungements/record sealings" for Ms. Dougalas;

b.   explained that "[a]ccording to my research, 3 would be eligible for record sealing and 2 would be eligible for an expungement"; and

c.   noted that the matter docketed at MJ-11102-CR-1999 was listed as "inactive" and inquired whether the District Attorney's office would automatically object if Respondent moved for expungement/sealing of the closed cases because of the unresolved inactive matter.

376. Respondent failed to act with the competence necessary for the representation when he contacted the District Attorney's Office without first ascertaining the grading of Ms. Dougalas' convictions and "operating under the impression that they don't involve felonies." (NT IV, 223-224)

377. By email to Ms. Dougalas sent at 6:20 a.m. on October 19, 2020, Respondent wrote (ODC-86/Bates 728):

    a.    the New Jersey expungement is proceeding through the process and he anticipates a hearing date to be scheduled shortly; and

    b.    he had been trying to contact the District Attorney's Office regarding resolving the outstanding "inactive" criminal matter, which will impact the expungements of the other Luzerne County criminal cases.

378. Respondent received the Pennsylvania State Police Background Check in December 2020. (NT IV, 234)

379. Respondent's receipt of the Background Check` was the first time Respondent "saw confirmation that [Ms. Dougalas] had felony convictions." (NT IV, 234)

380. By email to Ms. Dougalas sent at 7:02 a.m. on January 28, 2021 (ODC-87/Bates 729), Respondent wrote that (Stip 173):

    a.    the New Jersey expungement should be finalized shortly;

    b.    "[o]nce the Pennsylvania process is complete, [Respondent] anticipate[s] the final result being":

        1.    record sealing for one misdemeanor charge;

        2.    expungement of one summary offense;

        3.    a record sealing for one misdemeanor charge;

        4.    "a felony charge that was not able to be addressed";

5.    "There is also one other case which had 11 felony charges which was not able to be addressed" because Respondent "could not have these charges sealed or expunged"; and

6.    an inactive case that Respondent has been trying to have closed.

c.    Ms. Dougalas' "record will be significantly cleaned up once everything is complete, but there will be remaining charges which cannot be sealed or expunged"; and

d.    it "may be worth considering a pardon" of Ms. Dougalas' felony convictions after Respondent resolved the inactive case.

381.    Respondent did not have Ms. Dougalas' State Police Background Check at the time he drafted the email to Ms. Dougalas, having purportedly mailed the Background Check to the Luzerne County Clerk's Office. (NT IV, 261)

a.    Respondent failed to possess the competence necessary for the representation and keep a copy of the Background Check for his files; and

b.    Respondent failed to communicate with Ms. Dougalas and send her a copy of her Background Check and his purported filing with Luzerne County.

382.    Upon receiving Respondent's January 28, 2021 email, Ms. Dougalas felt:

a.    "lied to and grifted"; (NT I, 72);

b.    "[i]t's kind of comical" to assert her record was going to be significantly cleared up when by getting "rid of two misdemeanors sitting over there, but you have thirteen felonies staring me in the face" (*id.* at 73);

c.    "violated" (id. at 77); and

d.    that Respondent's receipt of $5,500 "hurt [her] and [her] family" when she was going through a "really bad, expensive divorce." (*Id.*)

383.    By emails to Respondent on the morning of January 28, 2021 (ODC-88/Bates 730), Ms. Dougalas wrote at (Stip 174):

75

143

a. 7:48 a.m., "why can't the other felonies be addressed in cases 3 and 4? In reading clean slate if your record is clear over 10 years with no new charge you qualify. Doesn't seem worth the money to do this if things are still left on";

b. 8:24 a.m., that "[i]f I had known I could not do anything with the pa felony convictions I would not have gone through this process or spent the money. Cleaned up record is just as bad as the original record"; and

c. 8:55 a.m., that over one year ago when Respondent called her, Ms. Dougalas "made clear about [her] felonies in PA and NJ," "sent you [Respondent] the dockets the same day," Respondent "never disclosed in the initial consult that nothing could be done with felonies in PA" and had she "known that," she "never would have moved forward," "as a client I made my goals clear to clean up my entire record," and her retaining Respondent was "clearly" a "waste of [her] money."

384. Thereafter, by emails to Mr. Altman (ODC-89/Bates 732), Respondent:

a. forwarded Ms. Dougalas' emails and wrote at 9:59 a.m. on January 28, 2021, "this is not accurate but..";

b. sent at 8:15 a.m. on January 29, 2021, Respondent's draft response to Ms. Dougalas; and

c. asked Mr. Altman to review Respondent's draft response, which Respondent finalized and sent on February 8, 2021.

385. Eleven days later, on February 8, 2021, Respondent wrote at 8:00 a.m. (ODC-89/Bates 732):

a. "[a]t no time do I ever state that felonies (or misdemeanors) can be expunged"; and

b. "[b]y the nature of what we were in part prospectively seeking, namely, a record sealing of applicable cases, there would arguably be no fundamental relief because sealed records still exist and must be disclosed as applicable."

386. At 10:36 a.m. on February 8, 2021, Ms. Dougalas replied (ODC-78/Bates 706, last email at bottom of page and continued on ODC-90/Bates 734 top of page):

76

144

a. during Respondent's initial telephone conversation with her, she "told you [Respondent] about [her] past situations and the resultant FELONIES and misdemeanors that resulted therefrom";

b. "[w]hile on the telephone [she] emailed you [Respondent]" the dockets" that "clearly outlined" her charges;

c. had Respondent "told" Ms. Dougalas that "'I cannot expunge or seal the Felony charges in PA,'" then Ms. Dougalas "would never have engaged" Respondent's legal services; and

d. "[n]ot until one year later" did Respondent inform her that she "cannot seal/expunge" her felonies in Pennsylvania.

387. On March 22, 2021, Respondent filed a Petition for Expungement with attached Background Check on behalf of Ms. Dougalas. (NT IV, 237)

388. Respondent failed to: review the Petition with Ms. Dougalas prior to its filing; advise Ms. Dougalas that he had filed a Petition; keep Ms. Dougalas informed about the status of her case; keep a copy of the Petition and Background Check in his office files; and provide Ms. Dougalas with a copy of the filed Petition and Background Check. (NT IV, 250-251)

389. On March 24, 2021, Ms. Dougalas sent an email to Respondent requesting a copy of the New Jersey filing Respondent claimed to have made on behalf of Ms. Dougalas, a receipt from New Jersey for the filing, and a refund of Respondent's unearned fee for Respondent's handling the "sealing" of her Luzerne County felony convictions. (ODC-90/Bates 734, Stip 177)

390. Respondent failed to send Ms. Dougalas copies of: correspondence with the Luzerne County District Attorney's office; drafts of pleadings; copies of pleadings he filed on her behalf in Pennsylvania; and Ms. Dougalas' PA State Police criminal records. (NT I, 78-79, 81; NT IV, 294)

77

145

391. Respondent sent Ms. Dougalas a copy of her New Jersey records in the spring of 2021. (NT I, 80; NT IV, 219)

392. By email to Respondent at 8:24 a.m. on May 14, 2021, Ms. Dougalas (ODC-91/Bates 735):

    a.    reiterated her request for a refund;

    b.    requested "a copy of any document and notes on [her] case";

    c.    advised that New Jersey had forwarded her what she "need[s] to handle everything on [her] own";

    d.    reminded Respondent that at her initial consult, Respondent "never said I cannot do anything about my [her] felonies";

    e.    explained that had Respondent given her "an honest consult I would not have engaged [him]. That is the heart of the matter"; and

    f.    informed Respondent that she had filed a complaint with the PA Bar association.

393. Upon the termination of the representation, Respondent failed to comply with Ms. Dougalas' request for a surrender of her documents and client file. (NT I, 81)

394. On the advice of Ms. Dougalas' attorney in Texas (NT I, 85), Ms. Dougalas filed a complaint with Office of Disciplinary Counsel because she "was an honest client, put all her cards on the table, and I should have been advised on day one that I did not qualify for anything because of my felonies....Because if he did it to me, he's doing it to other people too." (*Id.* at 86)

395. On June 16, 2021, Ms. Dougalas filed a Statement of Claim with the Fund. (ODC-92/Bates 736, Stip 180)

78

146

396. In her Statement of Claim, Ms. Dougalas wrote she had a telephone consultation with Respondent about her "20 yr old felony & misdemeanors" and "wanted to see if I could expunge/seal. He said I could on all." (Stip 181)

397. On June 23, 2021, the Fund advised Respondent that Ms. Dougalas had filed a Statement of Claim with the Fund; by letter to Ms. Dougalas dated July 7, 2021, Respondent enclosed a $5,500 check written from the operating account of Lento Law Firm, LLC and Joseph D. Lento, Esq., to Ms. Dougalas, with the notation "refund" in the memo portion of the check; following receipt of Respondent's letter, the Fund closed Ms. Dougalas' claim. (Stip 182)

398. Although Respondent testified that he had filed pleadings on behalf of Ms. Dougalas (NT III, 186), Respondent failed to introduce any exhibits to support his testimony. (NT III, 186, 188)

399. Respondent claimed it was "ludicrous" to question his handling of Ms. Dougalas' legal matter. (NT III, 190)

400. Respondent failed to recognize his wrongdoing in his handling of Ms. Dougalas' legal matter.

401. Respondent failed to express remorse for the harm his misconduct inflicted on Ms. Dougalas, the public, and the legal profession.

<u>La'Slondi Copelin Matter</u>

402. Respondent maintained a website address that as of August 16, 2021, advertised ODC-93/Bates 743) that Respondent (Stip 183):

    a.    "represents students and others in disciplinary cases and other proceedings at colleges and universities across the United States";

b.  "helped countless students, professors, and others in academia at more than a thousand colleges and universities across the United States";

c.  is "admitted pro hac vice as needed nationwide;" and

d.  is licensed in Pennsylvania, New Jersey, and New York.

403.  Ms. La'Slondi Copelin, a resident of Georgia, had an associate degree from Georgia State University (GSU) and had decided to return to school to obtain a four-year degree. (NT I, 184)

404.  On or before February 4, 2021, Ms. Copelin, received a letter notifying her that she would be expelled from GSU. (NT I, 185; Stip 184)

405.  The letter advised Ms. Copelin that she had 10 days to write an appeal to the GSU college president. (NT I, 185)

406.  Ms. Copelin called GSU and was "advised" that her letter "needed to be done by end of business day" on February 9, 2021. (NT I, 226)

a.  The GSU student handbook defines a "business day" as any day that the Office of the Dean of Students is open. (NT IV, 313)

407.  Ms. Copelin wanted to file an appeal, but did not want to handle the appeal herself, and decided that she needed an attorney to handle the appeal "[b]ecause it needed to be litigated. It was out of my hands, so—and I had tried initially, so I felt that I needed to go ahead and escalate it to someone of counsel who is familiar with the process." (NT I, 185)

408.  Ms. Copelin had discussed the pending expulsion matter with her family and friends, who likewise advised Ms. Copelin that she needed a lawyer. (NT I, 186)

409. Ms. Copelin did some research, "Googled 'school discipline attorneys,' and his [Respondent's] name popped up (NT I, 186); Ms. Copelin did not contact any attorneys other than Respondent to handle her matter. (*Id.*)

410. On February 4, 2021:

    a. prior to 10:01 a.m. Ms. Copelin contacted Respondent regarding her pending GSU expulsion;

    b. at 10:01 a.m., Respondent sent a text message to Ms. Copelin that (ODC-95/Bates 751-752):

        1. acknowledged receipt of Ms. Copelin's inquiry and stated that he would be available by telephone after 10:15 a.m. (Bates 751); was signed as follows (Bates 752):

        Attorney Joseph D. Lento
        Lento Law Firm
        Helping Clients Nationwide

        Additional Information:
        StudentDisciplineDefense.com

    c. at 11:27 a.m., Ms. Copelin replied that she had a break at 1:00 p.m., could call Respondent then, and in the meantime would send Respondent information to look at to see "what's going on." (Bates 753).

411. Ms. Copelin sent Respondent "everything that she had received from the school so he could be prepared for the phone consultation," including the expulsion letter and university rules. (NT I, 189)

412. Respondent spoke with Ms. Copelin at 1:00 p.m. on February 4, 2021, during which time:

    a. Ms. Copelin told Respondent she wanted a lawyer (NT I, 189);

b. Respondent stated that he "helps students nationwide," has "helped plenty of students in Georgia," and "he can take on this case and get it done" (*id.* at 190);

c. Ms. Copelin told Respondent about her February 9, 2021 deadline (*id.*) and that the deadline was "by end of business day" on February 9, 2021 (*id.* at 226);

d. Respondent reassured Ms. Copelin not to worry and "[w]e always get things done in the 11th hour" (*id.* at 190);

e. Respondent failed to inform Ms. Copelin that he was not licensed to practice law in Georgia: failed to explain his limitations because he was not licensed to practice law in Georgia, and never informed her that he could only act as her "advisor" (*id.*); and

f. Respondent failed to inform Ms. Copelin that he intended to "ghostwrite" a letter for her. (*Id.* at 191)

413. Respondent also negotiated a $350 telephone consultation fee with Ms. Copelin. (Stip 185)

414. Thereafter, at 4:15 p.m. on February 4, 2021, Respondent sent Ms. Copelin (Stip 186):

a. an email requesting information related to her school discipline case (ODC-96/Bates 754); and

b. a consultation agreement between the Lento Law Firm and Ms. Copelin charging a $350 consultation fee. (ODC-97/Bates 756)

c. Respondent charged his $350 fee to Ms. Copelin's credit card.

415. Respondent's email (ODC-96/Bates 755) was signed:

Joseph D. Lento, Esquire
Attorney & Counselor at Law
Lento
Law Firm
Helping Clients Nationwide

416. On February 5, 2021 (Stip 187):

150

    a.    Ms. Copelin returned a signed consultation agreement that was written on Lento Law Firm stationery (ODC-97/Bates 756); and

    b.    Respondent requested that Ms. Copelin call him at 1:45 p.m. the following day to discuss her case. (ODC-98/Bates 758)

417.    On February 6, 2021, Respondent had a telephone consultation with Ms. Copelin about her school discipline matter. (Stip 188)

418.    During the telephone consultation:

    a.    Keith Altman, Esquire, spoke with Ms. Copelin first about her legal matter in Georgia (NT I, 191);

    b.    Mr. Altman identified himself "[a]s an attorney who worked for Mr. Lento" (*id.* at 192);

    c.    Respondent joined the call approximately 15 minutes later and the total consult lasted approximately 30 minutes (*id.*);

    d.    Ms. Copelin explained she did not want to handle the case herself and needed a lawyer to handle it (*id.* at 192-193);

    e.    Ms. Copelin advised that the deadline was close of business on February 9, 2021, and Respondent and Mr. Altman agreed that they could submit a response by close of business on February 9th (*id.* at 193, 244);

    f.    Ms. Copelin agreed to retain Respondent (*id* at 195);

    g.    Ms. Copelin negotiated a $7,500 fee for Respondent's representation, Respondent having initially requested a $15,000 fee claiming he was giving her a break from $30,000 (*id.*);

    h.    Respondent agreed to send Ms. Copelin a retainer agreement with an "itemization of what the $7,500 is going to" cover and the "breakdown of" the payments (*id.* at 195); and

    i.    Respondent explained that his fee could be more if Ms. Copelin needed him to go to court. (*Id.* at 196)

419. During the consultation, Respondent and Mr. Altman failed to inform Ms. Copelin that they could not act as her attorney in Georgia and she could only hire Respondent as an "advisor". (NT I, 193, 196, 197, 230)

420. Respondent's testimony that he informed Ms. Copelin that he would be her "advisor" and "ghostwrite" a letter for her appeal (NT IV, 311) is not credible.

421. Respondent explained that he charged a $7,500 fee to ghostwrite a letter because "[t]here were approximately 100 pages of documentation as part of the case . . . and being expelled from school can have a lifetime of consequences." (NT IV, 318)

422. Ms. Copelin would not have agreed to pay $7,500 to Respondent if she knew that he could not provide her with legal representation in Georgia. (NT I, 197)

423. Respondent attempted to charge an excessive fee.

424. Respondent informed Ms. Copelin that he was bringing in Mr. Altman to work on her case, but failed to inform Ms. Copelin that Mr. Altman was not licensed to practice law in Georgia. (NT I, 198)

425. Ms. Copelin testified that Respondent's Answer to the Petition for Discipline, in which:

    a.    Respondent denies that Ms. Copelin told him she needed an attorney to handle her school discipline case (ODC-2, ¶ 188(a)/Bates 118), is "a total fabrication." (NT I, 199); and

    b.    Respondent claims that during his multiple conversations with Ms. Copelin, he made it clear that he was serving as an advisor (ODC-2, ¶ 209(b)/Bates 125), "is not true." (*Id.*)

426. Ms. Copelin's testimony, that a conversation regarding Respondent being an advisor "never came up," was unequivocal and credible. (*See* NT I, 199)

427. By email to Ms. Copelin dated February 7, 2021, sent at 7:30 a.m. (ODC-99/Bates 759), Respondent (Stip 190):

a. explained that "[w]e can proceed with a payment of $2,500 at this time" and that Ms. Copelin was to make payment of $2,500 on February 14, 2021, and $2,500 on March 7, 2021;

b. inquired whether Ms. Copelin would "prefer [Respondent] using the card on file?"; and

c. stated if Ms. Copelin agreed to proceed, then Respondent's "office can process the payment today and Keith [Altman, Esquire] and I can proceed."

428. During Respondent's conversation with Ms. Copelin on February 7, 2021, Respondent agreed to send her a retainer agreement. (NT I, 200)

429. Respondent failed to send Ms. Copelin a fee agreement on February 7, 2021. (Stip 191)

430. By text message to Respondent sent at 3:37 p.m. on February 7, 2021, Ms. Copelin inquired as to "attorney Keith's last name?" (ODC-100/Bates 760, Stip 192)

431. By email to Respondent dated February 8, 2021, sent at 7:09 a.m., Ms. Copelin (Stip 193; ODC-101/Bates 761):

a. inquired as to the realistic odds of what would happen;

b. explained that she would leave school voluntarily to not have the expulsion documented on her transcript; and

c. requested that Respondent "call so [she] can remit payment."

432. By email to Ms. Copelin dated February 8, 2021, sent at 7:49 a.m. (ODC-101/Bates 761), Respondent replied (Stip 194):

a. it was impossible to provide odds of success, but if Respondent were involved, the "chances of a better outcome increase, if not significantly increase";

b. it would be difficult to avoid a transcript notation, "so the only viable option is to try to maneuver for a suspension or less and go back to school"; and

85

153

c.    that his "colleague's name is attorney Keith Altman."

433.    Respondent did not call Ms. Copelin to obtain her payment information. (Stip 196; NT I, 202-203)    Respondent claimed that "I don't call clients, as a matter of practice, to collect money." (NT III, 201)

434.    To the extent Respondent does not call back clients to obtain payment information, Respondent failed to communicate with Ms. Copelin and send an email or text message to Ms. Copelin requesting that she call him back with her payment information.

435.    Respondent did not inform Ms. Copelin that he:

a.    would not begin working on her letter until he had received payment; (NT IV, 332); and

b.    would not represent her until she made payment. (*Id.* at 341)

436.    Respondent failed to send a retainer agreement as Ms. Copelin had requested. (NT I, 203)

437.    When Ms. Copelin did not hear back from Respondent on February 8, 2021, as "the deadline was approaching, [Ms. Copelin] took it upon [her]self to go ahead and write" a letter to the college president and "to plead [her] case." (NT I, 203)

438.    Ms. Copelin sent the letter she had written directly to the college president. (NT I, 203; *see also* NT I, 240-241)

439.    At 9:51 a.m. on February 9, 2021, Ms. Copelin called Respondent's office, during which time:

a.    Ms. Copelin informed Respondent that she had written and sent her own letter to the GSU president (NT I, 204, 210);

b.    Ms. Copelin explained that she was still willing to pay Respondent's fee to represent her (*id.* at 204-205);

86

154

c. Ms. Copelin gave Respondent her credit card information to charge the first $2,500 installment of his fee (ODC-102);

d. Respondent agreed to send a fee agreement to Ms. Copelin (Stip 197); and

e. Respondent told Ms. Copelin "don't worry, he'll get" a letter to the college president by close of business on February 9, 2021. (NT I, 206)

440. At 10:51 a.m. on February 9, 2021, Respondent charged $2,500 to Ms. Copelin's credit card. (ODC-102/Bates 762, Stip 198)

441. Respondent did not call GSU to confirm the hours and the time for close of business. (NT IV, 314)

442. Ms. Copelin explained that although she had written a letter to the college president herself, she wanted Respondent to *also* write a letter on her behalf "[b]ecause I was still giving him an opportunity to represent me. Because I still had a shot, and it was a stronger shot if I had representation than just my letter." (NT I, 204)

443. Ms. Copelin stated that she was "agreeing to pay for the representation" as Respondent "was my attorney. He was going to represent me throughout this whole ordeal." (NT I, 205)

444. Prior to accepting payment from Ms. Copelin, Respondent failed to inform Ms. Copelin that he was not licensed to practice law in Georgia and could not represent her as an attorney. (NT I, 205)

445. Prior to accepting payment from Ms. Copelin, Respondent failed to inform Ms. Copelin that she was hiring him only to act as an "advisor." (NT I, 190, 196, 216)

446. The GSU Code of Conduct provides that an "advisor" may not advocate or participate directly during the investigation and hearing process. (NT IV, 387)

447. Ms. Copelin would not have agreed to pay Respondent's $7,500 fee if she knew that Respondent was not representing her as an attorney "[b]ecause [she] never looked for anybody other than an attorney. So I wasn't looking for an advisor." (NT I, 205)

448. Ms. Copelin's testimony, that she "paid for counsel to represent" her, is credible and unequivocal. (NT I, 230)

449. Respondent failed to provide Ms. Copelin with a written fee agreement that set forth the basis and rate of his legal fee.

450. By email exchange between Mr. Altman and Ms. Copelin on February 9, 2021 (Stip 199):

    a.    at 10:32 a.m., Mr. Altman inquired whether Ms. Copelin had submitted a written response to the President of GSU (D-63);

    b.    at 5:10 p.m., Mr. Altman asked Ms. Copelin if she had sent a "letter to the president already?" (ODC-103/Bates 763);

    c.    at 5:46 p.m., Ms. Copelin replied that she sent a letter to "his secretary or whoever the admin person." (*id.*);

    d.    at 6:00 p.m., Mr. Altman stated that he would "create an additional document from" him (*id.*);

    e.    at 7:30 p.m., Mr. Altman requested that Ms. Copelin review his letter to the president so he could send it out (*id.*); and

    f.    Ms. Copelin only had time to review the letter for grammar and spelling. (*Id.* at 211-212)

451. Ms. Copelin explained that she was unable to promptly respond to Mr. Altman's email sent at 10:32 a.m. because she was at work and not permitted to have her personal email account on her work computer. (NT I, 207, 210)

452. At 8:05 p.m. on February 9, 2021, Mr. Altman sent an email (ODC-104/Bates 766) with an attached letter to GSU President Becker from Respondent (ODC-105/Bates 767, Stip 200):

a. the text of the email stated that it was from "Keith Altman, The Law Office of Keith Altman" and that Mr. Altman is licensed in California and Michigan; and

b. the attached letter was on stationery with letterhead from "Lento Law Firm" and signed by Respondent with a footnote indicating Respondent is "[l]icensed in New York, New Jersey, and Pennsylvania."

453. In the text of the letter, Respondent argued that Ms. Copelin should not be expelled because (Stip 201):

a. it would "impose a punishment so severe that she will not have an opportunity to earn a degree";

b. expulsion "does not serve any useful purpose and appears to be retribution";

c. "no rationale was provided [as] to why expulsion was the most appropriate disciplinary option";

d. Respondent's review of GSU "policies shows no guidelines for the imposition of such a severe sanction";

e. an expulsion "appears to be arbitrary and capricious" and "seems disproportionate to [Ms. Copelin's] misconduct"; and

f. a suspension is "an adequate consequence of [Ms. Copelin's] actions."

454. By email to Ms. Copelin sent at 8:06 p.m. on February 9, 2021, Mr. Altman wrote "Forgot to copy you" and attached a copy of his letter to President Becker. (ODC-104/Bates 766, Stip 204)

455. Respondent's letter to GSU:

    a.    was written on stationery from Lento Law Firm that states Respondent is licensed to practice law in Pennsylvania, New Jersey, and New York;

    b.    included Respondent's email address of joseph@StudentDisciplineDefense.com;

    c.    put forth legal and substantive arguments as to why Ms. Copelin should be suspended and not expelled from GSU;

    d.    was signed "Joseph Lento, Esq."; and

    e.    added a "cc" of Respondent's letter to "Keith Altman, Esq."

456. Respondent's:

    a.    law firm website advertises that Respondent practices education law and provides student discipline defense (Stip 208);

    b.    email correspondence with Ms. Copelin on February 6, 7, 8, and 9, 2021, omits the fact that Respondent was being retained, for a fee of $7,500, as a non-legal "advisor" for Ms. Copelin's school disciplinary matter;

    c.    correspondence to President Becker does not identify himself and Mr. Altman as acting as an "advisor" to Ms. Copelin (NT IV, 369-370); and

    d.    correspondence to President Becker does not contain any disclaimer that Respondent is not representing Ms. Copelin in his legal capacity when Respondent's correspondence is written on his law firm's legal stationery, makes legal arguments, and is signed by Respondent with the title "Esq." (NT IV, 370).

457. Neither Respondent nor Mr. Altman are licensed to practice law in Georgia.

(Stip 202)

458. Respondent engaged in the unauthorized practice of law in Georgia (GA RPC 5.5(a)) by:

    a.    taking a fee from Ms. Copelin for providing legal advice, writing a letter on his law firm stationery advocating on her behalf to GSU and depositing the fee in his law firm business operating account (NT IV, 374); and

90

b. "bring[ing] [his] expertise to the table regarding the matter and help[ing] accordingly." (NT III, 206)

459. Respondent agreed that his negotiating on behalf of a student with a university outside of the appeal process "could be" providing legal services. (NT IV, 395-396)

460. Ms. Copelin had not realized that Respondent and Mr. Altman were not members of the Georgia Bar prior to Ms. Copelin's receipt of the letter Respondent and Mr. Altman sent to the GSU college president, wherein Respondent had a footnote setting forth his bar membership and Mr. Altman's signature line set forth his bar membership. (NT I, 213)

461. Ms. Copelin explained that when she read the letter to the GSU president, she:

a. was "confused" because Respondent stated that he practiced "nationwide" and "Georgia wasn't listed" (NT I, 214);

b. was concerned that if GSU would "see the signature, they know these people can't even represent" her (*id.* at 215); and

c. felt it "wasn't honest and they wrote something on [her] behalf and they weren't legally able to represent" her. (*Id.*)

462. By email to Respondent and Mr. Altman sent at 11:29 p.m. on February 9, 2021 (ODC-106, Bates 769), Ms. Copelin replied that:

a. time was "of the essence" and Respondent's "letter was not sent timely";

b. Respondent failed to copy Ms. Copelin on the letter sent to GSU;

c. Respondent failed to advise Ms. Copelin that the letter could not be sent before the end of the business day;

91

d.   Respondent and Mr. Altman were not licensed to practice law in Georgia; and

e.   Respondent failed to send a retainer agreement as Ms. Copelin had requested and Respondent had repeatedly agreed to do.

463.   By reply email to Ms. Copelin with a "cc" to Mr. Altman, sent at 8:37 a.m. on February 10, 2021 (ODC-107/Bates 771), Respondent:

a.   alleged that "we are disturbed by your tone";

b.   claimed the letter to President Becker was sent timely because if the letter "was due at a specific time, they would have needed to specify the time";

c.   blamed Ms. Copelin for waiting "most of the two calendar weeks until [she] reached out to" Respondent;

d.   stated that "[w]e did everything we could given the fact that we were only officially retained yesterday";

e.   wrote that Respondent's "support of [Ms. Copelin] was not intended to be in a legal capacity at this time. It was as an advisor which you are allowed under the policies of the university";

f.   asserted that "there was insufficient time to get [Ms. Copelin] the retainer yesterday"; and

g.   informed Ms. Copelin that Respondent would only charge her for the first $2,500 because Respondent "completed the letter in support of [her] appeal on an expedited basis."

464.   Respondent's letter of February 10, 2021, was "the first time" that Respondent told Ms. Copelin that he would be acting only as Ms. Copelin's "advisor." (NT I, 216) Ms. Copelin felt that Respondent "was dishonest and that [she] should have been advised before he had taken [her] money." (Id.)

465.   By email reply to Respondent sent at 3:18 p.m. on February 10, 2021 (ODC-107/Bates 770), Ms. Copelin (Stip 209):

92

160

a.  rejected Respondent's claim that he was not hired as Ms. Copelin's attorney because: Ms. Copelin found Respondent's name listed on an internet website as an "education lawyer"; Ms. Copelin called Respondent "for representation"; Respondent contacted GSU on behalf of Ms. Copelin in his "legal capacity"; and if Respondent was not acting in his "legal capacity," then "why would [Respondent] be contacting [her] school writing a letter on [her] behalf past business hours?";

b.  explained that she "would never agree to pay $2500 just for a letter"; and

c.  advised that she did not authorize payment of $2,500 and instructed Respondent not to charge her credit card.

466.  Respondent did not promptly reply to Ms. Copelin's email. (NT I, 217)

467.  Thirteen days later, on February 23, 2021, Respondent replied to Ms. Copelin's email and blamed her for what had occurred, claiming (ODC-108/Bates 772):

a.  Ms. Copelin "did not retain [Respondent] until the morning that [her] appeal was due-February 9th";

b.  Respondent's "original intent" was to ghostwrite an appeal to be submitted by Ms. Copelin as if she had written it, but redrafted the letter under Mr. Altman's and Respondent's name only after Respondent learned that Ms. Copelin had already sent a letter under her name;

c.  that Ms. Copelin was "undoubtedly aware" that neither Mr. Altman and Respondent were members of the Georgia Bar and she "never raised any concerns or issues";

d.  Ms. Copelin's raising the issue of Respondent's and Mr. Altman's unauthorized practice of law "after the fact smacks of bad faith"; and

e.  Respondent was willing to refund $1,000 of the $2,500 charged "in the spirit of good faith."

468.  Respondent's February 23, 2021 email was the first time Ms. Copelin learned that Respondent had intended to "ghostwrite" a letter on her behalf and that she

93

161

"had never heard of such a thing. I did not call a ghostwriter. I did not call Ghostbusters. So I had no idea what he was referring to." (NT I, 217)

469. Ms. Copelin would not have agreed to pay Respondent $2,500 to ghostwrite a letter for her. (NT I, 217-218) Ms. Copelin explained that "initially, I had written a letter in my name and consulted with counsel so that they can go ahead and take this in a legal representation way." (*Id.* at 218)

470. Ms. Copelin rejected Respondent's offer of a $1,000 refund. (Stip 211)

471. Ms. Copelin then filed a complaint with Office of Disciplinary Counsel because she had informed Respondent that she "didn't have the money to spare initially. . . he took advantage of the situation. He preyed upon [her] urgency. . . he just took my money and just blew me off." (NT I, 220)

472. On June 4, 2021, Ms. Copelin filed a Statement of Claim with the Fund alleging that Respondent was "hired as student discipline attorney" and "sent a letter to my school after deadline." (ODC-109/Bates 774, Stip 212)

473. Ms. Copelin explained that she filed a Statement of Claim "because somebody was stealing my money off of false pretenses." (NT I, 223)

474. On June 11, 2021, Kathy Peifer Morgan, Executive Director and Counsel of the Fund, notified Respondent that Ms. Copelin had filed a Statement of Claim with the Fund; on July 7, 2021, Respondent wrote a letter to Ms. Copelin and enclosed a $2,500 check to Ms. Copelin, written from the operating account of Lento Law Firm, LLC and Joseph D. Lento, Esq., with the notation "client refund" in the memo portion of the check; after receipt of notice of Respondent's refund to Ms. Copelin, the Fund dismissed Ms. Copelin's claim against Respondent. (Stip 213)

### The Disciplinary Proceeding at No. 80 DB 2022

475. On June 3, 2022, Office of Disciplinary Counsel ("Petitioner") filed a Petition for Discipline against Respondent and charged him with violations of the Rules of Professional Conduct related to the six client matters set forth above.

476. On July 18, 2022, Respondent filed an Answer to the Petition.

477. Due to the anticipated length of the disciplinary hearing, by Order dated August 25, 2022, the Board Chair appointed former Board Member Stewart L. Cohen, Esquire, as Special Master, pursuant to Pa.R.D.E. 206(d), to conduct the hearing and submit a report to the Board.

478. The Special Master held prehearing conferences on November 1, 2022 and January 13, 2023.

479. The disciplinary hearing commenced on January 23, 2023. Petitioner entered exhibits ODC-1 through ODC-136 and 138, into evidence without objection. Petitioner also introduced the parties' Joint Stipulations into evidence. Respondent introduced exhibits, D1 through D-73 into evidence, with the exception of D-6 (last page), D-11, D-28, D-35, D-54, D-55, and D-74. Petitioner called three witnesses: Respondent's former clients Renee Dougalas, John Gardner, and La'Slondi Copelin.

480. Ms. Dougalas, Mr. Gardner, and Ms. Copelin credibly testified.

481. The hearing continued on January 24, 2023. Petitioner presented the testimony of two of Respondent's former employees, Joan Feinstein and Steven Feinstein. Ms. Feinstein and Mr. Feinstein credibly testified.

482. On January 25, 26, and 27, 2023, Respondent testified on his own behalf. Respondent called no additional witnesses.

483. Thereafter, the Special Master found that Petitioner had established at least one violation of the Rules of Professional Conduct.

484. The hearing resumed on March 6, 2023 and March 8, 2023, for the introduction of evidence pursuant to Disciplinary Board Rule § 89.151(b).

*Aggravating factors*

485. Respondent has a record of attorney discipline in Pennsylvania, New Jersey, and the United States District Court, Eastern District of Pennsylvania (EDPA):

a. (P-1/002) *Office of Disciplinary Counsel v. Joseph D. Lento,* No. 5 DB 2013 (S. Ct. Order 7/17/2013) (on consent) Respondent received a one-year suspension and a consecutive one-year term of probation with a practice monitor for violating RPC 5.4(a), 7.3(a), 8.4(a), 8.4(c), and 8.4(d);

b. (P-2/025) *In the Matter of Joseph D. Lento, An Attorney at Law,* No. D-13 September Term 2016, NJ Supreme Court Order (4/26/2017) (reciprocal one-year suspension); and

c. (P-3/0028) *In the Matter of: Joseph D. Lento,* No. 2:13-mc-00195-PD (EDPA) (reciprocal one-year suspension; and reinstatement petition withdrawn).

486. In the Pennsylvania suspension matter, Respondent's misconduct involved his wrongful attempts to solicit client referrals by requesting court employees to enter into a "mutually beneficial business arrangement" and refer potential clients to him.

487. Respondent's conduct in the instant matter betrayed the trust of his clients, who he deceived to retain him to handle their legal matters. (NT I, 109, 141, 152-153, 154-155, 170, 216-218, 220-221, 244-247).

488. Respondent failed to recognize or accept any wrongdoing in his handling of the Gardner, Dougalas, and Copelin matters.

489. Respondent failed to express sincere remorse and recognize the harm his misconduct inflicted on his clients, his former employees, and the legal profession.

490. Respondent failed to accept responsibility and blamed his employees, his clients, and other attorneys for his misconduct. (NT II, 277; NT III, 276; NT V. 22, 27, 34-35, 38; 43-44, 46-47; D-30, -71).

491. From 2015 until 2022, Respondent submitted false PA Attorney Annual Fee forms omitting his suspension in the EDPA. ODC-122/Bates 917 through ODC 128/Bates 925.

492. Respondent gave evasive answers to questions and his testimony is not credible. (NT III, 218, 219, 229, 230-233, 238, 249, 250, 253, 256-258, 262-264, 268, 319-321, 380-381, 388-392; NT V, 23-24, 28-29).

*Mitigating Factors*

493. At the hearing on March 6, 2023, Respondent presented the testimony of four character witnesses: Liam Riley, Esquire; Patricia M. Hoban, Esquire; Jason D. Schiffer, Esquire; and Walter J. McHugh, Esquire. At the hearing on March 8, 2023, Respondent presented the testimony of five additional character witnesses: David M. Simon, Esquire; Gary Garant, Esquire; Soleiman Raie, Esquire; Michael Canavan, Esquire; and Jeremy-Evan Alva, Esquire.

494. Respondent's character witnesses all testified that Respondent had a good reputation for being truthful, honest and law-abiding.

495. However, Respondent's character witnesses:

    a. had no recent contacts with Respondent professionally or personally (Hoban, NT VI, 62, 77; Schiffer, NT VI, 89-90; Garant, NT VII, 40, 44);

    b. had limited professional contacts with Respondent over the years (Hoban, NT VI, 63-64; McHugh, NT VI, 110; Canavan, NT VII, 103-106, 108);

97

c. did not know that Respondent had a record of attorney discipline (Schiffer, NT VI, 93; Garant, NT VII, 46-47, Canavan, NT VII, 107);

d. did not know the facts of Respondent's misconduct that resulted in Respondent's having a record of attorney discipline (Riley, NT VI, 39; Schiffer, NT VI, 93; Simon, NT VII, 16-17; Canavan, NT VII, 117);

e. did not know the current disciplinary charges against Respondent (Hoban, NT VI, 71-74; Canavan, NT VII, 111-116);

f. agreed that an attorney who takes money from clients for work that cannot be done, files false pleadings, and disregards court orders would be a danger to the public (Hoban, NT VI, 79-80; Schiffer, NT VI, 99; McHugh, NT VI, 123-124; Raie, NT VII, 82).

496.    Respondent admitted his wrongdoing in failing to supervise his employees in the matters of Red Wine Restaurant (NT V, 222, 223), American Club (NT V, 56), and Watsons (NT V, 121-122).

The Procedural History Below

497.    On June 12, 2023, Petitioner submitted a post-hearing brief to the Special Master. Petitioner requested that the Special Master conclude that Respondent violated all of the rules charged in the Petition for Discipline, and recommend to the Board that he be suspended for a period of four years.

498.    On August 11, 2023, Respondent submitted a post-hearing brief to the Special Master. Respondent requested that the Special Master conclude that Petitioner did not meet its burden on all of the charged rule violations and recommend a sanction of a public reprimand with one year of probation and a practice monitor. In the event that the

Special Master concluded that Respondent violated all of the charged rule violations, Respondent requested that the appropriate sanction fall between a public reprimand and a one year suspension.

499.    By Report filed on September 18, 2023, the Special Master concluded that Petitioner met its burden as to all rule violations charged in the Petition for Discipline.[3] The Special Master recommended that the Board impose a suspension for four years.

500.    On November 7, 2023, Respondent filed a Brief on Exceptions and requested oral argument before the Board. Respondent requests that the Board either dismiss the Petition for Discipline, or in the alternative, reduce the Special Master's recommended sanction by at least 30 months, which would result in in an 18 month or less period of suspension.

501.    On December 19, 2023, Petitioner filed a Brief Opposing Exceptions. Petitioner requests that the Board adopt the Special Master's recommended discipline of a four year suspension.

502.    A three-member panel of the Board held oral argument on March 19, 2024.

503.    The Board adjudicated this matter at the meeting on April 10, 2024.

II.         CONCLUSIONS OF LAW

By his conduct as set forth above, Respondent violated the following Rules of Professional Conduct:

1. RPC 1.1 (5 counts) (Gardner, Robreno – Red Wine Restaurant, American Club, Dougalas, Copelin) - A lawyer shall provide competent representation to a client.

---

[3] The Report states 47 rule violations; by the Board's count, there are 48 violations.

Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.

2. RPC 1.2(a) (2 counts) (Dougalas, Copelin) - A lawyer shall abide by a client's decisions concerning the objectives of representation and as required by Rule 1.4, shall consult with the client as to how they are to be pursued. A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation. A lawyer shall abide by a client's decision whether to settle a matter. In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify.

3. RPC 1.3 (5 counts) Gardner, Robreno – Red Wine Restaurant, American Club, Dougalas, Copelin) - A lawyer shall act with reasonable diligence and promptness in representing a client.

4. RPC 1.4(a)(3) (2 counts) (Dougalas, Copelin) - A lawyer shall keep the client reasonably informed about the status of the matter.

5. RPC 1.4(a)(4) (Dougalas) – A lawyer shall promptly comply with reasonable requests for information.

6. RPC 1.4(b) (2 counts) (Gardner, Dougalas) - A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

7. RPC 1.5(a) (2 counts) (Gardner, Copelin) - A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.

8. RPC 1.16(d) (3 counts) (Gardner, Dougalas, Copelin) - Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee or expense that has not been earned or incurred. The lawyer may retain papers relating to the client to the extent permitted by other law.

9. RPC 5.1(a) (3 counts) (Robreno-Red Wine Restaurant, Watsons, American Club) - A partner in a law firm, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm, shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that all lawyers in the firm conform to the Rules of Professional Conduct.

10. RPC 5.1(b) (Robreno-Red Wine Restaurant) - A lawyer having direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the Rules of Professional Conduct.

11. RPC 5.1(c)(1) (Robreno – Red Wine Restaurant) - A lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct if the lawyer orders or, with knowledge of the specific conduct, ratifies the conduct involved.

12. RPC 5.1(c)(2) (Robreno-Red Wine Restaurant) - A lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct if the lawyer is a partner or has comparable managerial authority in the law firm in which the other lawyer practices, or has direct supervisory authority over the other lawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

13. RPC 5.3(a) (3 counts) (Robreno-Red Wine Restaurant, Watsons, American Club) - A partner and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer.

14. RPC 5.3(c)(1) (2 counts) (Robreno-Red Wine Restaurant, American Club) - A lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved.

15. RPC 5.3(c)(2) (Robreno-Red Wine Restaurant) - A lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if the lawyer is a partner or has comparable managerial authority in the law firm in which the person is employed, or has direct supervisory authority over the person, and in either case knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

16. RPC 5.5(a) (Copelin) - A lawyer shall not practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction, or assist another in doing so.

17. RPC 8.1(a) (American Club) - An applicant for admission to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not knowingly make a false statement of material fact.

18. RPC 8.4(a) (5 counts) (Gardner, Robreno-Red Wine Restaurant, Watsons, American Club, Copelin) - It is professional misconduct for a lawyer to violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another.

19. RPC 8.4(c) (4 counts) (Gardner, American Club, Dougalas, Copelin) - It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

101

20. RPC 8.4(d) (3 counts) (Robreno-Red Wine Restaurant, Watsons, American Club) - It is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice.

III.     DISCUSSION

This matter is before the Board on review of the Special Master's Report, wherein the Master concluded that Respondent violated multiple Rules of Professional Conduct in six matters over the course of two and a half years, and recommended that Respondent be suspended for a period of four years. Respondent raises exceptions to the Report and recommendation and a Board panel heard argument on the issues.

**Respondent's exceptions**

The crux of Respondent's exceptions is that Petitioner failed to meet its burden on some of the rule violations charged in the Gardner, Red Wine Restaurant, Watsons, and American Club matters[4], and all of the rule violations charged in the Dougalas and Copelin matters. Respondent contends that since his "testimony directly contradicted the vast majority of the allegations contained within the Petition and the proofs offered in support of its allegations were largely dependent on the Complainants' testimony," Petitioner failed to meet its burden. (Respondent's Brief on Exceptions at 2) Respondent further argues that because the Special Master erred in concluding that Petitioner met its burden on all counts, the Master's recommended four year suspension is too harsh and not warranted. It is Petitioner's burden to prove ethical misconduct by a preponderance of clear and satisfactory evidence. *Office of Disciplinary Counsel v. John*

---

[4] In Gardner, 1.3, 1.4(b), 1.5(a), 1.16(d), 8.4(c); in Red Wine Restaurant, 1.1, 1.3; in Watsons, 8.4(d); in American Club, 1.3, 8.1(a), 8.4(c).

*Grigsby*, 425 A.2d 730, 732 (Pa. 1981). With this burden in mind, we review the charged rule violations in the context of the evidence of record.

RPC 1.1 and 1.3

RPC 1.1 places a duty on an attorney to provide competent representation to a client. The Rule explains that competent representation requires the attorney to have the legal knowledge, skill, and thoroughness reasonably necessary for the representation. In addition, RPC 1.3 places a duty on an attorney to act with reasonable diligence in representing a client. Respondent failed to act with the necessary competence and diligence in handling the Gardner, Robreno (Red Wine Restaurant), American Club, Dougalas, and Copelin matters.

In the Gardner matter, in August 2018, Mr. Gardner spoke with Respondent about expunging Mr. Gardner's entire criminal record. Respondent failed to act with the competence and diligence necessary for the representation when he failed to ascertain that: (1) Mr. Gardner would not be eligible for expungement of his summary conviction until 2022, as 18 Pa.C.S.A. § 9122(b)(3)(i) required Mr. Gardner to be free of arrest for five years following his January 2017 summary conviction; and (2) *Commonwealth v. Lutz*, prohibited the expungement of Mr. Gardner's misdemeanor charges that were withdrawn as part of his guilty plea agreement. (NT III, 284-285, 288, 327, 330)

Furthermore, until the Luzerne County D.A.'s Office objected to Mr. Gardner's Petition for Expungement, Respondent did not even know that Mr. Gardner's misdemeanor charges were withdrawn pursuant to a guilty plea agreement. (NT III, 252) After learning of the D.A.'s objection, Respondent failed to act with competence and diligence and undertake any research to determine if there was a legal basis for the D.A.'s objection. (NT III, 272, 390-391) Instead, Respondent advised Mr. Gardner that the D.A.'s

103

objection was "disingenuous," prompting Mr. Gardner to retain Respondent for $7,500 for additional representation. (NT I, 140) Respondent collected a $9,000 fee in two installments from his client before ever advising Mr. Gardner that he could not expunge the summary.

In the Red Wine Restaurant cases, Respondent was retained to represent a disabled individual and assigned Mr. Feinstein, his legal associate, to file a complaint under the ADA against Red Wine Restaurant for failing to make the restaurant accessible to a person in a wheelchair. Respondent repeatedly failed to competently and diligently handle the Red Wine Restaurant matters when he: (1) failed to assign substitute counsel to attend the December 20, 2019 prehearing conference after Mr. Feinstein resigned (NT II, 85); (2) failed to confirm there was legal authority under the ADA for bringing a claim based on promoter liability against Alex Torres Production, Inc., and then include the legal authority in the complaint; and (3) failed to supervise and insist that his law firms' attorneys and nonlawyer assistants, complete and file the correct forms and pleadings in the correct jurisdiction. The fact that Respondent was suspended from the Eastern District did not preclude him from reviewing documents and ensuring compliance with court orders and rules.

In the American Club matter, Respondent was retained to represent the plaintiff in a matter that was transferred to Commerce Court in Philadelphia County. Respondent failed to handle the matter with competence and diligence when he: (1) failed to ascertain the legal requirements for filing a *Pro Hac Vice* motion prior to filing three separate deficient motions (NT V, 11); (2) failed to review and correct a *Pro Hac Vice* Motion drafted by his paralegal despite having been provided the opportunity to do so (NT III, 137; NT V, 12-14); (3) signed and filed a Motion for a legal associate's *Pro Hac*

104

*Vice* admission that misrepresented or omitted Respondent's disciplinary history (Stip 125-128); (4) signed and filed a second Motion for *Pro Hac Vice* admission for a legal associate that intentionally failed to include Respondent's disciplinary history in the Eastern District of Pennsylvania (Stip 139-142); (5) signed two *Pro Hac Vice* motions that failed to comply with Pa.R.Civ.P. 1021.1; and (6) through the acts of his legal associate, filed a third *Pro Hac Vice* motion that failed to comply with Pa.R.Civ.P. 1021.1 (Stip 150).

In the Dougalas matter, Respondent was retained to seal or expunge Ms. Dougalas' Pennsylvania and New Jersey criminal convictions. (ODC-80/Bates 709) At the outset of the representation, Ms. Dougalas told Respondent about her convictions for forging prescriptions for controlled substances. Ms. Dougalas sent Respondent copies of the docket entries that showed she was arrested and held for court on thirteen felony charges in Pennsylvania. Respondent failed to act with competence and diligence necessary for the representation when he failed to: (1) properly conduct and take written notes of his intake interview with Ms. Dougalas to determine whether she had any felony convictions; (2) expeditiously order Ms. Dougalas' State Police Background Check after his legal assistant informed him that the docket entries did not reflect the grading of Ms. Dougalas' criminal convictions; (3) promptly ascertain that the Clean Slate Act would not permit Ms. Dougalas to seal her Pennsylvania felony convictions and continued "operating under the impression that [Ms. Dougalas' convictions] don't involve felonies" (NT IV, 223-224); and (4) keep a file copy of pleadings he purportedly filed on behalf of Ms. Dougalas and a copy of Ms. Dougalas' Background Check. (NT IV, 261)

In the Copelin matter, Ms. Copelin received a letter informing her that she had 10 days to submit an appeal of her pending expulsion from GSU to the college president. (NT I, 185) Ms. Copelin called the school and was "advised" that her appeal

"needed to be done by end of business" on February 9, 2021. (*Id.* at 226) Ms. Copelin decided that she wanted an attorney to handle her appeal, discovered Respondent's website, and contacted Respondent's office. From the outset, Ms. Copelin made clear that she wanted an attorney. During Ms. Copelin's initial telephone conversation with Respondent on February 4, 2021, Ms. Copelin informed Respondent that her deadline to file an appeal to the GSU college president was "by the end of business day" on February 9, 2012 (*id.* at 226). In a subsequent telephone consult with Respondent and Mr. Altman on February 6, 2021, Ms. Copelin reiterated that her deadline was close of business day on February 9, 2021, and neither Respondent nor Mr. Altman replied that they could not meet this deadline (*id.* at 193, 244). On the February 9, 2021 call Respondent reassured Ms. Copelin, "don't worry, he'll get" a letter to the college president by the close of business on February 9, 2021. (*Id.* at 206) Yet Respondent failed to handle Ms. Copelin's matter with the requisite competence and diligence necessary for the representation when he failed to timely send the appeal of Ms. Copelin's expulsion to the college president by close of business on February 9, 2021, and copy Ms. Copelin on the letter written on her behalf to the college president.

### RPC 1.4 and RPC 1.2(a)

RPC 1.4(a)(3) requires that an attorney keep a client reasonably informed about the status of a matter; RPC 1.4(a)(4) requires an attorney to promptly comply with a client's reasonable requests for information; and RPC 1.4(b) requires an attorney to explain a matter to a client to the extent reasonably necessary to enable the client to make informed decisions about the representation. In addition, RPC 1.2(a) requires an attorney to abide by a client's decisions concerning the objectives of the representation

and to consult with the client as to how the objectives are to be pursued. Respondent violated RPC 1.4 and RPC 1.2(a) in the Gardner, Dougalas, and Copelin matters.

In the Gardner matter, Respondent violated RPC 1.4(b) when he failed to explain Mr. Gardner's legal matter to the extent necessary to enable Mr. Gardner to make an informed decision regarding the representation. Respondent failed to inform Mr. Gardner that: (1) his summary Disorderly Conduct conviction could not be expunged until January 2022 because Pennsylvania law requires an individual to be free of arrest or prosecution for five years (NT I, 129); and (2) the District Attorney's Office had objected to Mr. Gardner's expungement of his misdemeanor charges because the charges were withdrawn as part of a guilty plea agreement. (NT I, 288) Contrary to Respondent's claim, Respondent's vague and imprecise form fee agreement referencing expungement of the "applicable charges" failed to inform Mr. Gardner of the legal limitations of Mr. Gardner's seeking an expungement at that time. (NT I, 135; NT III, 264, 380-381) Indeed, Mr. Gardner credibly testified that he understood "applicable charges" to include expungement of "everything that happened that day" he was arrested, and believed he had retained Respondent to do that. (NT I, 134; see also NT I, 144-145) Furthermore, Respondent failed to obtain Mr. Gardner's permission to sign his name to a form expungement petition, have Mr. Gardner review the petition before it was filed, or provide Mr. Gardner with a copy of the Petition after it was filed.

Similarly, in the Dougalas matter, at the outset of Respondent's representation of Ms. Dougalas in February 2020, Ms. Dougalas told Respondent about her Pennsylvania convictions and sent Respondent copies of the docket entries that showed she was arrested and held for court on felony charges. (NT I, 36-38, 96, 97, 335) Respondent violated RPC 1.4(b) when he failed to explain to Ms. Dougalas, to the extent

necessary to enable her to make an informed decision regarding the representation, that felony convictions would not be eligible for Pennsylvania Clean Slate limited access as felony convictions were listed as specific exceptions under the Act. (NT I, 41-42) Respondent's failure to explain the limitations of the Clean Slate Act and the necessity of obtaining her State Police records at the outset of the representation also violated RPC 1.2(a), as Respondent could not possibly achieve Ms. Dougalas' objectives to fully seal her criminal record.

Respondent violated RPC 1.4(a)(3) when he failed to keep Ms. Dougalas apprised of the status of his efforts to seal and expunge her criminal record for nearly a year. Respondent failed to advise Ms. Dougalas that his attorney assistant could not complete drafting her petitions because her criminal dockets did not reflect the grading of all her convictions. Despite monthly inquiries from Ms. Dougalas about the status of her legal matter (ODC-84/Bates 719-725), at no time prior to January 28, 2021, did Respondent inform Ms. Dougalas that her Luzerne County felony convictions would not be eligible for sealing under the Clean Slate Act. (Stip 170) Although Respondent received Ms. Dougalas' official criminal history from the Pennsylvania State Police "sometime in December 2020" (NT IV, 234), it was not until January 28, 2021 (Stip 173), over one month after Respondent received the State Police records and almost one year after he was retained, that Respondent informed Ms. Dougalas that he could not seal or expunge her Luzerne County felony convictions. (NT I, 62) Finally, Respondent failed to advise Ms. Dougalas that he had filed on her behalf a Petition for Expungement with a Background Check attached. (NT IV, 250-251)

Respondent also violated RPC 1.4(a)(4) in the Dougalas matter when he failed to: (1) comply with Ms. Dougalas' reasonable requests for information (ODC-

91/Bates 736; NT I, 80); (2) promptly provide Ms. Dougalas with copies of the New Jersey pleadings she had requested (NT I, 80, NT IV, 219); and (3) send Ms. Dougalas copies of any correspondence, pleadings, and records from her Luzerne County legal matter. (NT I, 78-79, 81; NT IV, 250-252, 261)

In the Copelin matter, Ms. Copelin contacted Respondent to provide legal representation for her college discipline case and file a timely appeal of her expulsion to the GSU president. (NT I, 185) From the outset, Ms. Copelin made clear that she wanted an attorney. Respondent failed to inform Ms. Copelin that he could not abide by her objective of having legal representation and could allegedly act as an "advisor" and ghostwrite a letter for her. (NT I, 190, 191, 196, 205, 216) Respondent also failed to comply with Ms. Copelin's request to "call so she can remit payment" for the representation. (Stip 196, 197, NT I, 202-203) Respondent failed to send Ms. Copelin a copy of his Letter of Engagement as she had requested and as Respondent had repeatedly promised. (NT I, 200, 203; Stip 200) Respondent's conduct violated RPC 1.2(a) and RPC 1.4(a)(3).

RPC 1.5(a), 1.16(d), 8.4(a)

RPC 1.5(a) prohibits an attorney from entering into an agreement for, charging, or collecting an excessive fee. In determining whether a fee is excessive, the Rule lists, among other factors, the time and labor required, novelty of question involved, skill required, and results obtained. RPC 1.16(d) requires an attorney to refund any unearned fee upon the termination of the representation. RPC 8.4(a) prohibits a lawyer from violating or attempting to violate the rules.

In the Gardner matter, in August 2018, Respondent received $1,500 to file a petition for the "expungement of the applicable charges," and in January 2019,

109

Respondent received an additional $7,500 to file a formal motion with the Court for a contested hearing on Mr. Gardner's expungement. (Stip 4) Both statutory law and case law prohibited the expungement of Mr. Gardner's January 2017 guilty plea until 2022. (Stip 5) Respondent failed to file the formal motion and Mr. Gardner terminated Respondent's representation four months after paying the $7,500 fee. Respondent failed to promptly refund any of his unearned fee. Given the time and labor Respondent had expended on this routine matter, as well as the unlikelihood of success under statutory law and case law, Respondent's $7,500 fee was clearly excessive. It was not until June 2021, after Respondent received notice that Mr. Gardner filed a Statement of Claim with the Lawyers Fund for Client Security, that Respondent refunded a partial fee of $3,500 to Mr. Gardner. (Stip 23, 24, 25) Respondent's conduct in collecting a $7,500 fee, failing to refund his unearned fee upon the termination of the representation, attempting to retain an excessive fee, and belatedly refunding only a portion of his fee violated RPC 1.5(a), 1.16(d), and 8.4(a).

In the Dougalas matter, Respondent received $5,500 from Ms. Dougalas to expunge or seal her criminal record in Pennsylvania and New Jersey. On March 24, 2021, after Respondent informed Ms. Dougalas that he could not expunge or seal her Pennsylvania felony convictions, Ms. Dougalas requested a refund of Respondent's unearned fee and records from her legal matters. (ODC-90/Bates 734) On May 14, 2021, Ms. Dougalas reiterated her request for a refund and her records. (ODC-91/Bates 735) Respondent failed to provide Ms. Dougalas with any records from her Luzerne County matter. (NT I, 81) In addition, Respondent failed to promptly refund his unearned fee. It was not until July 2021, after Respondent received notice that Ms. Dougalas had filed a Statement of Claim with the Lawyers Fund for Client Security, that Respondent refunded

110

178

$5,500 to Ms. Dougalas. Respondent's conduct violated 1.16(d).

In the Copelin matter, Respondent requested $7,500 to write a letter on behalf of Ms. Copelin to the GSU college president and explained that there may be an additional fee if her matter proceeded to court. (NT I, 196) Respondent failed to inform Ms. Copelin that he could not act as her attorney in Georgia and Ms. Copelin could only retain Respondent to act as an "advisor." (NT I, 193, 196, 197, 230) On the morning of February 9, 2021, Ms. Copelin paid an initial installment of $2,500 (ODC-102/Bates 762), and later that evening, Respondent's legal associate sent an untimely letter signed by Respondent to the GSU president challenging Ms. Copelin's pending expulsion. (ODC-104, -105/Bates 766, 767) The following day, Ms. Copelin terminated Respondent's representation and instructed Respondent not to charge her credit card. (ODC-107/Bates 770); Respondent subsequently offered to refund $1,000. (ODC-108/Bates 108) It was not until July 2021, after Respondent received notice that Ms. Copelin filed a Statement of Claim with the Lawyers Fund for Client Security, that Respondent refunded $2,500 to Ms. Copelin. (Stip 213)

At his disciplinary hearing, Respondent justified his $7,500 fee to ghostwrite a letter because "[t]here were approximately 100 pages of documentation as part of the case. . . .and being expelled from school can have a lifetime of consequences." (NT IV, 318) Respondent's justification is unavailing. Given the limitations regarding representation under the GSU student code, time and labor involved, the lack of novelty and difficulty of the question involved, the skill required to ghostwrite the letter, and the unsuccessful results obtained, Respondent attempted to charge an excessive fee to a client. In addition, Respondent failed to promptly refund his unearned fee upon termination of the representation. Respondent's conduct violated RPC 1.5(a), 1.16(d),

111

and 8.4(a).

### RPC 5.1 and RPC 5.3

Rule 5.1 concerns the responsibilities of managerial and supervisory attorneys. RPC 5.1(a) requires an attorney with managerial authority to make reasonable efforts to ensure that there are measures in effect that give reasonable assurance that the conduct of the firm's attorneys conforms to the RPCs; RPC 5.1(b) requires a supervising attorney to make efforts to ensure that the conduct of other attorneys conforms to the RPCs; and RPC 5.1(c) provides that an attorney shall be responsible for another attorney's conduct if (1) the other attorney either has knowledge of the conduct and ratifies it or (2) knows of the conduct at the time when the conduct could be mitigated/avoided, but fails to take remedial action.

RPC 5.3 concerns the responsibilities of managerial and supervisory lawyers over nonlawyer assistants. RPC 5.3(a) requires an attorney with managerial authority to make reasonable efforts to ensure that there are measures in effect that give reasonable assurance that the conduct of the firm's nonlawyers conforms to the RPCs; RPC 5.3(b) requires an attorney with direct supervisory responsibility over a nonlawyer to make reasonable efforts to ensure that the nonlawyer's conduct is compatible with the professional obligations of the lawyer; and RPC 5.3(c) provides that a lawyer shall be responsible for a nonlawyer's conduct if the lawyer (1) knows about and ratifies the conduct involved or (2) knows of the conduct at the time when the conduct could be mitigated/avoided, but fails to take remedial action.

Respondent was the sole managing partner of Optimum, Lento Law Group, and Lento Law Firm. Respondent had direct supervisory authority over attorneys who worked for the firms. (NT IV, 384; Stip 80) In addition, Respondent had direct supervisory

authority over nonlawyer employees at his law firms. (NT V, 64, 66, 67; Stip 80) In managing his law firms and supervising his attorney and nonlawyer employees, Respondent conceded that he repeatedly violated the mandates of both RPC 5.1 and RPC 5.3 in the Red Wine Restaurant, Watsons, and American Club matters. (See Red Wine Restaurant matter, NT III, 134; Watsons matter, NT V, 121-122; American Club matter, NT III, 146, NT V, 56) Respondent's failure to manage and supervise his lawyer and nonlawyer assistants resulted in the violation of multiple ethical rules.

In the Red Wine Restaurant matter, Respondent originally assigned Mr. Feinstein to draft the complaint. Judge Robreno dismissed the complaint filed by Mr. Feinstein in Red Wine Restaurant I and ordered that "[i]f the complaint is refiled, it shall include legal authority" on promoter liability. (ODC-29/Bates 232). In Respondent's Answer to the Rule to Show Cause, Respondent acknowledged that he "will provide a legal basis" should Respondent refile the complaint. (ODC-31/Bates 258)

Following the departure of Mr. Feinstein, Respondent assigned the Red Wine Restaurant case to Ms. Feinstein, who was not admitted in the Eastern District. Mr. Lento encouraged her to seek admission after repeatedly trying, without success, to associate with an experienced counsel. Ms. Feinstein was given a document to sign and required to file the complaint, which did not comply with Judge Robreno's order. (NT II, 149; Stip 56) The Red Wine Restaurant II complaint was identical to the complaint previously dismissed by Judge Robreno and failed to contain the required legal authority for suing the concert promoter under the ADA. (ODC-34/Bates 273) Respondent violated RPC 5.1(b) when he failed to make reasonable efforts and supervise: (1) Mr. Feinstein's drafting of the original Red Wine Restaurant complaint and confirm that Mr. Feinstein had reasonably concluded that there was a legally supportable basis for bringing a claim

113

181

under the ADA against Alex Torres Production, Inc. (NT III, 43); (2) Ms. Feinstein by failing to advise her of the legal and factual background of the *Red Wine Restaurant I* case prior to Ms. Feinstein's signing a complaint identical to the one had been dismissed; and (3) Ms. Feinstein to ensure that she had reasonably concluded that there was a legally supportable basis for bringing a claim under the ADA against Alex Torres Production, Inc.

Furthermore, Respondent violated RPC 5.1(c)(1) and (2) as he knew about the deficiencies in the *Red Wine Restaurant I* complaint, but failed to ensure that Ms. Feinstein included legal authority on promoter liability in the *Red Wine Restaurant NJ* and *Red Wine Restaurant II* complaints at a time when the consequences of filing the complaints could be avoided or mitigated. Indeed, Respondent failed to review the Red Wine Restaurant complaints or ensure that another attorney reviewed the complaints before they were filed. The totality of Respondent's handling of the Red Wine Restaurant cases violated RPC 5.1(a), in that Respondent's conduct demonstrated that he failed to have measures in effect to give reasonable assurance that the conduct of attorneys in his law firm would conform to the RPCs.

In the Watsons matter, Respondent also violated RPC 5.1(a). As the managing partner at Optimum with managerial authority over attorney employees, Respondent failed to make reasonable efforts to ensure that attorneys in his law firm: (1) routinely gave him or another attorney at the firm drafts of complaints and pleadings to review before they were filed with the court (NT II, 23, 137, 43-44); (2) supervised the filing of complaints and ensured that a complaint filed in the First Judicial District against residents of Delaware County was properly served by the Delaware County sheriff who had been deputized by the sheriff of the First Judicial District as required by the rules (NT V, 62-63, 81-81; (3) reviewed and proofread documents prior to filing the documents with

the court (NT II, 107); (4) maintained an accurate case management system that would provide necessary information, including who filed a complaint, who arranged service of process, and whether Notice of Intent to Take Default Judgment was timely mailed (NT V, 73, 76, 77, 86); and (5) refrained from engaging in conduct that needlessly expended the court system's limited resources.

In the American Club matter, Respondent also violated RPC 5.1(a). After Judge Djerassi dismissed Respondent's two *Pro Hac Vice* motions, for among other issues, failing to comply with Pa.R.Civ.P. 1012.1, Respondent withdrew from the case and assigned his legal associate to file a *Pro Hac Vice* motion. (NT V, 52) Respondent failed to make reasonable efforts to ensure that the associate's motion—the third *Pro Hac Vice* motion filed in the American Club matter—complied with Pa.R.Civ.P. 1012.1 and Judge Djerassi's orders. (NT V, 54) As a result, Judge Djerassi denied the *Pro Hac Vice* motion.

Moreover, Respondent violated RPC 5.3(a) when he failed to have measures in effect to give reasonable assurance that his nonlawyer assistants would: (1) file the Red Wine Restaurant complaint in the correct federal court, receive approval from the assigned attorney prior to filing a complaint with the federal court, properly complete the forms and cover sheets for filing a complaint in the federal court, and accurately complete and file the request for a refund of Respondent's filing fee; (2) in the Watsons matter, provide Mr. Feinstein with drafts of documents to proofread and review prior to filing the documents (NT II, 107), upload a copy of the 10-day Notice to the CLIO system (NT II, 107; NT V, 92-93); and (3) in the American Club matter, draft and file a Motion for *Pro Hac Vice* Admission that did not falsely state Respondent's disciplinary history.

Respondent also violated RPC 5.3(c)(1) in the American Club matter when

he failed to review and correct the *Pro Hac Vice* motion drafted by his paralegal, which falsely stated Respondent declared under penalty of perjury that "I presently am not, and have never been, the subject of any disbarment or suspension proceeding before this or any Court." (NT III, 137; NT V, 12-14) Respondent's failure to review and correct the motion filed in his name after he received it from Ms. Stone resulted in filing a false pleading with the Court. (Stip 125, 128)

Finally, in the Red Wine Restaurant matter, Respondent violated RPC 5.3(c)(1) in ordering that the identical complaint be refiled in federal court without having reviewed the complaint before it was filed (NT V, 216), and violated RPC 5.3(c)(2) when knowing that the complaint was going to be refiled, Respondent failed to take remedial action to ensure that the lawyers and the staff who prepared the forms and pleadings fully understood the legal basis for Judge Robreno's dismissal of the *Red Wine Restaurant I* complaint so that the consequences of the complaint's prior dismissal could be avoided.

### RPC 5.5(a)

PA RPC 5.5(a) and Georgia RPC 5.5(a) employ identical language prohibiting an attorney from practicing law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction or assisting another in doing so.[5] In addition, RPC 8.5(a) provides that an attorney admitted to practice law in this jurisdiction is subject to the disciplinary authority of this jurisdiction regardless of where the lawyer's conduct occurs.[6] In the Copelin matter, Respondent violated PA RPC 5.5(a).

---

[5] Georgia RPC 5.5(a) provides that a lawyer shall not practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction, or assist another in doing so. The Georgia Code, § 15-19-51 (a), also prohibits any person other than a duly licensed attorney in Georgia, to furnish advice or legal services of any kind.

[6] RPC 8.5(a) provides that a "lawyer admitted to practice in this jurisdiction is subject to the disciplinary authority of this jurisdiction, regardless of where the lawyer's conduct occurs. A lawyer not admitted in this jurisdiction is also subject to the disciplinary authority of this jurisdiction if the lawyer provides or offers to

Neither Respondent nor Mr. Altman are members of the Georgia Bar. (Stip 202) Respondent received a $2,500 fee from Ms. Copelin, a citizen of Georgia, to provide advice and write a letter on her behalf to a university in Georgia regarding her expulsion, and deposited the fee for furnishing this advice and legal services in his Pennsylvania law firm's operating account. (NT IV, 374) On February 9, 2021, Mr. Altman sent an email to the GSU president stating that the email was from "The Law Office of Keith Altman." (ODC-104/Bates 766, ODC-105/Bates 767) The email attached a letter written on stationery with the letterhead "Lento Law Firm," signed by Respondent with the title "Esq." after his name, included a footnote stating that Respondent is licensed to practice law in New York, New Jersey, and Pennsylvania, and contained substantive legal arguments in support of Ms. Copelin's appeal from her pending expulsion. (Stip. 200, 201, 207)

Respondent's correspondence to the GSU President did not state that he and Mr. Altman were acting as an "advisor" to Ms. Copelin. (NT IV, 369-370) Nor does Respondent's correspondence contain any disclaimer that he was not acting in his legal capacity. In fact, Respondent was providing legal advice and services. Respondent offered no credible evidence that he took this fee or was acting in any capacity other than as an attorney. He engaged in the unauthorized practice of law in Georgia and assisted Mr. Altman in doing so. Respondent's conduct violated RPC 5.5(a)(1) and 8.4(a).

<u>RPC 8.1(a)</u>

RPC 8.1(a) prohibits an attorney from knowingly making a false statement of material fact in connection with a bar admission application. In the American Club matter, Respondent signed a May 26, 2020 Verification to a Motion for *Pro Hac Vice*

---

provide any legal services in this jurisdiction. A lawyer may be subject to the disciplinary authority of both this jurisdiction and another jurisdiction for the same conduct."

Admission that falsely stated Respondent had "never been" the subject of a suspension proceeding. (ODC-62/Bates 515) After the court dismissed the Motion without prejudice to a refiling that would include disclosure of Respondent's disciplinary history, on August 14, 2020, Respondent signed and filed a second motion for Pro Hac Vice Admission. (Stip 130, 140) In his second Pro Hac Vice motion, Respondent knowingly and intentionally failed to disclose his disciplinary history in the Eastern District of Pennsylvania. (Stip 137, 139) Respondent's conduct violated RPC 8.1(a).

RPC 8.4(c)

RPC 8.4(c) prohibits an attorney from engaging in conduct involving deceit or misrepresentation. An attorney's conduct need only be reckless to violate RPC 8.4(c). See Office of Disciplinary Counsel v. Anonymous Attorney A, 714 A.2d 404 (Pa. 1998) (A violation of RPC 8.4(c) can be established by an attorney's reckless disregard of truth or falsity). Respondent engaged in deceitful conduct in the Gardner, American Club, Dougalas, and Copelin matters.

In the Gardner matter, Respondent provided Mr. Gardner with vague fee agreements that referenced the "expungement of applicable charges" without defining what charges he would seek to expunge. (NT III, 273, 277-281) Mr. Gardner was misled and believed he was retaining Respondent in August 2019, for a fee of $1,500, to expunge Mr. Gardner's entire criminal record, which included Mr. Gardner's January 2017 summary conviction and withdrawn misdemeanor charges. (NT I, 145, 170) Respondent knew or should have known that Pennsylvania law required an individual to be free of arrest or prosecution for five years following a summary conviction and that established Pennsylvania case law prohibited the expungement of Mr. Gardner's misdemeanor charges that were withdrawn as part of a guilty plea agreement. Mr. Gardner credibly

118

explained that had Respondent informed him at the outset that his conviction could not be expunged for five years from the date of his guilty plea, Mr. Gardner would "absolutely not" have retained Respondent (NT I, 129) and would have waited until 2022 to expunge his entire criminal record as he had "no choice." (*Id.* at 130)

Respondent engaged in similar deceit in December 2018 following his receipt of the D.A. Office's objection to Mr. Gardner's Expungement Petition. Respondent stated that the DA's "argument is disingenuous" and "may/most likely can be defeated." (ODC-9/Bates 000152), Respondent's misleading opinion was offered without the benefit of any legal research or factual support (NT III, 231, 251, 314-315, 328-29, 340), was deceitful, and intended to and did cause Mr. Gardner to pay Respondent an additional $7,500 to file a formal motion with the Court. (NT I, 140, 142-43)[7] This statement was made with reckless disregard for the facts and the law.

In the American Club matter, Respondent misrepresented his record of attorney discipline in two separate motions for another attorney's *Pro Hac Vice* admission. After Respondent filed the first *Pro Hac Vice* motion, he engaged in deceit and misrepresentation when he requested his legal assistant to inform the court and all parties that the false statements about his disciplinary history were a "clerical error" (D-30) and had his assistant file a Certification claiming the false statements were due to her "inadvertence." (ODC-64/Bates 599) In fact, the false statements about Respondent's disciplinary record were a result of Respondent's admitted failure to review the first *Pro Hac Vice* motion before it was filed. Respondent then engaged in deceit and misrepresentation in his second *Pro Hac Vice* motion when he knowingly and intentionally

---

[7] Mr. Gardner testified that he "felt used, lied to. I felt like he stole my money." (NT I, 152)

failed to reveal his discipline in the EDPA (ODC-68/Bates 634), even though the court ordered the "disclosure of movant's disciplinary history" upon any refiling. (Stip 136)

In the Dougalas matter, Respondent deceived Ms. Dougalas to retain him to seal her criminal record for a fee of $5,500, when in fact, Pennsylvania's Clean Slate Act (ODC-81, -82/Bates 711, 713) patently excluded the sealing of her thirteen felony convictions. At the time Ms. Dougalas contacted Respondent in February 2020, Ms. Dougalas knew the difference between a felony and misdemeanor conviction, knew the schedule of the drug for which she had forged prescriptions, and knew that she had been convicted of thirteen felony charges in Luzerne County. (NT I, 34) Ms. Dougalas wanted to seal her criminal record "because" it "follow[ed] [her] around anywhere" and contacted Respondent because she was "confused" as to whether she qualified for sealing under Pennsylvania's Clean Slate Act. (Id. at 35-36)

Respondent failed to advise Ms. Dougalas that her criminal dockets did not reflect the grading of her criminal convictions (NT III, 164), inquire whether Ms. Dougalas knew if she had been convicted of any of the felonies for which she was arrested and held for court (ODC-133/Bates 936-37), ask Ms. Dougalas the schedule of drug for which she had forged prescriptions, explain the limitations of the Clean Slate Act, and inform Ms. Dougalas that he needed to obtain official confirmation of the grading of her convictions. (NT I, 41-42) Instead of obtaining this critical information, Respondent provided Ms. Dougalas with a vague Letter of Engagement promising to seal "3 applicable cases" and expunge "2 applicable cases" for a $5,500 fee. (ODC-80/Bates 709) Ms. Dougalas explained that "[b]ased upon the docket that [Ms. Dougalas] had sent [Respondent]," she assumed that the "three applicable" cases referred to her misdemeanor cases and the "two applicable" cases referred to her felony cases. (NT I, 57) Ms. Dougalas signed the

120

188

Engagement Letter, paid $2,500, and agreed to pay the balance of the fee upon request. (Stip 164; NT I, 64) Ms. Dougalas testified that had Respondent initially informed her that her felony convictions did not "qualify for anything," it would have been the "end of the conversation right there." (NT I, 113)

One month after being retained, Respondent's assistant notified Respondent of the need to obtain the grading of Ms. Dougalas' convictions in order to complete the petitions to seal and expunge Ms. Dougalas' record. (D-40-42) Rather than contacting Ms. Dougalas, advising her that the dockets were unclear regarding the grading of her offense (NT I, 67, 100), and obtaining information about her convictions (NT IV, 210), Respondent waited until October 2020, after being paid in full, to order the State Police Background Check. (NT III, 183; NT IV, 119, 212-213) Had Respondent advised Ms. Dougalas that her felony convictions could not be sealed, Ms. Dougalas would not have paid $5,500 and "could have put her money somewhere else." (NT I, 63; Stip 174) Ms. Dougalas testified that she felt "lied to and grifted." (NT I, 72)

In the Copelin matter, Respondent engaged in a pattern of conduct involving deceit and misrepresentation regarding his ability to act as Ms. Copelin's attorney and represent her in Georgia, when: (1) Respondent signed his February 4, 2021 text message to Ms. Copelin, "Attorney Joseph D. Lento, Lento Law Firm, Helping Students Nationwide" (ODC-95/Bates 752); (2) during Respondent's February 4, 2021 conversation with Ms. Copelin, in response to Ms. Copelin's statement that she wanted a lawyer, Respondent replied that he "helps students nationwide" and has "helped plenty of students in Georgia" (NT I, 190); (3) Respondent signed his February 4, 2021 email to Ms. Copelin, "Joseph D. Lento, Esquire, Attorney & Counselor at Law, Lento Law Firm, Helping Clients Nationwide" (ODC-96/Bates 755); (4) during Ms. Copelin's February 6,

121

2021 telephone consult with Mr. Altman and Respondent, Mr. Altman identified himself as an attorney who worked for Respondent (NT I, 92, 198), Ms. Copelin explained that she did not want to handle the case herself and wanted an attorney (*id.* at 192-193), Respondent stated his fee could be more if Ms. Copelin needed him to go to court (*id.* at 196), and Respondent and Mr. Altman failed to inform Ms. Copelin that they could not act as an attorney in Georgia and could only act as her advisor (*id.* at 193, 196, 197, 205, 230); and (5) Respondent failed to explain to Ms. Copelin, in any of his oral conversations or written communication, that he could not be her attorney in Georgia and could only act as her advisor. (NT I, 190; FOF 449, 450, 461(b))

Ms. Copelin explained that although she had written a letter to the college president herself, she wanted Respondent to write a letter on her behalf because "it was a stronger shot if I had representation than just my letter." (NT I, 205) Ms. Copelin was "never looking for anybody other than an attorney" and "wasn't looking for an advisor." (NT I, 205) Ms. Copelin was also not interested in retaining Respondent to be a "ghostwriter." (NT I, 217) Ms. Copelin made clear that she would not have agreed to pay $7,500 to Respondent if she knew that Respondent could not provide her with legal representation in Georgia and had only intended to ghostwrite a letter for her. (NT I, 97, 217-218) The sum of Respondent's omissions and misrepresentations deceived Ms. Copelin to retain Respondent.

Respondent's conduct in these matters violated RPC 8.4(c).

RPC 8.4(d)

RPC 8.4(d) prohibits an attorney from engaging in conduct that is prejudicial to the administration of justice. Conduct is deemed prejudicial when it unnecessarily expends the limited time and resources of the court system. *See Office of Disciplinary*

122

*Counsel v. James P. Miller*, No. 52 DB 2022 (D. Bd. Rpt. 9/7/2023, p. 36-37) (S. Ct. Order 11/20/2023) (Miller's conduct prejudiced the administration of justice, as he created additional work for the Erie County court system and forced the court to schedule multiple hearings to address Miller's contemptuous behavior). Respondent's conduct in the Red Wine Restaurant matter, Watsons matter, and American Club matter repeatedly violated RPC 8.4(d).

In the Red Wine Restaurant matter, Respondent's conduct unnecessarily expended the time and resources of the federal court when Respondent: (1) failed to substitute Mr. Feinstein's appearance at the prehearing conference in the Red Wine Restaurant case or request a continuance to find substitute counsel, resulting in Judge Robreno's holding a prehearing conference, dismissing the complaint (Stip 48), entering a Rule to Show Cause Order and holding a hearing, and referring Respondent to Office of Disciplinary Counsel (Stip 51); (2) Respondent's legal assistant incorrectly filed the Red Wine Restaurant case in New Jersey and filed incorrect forms accompanying the case, resulting in the withdrawal of the complaint and unnecessary correspondence with the court; (3) Respondent failed to review the *Red Wine Restaurant II* complaint before it was filed to ensure that it complied with Judge Robreno's Order to include the law on promoter liability and failed to ensure that the coversheet accompanying the *Red Wine Restaurant II* complaint reflected that the complaint had been previously filed, resulting in Judge Robreno issuing a Rule to Show Cause Order, holding a hearing, and referring the matter to Office of Disciplinary Counsel.

In the Watsons matter, through the conduct of Respondent's lawyer and nonlawyer assistants, Respondent unnecessarily expended the time and resources of the Court of Common Pleas when Respondent's nonlawyer assistants filed a Praecipe to

123

Enter Default Judgment that contained inconsistent dates the Notice of Intent to Take Default was served (Stip 109), which resulted in the Watsons filing a Petition Strike, the Court's issuance of a Rule to Show Cause Order, Mr. Feinstein's filing a Response to the Petition, the Court holding a Rule to Show Cause hearing, and the Court dismissing the complaint against the Watsons.

In the American Club matter, the actions of Respondent, Respondent's associate attorney, and Respondent's legal assistant unnecessarily expended the limited time and resources of the Court of Common Pleas when: (1) Respondent's office filed three flawed *Pro Hac Vice* motions; (2) opposing counsel filed responses to Respondent's flawed motions; and (3) the court reviewed the parties' pleadings and entered orders dismissing each of the *Pro Hac Vice* motions.

On this record, we find Respondent's exceptions to be unfounded. Our independent review of the Joint Stipulations of Fact, Petitioner's and Respondent's exhibits, the testimony of Petitioner's witnesses, and Respondent's own testimony, informs our conclusion that the Special Master properly found that the totality of the evidence established Respondent's violations of all rule violations charged in the six matters.

The Special Master found Petitioner's witnesses credible. Ms. Dougalas, Ms. Copelin and Mr. Gardner credibly testified as to how Respondent misled them to pay him legal fees for work that Respondent could not or did not perform. Ms. Feinstein and Mr. Feinstein credibly testified regarding Respondent's failure to supervise his attorney and non-attorney employees, their efforts to discuss with Respondent the shortcomings in his law office management, Respondent's failure to undertake remedial measures to address these shortcomings, and the negative consequences of Respondent's

management of his clients' cases. In contrast, the Special Master found Respondent to be not credible.

The Board gives great deference to the Master's credibility determinations, as he had ample opportunity to assess the witnesses. *See Office of Disciplinary Counsel v. Joseph Q. Mirarchi*, No. 56 DB 2016 (D. Bd. Rpt. 5/6/2018, p. 67) (S. Ct. Order 3/18/2019). While there were contradictions between Respondent's version of events and the version of Respondent's former clients and former employees—Respondent described this as "he said" "she said" (Respondent's Brief on Exceptions, p. 8; N.T. oral argument 3/19/2024, p. 12)—upon our independent review, we find no basis to disturb the Master's findings. Moreover, the documentary evidence corroborates the testimony of Petitioner's witnesses. On this record, we conclude that the Master did not err in his conclusions of law.

## Appropriate discipline

Having determined that Respondent engaged in serious professional misconduct, we turn next to the appropriate quantum of discipline to be imposed. In looking at the general considerations governing the imposition of final discipline, it is well-established that disciplinary sanctions serve the dual purpose of protecting the public from unfit attorneys and maintaining the integrity of the legal system. *Office of Disciplinary Counsel v. John Keller*, 506 A.2d 872, 875 (Pa. 1986). Another compelling goal of the disciplinary system is deterrence. *In re Dennis Iulo*, 766 A.2d 335, 338, 339 (Pa. 2001). The Board also recognizes that the recommended discipline must be tailored to reflect facts and circumstances unique to the case, including circumstances that are aggravating or mitigating. *Office of Disciplinary Counsel v. Anthony C. Cappuccio*, 48 A.3d 1231, 1238 (Pa. 2012). And importantly, while there is no per se discipline in Pennsylvania, the Board

is mindful of precedent and the need for consistency in discipline. *Office of Disciplinary Counsel v. Robert Lucarini*, 472 A.2d 186, 189-91 (Pa. 1983).

### 1. Aggravating factors

This record reveals aggravating factors that weigh in favor of severe discipline.

#### a. Record of prior discipline

Respondent's prior discipline constitutes a weighty aggravating factor. *See Office of Disciplinary Counsel v. Michael Eric Adler*, No. 88 DB 2022 (D. Bd. Rpt. 11/6/2023, p. 32) (S. Ct. Order 1/23/2024). By Order dated July 17, 2013, the Court suspended Respondent on consent for a period of one year and imposed a consecutive one year term of probation with a practice monitor. Respondent's misconduct occurred in the latter part of 2011 through early 2012, approximately three years after his admission to the bar in Pennsylvania, and involved his wrongful attempts to solicit client referrals by requesting court employees to enter into a "mutually beneficial business arrangement" and refer potential clients to him. Respondent's prior misconduct and resulting discipline are significant for two reasons: 1) the prior wrongful acts reflect Respondent's attempts to seek professional employment outside the boundaries of the conduct rules, similar to his instant efforts in obtaining employment from clients without regard to ethical rules and with profit his driving motivation; and 2) the disciplinary sanction did not have the intended deterrent effect upon him, as Respondent's probationary period ended in 2015 and his misconduct in the instant matter started in 2018, revealing that the sanction had no appreciable beneficial effect on Respondent's subsequent actions. Considering these concerns, we find it necessary that the sanction imposed for Respondent's instant misconduct be of

126

significant weight, recognizing that the prior suspension and probationary period failed to impress upon him the need to evaluate his actions and change his unethical ways of practicing law.

> b. *Failure to recognize wrongdoing in certain matters and express remorse*

The record demonstrates that Respondent failed to acknowledge and appreciate his wrongdoing in the Gardner, Dougalas, and Copelin matters, and exhibited an overall lack of sincere remorse for the harm his conduct inflicted on any of his clients. Respondent's lack of genuine remorse compels a heavier disciplinary sanction, as the absence of remorse is an aggravating factor. *See Office of Disciplinary Counsel v. Cynthia Baldwin*, 225 A.3d 817, 858-59 (Pa. 2020). Respondent's failure to express any remorse correlates with his inability to accept that he committed wrongdoing and inflicted harm on his clients. As well, Respondent's failure to acknowledge the harm he inflicted upon the legal profession and the court system is yet more aggravation. *See Office of Disciplinary Counsel v. William H. Lynch*, No. 70 DB 2020 (D. Bd. Rpt. 10/21/2021, p. 28) (S. Ct. Order 1/6/2022).

> c. *Respondent's lack of integrity*

The record demonstrates Respondent's lack of integrity in a variety of ways. Respondent placed blame on his clients and employees in an attempt to deflect responsibility, and offered evasive, dubious and incredible testimony on many points regarding his representation of clients and management of his law practice. The impact of Respondent's lack of integrity caused harm to his clients, as shown by the testimony of Mr. Gardner, who felt "lied to and used" (NT I, 152), and Ms. Dougalas, who felt "lied

127

to and grifted." (NT I, 72) Additionally, Respondent submitted false PA Annual Attorney Registration Fee Forms from 2015 to 2022, on which forms he omitted his suspension from the Eastern District of Pennsylvania, providing yet another example of his unwillingness or inability to adhere to rules.

2. Mitigating factors

Upon review of this record, we identity factors of a mitigating nature, as set forth below. We conclude, however, that the weight accorded to these factors does not counter the significant aggravating factors as outlined above.

a. *Acceptance of responsibility in certain matters*

Respondent recognized his wrongdoing in failing to supervise his employees in the Red Wine Restaurant, Watsons, and American Club matters. Mitigation is appropriate where a respondent demonstrates acceptance of responsibility. *See Office of Disciplinary Counsel v. Robert G. Young*, No. 115 DB 2019 (D. Bd. Rpt. 11/30/2020, p. 32) (S. Ct. Order 3/16/2021). However, the weight in mitigation is reduced due to our conclusion that in general, Respondent failed to express credible remorse for the harm he inflicted upon his clients, his colleagues, and the legal profession.

b. *Character evidence*

Respondent presented the testimony of nine character witnesses. Although these witnesses credibly testified that Respondent was a truthful, honest and law abiding individual, we accord little weight to this testimony, as it revealed that these witnesses had no recent contacts with Respondent professionally or personally, did not know the current disciplinary charges against Respondent, and did not know that Respondent had a record of attorney discipline. *See Office of Disciplinary Counsel v. Valerie Andrine*

128

196

*Hibbert*, No. 215 DB 2019 (D. Bd. Rpt. 2/17/2021, p. 38) (S. Ct. Order 4/27/2021) (overall weight and significance of character evidence is undermined where a character witness has little knowledge of the underlying disciplinary charges).

### 3.    Support for a five year term of suspension

Here, the Special Master recommends a suspension for four years, adopting Petitioner's recommendation, while Respondent advocates for a suspension of 18 months or less. Initially, we address the Master's use of a "building block" approach to determine the appropriate sanction, whereby he examined each of the rule violations and decisional law pertinent to the violations and assessed appropriate discipline for the discrete acts of misconduct before reaching the end result of a four year suspension.[8] Respectfully, we disagree with this approach, as in our view it fails to account for the totality of the circumstances and does not capture the essence of Respondent's attitude and approach to his law practice that permeated his actions in each of the six matters.

As amply demonstrated by the evidence presented over seven days of hearing, during a two and a half year period, Respondent, a previously suspended lawyer, repeatedly failed to represent his clients and manage his law practice in accordance with ethical standards. He engaged in a wide range of misconduct involving: entering into vague fee agreements with clients for legal work that he could not or did not perform through his incompetence, lack of diligence and communication deficiencies; repeatedly filing incorrect or plainly false pleadings in state and federal courts, most egregiously in regard to his motion in support of another attorney's pro hoc vice admission, where Respondent deceitfully concealed his suspension in the Eastern District; and failing to

---

[8] Petitioner employed this approach, as set forth in its Brief to the Special Master.

properly manage and supervise his lawyer and nonlawyer employees. Disturbingly, Respondent failed to recognize any wrongdoing for his conduct in the Dougalas, Copelin and Gardner matters and blamed his clients for not understanding the limitations in his representation and his vague fee agreements. Further, Respondent blamed his law associates and nonlawyer employees for not following his instructions or not knowing applicable court rules, which resulted in the law firm's filing multiple incorrect pleadings in the Red Wine Restaurant, American Club and Watsons matters.

The facts of this matter make plain that in the six matters at issue, Respondent placed profit over professionalism. He employed a predatory style of taking on client representation, failing to ascertain whether the client's goals could be accomplished, and nevertheless accepting legal fees.[9] Respondent would either pass off the matter to employees without supervising the work to ensure that it was handled properly, or himself fail to do the work for which he and his firm had been retained. Respondent's explanations of how he practices law and manages his law firms reveal his nonchalance and ineptitude. By his own admission, Respondent did not take written notes of his conversations with clients, failed to keep a copy of documents that he sent to court, had vague and misleading engagement letters, failed to have another attorney review pleadings and motions before they were filed in court, was unfamiliar with procedural rules and established case law, and relied on his office manager to handle the operation of his law firms.

---

[9] The Gardner and Dougalas matters exemplify this approach. In these matters, Respondent's clients did not become aware that their requested action could not be accomplished until long after Respondent took their money. Mr. Gardner paid Respondent a first installment in August 2018 and a second installment in January 2019 for a total of $9,000 before learning in May 2019 that his expungement request could not be accomplished. Ms. Dougalas retained Respondent in 2020 and paid him $5,500 before he finally advised her in March 2021 that he could not expunge or seal her Pennsylvania felony convictions. In each of these matters, Respondent failed to undertake simple research to ascertain the viability of the requested actions.

Respondent's theory of practicing law is laid bare by his testimony that he used a "pragmatic" approach to his law practice, explaining that "certain things may not be done as may be required." (NT IV, 145, 158) The record demonstrates that in fact, many "things" were not done as required to comply with the rules of court or ethical rules. Such a confounding statement of his professional approach highlights Respondent's choice to operate a law practice outside the bounds of the rules and underscores his lack of ethical compass, revealing him to be a danger to the public and to the integrity of the legal profession. Respondent bore responsibility for the client matters that came to his firm. Here, he wholly abdicated that obligation and in doing so, seemingly forgot that while the practice of law is a business, the fundamental core of that business is the client. Upon this record, we find no evidence that Respondent had genuine concern for his clients.

Having thoroughly reviewed the record, in light of the serious nature of the violations discussed in this Report and the breadth of the misconduct, coupled with the weighty aggravating factors and less significant mitigation, for the following reasons we recommend that the Court suspend Respondent from the practice of law for a period of five years.

The recommended five year period of suspension is supported by the case law. "As is often the case with attorney disciplinary matters, there is no case precedent that is precisely on all fours..." *Cappuccio*, 48 A.3d at 1240. While our survey of prior matters did not reveal a case that squares with the instant matter, in reviewing the decisional law, we find cases that provide a benchmark to determine the severity of discipline.

Case precedent suggests that a lengthy suspension is appropriate in matters where the respondent-attorney engages in pervasive misconduct in multiple client

131

matters and there are significant aggravating factors. In the matter of *Office of Disciplinary Counsel v. James P. Miller*, No. 52 DB 2022 (D. Bd. Rpt. 9/7/2023) (S. Ct. Order 11/20/2023), the Court suspended Miller for four years. The underlying facts demonstrated that Miller, in his capacity as conflicts counsel for Erie County, repeatedly failed to properly represent multiple clients, some of whom were juveniles incarcerated in adult prison, by failing to communicate, failing to act with diligence and promptness to move matters to their conclusion, failing to adhere to deadlines, and failing to follow court orders. Miller also failed to respond to Office of Disciplinary Counsel's requests for information. In aggravation, the Board noted Miller's "grievous" neglect of juvenile defendants as well as his continued procrastination after the court become involved. Miller had no prior history of discipline; however, the Board found that the nature of the repeated neglect and failure to comply with court orders was significantly serious to warrant a lengthy suspension.

In the matter of *Office of Disciplinary Counsel v. Christopher John Basner*, No. 80 DB 2014 (D. Bd. Rpt. 10/16/2015) (S. Ct. Order 12/17/2015), the Court suspended Basner for a period of five years for his misconduct in eleven matters involving neglect, incompetence, failure to communicate with clients, dishonesty, and conduct prejudicial to the administration of justice. Basner displayed a repeated lack of professionalism, which included failing to follow court rules and procedures, filing last minute pre-trial motions, filing meritless briefs, appeals, motions and petitions in various courts, and failing to appear for court, including at jury selection, trial, Megan's Law hearings, sentencing, and contempt proceedings against himself and clients in multiple courts. Basner also failed to refund a fee to one client. Basner had no prior history of discipline.

The Board found that Basner, similar to the instant Respondent, had "little or no understanding of the law, lacks appreciation for the need to comply with court orders, appears unable to understand instructions from judges, and consistently reflects poorly upon the legal profession." D. Bd. Rpt., p. 43. In making its recommendation to the Court, the Board concluded that "[a] suspension of five years is warranted to call appropriate attention to [Basner's] pervasive neglect and incompetence, and his repeated habit of ignoring the rules governing the courts of this Commonwealth and the disciplinary system." Although Basner committed misconduct in more matters than Respondent, the Board's conclusion in *Basner* applies here with equal force, recognizing that Respondent is a repeat offender who has previously been suspended for misconduct that stemmed from his choice to place profit over professionalism.

Upon this record, we conclude that Respondent is not fit to practice law. The serious and troubling misconduct established in this record compels a lengthy suspension in order to protect the public, preserve the integrity of the profession and the courts, and deter other practitioners from engaging in similar misconduct. We recommend that Respondent be suspended for a period of five years.

IV.        RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania unanimously recommends that the Respondent, Joseph D. Lento, be Suspended for five years from the practice of law in this Commonwealth.

It is further recommended that the expenses incurred in the investigation and prosecution of this matter are to be paid by the Respondent.

Respectfully submitted,

THE DISCIPLINARY BOARD OF THE
SUPREME COURT OF PENNSYLVANIA

By:_____
Joshua M. Bloom, Member

Date:__7-1-24__

134

SUPREME COURT OF NEW JERSEY
Disciplinary Review Board
Docket No. DRB 15-425
District Docket No. XIV-2014-0338E

_____    :
                             :
IN THE MATTER OF             :
                             :
JOSEPH D. LENTO              :
                             :
AN ATTORNEY AT LAW           :
_____    :

                                        Decision


Argued: April 21, 2016

Decided: September 23, 2016

Hillary K. Horton appeared on behalf of the Office of Attorney Ethics.

Respondent appeared pro se.


To the Honorable Chief Justice and Associate Justices of the Supreme Court of New Jersey.

This matter was before us on a motion for reciprocal discipline filed by the Office of Attorney Ethics (OAE), following Pennsylvania's one-year suspension of respondent for his violation of the Pennsylvania equivalent of New Jersey RPC 5.4(a) (sharing legal fees with a nonlawyer); RPC 7.3(d) (compensating or giving anything of value to a person to recommend or secure the lawyer's employment by a client, or as a reward for

having made a recommendation resulting in the lawyer's employment by a client); RPC 8.4(a) (violating or attempting to violate the Rules of Professional Conduct); RPC 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit or misrepresentation); and RPC 8.4(d) (engaging in conduct prejudicial to the administration of justice).

We determine to grant the motion for reciprocal discipline and impose a reprimand.

Respondent was admitted to the Pennsylvania and New Jersey bars in 2008. At all relevant times, he maintained an office for the practice of law in Philadelphia, Pennsylvania. He has no history of discipline.

On April 4, 2013, the Pennsylvania Office of Disciplinary Counsel (ODC) filed a "Joint Petition in Support of Discipline on Consent Under Pa. R.D.E. 215(d)" (Joint Petition). On April 23, 2013, the Disciplinary Board for the Supreme Court of Pennsylvania (PaDB) approved the Joint Petition and recommended a one-year suspension, to be followed by one year of probation (with conditions). On July 17, 2013, the Supreme Court of Pennsylvania granted the Joint Petition and respondent was suspended from the practice of law for one year, followed by a one-year period of probation, with recommended conditions. Specifically, respondent was required to select a practice

2

204

monitor subject to the ODC's approval, who would periodically examine respondent's law office organization, meet with respondent monthly, answer law office management questions, file quarterly reports, and report any violations of the probation terms.

The Joint Petition set forth the factual basis for respondent's multiple Pennsylvania RPC violations. Specifically respondent agreed that, by letter dated November 10, 2011, he "reach[ed] out" to Dwayne Stevens, an employee with the First Judicial District of Pennsylvania, Curran-Fromhold Correctional Facility, Bail Unit, in an effort to expand his criminal defense practice. The letter requested an opportunity for respondent to speak to Stevens "about the prospect of a mutually beneficial business relationship." Respondent suggested they meet for lunch and, to that end, gave Stevens his phone number.

On December 26, 2011, respondent sent similar letters to eight clerical assistants assigned to the bail unit in pretrial services at the Criminal Justice Center. In addition to proposing the same "mutually beneficial business relationship," respondent explained that he was "trying to find out who posts bail in Philadelphia so that [he] can follow up on [his] end." Further, he acknowledged that, although the requested

information might be public, he was hoping they would expend the minimal effort and assist him.

During the week of January 2, 2012, respondent approached Brittany Baggio, a court employee, at the information counter at the Criminal Justice Center in Philadelphia. He asked her to take a stack of his business cards and keep them at the information counter so she could distribute them to anyone looking for a lawyer. He also offered to pay Baggio if she gave a card to a prospective client who eventually retained his services. He suggested she give her name to the client or put her initials on the back of the card so he would know the source of the referral. He said the arrangement was "just between" them. Baggio refused to accept the stack of cards. Nevertheless, he placed the stack of business cards on the information counter and left. Prior to January 10, 2012, he returned to the information counter and left a stack of his business cards with a different court employee.

Judge John W. Herron, Administrative Judge of the Court of Common Pleas, Trial Division, became aware of respondent's conduct and, by letter dated January 4, 2012, requested respondent explain the improper solicitation of referrals contained in the letters he sent to court personnel. Further, Judge Herron requested the names of all individuals to whom

respondent had made offers of compensation in exchange for business. Respondent was suspended from the court-appointed attorney list for the First Judicial District.

For this conduct, the Joint Petition established that respondent violated Pennsylvania RPC 5.4(a), RPC 7.3(a)[1], RPC 8.4(a), RPC 8.4(c) and RPC 8.4(d).

The Joint Petition found, as an aggravating factor, that respondent "had been employed by the First Judicial District as a Juvenile Probation Officer since 2003, [and] was terminated from his employment for failing to return to work." As to the mitigation, the parties agreed that respondent admitted his misconduct and had been practicing law for only three years.

For these violations, the parties agreed that a one-year suspension was the appropriate discipline, followed by a one-year period of probation (with conditions). According to the OAE's brief, respondent "properly self-reported his Pennsylvania discipline" to the New Jersey disciplinary authorities.

---

[1] RPC 7.3(a), which has no precise New Jersey equivalent, prohibits solicitation of professional employment, whether "in-person or by intermediary," for pecuniary gain. New Jersey RPC 7.3(d) prohibits compensating another to recommend the lawyer's employment.

5

Pursuant to R. 1:20-14(a)(5), another jurisdiction's finding of misconduct shall establish conclusively the facts on which it rests for purposes of disciplinary proceedings. Although we adopt the PaDB's factual findings, as well as its conclusion that respondent was guilty of unethical conduct, we cannot agree with its particular RPC findings. Specifically, the PaDB found that respondent's conduct violated the New Jersey equivalent of RPC 5.4(a) (sharing a fee with a nonlawyer) and RPC 7.3(d) (compensating or giving anything of value to a person to recommend or secure the lawyer's employment or as a reward for having made a recommendation resulting in the lawyer's employment by a client). Respondent, however, was unsuccessful in his attempts to convince the Pennsylvania court employees to refer business to him in return for a monetary payment. He, thus, never made any such payments. Accordingly, we cannot find that he violated those rules. Nevertheless, we do find that respondent's actions in furtherance of his intention to generate business through the court employees' referrals constituted a clear attempt to violate both RPC 5.4(a) and RPC 7.3(d). For these attempts, respondent is guilty of a violation of RPC 8.4(a), a finding also made by the PaDB.

Additionally, the record does not support a finding that respondent violated RPC 8.4(c) or RPC 8.4(d). Although respondent

6

admitted that he attempted to convince third parties to refer him business, nothing about his attempts involved dishonesty, fraud, deceit or misrepresentation. Therefore, we decline to find that he violated RPC 8.4(c).

Further, respondent's attempts to solicit business took place over two months and ceased promptly after Judge Herron intervened. Respondent did not secure any business as a result of his misconduct. The record contains no evidence that his conduct had any effect on the administration of justice. We, thus, decline to adopt the PaDB's finding that respondent violated RPC 8.4(d).

Reciprocal discipline proceedings in New Jersey are governed by R. 1:20-14(a)(4), which provides:

> The Board shall recommend the imposition of the identical action or discipline unless the respondent demonstrates, or the Board finds on the face of the record on which the discipline in another jurisdiction was predicated that it clearly appears that:
>
> (A) the disciplinary or disability order of the foreign jurisdiction was not entered;
>
> (B) the disciplinary or disability order of the foreign jurisdiction does not apply to the respondent;
>
> (C) the disciplinary or disability order of the foreign jurisdiction does not remain in full force and effect as the result of appellate proceedings;

7

209

(D) the procedure followed in the foreign disciplinary matter was so lacking in notice or opportunity to be heard as to constitute a deprivation of due process; or

(E) the unethical conduct established warrants substantially different discipline.

A review of the record does not reveal any conditions that would fall within the ambit of subparagraphs (A) through (D). Paragraph (E) applies, however. In New Jersey, respondent's misconduct would merit discipline far less severe than the suspension imposed in Pennsylvania. For the reasons discussed below, in our view, respondent's misconduct warrants a reprimand.

Notwithstanding the inchoate nature of respondent's alleged violations of RPC 5.4(a) and RPC 7.3(d), in analyzing the proper quantum of discipline, we considered cases that addressed the specific RPCs that respondent attempted to violate.

In cases involving improper fee sharing with nonlawyers, the discipline has ranged from an admonition to a lengthy suspension, depending on the severity of the lawyer's conduct, the presence of other serious violations, and the lawyer's ethics history. See, e.g., In the Matter of Paul R. Melletz, DRB 12-224 (November 16, 2012) (admonition for attorney who hired a paralegal for immigration matters as an independent contractor and, for a few years, evenly divided the flat fee charged to

8

210

immigration clients); <u>In re Agrapidis</u>, 188 <u>N.J.</u> 248 (2006) (reprimand imposed where, over a four-year period, attorney shared fees with nonlawyer employees on twelve occasions by paying them a percentage of legal fees received from clients whom the employees had referred to him; the attorney was not aware of the prohibition against fee-sharing and viewed the payments as "bonuses"); <u>In re Macaluso</u>, 197 <u>N.J.</u> 427 (2009) (censure imposed on attorney, who, as a nominal partner, participated in a prohibited compensation arrangement with an employee and failed to report the controlling partner's misconduct); <u>In re Fusco</u>, 197 <u>N.J.</u> 428 (2009) (companion case to Macaluso) (attorney suspended for three months for paying a nonlawyer claims manager both a salary and a percentage of the firm's net fee recovered in personal injury matters that were resolved with the manager's "substantial involvement;" the claims manager received a larger percentage of the firm's fees in cases that he had referred to the firm; other infractions included failure to supervise nonlawyer employees and failure to report another lawyer's violation of the <u>RPC</u>s); and <u>In re Carracino</u>, 156 <u>N.J.</u> 477 (1998) (six-month suspension for attorney who agreed to share fees with a nonlawyer, entered into a law partnership agreement with a nonlawyer, engaged in a conflict of interest, displayed gross neglect, failed to

9

communicate with a client, engaged in conduct involving misrepresentation, and failed to cooperate with disciplinary authorities).

In facts similar to the instant matter, the Court, in In re Lisa, 169 N.J. 419 (2001), imposed a six-month suspension on an attorney for his attempt to arrange for a third party to distribute his business cards to prospective clients. Specifically, the attorney asked a corrections officer to distribute his business cards to criminal defendants in exchange for receiving a percentage of the fee earned. In the Matter of James R. Lisa, DRB 00-220 (May 29, 2001) (slip op. at 5). Although the corrections officer rejected the attorney's offer, we found that the attorney violated RPC 8.4(a) for his attempt at sharing a fee with a nonlawyer. Id. at 5, 8. Although the attorney's significant ethics history weighed heavily in our decision to impose a six-month suspension, we viewed respondent's attempt to share legal fees with a nonlawyer, albeit unsuccessful, as extremely serious. Id. at 10.

Here, the agreed facts make clear that respondent engaged in several attempts to solicit business by offering financial compensation to court employees for referrals. Specifically, respondent wrote to Dwayne Stevens and eight clerical assistants requesting an opportunity to discuss a "mutually beneficial

10

212

business relationship." Further, in January 2012, respondent asked Brittany Baggio, a court employee at the information counter at the Criminal Justice Center in Philadelphia, to distribute his business cards for individuals looking for a lawyer; in exchange, respondent offered her financial compensation. Although she refused his offer, he left a stack of his business cards on the counter. Respondent also returned later that month and left a stack of his business cards with another court employee.

Respondent's attempt to receive referrals was thwarted only by the intervention of Judge Herron, who, by letter dated January 4, 2012, informed respondent that his conduct was improper and suspended him from the court-appointed attorney list for the First Judicial District.

In his brief, respondent described his conduct as "overzealous business development efforts" and analogized it to his requests to be placed on court appointment lists. Further, he explained that he did not ask for guidance from other attorneys as to where to find the bail receipt information, for fear of competition, believing that those attorneys would then adopt his idea and, thus, obtain the same clients respondent was seeking.

The OAE recommends a reprimand, citing In re Burger, 201 N.J. 120 (2010). There, an attorney who had been practicing law

11

213

for forty-seven years, without incident, employed a paralegal who performed office tasks as well as translation services. In the Matter of Martin Burger, DRB 09-243 (slip op. at 2) (December 3, 2009). The paralegal also referred cases from her personal contacts and the attorney paid her fifty percent of the fees generated by her referrals, plus $200 per week for her secretarial services. Id. at 2-3. The payments were made to an entity created and controlled by the paralegal, which had amassed $230,000 in referral fees. Ibid. Through a stipulation, the attorney was found to have violated RPC 5.4(a) and RPC 7.3(d). Ibid. He received a reprimand after consideration of mitigation, including his acknowledgement of wrongdoing, character letters, and an unblemished history. Id. at 6-7.

We consider respondent's misconduct to be most analogous to that of the attorney in Lisa. Although we view respondent's unabashed attempts to solicit business through improper referral methods as serious, there is mitigation to consider. First, unlike the attorney in Lisa, who had a significant ethics history, this is respondent's first brush with the disciplinary system. Moreover, at the time of his misconduct, he was a relatively inexperienced attorney with no senior guidance. Finally, respondent admitted to his misconduct and has expressed

12

remorse for his mistakes. In this light, we determine to impose a reprimand for respondent's misconduct.

Member Gallipoli did not participate.

We further determine to require respondent to reimburse the Disciplinary Oversight Committee for administrative costs and actual expenses incurred in the prosecution of this matter, as provided in R. 1:20-17.

Disciplinary Review Board
Bonnie C. Frost, Chair

By:  Ellen A. Brodsky
Chief Counsel

13

215

SUPREME COURT OF NEW JERSEY
DISCIPLINARY REVIEW BOARD
VOTING RECORD

In the Matter of Joseph D. Lento
Docket No.  DRB 15-425

Argued:  April 21, 2016

Decided: September 23, 2016

Disposition: Reprimand

| Members | Disbar | Suspension | Reprimand | Dismiss | Disqualified | Did not participate |
|---|---|---|---|---|---|---|
| Frost | | | X | | | |
| Baugh | | | X | | | |
| Boyer | | | X | | | |
| Clark | | | X | | | |
| Gallipoli | | | | | | X |
| Hoberman | | | X | | | |
| Rivera | | | X | | | |
| Singer | | | X | | | |
| Zmirich | | | X | | | |
| Total: | | | 8 | | | 1 |

Ellen A. Brodsky
Chief Counsel

216

Ex. F4

**VIRGINIA:**

### BEFORE THE VIRGINIA STATE BAR DISCIPLINARY BOARD

**IN THE MATTER OF**
**JOSEPH D. LENTO**                          **VSB DOCKET NO.: 24-090-132162**

### MEMORANDUM ORDER OF REVOCATION

A panel of the Virginia State Bar Disciplinary Board (the "Board") heard this matter on May 16, 2025. The panel members included Alison G. M. Martin, Chair; Yvonne S. Gibney; Mary Beth Nash; Theodore Smith, Lay Member; and Reiss F. Wilks. At the outset of the hearing, the Chair inquired of each member of the panel whether any of them had any personal or financial interest that might affect or reasonably be perceived to affect their ability to be impartial in this matter. Each member, including the Chair, responded in the negative.

Edward J. Dillon, Deputy Bar Counsel, represented the Virginia State Bar ("Bar" or "VSB"). Dennis John Quinn and Anthony C. Gunst, IV, appearing *pro hac vice*, represented Respondent Joseph D. Lento ("Respondent"), who appeared by video conference.

Court Reporter Beverly S. Horne, Chandler & Halasz, P.O. Box 1975, Mechanicsville, Virginia 23116, (804) 730-1222, after being duly sworn by the Chair, reported this matter and transcribed the proceedings.

The Clerk of the Disciplinary System ("the Clerk") timely sent all legal notices of the date and place in the manner prescribed by the *Rules of the Supreme Court of Virginia*, Part Six, §IV, ¶¶13-12.C and 13-18.C.

This matter came before the Board on the Subcommittee Determination (Certification) of the Ninth District Subcommittee, dated February 7, 2025 (the "Certification"), in accordance with

Part Six, §IV, ¶13-18 of the *Rules of the Supreme Court of Virginia*, involving misconduct charges against the Respondent.

Prior to the hearing, at the Pre-Hearing Conference, over objections from the Respondent, the Chair ruled that VSB Exhibits 1-46 would be admitted into evidence. The Chair also ruled, over objections from the Bar, that Respondent's Exhibits 1-14 would be admitted into evidence. There were no objections from either party to the proposed witnesses.

During the misconduct phase of the hearing the Board heard testimony from the following witnesses, all of whom testified under oath and by video conference: Rodney J. Guyton, Lawrence Katz, Joseph D. Lento, and McGavock D. Reed, Jr. In addition, the Board considered the Affidavit of John E. Groff, which it received into evidence as Respondent's Exhibit 15 admitted over objection.

At the conclusion of the Bar's presentation of its case, Respondent moved to strike the following alleged violations of the Rules of Professional Conduct: Rule 1.1, Rule 1.3(a) and (b), Rule 1.4(a) and (b), Rule 1.5(a), Rule 5.1(a) and (c), and Rule 8.4(b). Following the Board's consideration of the motion, the Chair announced that the Board would take the motion under advisement. The Respondent then presented his case.

The Board considered the witnesses' testimony and the exhibits; heard argument of counsel for the Bar and for Respondent; and met in private to consider its decision.

## MISCONDUCT

The Board made the following findings of fact based on clear and convincing evidence:

1. Respondent is not admitted to practice law in the Commonwealth of Virginia.

2. Respondent was licensed to practice law in the State of New Jersey and the State of New York at all times relevant to the allegations of the Certification. Respondent was licensed

to practice law in the Commonwealth of Pennsylvania until November 19, 2024. Respondent began practicing law in 2008.

3.    Respondent is the founding attorney and a majority shareholder of the Lento Law Group, P.C. Between 2008 and December 2024, he was the sole owner and managing attorney of the Lento Law Firm, a "separate, complementary law practice to Lento Law Group."[1] Lento Law advertises and markets itself as "a national law firm" that specializes in education matters. In 2024 Lento Law advertised that it had a Virginia office. Respondent works primarily out of the firm's Pennsylvania office.

4.    On or about March 4, 2024, Rodney Guyton communicated with Lento Law about representing him in a case Guyton had filed in Virginia, *pro se*, against Liberty University ("Liberty"), which case was then pending in Lynchburg General District Court. Lento Law responded the same day, quoting a "non-refundable (earned upon receipt) $350 consultation fee[.]" Guyton immediately paid the quoted fee and received an email from Respondent that requested information about Guyton's case and transmitted a Consultation Engagement Letter, which Respondent prepared.

5.    By email sent on March 9, 2024, Respondent arranged a telephone consultation with Guyton. Respondent and a non-attorney employee of Lento Law, John Groff, participated in the consultation with Guyton on March 11, 2024. Guyton understood that Respondent was a licensed attorney and capable of representing Guyton in Virginia. Respondent did not tell Guyton that he was not licensed in Virginia.

6.    During their consultation Guyton informed Respondent of the upcoming deadlines in his case against Liberty. As a result, Respondent was aware, in particular, that Guyton had a

---

[1] Both Lento Law Group and Lento Law Firm will be referred to as "Lento Law" throughout this memorandum order, as the two entities are factually indistinguishable for purposes of the facts underlying the Certification.

3

court-imposed deadline to file a Bill of Particulars in just over three weeks. In his testimony Respondent considered Guyton's approaching court deadline as a factor in his decision whether Lento Law could handle Guyton's representation. Respondent is the person in the firm who decides which cases to take and the amount of the fee the firm will charge a client.

7. On March 12, the day after their consultation, Respondent sent Guyton an email that included an engagement letter. It stated that Lento Law would represent Guyton in his claims against Liberty in exchange for an up-front "non-refundable" $15,000 payment to cover "costs and expenses," in addition to a percentage of any recovery. The engagement letter further explained that the $15,000 payment "is fully earned upon receipt." Respondent had not asked a licensed Virginia attorney to review the engagement letter before presenting it to Guyton. Guyton signed the engagement letter and paid the $15,000 fee the same day. Respondent's March 12 email was the last time Respondent ever communicated with Guyton.

8. The following day, Guyton sent an email to Respondent to which he attached pleadings and other documents pertinent to his case against Liberty. On March 25, 2024, Guyton emailed Lento Law, stating that he had "yet to hear anything from the team after [he] submitted relevant materials and a follow up e-mail. The submission deadline [for filing a Bill of Particulars] is 4/3/24; please advise."

9. Respondent testified that the Lento Law attorney that is assigned to handle a case is the attorney who will prosecute the case "in all respects." However, the day after his consultation with Respondent, Guyton received an email from Lento Law, advising him that his case had been assigned to Angela Tate Martinez, an attorney who was not licensed to practice law in Virginia. Ms. Martinez could not have prosecuted Guyton's case in any respect. Moreover, within days after this "assignment," Martinez's employment with Lento Law had terminated.

4

10.     On April 3, 2024 – the due date for the Bill of Particulars – Guyton received a voicemail message from Randall Stone, an attorney with Lento Law. Stone was the only attorney with Lento Law who was admitted to practice in Virginia. Stone asked for a calculation of Guyton's damages arising from his claim against Liberty. Guyton responded by text message, advising Stone that his total damages were $16,416. Because of Stone's schedule, Guyton was not able to speak with Stone by phone until April 9, 2024, when Stone told Guyton that he could not represent Guyton. Stone told him that although Stone was licensed to practice in Virginia, he was located in Arizona and the amount of damages Guyton was seeking was too small for Stone to handle Guyton's case from out of state. Stone advised Guyton it might be best to allow the case to be dismissed and possibly consider refiling suit in another court. [2] However, Stone did not file a Bill of Particulars or otherwise act on Guyton's behalf.

11.     On April 10, 2024, after Stone declined to handle Guyton's case, Guyton sent an email to Respondent and Lento Law raising the concern that no one from Lento Law had contacted him about filing the Bill of Particulars which was one week overdue. Two days later, Guyton sent an email to Respondent noting that Stone had declined to represent Guyton and added, "I am now nine days overdue and do not have an assigned attorney on my case." Respondent did not know that Stone had declined to handle Guyton's case until he received this email. Nevertheless, neither he nor anyone else from Lento Law responded to Guyton or acted to protect his interests when they received this news.

12.     On April 16, 2024, Liberty moved the court to dismiss Guyton's case because Guyton had not filed a Bill of Particulars by the April 3 deadline. The court granted the motion and dismissed Guyton's case on April 18, 2024. Guyton sent an email to Respondent four days

---

[2] Guyton's testimony reflects that this is the only advice he received from the Lento Law firm on his case.

5

later to advise of Liberty's motion to dismiss. He sent another email to Respondent the following day to advise him that the court had dismissed the case and to request Respondent's advice. Neither Respondent nor anyone else from Lento Law responded to these emails.

13. Although Respondent offered no responses to Guyton's emails, Respondent's internal emails at Lento Law show that he understood that the growing disaster of Guyton's case was becoming a problem for Respondent himself. His prosaic assessment was that the court would likely dismiss Guyton's case "with prejudice and then I will be farked [sic]."

14. Respondent's claims that he or Lento Law attempted to retain a Virginia attorney to handle Guyton's representation after Stone declined to do so were not supported by credible evidence.

15. At no time during Respondent's representation of Guyton did Respondent or another attorney with Lento Law perform any work or incur any costs or expenses on Guyton's behalf. In an internal email Respondent admitted that Guyton "really should get his money back b/c [Stone] punted the case/did nothing . . ." Yet, in the two months after Respondent learned that Lento Law's only Virginia attorney would not handle Guyton's representation, Respondent did not return Guyton's $15,000.

16. After many unanswered communications to Respondent and others at Lento Law, which included multiple telephone calls and emails, Guyton filed the present bar complaint. He also engaged Virginia attorney McGavock D. Reed, Jr., Esq. to assist him in recovering his $15,000 from Lento Law. Reed sent a demand letter to Respondent requesting the return of Guyton's unearned fee on June 11, 2024, but received no response.

17. After Reed filed a lawsuit against Lento Law to recover Guyton's $15,000, Lento Law's legal counsel contacted Reed. Over the next ten months, Lento Law, through its counsel,

6

222

negotiated the amount Lento Law would agree to return to Guyton. After having kept Guyton's money for well over a year, Lento Law finally refunded Guyton the original $15,000 advancement of "costs and expenses", on or about April 21, 2025.

18. Guyton paid Reed legal fees in the amount of $4250 to collect the $15,000 from Lento Law.

## RULES VIOLATED

Pursuant to the provisions of *Rule 8.5* of the *Virginia Rules of Professional Conduct* [3] the Board concludes that Respondent is subject to the Board's authority because he held himself out as providing, and offered to provide, legal services in Virginia.[4] The Board further finds that because the alleged misconduct occurred "in the course of providing, holding out as providing, or offering to provide legal services in Virginia," the *Virginia Rules of Professional Conduct ("Rules"* or *"Rule"*) apply, and the Board finds by clear and convincing evidence that the conduct of

---

[3] *Rule 8.5* provides as follows:

(a) Disciplinary Authority. A lawyer admitted to practice in this jurisdiction is subject to the disciplinary authority of Virginia, regardless of where the lawyer's conduct occurs. A lawyer not admitted in Virginia is also subject to the disciplinary authority of Virginia if the lawyer provides, holds himself out as providing, or offers to provide legal services in Virginia. By doing so, such lawyer consents to the appointment of the Clerk of the Supreme Court of Virginia as his or her agent for purposes of notices of any disciplinary action by the Virginia State Bar. A lawyer may be subject for the same conduct to the disciplinary authority of Virginia and any other jurisdiction where the lawyer is admitted.

(b) Choice of Law. In any exercise of the disciplinary authority of Virginia, the rules of professional conduct to be applied shall be as follows:

(1) for conduct in connection with a proceeding in a court, agency, or other tribunal before which a lawyer appears, the rules to be applied shall be the rules of the jurisdiction in which the court, agency, or other tribunal sits, unless the rules of the court, agency, or other tribunal provide otherwise;

(2) for any other conduct, the rules of the jurisdiction in which the lawyer's conduct occurred; and

(3) notwithstanding subparagraphs (b)(1) and (b)(2), for conduct in the course of providing, holding out as providing, or offering to provide legal services in Virginia, the Virginia Rules of Professional Conduct shall apply.

[4] Respondent has noted no objection to the Bar's disciplinary authority over him in this matter.

7

223

Respondent set forth above constitutes misconduct in violation of the following provisions of the *Rules*:

**Rule 1.1      Competence**

**A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.**

Respondent violated this Rule by accepting Guyton's $15,000, agreeing to represent Guyton in his Virginia lawsuit against Liberty, failing to take actions to ensure that a licensed Virginia attorney was handling Guyton's representation and taking appropriate steps to avoid the dismissal of the case, failing to withdraw promptly from Guyton's representation when he had no Virginia attorneys to handle the representation, and failing to communicate with Guyton at any time after March 12, 2024.

**Rule 1.3      Diligence**

**(a)      A lawyer shall act with reasonable diligence and promptness in representing a client.**
**(b)      A lawyer shall not intentionally fail to carry out a contract of employment entered into with a client for professional services but may withdraw as permitted under Rule 1.16.**

Respondent violated Rule 1.3 (a) and (b) by agreeing to accept Guyton's representation but failing to provide Guyton with a licensed Virginia attorney who would carry out that representation. Respondent initially assigned an attorney who was not licensed in Virginia to represent Guyton who left Lento Law days later. Respondent assigned no one to represent Guyton until the day Guyton's Bill of Particulars was due, when Lento Law's only Virginia attorney — Randall Stone — was assigned to handle Guyton's representation. Respondent failed to ensure that Stone was able to provide those legal services, however, and by April 12, 2024, Respondent either knew or should have known that Stone had declined to represent Guyton. Yet, Respondent took

8

224

no action to find a licensed Virginia attorney to represent Guyton at any time before Respondent finally refunded Guyton's advanced payment a year later.

**Rule 1.4      Communication**

**(a)      A lawyer shall act with reasonable diligence and promptness in representing a client.**

**(b)      A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.**

Respondent violated Rule 1.4 (a) and (b) by failing to communicate with Guyton at any time after March 12, 2024. At minimum Respondent should have communicated with Guyton about the attorney assignments for Guyton's representation; he should have responded when Guyton raised concerns about the missed deadline, Liberty's motion to dismiss, and the dismissal of Guyton's case; and he should have communicated when he learned that Stone would not handle Guyton's representation by promptly returning Guyton's fee and withdrawing from the representation.

**Rule 1.5      Fees**

**(a)      A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:**

**(1)      The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;**
**(2)      The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;**
**(3)      The fee customarily charged in the locality for similar legal services;**
**(4)      The amount involved and the results obtained;**
**(5)      The time limitations imposed by the client or by the circumstances;**
**(6)      The nature and length of the professional relationship with the client;**
**(7)      The experience, reputation, and ability of the lawyer or lawyers performing the services; and**
**(8)      Whether the fee is fixed or contingent.**

9

225

Respondent violated this Rule by charging and accepting from Guyton a nonrefundable fee of $15,000, in addition to a percentage of any recovery, for which Lento Law performed no services and incurred no costs or expenses.

**Rule 1.15     Safekeeping Property**

. . .

**(b) <u>Specific Duties</u>: A lawyer shall:**

. . .

      **(4)     Promptly pay or deliver to the client or another as requested by such person the funds, securities, or other properties in the possession of the lawyer that such person is entitled to received[.]**

Respondent violated this Rule by accepting from Guyton a fee of $15,000. However, he performed no work and incurred no expenses on Guyton's behalf. Respondent further failed to refund any portion thereof for more than a year, even after Guyton, through his legal counsel, had made a written demand to Respondent ten months earlier for the fee to be refunded.

**Rule 1.16     Declining or Terminating Representation**

**(a)     Except as stated in paragraph (c), a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if:**
      **(1)     The representation will result in violation of the Rules of Professional Conduct or other law;**

. . .

**(d)     Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, refunding any advance payment of fee that has not been earned and handling records as indicated in paragraph (e).**

Respondent violated subsection (a) of this Rule by failing to withdraw from Guyton's representation when no attorney with Lento Law entered an appearance on Guyton's behalf in his lawsuit against Liberty and by continuing Guyton's representation

10

226

while failing to provide Guyton competent representation (violating Rule 1.1), failing to provide him diligent representation (violating Rule 1.3), failing to communicate with Guyton (violating 1.4), and charging Guyton an unreasonable fee (violating Rule 1.5)

Respondent violated subsection (d) of this Rule by failing to refund Guyton's $15,000 fee in April 2024, as soon as Respondent knew he had no licensed Virginia attorney on his staff who could represent Guyton in his lawsuit against Liberty. Lento Law had not earned the fee and had no right to retain it for more than a year.

**Rule 5.1    Responsibilities of Partners and Supervisory Lawyers**

**(a)    A partner in a law firm, or a lawyer who individually or together with other lawyers possesses managerial authority, shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that all lawyers in the firm conform to the Rules of Professional Conduct.**

As sole owner and managing attorney of Lento Law, as the only attorney who arranged for and conducted Guyton's initial consultation with Lento Law, and as the only attorney in the firm who decides which cases the firm will take and the amount of the fee to be charged, Respondent possessed managerial authority at Lento Law. Respondent violated Rule 5.1(a) by failing to take any action to ensure that the firm had a licensed Virginia lawyer who was available and willing to handle Guyton's representation and by failing to ensure that the terms of the engagement letter with Guyton complied with Virginia's *Rules*.

**Rule 8.4    Misconduct**

**It is professional misconduct for a lawyer to do any of the following:**

. . .

**(b)    Commit a criminal or deliberately wrongful act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness to practice law; [.]**

11

227

Respondent violated this Rule by deliberately retaining a nonrefundable $15,000 fee for over a year that he knew that his firm had not earned and that he admitted should be returned to Guyton. He further violated this Rule by deliberately failing to respond to Guyton's emails and calls, while his internal emails reflected his awareness of Guyton's communications and the serious problems he and his firm had created for Guyton.

The Board found insufficient evidence to support a finding that Respondent violated Rule 5.1(c).

## SANCTION PHASE

After the Board announced its findings by clear and convincing evidence, it received further evidence and argument from the Bar and Respondent regarding aggravating and mitigating factors applicable to the appropriate sanction for the misconduct underlying the Rules violations, including Respondent's prior disciplinary record. Respondent's Virginia disciplinary record, admitted as VSB Exhibit 47, reflected no prior disciplinary history. However, Respondent's disciplinary history in Pennsylvania was significant.

In an Order issued by the Supreme Court of Pennsylvania on July 17, 2013, Respondent received a one-year suspension from the practice of law as a result of his violation of Pennsylvania Rules of Professional Conduct ("PA Rule") 5.4(a) (prohibiting the sharing of legal fees with a nonlawyer), PA Rule 7.3(a) (prohibiting the solicitation of prospective clients by telephone, in person, or real-time electronic communication), and PA Rule 8.4(a),(c), and (d) (stating that it is professional misconduct to violate the Rules of Professional Conduct, to engage in conduct involving dishonesty, and to engage in conduct prejudicial to the administration of justice). The Order, which was admitted as VSB Exhibit 48, described Respondent's underlying misconduct as

12

228

follows: "From mid-November 2011 to mid-January 2012, Respondent initiated two schemes to pay government employees to assist him in obtaining new clients."

On November 19, 2024, the Supreme Court of Pennsylvania issued an order suspending Respondent from the practice of law for five years. The Order, which was admitted as VSB Exhibit 49, was based on misconduct by Respondent in six different matters he and his firm handled. The Court found that Respondent's misconduct in the Pennsylvania matters violated PA Rules 1.1, 1.3, 1.4(a) and (b), 1.5(a), 1.16(d), 5.1(a), and 8.4(c)[5]. The Pennsylvania Court also found that Respondent violated Rule 5.3, Rule 5.5, and Rule 8.1. The Order characterized Respondent's misconduct as follows:

> The facts of this matter make plain that in the six matters at issue, Respondent placed profit over professionalism. He employed a predatory style of taking on client representation, failing to ascertain whether the client's goals could be accomplished, and nevertheless accepting legal fees. Respondent would either pass off the matter to employees without supervising the work to ensure that it was handled properly, or himself fail to do the work for which he and his firm had been retained.

The Court's description of Respondent's handling of the six cases is a perfect description of Respondent's misconduct in Guyton's representation.

The fallout from Respondent's misconduct includes Guyton's need to hire McGavock Reed to seek a refund of his $15,000 from Respondent. Guyton incurred $4,250 in attorney's fees for Reed's services. Guyton's lawsuit against Liberty has been dismissed because of Respondent's misconduct and until Respondent finally returned Guyton's fee within weeks of this hearing, Guyton was unable to take any further steps to pursue Liberty.

## DISPOSITION

---

[5] Pennsylvania's Rule 8.4(c) is the same as Virginia's Rule 8.4(b).

13

After considering the exhibits, testimony, and arguments of counsel, the Board was guided by Standard 4.11 of the Annotated Standards for Imposing Lawyer Sanctions, 2nd Edition (ABA 2019), which provides that "disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client." Here, Respondent retained Guyton's $15,000 for more than a year during which time (1) he either knew or should have known that his firm had no licensed Virginia attorney to perform the services Guyton had engaged Respondent's firm to perform, (2) he admitted in internal emails that Guyton's fee should be returned to him, and (3) he retained Guyton's funds long after his firm had utterly failed to perform any services on Guyton's behalf. By retaining the funds belonging to Guyton, Respondent denied Guyton the ability to pursue any possible action against Liberty.

The Board found no mitigating factors.

The Board considered as aggravating factors the following:

(1)     Respondent's prior disciplinary offenses. Respondent's prior one-year suspension and current five-year suspension reflect pervasive, serious, and troubling misconduct.

(2)     Respondent's dishonest motive, as reflected in his failure to return Guyton's fee for more than a year.

(3)     Respondent's pattern of misconduct. Respondent's Rule violations in this case are nearly identical to the Rule violations identified in the Supreme Court of Pennsylvania's November 19, 2024 Order, which chronicled Respondent's misconduct in six different matters.

(4)     Respondent's multiple disciplinary offenses.

(5)     Respondent's refusal to acknowledge the wrongful nature of his conduct. Respondent takes no responsibility as a managing attorney for supervising his attorneys, but places blame instead on those attorneys.

14

230

(6)     Respondent's substantial experience in practicing law. After 17 years of practicing law, in which he has received sanctions for his misconduct, Respondent appears to have learned little from that experience.

At the conclusion of the evidence in the sanction phase ·of the proceeding, the Board recessed to deliberate. Following deliberation of the appropriate sanction, the Board reconvened and announced its decision. Having considered the evidence presented and argument of counsel, it is

ORDERED that Respondent's privilege to practice law in the Commonwealth of Virginia is hereby REVOKED, effective May 16, 2025.

It is further ORDERED that Respondent shall comply with the requirements of Part Six, §IV, ¶13-29 of the *Rules of the Supreme Court of Virginia*. The Respondent shall forthwith give notice by certified mail, return receipt requested, of the revocation of his privilege to practice law in the Commonwealth of Virginia to all clients for whom he is currently handling matters and to all opposing attorneys and presiding judges in pending litigation. The Respondent shall also make appropriate arrangements for the disposition of matters then in his care and conformity with the wishes of his clients. The Respondent shall give such notice within fourteen (14) days of the effective date of this order, and he shall make such arrangements as are required herein within forty-five (45) days of the effective date of the revocation. The Respondent shall also furnish proof to the Bar within sixty (60) days of the effective date of the revocation that such notices have been timely given and such arrangements made for the disposition of matters.

It is further ORDERED that pursuant to Part Six, §IV, ¶13-9. E of the *Rules of the Supreme Court of Virginia*, the Clerk shall assess costs against the Respondent.

15

231

An attested copy of this Memorandum Order of Revocation will be mailed to the Respondent by first-class mail to Joseph D. Lento, The Lento Law Firm, 1650 Market Street, Ste. 3600, Philadelphia, PA 19103, and by email to jdlento@lentolawgroup.com; and to Dennis John Quinn, Respondent's Counsel, by first-class mail, at Carr Maloney P.C., 2000 Pennsylvania Avenue, NW, Suite 8001, Washington, D.C. 20006, and by email to Dennis.Quinn@carrmaloney.com; and to Anthony C. Gunst, IV, Respondent's Counsel *pro hac vice,* by first-class mail, at Nissenbaum Law Group, P.C.; 2400 Morris Avenue, Suite 301, Union, New Jersey 07083, and by email to ag@gdnlaw.com; and by first-class mail to Muriel-Theresa Pitney, Clerk of the Supreme Court of Virginia, 100 N. 9th Street, 5th Floor, Richmond, Virginia 23219; and via hand delivery to Edward J. Dillon, Deputy Bar Counsel, Virginia State Bar, 1111 E. Main Street, Suite 700, Richmond, Virginia 23219.

ENTERED THIS 26 DAY OF JUNE 2025

VIRGINIA STATE BAR DISCIPLINARY BOARD

Alison G.M. Martin
Second Vice Chair

16

232

Ex. F5



**Disciplinary System Action Summary**

May 23, 2025

**Joseph D. Lento * ***

1650 Market St. Suite 3600
Philadelphia, PA 19103

**VSB Docket No. 24-090-132162**

Effective May 16, 2025, the Virginia State Bar Disciplinary Board revoked Joseph D. Lento's privilege to practice law in the Commonwealth of Virginia for violating professional rules that govern diligence, communication, fees, safekeeping property, declining or terminating representation, responsibilities of partners and supervisory lawyers, and misconduct.

VIEW ORDER

*On July 29, 2025, Mr. Lento Filed a Notice of Appeal.

** On March 6. 2026. Mr. Lento's Petition for Rehearing was denied by the Supreme Court of Virginia.

Ex. G1

# Business Center

<span style="float:right">Online Services    Search</span>

## DETAIL

RETURN TO YOUR SEARCH          FILE YOUR ANNUAL REPORT

Global Real Estate Development, Inc.

This detail reflects the current data for the filing in the system.                    Print

**Name**
Global Real Estate Development, Inc.

| | | |
|---|---|---|
| **Filing ID** | **Status** | **Fictitious Name** |
| 2020-000944286 | Active | |
| **Type** | **Sub Status** | |
| Profit Corporation - Domestic | Current | |
| | **Initial Filing** | |
| | 09/14/2020 | |

**Standing - Tax**                        **Term of Duration**
Good                                      Perpetual

**Standing - RA**                         **Formed In**
Delinquent                                Wyoming

**Standing - Other**
Good

**Principal Office**
30 N Gould St
Ste R
Sheridan, WY 82801
USA

**Mailing Address**
30 N Gould St
Ste R
Sheridan, WY 82801
USA

---

### Additional Details

**Registered Agent:**                     **Latest AR/Year**
No Agent                                  12308570 / 2025
No Office                                 **AR Exempt**
Laramie County WY                         No
                                          **License Tax Paid**
                                          $60.00

**Common Shares**
3,000,000
**Common Par Value**
$0.01

Skip to main content

234

**Preferred Shares**
0

**Preferred Par Value**

---

History

| | |
|---|---|
| RA Resignation - 2026-006583300 | Date: 05/06/2026 |
| 2025 Original Annual Report - 12308570 | Date: 08/07/2025 |
| Reinstatement - Tax - 2025-005815643 | Date: 05/30/2025 |
| 2024 Original Annual Report - 11451986 | Date: 05/30/2025 |
| 2023 Original Annual Report - 11451964 | Date: 05/30/2025 |
| RA Information Change - 2024-004895286 | Date: 06/10/2024 |
| Dissolution / Revocation - Tax - 2023-004457432 | Date: 11/09/2023 |
| Delinquency Notice - Tax - 2023-004346323 | Date: 09/02/2023 |
| Reinstatement - Tax - 2022-003954848 | Date: 12/15/2022 |
| 2022 Original Annual Report - 07952779 | Date: 12/15/2022 |
| Dissolution / Revocation - Tax - 2022-003914357 | Date: 11/09/2022 |
| Delinquency Notice - Tax - 2022-003818756 | Date: 09/02/2022 |
| Reinstatement - Tax - 2022-003648784 | Date: 04/26/2022 |
| 2021 Original Annual Report - 07207281 | Date: 04/26/2022 |
| Dissolution / Revocation - Tax - 2021-003472466 | Date: 11/09/2021 |
| Delinquency Notice - Tax - 2021-003312127 | Date: 09/02/2021 |
| Initial Filing - See Filing ID | Date: 09/14/2020 |

---

Public Notes

No Public Notes Found...

Parties

John Groff (Director)                                          Organization:
Address: PO Box 219, Voorhees, NJ 08043

Skip to main content

Ex. G1

David Haislip (Treasurer / Director)                                    Organization:
   Address: PO Box 219, Voorhees, NJ 08043

FORM **BCA 2.10**
ARTICLES OF INCORPORATION
Business Corporation Act

Filing Fee: $150

File #: __75305621__

Approved By: __EEC__

FILED

**OCT 02 2025**

**Alexi Giannoulias**
Secretary of State

1. Corporate Name: TURLINGTON HOMES INC. _____

_____

2. Initial Registered Agent: JOHN C. NORKUS _____

| | First Name | | Middle Initial | | Last Name |

Initial Registered Office: 11 N NORTHWEST HWY STE 123 _____

| | Number | Street | | Suite No. | |
| | PARK RIDGE | | IL | 60068-3444 | COOK |
| | City | | | ZIP Code | County |

3. Purposes for which the Corporation is Organized:
The transaction of any or all lawful businesses for which corporations may be incorporated under the Illinois Business Corporation Act.

4. Authorized Shares, Issued Shares and Consideration Received:

| Class | Number of Shares Authorized | Number of Shares Proposed to be Issued | Consideration to be Received Therefor |
|---|---|---|---|
| COMMON | 3000000 | 10000 | $ 1 |

**NAME & ADDRESS OF INCORPORATOR**

5. The undersigned incorporator hereby declares, under penalties of perjury, that the statements made in the foregoing Articles of Incorporation are true.

Dated OCTOBER 02 _____ , 2025
| Month & Day | | Year |

DAVID HAISLIP
| | Name |

PO BOX 219
| | Street |

| VOORHEES | | NJ | 08043 |
| City/Town | | State | ZIP Code |

This document was generated electronically at www.ilsos.gov



**Wyoming Secretary of State**
Herschler Building East, Suite 101
122 W 25th Street
Cheyenne, WY 82002-0020
Ph. 307.777.7311
Email: Business@wyo.gov

**WY Secretary of State**
**FILED: 05/06/2026 02:01 PM**
**Global Amendment ID: 57590**
**Affected Entities: 1**

# Statement of Resignation of Registered Agent

1. ☐ This change affects <u>every</u> entity that I represent.
   **OR**
   ☑ This change affects <u>only</u> the entities on the attached list.
   *(Please complete the attached template to provide the name and ID number for each entity and the date the resignation notice was sent.)*

2. I, | Registered Agents Inc | , hereby resign my agency appointment as the
   *(name of registered agent as recorded with this office)*
   registered agent for the entities listed on the attached list.

3. I hereby certify that notice of my resignation was sent on | 02/12/2026 | to an officer or controlling
   *(Date – mm/dd/yyyy)*
   member of the business entities to its last known address thirty (30) days prior to the filing of this statement with the Wyoming Secretary of State.

4. The resignation is effective immediately upon filing of this statement with the Wyoming Secretary of State.

5. If the registered office address is currently on file as the mailing and/or principal office address, a separate notice must be provided to change the mailing and/or principal office address to the last known address.

**Signature:** _David Roberts_     **Date:** | 04/15/2026 |
*(Shall be executed by the registered agent or person authorized by the registered agent.)*    *(mm/dd/yyyy)*

Print Name: | David Roberts |    Contact Person: | David Roberts |

Title: | Assistant Secretary |    Daytime Phone Number: | (307) 200-2803 |

Email: | filings@registeredagentsinc.com |
*(An email address is required. Email(s) provided will receive important reminders, notices and filing evidence.).*

<u>Checklist</u>
☐ ***Filing fee of $5.00 for each affected entity.*** *(Example: if the registered agent resigns from seven (7) business entities, the filing fee is $35.)*
☐ **Processing time is up to 15 business days** following the date of receipt in our office.
☐ Please mail with payment to the address at the top of this form. **This form cannot be accepted via email.**
☐ Please review the form prior to submission. **The Secretary of State's Office is unable to process incomplete forms.**

RAResignation – Revised May 2025

# Registered Agent Bulk Resignation Template
### This document must be attached to the completed Statement of Resignation of Registered Agent form for filing.

| | Original Filing ID | Entity Name | Resignation Notice Mailing Date |
|---|---|---|---|
| 1 | 2026-001894213 | Global Real Estate Development, Inc. | 02/12/2026 |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |
| 26 | | | |
| 27 | | | |
| 28 | | | |
| 29 | | | |
| 30 | | | |
| 31 | | | |
| 32 | | | |
| 33 | | | |
| 34 | | | |
| 35 | | | |
| 36 | | | |
| 37 | | | |
| 38 | | | |
| 39 | | | |
| 40 | | | |
| 41 | | | |
| 42 | | | |
| 43 | | | |
| 44 | | | |
| 45 | | | |

* Invalid entries may be crossed out by the Business Division without rejecting entire filing

Page _____ of _____

# STATE OF WYOMING ✱ SECRETARY OF STATE
# BUSINESS DIVISION

Herschler Bldg East, Ste.100 & 101, Cheyenne, WY 82002-0020
Phone: 307-777-7311 · Website: https://sos.wyo.gov · Email: business@wyo.gov

## Global Amendment Summary

**Global Amendment ID:** 57590

**Amendment Type:** RA Resignation

**Amendment Date:** 05/06/2026 2:01 PM

**Copy To Mailing:** N

**Copy To Principal:** N

**Affected Entities:** 1

**Agent Name:** Registered Agents Inc

**Address:** 30 N Gould St Ste R
Sheridan, WY 82801

| Field Name | Changed From | Changed To |
|---|---|---|
| Registered Agent # | 0185352 | 0000000 |
| Registered Agent Email | support@registeredagentsinc.com | No Value |
| Registered Agent Organization Name | Registered Agents Inc | No Agent |
| Registered Agent Phone | (307) 200-2803 | No Value |
| Registered Agent Physical Address 1 | 30 N Gould St Ste R | No Office |
| Registered Agent Physical City | Sheridan | No Value |
| Registered Agent Physical County | Sheridan | No Value |
| Registered Agent Physical Postal Code | 82801 | No Value |









# John E. Groff

## National Firm Administrator

### 1-833-Lento-Law

### john.groff@llgnational.com

John Groff: A Life of Service and Legal Acumen

John Groff, a native of New Jersey, has built a notable career in the legal field, paralleled by a steadfast commitment to community service. Born and raised in the Garden State, John's early life was marked by his education and local involvement. John attended Camden Catholic High School in Cherry Hill, New Jersey, which he first demonstrated his penchant for leadership and community engagement.

Following high school, John pursed higher education with a focus on business administration., He attended Pierce Junior College, further honing his organizational and managerial skills. John academic journey continued at Rutgers University, where he solidified his foundation in business principles – knowledge that would prove invaluable in his legal career.

Parallel to his academic pursuits, John was deeply involved in volunteering. His dedication to

community service is evident through his extensive work with organizations like the Boy Scouts of America and Muscular Dystrophy Association. Groff's compassion and commitment also shone through in his involvement with Make- A -Wish fundraisers, alongside consistent donations to various charities throughout the year. This blend of community service and leadership set the stage for his professional life.

John's legal career began in 1990 when he joined a law firm based in Haddon Heights, New Jersey, as a paralegal. This role marked his initial foray into the legal world, offering him practical understanding of law firm operations. His talent and dedication quickly became apparent, and he soon transitioned to a more prominent national law firm based in Philadelphia, Pennsylvania. Here, John took on the significant role of office administrator, managing daily operations and playing a crucial part in the firm's success.

The culmination of John's career journey was his move to LLG National Law Group PC, a prestigious national law firm headquartered in Philadelphia. As an office administrator at LLG National Law Group, John has been integral in handling several high-profile cases, showcasing his exceptional organizational skills and legal knowledge. His role involves a blend of managerial expertise and legal insight, making him a vital asset to the firm.

Throughout his career, John has exemplified a unique combination of legal acumen and a heartfelt commitment to community service. His journey from a New Jersey high school to a respected figure in the legal community throughout the Nation is a testament to his hard work, dedication, and unwavering sense of civic duty. John's story is not just one of professional success, but also of a life of dedicated to the service of others, making him a distinguished and respected figure in both his professional and local communities.

## Follow us on Social Media:

Ex. I1



© 2025 All Rights Reserved | LLG National Law Group









248



249







Harvey officials came out in frigid weather Feb. 24 for a symbolic groundbreaking on Turlington Homes, a redevelopment project approved last year under the late Mayor Christopher Clark.

The Turlington Homes project is one of the only initiatives Harvey has undertaken since declaring a state of financial distress in October. The Turlington Homes project was approved at the first City Council meeting after that declaration, where it was the only item of new business.

Acting Mayor Shirley Drewenski was elected by the City Council Feb. 23 to serve out the remainder of Clark's term.

"These homes will strengthen our community, support growth and help move the city forward," Drewenski said at the ground-breaking.

Speakers commemorated the late mayor, praising his drive and vision.

John Groff, vice president of Global Real Estate Development, the project's developer, called Clark's vision for Harvey outstanding.

"When we got the call about Harvey, we looked up Harvey, we said, it's a small little borough, let's go out there and let's see what they have to say," Groff said. "Meeting the former mayor, Mayor Clark, was an inspiration, because even though you didn't want to hear what he had to say, he told you."

However, some residents opposed the project, criticizing its suddenness and lack of public input. There was no debate on the proposed development agreement when it was approved, as 3rd Ward Ald. Telanee Smith called the question, bringing the issue to an immediate vote.





254





### Permits, timeline and starting prices

Developers say they still need permits before any real construction can begin, but have told reporters they expect work to start in March 2026. Under the redevelopment agreement, the build-out is projected to wrap up in the final quarter of 2027, with the city allowed to help the project along by selling the lots at a discounted price.

Chicago Tribune noted a site sign advertising starting home prices at about $180,000 and reported that the development would pick up 10 unused city-owned properties on the 15100 block of Turlington Avenue.

### High stakes in a city under financial strain

Residents, opposing aldermen, and civic watchdogs are expected to keep close tabs on how permits are handled, what the final price points look like, and whether the city squeezes enough long-term value out of the land.

Coverage last year noted that Harvey declared a state of financial distress in October 2025, setting the backdrop for every new public-private deal that follows. Local leaders say future partnerships will be judged against that reality, according to reporting by CBS Chicago.

For now, residents are left weighing whether a row of new houses on Turlington Avenue is the start of a turnaround or just the city's most visible bet in a very tight financial game.

THIS DOCUMENT
PREPARED BY AND
AFTER RECORDING
RETURN TO:

Megan A. Mack
Ancel Glink, P.C.
140 S. Dearborn Street,
Suite 600
Chicago, IL 60603

This Space for Recorder's Use Only

# REDEVELOPMENT AGREEMENT

## BY AND BETWEEN

## CITY OF HARVEY

## AND

## Turlington Homes, Inc.

1

# REDEVELOPMENT AGREEMENT

# BY AND BETWEEN

# CITY OF HARVEY

# AND

# Turlington Homes, Inc.

**THIS REDEVELOPMENT AGREEMENT** (*"Agreement"*) is made and entered into this 22nd day of December, 2025 (*"Effective Date"*), by and between the **CITY OF HARVEY**, an Illinois home rule municipality (*"City"*), and Turlington Homes, Inc., an Illinois corporation (*"Developer"*). (For convenience, the City and Developer may be referred to individually as a *"Party"* and collectively as the *"Parties"*).

**IN CONSIDERATION OF** the recitals and the mutual covenants and agreements set forth in this Agreement, and pursuant to the City's home rule powers, the Parties agree as follows:

**Section 1.    Recitals.**[1]

A.    The City is a home rule unit of local government by virtue of the provisions of the Illinois Constitution of 1970.

B.    The City is the owner of a certain parcel of real property that is located in the City of Harvey Illinois, referred to as the (*"Redevelopment Properties"), as shown in Exhibit A.*

C.    Global Estate Development and its contractors specialize in the construction of new single family homes throughout the Country.

D.    The City desires to engage the services of the Developer for the rehabilitation of the Redevelopment Properties (*"Redevelopment Project"*).

E.    The Developer estimates that the Redevelopment Property costs will be approximately $2,124,000 and will generate homeownership.

F.    The City desires to promote new investment as part of its economic development strategy which includes the creation of new housing opportunities for City residents and sources of revenue.

G.    The City is willing to assist the Developer by selling the Redevelopment Property at a discounted sale price in the exercise of the City's home rule powers provided that the Developer agrees to the terms as set forth in this Agreement.

H.    The City and Developer desire that the Property be developed and used solely to promote homeownership, in compliance with this Agreement.

---

[1] All defined terms initially appear in bold and italics and thereafter as capitalized words and phrases throughout this Redevelopment Agreement. They shall have the meanings set forth in the preamble, in Section 2, and elsewhere in this Redevelopment Agreement.

2

## Section 2.   Definitions.

A.   Definitions. Whenever used in this Agreement, the following terms shall have the following meanings unless a different meaning is required by the context:

*"Building Code"*: Title 15, entitled "Buildings and Construction", of the Municipal Code of Harvey, as amended.

*"Certificate of Occupancy"*: a certificate issued by the City planning department in accordance with Section 16-04-270 of the City's Zoning Ordinance.

*"Corporate Authorities"*: The Mayor and City Council of the City.

*"Force Majeure"*: Strikes, lockouts, acts of nature, or other factors beyond a party's reasonable control and reasonable ability to remedy; provided, however, that Force Majeure shall not include delays caused by weather conditions, unless those conditions are unusually severe or abnormal considering the time of year and the particular location of the Redevelopment Property.

*"Improvements"*: All of the public and private improvements and facilities necessary to serve the Redevelopment Property, including without limitation the improvements shown on the Scope of Work, all other storm water detention and retention facilities, water mains, storm sewers, sanitary sewers, streets, lighting, sidewalks, parkways, rough and final grading, trees, sod, seeding, and other landscaping, and all other improvements required pursuant to this Agreement, and the Requirements of Law other than the building(s) and accessory structures.

*"Person"*: Any corporation, partnership, individual, joint venture, trust, estate, association, business, enterprise, proprietorship, or other legal entity of any kind, either public or private, and any legal successor, agent, representative, or authorized assign of the above.

*"Property Conveyance Schedule"*: The schedule set forth by the City and Developer for the anticipated closing dates for Phase 1 and Phase 2 of the Redevelopment Properties as identified in *Exhibit C.*

*"Redevelopment Property"*: That certain property that will be the site of the Redevelopment Project, which is depicted in *Exhibit A.*

*"Redevelopment Project"*: Developer's plans and specifications for the redevelopment of the Redevelopment Property, including but not limited to exterior improvements (e.g., a new roof, a new garage, masonry repair, landscaping), interior improvements (e.g., plumbing, electrical and HVAC improvements), surface improvements (constructing, sealing, and striping a parking lot).

*"Requirements of Law"*: All applicable federal, state, and local laws, statutes, codes, ordinances, resolutions, orders, rules, and regulations.

*"Zoning Ordinance"*: Title 16, entitled "The Zoning Ordinance of the City of Harvey" of the Municipal Code of Harvey, as amended.

B.   Rules of Construction.

1.   Grammatical Usage and Construction. In construing this Agreement, pronouns include all genders, and the plural includes the singular and vice versa.

2.   Headings. The headings, titles, and captions in this Agreement have been inserted only for convenience and in no way define, limit, extend, or describe the scope or intent of this Agreement.

3.   Calendar Days. Unless otherwise provided in this Agreement, any reference in this Agreement to "day" or "days" shall mean calendar days and not business days. If the date for giving of any notice required to be given, or the performance of any obligation, under this Agreement falls on a Saturday, Sunday, or federal holiday, then the notice or obligation may be given or performed on the next business day after that Saturday, Sunday, or federal holiday.

## Section 3.   Mutual Assistance.

3

A. **Documents.** The Parties agree to take such actions, including the execution and delivery of such documents, instruments, petitions and certifications, as well as the consideration and possible adoption of such ordinances and resolutions, as may be necessary or appropriate, from time to time, to carry out the terms, provisions and intent of this Agreement and to aid and assist each other in carrying out such terms, provisions and intent.

B. **Governmental Approvals.** The Parties will cooperate fully with each other in implementing the provisions and terms of this Agreement and in seeking and obtaining from any or all appropriate governmental bodies, whether federal, state, county or local, any required permits, entitlements and approvals for the Redevelopment Project, for the provision of public and private utility services to the Property, and the demolition and clearance of blighted improvements on the Redevelopment Property.

C. **City Approvals.** The City will, in accordance with the Requirements of Law and the terms of this Agreement, issue all permits and approvals necessary or desirable for the Redevelopment Project, including, without limitation, demolition, building and other permits and certificates of occupancy, provided that Developer applies and receives approval for all permits and approvals required under applicable City codes, ordinances, standards, rules, and regulations, as the same may be amended from time to time, and other Requirements of Law; provided, further, that the City has the right to withhold any building permit or certificate of occupancy at any time Developer is in violation of, or is not in full compliance with, any term of this Agreement until such time as Developer is in compliance with this Agreement or any violation is cured. The Parties agree to execute all documents and other instruments reasonably required by Developer's lender in connection with the financing of the development and construction of the Redevelopment Project.

### Section 4. Conveyance of Redevelopment Property.

A. Conveyance of Redevelopment Property.

1. **Conveyance.** The City is the owner of the Property. The City shall convey its interest in the Redevelopment Property to the Developer by a recordable warranty deed, providing clean title free from any encumbrances or liens on the properties. The Developer shall be responsible for all costs and the preparation of all documents necessary to close the transaction between the City and the Developer and shall be responsible for costs of transfer including City Transfer Stamps, if any, and recoding. The City will use its best efforts to convey fee simple title to the Redevelopment Property as promptly as us reasonably possible, with the timing of the transfer scheduled for be a simultaneous sign-and-close with Developer's closing for construction and acquisition financing. Developer agrees to acquire from the City, absent a Force Majeure Event, the fee simple interest in the Redevelopment Property in "as is, where is" condition together with all privileges, rights and appurtenances.

2. **Due Diligence.** Title Insurance and Survey shall be the responsibility of the Developer. The Developer has conducted its due diligence investigation concerning the condition of the improvements upon the Redevelopment Property and will take title to the Redevelopment Property in an "AS IS" condition. Developer has further conducted its due diligence investigation concerning the title to the Redevelopment Property including all liens, taxes and encumbrances and has consulted with an attorney of its choosing concerning the title to the Property and is satisfied with the condition of said title. It shall be Developer's responsibility to remove or take subject to all objectionable liens, taxes and encumbrances, if any, from the title to the Redevelopment Property. THE CITY OF HARVEY MAKES NO WARRANTIES OF ANY KIND CONCERNING THE MERCHANTABILITY OF THE TITLE TO THE PROPERTY OF THE CONDITION OF THE STRUCTURE OR THE STATUS OR PRESENCE OF ANY ENVIRONMENTAL CONTAMINATION (INCLUDING MOLD OR OTHER HAZARDOUS MATERIALS) ON THE REDEVELOPMENT PROPERTY.

3. **Purchase Price.** Developer will as the purchase price (*"Purchase Price"*) for the Property the sum of Ten Dollars ($10.00). The Purchase Price, when due, will be payable in cash by cashier's or bank check or by wire transfer providing immediately available funds to a City specified account.

4. **Deed and Conveyed Interest.** Upon payment of the Purchase Price, the City will convey the Redevelopment Property in the form of a Quit Claim

4

Deed, where the city represents that the title is free from any liens or encumbrances.

5. Prior to the conveyance of the Redevelopment Property to Developer, Developer shall deliver to the City a recordable re-conveyance warranty deed for the Property. The City shall have the right to record the re-conveyance warranty deed if there is a default by Developer at any time or if Developer cannot or does not complete the Redevelopment Project in accordance with the terms of this Agreement, after a thirty day cure period upon written notice to Turlington Homes. The Developer agrees to hold the City harmless in the event that title to the Redevelopment Property is encumbered by any liens. The City shall return the re-conveyance warranty deed to Developer after the Certificate of Occupancy has been issued.

6. Incentives. The City agrees, at its sole cost and expense, to reimburse the Developer for costs incurred in connection with the reconstruction of sidewalks located on public property and subject to the City's oversight. Such reimbursement shall be limited to an amount not to exceed Thirty Thousand Dollars ($30,000.00) and shall only be provided for work reasonably detailed in an invoice submitted to the City. Reimbursement shall be made within ninety (90) days following the City's receipt of (i) a completed invoice from the Developer and (ii) certification that the work has been completed in accordance with the applicable standards established by the City's designated engineering consultant and the Harvey Municipal Code. All sidewalk reconstruction work must comply with said standards as a condition precedent to reimbursement.

In addition, the City agrees to waive all utility tap fees otherwise applicable under the Harvey Municipal Code in connection with the redevelopment of the properties identified in this Agreement. Such waiver shall apply to each parcel or section of the redevelopment project as specifically listed in this Agreement, and shall be granted in accordance with the procedures and limitations set forth in the applicable provisions of the Municipal Code.

### Section 5.    Redevelopment of Property.

A.    General Restrictions. Subject to the particular terms for development set forth in this Agreement, for the Redevelopment Project, except for minor alterations due to site work approved by the City Engineer shall be pursuant to and in accordance with the following:

1. This Agreement.

2. The Scope of Work.

3. The City's Zoning Ordinance.

4. The City's Building Code.

5. The Subdivision Code.

6. The other Requirements of Law.

Unless otherwise provided in this Agreement, in the event of a conflict between or among any of the above plans or documents, the plan or document that provides the greatest control and protection for the City, as determined by the City Engineer, shall control. All of the above plans and documents shall be interpreted so that the duties and requirements imposed by any one of them are cumulative among all of them, unless otherwise provided in this Agreement.

B.    Easements. Utility and enforcement easements shall be granted to the City and other governmental bodies and utility services over, on, and across the Property, for the purposes of enforcing applicable laws, making repairs, installing and servicing utilities, and providing public and emergency services.

C.    Damage to Public Property. The Developer shall maintain the Redevelopment Property and all streets, sidewalks, and other public property in and adjacent to the Property in a good and clean condition at all times during development of the Redevelopment Property and construction of the Improvements. Further, the Developer shall promptly clean all mud, dirt, or debris deposited on any street, sidewalk, or other public property in or adjacent to the Redevelopment Property by the Developer or any agent of or contractor hired by, or on behalf of, the Developer, and shall repair any damage that may be caused by the activities of the Developer

5

or any agent of or contractor hired by, or on behalf of, the Developer. If, within one hour after the City gives the Developer notice to clean all mud, dirt, or debris deposited on any street, sidewalk, or other public property in or adjacent to the Redevelopment Property by the Developer or any agent of or contractor hired by, or on behalf of, the Developer, the Developer neglects to clean, or undertake with due diligence to clean, the affected public property, then the City shall be entitled to clean, either with its own forces or with contract forces, the affected public property and to recover from the Developer per hour charge based on the City's most currently effective prevailing wage rates, in accordance with the Prevailing Wage Act, 820 ILCS 130/0.10 *et seq.*, multiplied by the number of personnel reasonably required to perform the cleaning.

    D.    <u>Changes in the Scope of Work during Development.</u>

        1.    <u>Minor Adjustments.</u> During the construction and development of the Redevelopment Project, the City Engineer may authorize minor adjustments to any of the Scope of Work when the adjustments are necessary in light of technical or engineering considerations.

        2.    <u>Major Adjustments.</u> Any major adjustment to any of the Scope of Work not specifically listed in, or approved pursuant to this Agreement shall be considered to be a major adjustment and shall be granted only after application to, and approval by, the Corporate Authorities, by resolution duly adopted. The Corporate Authorities may, but shall have no obligation to, require that the application for a major adjustment be considered at a public hearing before the Corporate Authorities or other City board or commission as the Corporate Authorities shall require.

## Section 6. Improvements.

    A.    <u>Developer Duty to Construct Improvements.</u> The Developer shall, at its sole cost and expense, construct and install all of the Improvements on the Property.

    B.    <u>Standards Applicable to Improvements.</u>

        1.    <u>General Standards.</u> All Improvements for the Redevelopment Project shall be designed and constructed pursuant to, and in accordance with the Scope of Work and to the satisfaction of the City Engineer. All work performed on the Improvements shall be conducted in a good and workmanlike manner and in accordance with the schedule established in Section 6.C of this Agreement. All materials used for construction of the Improvements shall be new and of first-rate quality.

        2.    <u>Contract Terms; Prosecution of the Work.</u> The Developer and all of its contractors shall prosecute the work diligently, continuously, in full compliance with, and as required by or pursuant to, this Agreement, until the work is properly completed. Each Developer's contract with a contractor shall provide that the Developer may take over and prosecute the work if the contractor fails to do so in a timely and proper manner.

        3.    <u>Engineering Services.</u> The Developer shall provide, at its sole cost and expense, all engineering services for the design and construction of the Improvements, including without limitation full inspection services of a professional engineer responsible for overseeing the construction of the Improvements if applicable. The Developer shall promptly provide the City with the name of the resident engineer and a telephone number or numbers at which the engineer can be reached at all times.

        4.    <u>City Inspections and Approvals.</u> City representatives shall have the full right, permission, and authority to inspect and approve all work on the Improvements at all times.

        5.    <u>Other Approvals.</u> If the construction and installation of any Improvement require the consent, permission, or approval of any Person, then the Developer shall take all steps required to obtain the required consent, permission, or approval. No work requiring the consent, permission, or approval of any Person shall commence without that prior consent, permission, or approval.

    C.    <u>Schedule for Completion of Improvements.</u> All Improvements for the Redevelopment Project shall be completed and made ready for inspection, approval, and any

6

required acceptance by the City pursuant to the construction schedule approved by the City Engineer. The Developer shall be allowed extensions of time beyond the completion dates set forth in the construction schedule only for delay caused by Force Majeure. The Developer shall, within two days after any unavoidable delay commences and again within two days after the delay terminates, give notice to the City for its review and approval of the delay, the cause for the delay, the period or anticipated period of the delay, and the steps taken by the Developer to mitigate the effects of the delay. Any failure of the Developer to give the required notice shall be deemed a waiver of any right to an extension of time for any the delay.

D.     Final Inspections and Approvals. When the Developer determines that an improvement has been properly completed, the Developer shall request final inspection, approval, and, as appropriate, acceptance of the improvement by the City. The notice and request shall comply with the requirements of the Building Code, and the other Requirements of Law, and shall be given sufficiently in advance to allow the City time to inspect the improvement and to prepare a punch list of items requiring repair or correction and to allow the Developer time to make all required repairs and corrections prior to the scheduled completion date. The Developer shall promptly make all necessary repairs and corrections as specified on the punch list. The City shall not be required to approve or accept any improvement until all of the improvements, including without limitation all punch list items, have been fully and properly completed.

E.     Issuance of Building and Occupancy Permits. The City shall have the absolute right to withhold any building permit or Certificate of Occupancy at any time the Developer is in violation of, or is not in full compliance with, any term of this Agreement, only after written notice is sent to Turlington Homes and is not cured in a 30 day period.

F.     Completion of Construction. If the Developer fails to diligently pursue all construction, as required in, or permitted by, Sections 5 and 6 of this Agreement, to completion within the time period prescribed in the building permit or permits issued by the City for the construction, and if the building permit or permits are not renewed within three months after expiration, the Developer shall, within 60 days after notice from the City, remove any partially constructed or partially completed buildings, structures, or improvements from the Property, unless the delay is caused by The City, lender or other government delays. If the Developer fails or refuses to remove the buildings, structures, and improvements as required, then the City shall have, and is hereby granted, in addition to all other rights afforded to the City in this Agreement and by law, the right, at its option, to demolish and/or remove any of the buildings, structures, and improvements, and the City shall have the right to charge the Developer an amount sufficient to defray the entire cost of the work, including without limitation legal and administrative costs.

### Section 6. Developer's Representations.

A.     As of the date of execution of this Agreement, Developer is financially solvent, able to pay its debts as they mature, and able to perform the obligations hereunder, and will promptly give written notice to the City of any material adverse change in the financial condition of Developer which would have an adverse effect on the execution, delivery, performance, or enforceability of this Agreement;

B.     Developer is authorized to do business in, and is in good standing in, the State of Illinois;

C.     Except for only those representations, statements, or promises expressly contained in this Agreement, no representation, statement, or promise of any kind whatsoever by the City, its officials, agents, or employees has induced Developer to enter into this Agreement or has been relied on by Developer. No proceeding of any kind including, without limitation, litigation or arbitration, whether judicial or administrative, is pending or, to its knowledge, threatened against Developer or contemplated by Developer which would under any circumstance have any material adverse effect on the execution, delivery, performance, or enforceability of this Agreement. As of the date of execution of this Agreement, Developer has not received notice, and does not to its knowledge have a reasonable basis for believing that Developer or any of its corporate officers is the subject of any of the proceedings identified in the following subparts having a material adverse effect on the execution, delivery, performance or enforceability of this Agreement: (i) criminal action, complaint, or investigation pertaining to any felony charge, or (ii) any civil action or claim, predicated on alleged acts of antitrust violations, business fraud, or class discrimination due to race, creed, color, disability, gender, marital status, age, national origin, or religious affiliation.

7

**Section 10. Fees, Dedications, Donations, and Contributions.**

A.    Negotiation and Review Fees. In addition to all other costs, payments, fees, charges, contributions, or dedications required by this Agreement or by the Requirements of Law, Developer will pay to the City, upon presentation of itemized bills and costs, immediately after presentation of a written demand or demands for payment, all reasonable legal, engineering, and other consulting or administrative fees, costs, and expenses incurred or accrued in connection with the review and processing of plans for the redevelopment and renovation of the Redevelopment Project, or the demolition and clearance work on the Property and in connection with the negotiation, preparation, consideration, and review of this Agreement. Payment of all fees, costs, and expenses for which demand has been made, but payment has not been received, by the City prior to execution of this Agreement, will be made by a certified or cashier's check or wire transfer contemporaneous with the execution of this Agreement by the City. Further, the Developer agrees that it will continue to be liable for and to pay, immediately after presentation of a written demand or demands for payment, the fees, costs and expenses incurred in connection with any applications, documents, or proposals, whether formal or informal, of whatever kind submitted by Developer during the term of this Agreement in connection with the use, redevelopment, and renovation of the Redevelopment Project and the use, demolition, and clearance of the Property. Further, Developer agrees that it will be liable for and will pay after demand all customary fees, costs, and expenses incurred by the City for publications and recordings required in connection with the above matters.

B.    Other City Fees. In addition to all other costs, payments, fees, charges, contributions, or dedications required by this Agreement, Developer will pay to the City all application, inspection, and permit fees, all water and sewer general and special connection fees, tap-on fees, charges, and contributions, and all other fees, charges, and contributions pursuant to the Requirements of Law.

**Section 11. Developer's Insurance Requirements; Indemnification of City.**

A.    Developer's Risk Prior to Completion. Prior to completion of the Redevelopment Project, Developer will keep in force at all time builders' risk and liability insurance on a completed value basis, in a non-reporting form, against all risks of physical loss, including collapse, covering the total value of work performed and equipment, supplies and material furnished for the Redevelopment Project (including on-site stored materials), all as to work by Developer. The insurance required under this Subsection 11.A will be issued by companies properly licensed by the State of Illinois and reasonably satisfactory to the City. The insurance required under this Subsection 11.A will name as the City as an additional insured. All such policies will contain a provision that the same will not be canceled or modified without 30 days' prior written notice to the City.

B.    City Review. Developer acknowledges and agrees that the City is not, and will not be, in any way liable for any damages or injuries that may be sustained as the result of the City's review and approval of any plans for the Redevelopment Project, or demolition and removal of the blighted improvements from the Property, or the issuance of any approvals, permits, certificates, or acceptances for the development or use of the Redevelopment Project, or demolition and removal of the blighted improvements from the Property, and that the City's review and approval of those plans and issuance of those approvals, permits, certificates, or acceptances does not, and shall not, in any way, be deemed to insure Developer, or any of its successors, assigns, tenants, and licensees, or any other Person, against damage or injury of any kind at any time.

C.    City Procedure. Developer acknowledges and agrees that notices, meetings, and hearings have been properly given and held by the City with respect to the approval of this Agreement and agrees not to challenge the City's approval on the grounds of any procedural infirmity or of any denial of any procedural right.

D.    Indemnity. Developer agrees to, and does hereby, hold harmless and indemnify the City, all City commissions, boards, public bodies, and all City elected or appointed officials, officers, employees, agents, representatives, engineers, and attorneys (collectively, "Indemnitees"), from any and all claims that may be asserted at any time against any of them in connection with (i) the City's review and approval of any plans for the Redevelopment Project or demolition and removal of the blighted improvements from the Property; (ii) the issuance of any approval, permit, certificate, or acceptance for the Redevelopment Project, or demolition and removal of the blighted improvements from the Property; and (iii) the development, construction, maintenance, or use of any portion of the Redevelopment Project, or demolition and removal of the blighted improvements from the Redevelopment Property from Turlington Homes negligence

8

or wilful misconduct provided, however, that the foregoing obligation shall not apply to any negligence or willful misconduct of the Indemnitees.

E.    Defense Expense. Each party shall, and does hereby agree to pay all expenses, including without limitation legal fees and administrative expenses incurred by a party in defending itself with regard to any and all claims referenced in Section 11.D. of this Agreement caused by the other party.

## Section 12.    Nature, Survival, and Transfer of Obligations.

All obligations assumed by Developer under this Agreement will be binding on and inure for the benefit of Developer, on any and all of Developer's successors, and assigns, and on any and all of the respective successor legal or beneficial owners, lessees, or sublessees. To assure that Developer's successors, and assigns, and successor owners, lessees, or sublessees have notice of this Agreement and the obligations created by it, Developer will:

1.    Deposit with the City's Administrator, contemporaneously with the City's approval of this Agreement, any consents or other documents necessary to authorize the City to record this Agreement in the office of the Recorder of Cook County; and

2.    Notify the City in writing at least thirty (30) days prior to any date after which Developer transfers its interest in all or any part of the Redevelopment Project to any Person not a party to this Agreement; and

3.    Incorporate, by reference, this Agreement into any and all real estate sales, lease, or sublease contract to any Person not a party to this Agreement; and

4.    Require, prior to the transfer all or any part of its interests in the Redevelopment Project to any Person not a party to this Agreement, the transferee to execute an enforceable written agreement, in substantially the form attached to this Agreement as Exhibit B, agreeing to be bound by this Agreement ("*Transferee Assumption Agreement*"), and to provide the City, after request, with reasonable assurance of the financial ability of the transferee to meet those obligations as the City may require, and cannot be unreasonably withheld.

The City agrees that after a successor becoming bound to the obligation created in the manner provided in this Agreement, the personal liability of Developer will be released and terminated. The failure of Developer to provide the City with a fully executed copy of a Transferee Assumption Agreement, as required above, executed by the transferee and, if requested by the City, before completing the transfer, will result in Developer remaining fully liable for all of its obligations under this Agreement but will not relieve the transferee of its liability for those obligations as a successor to Developer. Under these circumstances, the Developer and transferee will be jointly and severally liable for the obligations unless and until such time as an executed copy of the Transferee Assumption Agreement is delivered to the City.

## Section 13. Term. This Agreement will be in full force and effect through the earlier of the following: (i) default by the Developer, or (ii) five years following the conveyance of the Property from the City to the Developer, unless renewed, amended or extended by both parties.

## Section 14. Enforcement. The Parties to this Agreement may, in law or in equity, by suit, action, mandamus, or any other proceeding, including without limitation specific performance, enforce or compel the performance of this Agreement; provided, however, that the Developer agrees that it will not seek, and does not have the right to seek, to recover a judgment for monetary damages against the City, or any of its elected or appointed officials, officers, employees, agents, representatives, engineers, or attorneys, on account of the negotiation, execution, or breach of this Agreement. In addition to every other remedy permitted by law for the enforcement of the terms of this Agreement, the City shall be entitled to withhold the issuance of building permits or certificates of occupancy for any and all buildings and structures within the Redevelopment Property at any time when the Developer has failed or refused to meet fully any of its obligations under this Agreement. In the event of a judicial proceeding brought by one party to this Agreement against the other party to this Agreement pursuant to this Section 14, the prevailing party shall be entitled to reimbursement from the unsuccessful party of all costs and expenses, including without limitation reasonable attorneys' fees, incurred in connection with the judicial proceeding.

## Section 15. General Provisions.

A.    Notice. Any notice or communication required or permitted to be given under this Agreement shall be in writing and shall be delivered (i) personally, (ii) by a reputable overnight

courier, (iii) by certified mail, return receipt requested, and deposited in the U.S. Mail, postage prepaid, (iv) by facsimile, or (v) by electronic internet mail ("e-mail"). Facsimile notices shall be deemed valid only to the extent that they are (a) actually received by the individual to whom addressed and (b) followed by delivery of actual notice in the manner described in either (i), (ii), or (iii) above within three business days thereafter at the appropriate address set forth below. E-mail notices shall be deemed valid only to the extent that they are (a) opened by the recipient on a business day at the address set forth below, and (b) followed by delivery of actual notice in the manner described in either (i), (ii), or (iii) above within three business days thereafter at the appropriate address set forth below. Unless otherwise provided in this Agreement, notices shall be deemed received after the first to occur of (a) the date of actual receipt; or (b) the date that is one (1) business day after deposit with an overnight courier as evidenced by a receipt of deposit; or (b) the date that is three (3) business days after deposit in the U.S. mail, as evidenced by a return receipt. By notice complying with the requirements of this Section 15.A, each party to this Agreement shall have the right to change the address or the addressee, or both, for all future notices and communications to them, but no notice of a change of addressee or address shall be effective until actually received.

Notices and communications to the City shall be addressed to, and delivered at, the following address:

City of Harvey
15320 Broadway Avenue
Harvey, IL 60426
ATTN: City Administrator
E-mail: Cdavis@cityofharveyil.gov
Fax: 708-210-5300

With a copy to:

Ancel Glink, P.C
140 S. Dearborn Street, Suite 600
Chicago, IL 60603
ATTN: Megan Mack
E-mail: mmack@ancelglink.com
Fax: 312-782-0943

Notices and communications to Developer shall be addressed to, and delivered at, the following address:

Turlington Homes, Inc.
P.O Box 219
Voorhees, NJ 08043
Attn: David Haislip
Dhaislip@globalredevelopment.com

B.     Time of the Essence. Time is of the essence in the performance of this Agreement.

C.     Rights Cumulative. Unless expressly provided to the contrary in this Agreement, each and every one of the rights, remedies, and benefits provided by this Agreement shall be cumulative and shall not be exclusive of any other rights, remedies, and benefits allowed by law.

D.     Non-Waiver. The City shall be under no obligation to exercise any of the rights granted to it in this Agreement. The failure of the City to exercise at any time any right granted to the City shall not be deemed or construed to be a waiver of that right, nor shall the failure void or affect the City's right to enforce that right or any other right.

E.     Consents. Unless otherwise provided in this Agreement, whenever the consent, permission, authorization, approval, acknowledgement, or similar indication of assent of any party to this Agreement, or of any duly authorized officer, employee, agent, or representative of any party to this Agreement, is required in this Agreement, the consent, permission, authorization, approval, acknowledgement, or similar indication of assent shall be in writing.

F.     Governing Law. This Agreement shall be governed by, and enforced in accordance with, the internal laws, but not the conflicts of laws rules, of the State of Illinois.

G.     Severability. It is hereby expressed to be the intent of the Parties to this Agreement that should any provision, covenant, agreement, or portion of this Agreement or its application to any Person or property be held invalid by a court of competent jurisdiction, the remaining provisions of this Agreement and the validity, enforceability, and application to any Person or

10

property shall not be impaired thereby, but the remaining provisions shall be interpreted, applied, and enforced so as to achieve, as near as may be, the purpose and intent of this Agreement to the greatest extent permitted by applicable law.

H.    Entire Agreement. This Agreement constitutes the entire agreement between the parties and supersedes any and all prior agreements and negotiations between the parties, whether written or oral, relating to the subject matter of this Agreement.

I.    Interpretation. This Agreement shall be construed without regard to the identity of the party who drafted the various provisions of this Agreement. Moreover, each and every provision of this Agreement shall be construed as though all Parties to this Agreement participated equally in the drafting of this Agreement. As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable to this Agreement.

J.    Exhibits. Exhibits A through C attached to this Agreement are, by this reference, incorporated in, and made a part of this Agreement. In the event of a conflict between an exhibit and the text of this Agreement, the text of this Agreement shall control.

K.    Amendments and Modifications. No amendment or modification to this Agreement shall be effective until it is reduced to writing and approved and executed by all Parties to this Agreement in accordance with all applicable statutory procedures.

L.    Changes in Laws. Unless otherwise provided in this Agreement, any reference to the Requirements of Law shall be deemed to include any modifications of, or amendments to, the Requirements of Law that may occur in the future.

M.    Authority to Execute. The City hereby warrants and represents to Developer that the Persons executing this Agreement on its behalf have been properly authorized to do so by the Corporate Authorities. Developer hereby warrants and represents to the City (i) that it has the full and complete right, power, and authority to enter into this Agreement and to agree to the terms, provisions, and conditions set forth in this Agreement, (ii) that all legal actions needed to authorize the execution, delivery, and performance of this Agreement have been taken, and (iii) that neither the execution of this Agreement nor the performance of the obligations assumed by Developer will (a) result in a breach or default under any agreement to which Developer is a party or (b) to its knowledge, violate any statute, law, restriction, court order, or agreement to which Developer is subject.

N.    No Third-Party Beneficiaries. No claim as a third-party beneficiary under this Agreement by any Person shall be made, or be valid, against the City or Developer.

O.    Recording. Developer will be responsible for the cost of recording this Agreement.

P.    Counterparts. This Agreement may be executed in counterpart, each of which shall constitute an original document, which together shall constitute one and the same instrument.

*[Signature Pages Follow]*

11

**IN WITNESS WHEREOF,** the Parties have caused this Redevelopment Agreement to be executed by their duly authorized representatives, all on the day and year first above written.

ATTEST:

By: [PERSONAL INFO]

Its: City Clerk

ATTEST:

By: [PERSONAL INFO]

Its: _Director_

**THE CITY OF HARVEY,** an Illinois home rule municipal corporation

By: [PERSONAL INFO]

Its: Mayor

**Turlington Homes, Inc.,** an Illinois Corporation

[PERSONAL INFO]

David Haislip, <u>Director, President and Secretary</u>

12

## EXHIBIT LIST

Exhibit A    Property Legal Description

Exhibit B    Transferee Assumption Agreement

Exhibit C    Redevelopment Project

13

## EXHIBIT A

### PROPERTY REDEVELOPMENT PHASE I LIST

### City Owned Properties

| City Owned Property | Address | PIN | Lot Size |
|---|---|---|---|
| Vacant Property - To Be Demolished | 15100 Turlington Avenue | 29-17-104-020-0000 | 0.0987 |
| Vacant Lot | 15115 Turlington Avenue | 29-17-105-008-0000 | 0.0987 |
| Vacant Lot | 15119 Turlington Avenue | 29-17-105-010-0000 | 0.0987 |
| Vacant Lot | 15120 Turlington Avenue | 29-17-104-028-0000 | 0.0987 |
| Vacant Lot | 15124 Turlington Avenue | 29-17-104-029-0000 | 0.0987 |
| Vacant Lot | 15125 Turlington Avenue | 29-17-105-012-0000 | 0.0987 |
| Vacant Lot | 15127 Turlington Avenue | 29-17-105-013-0000 | 0.0987 |
| Vacant Lot | 15133 Turlington Avenue | 29-17-105-016-0000 | 0.0987 |
| Vacant Lot | 15133 Turlington Avenue | 29-17-105-017-0000 | 0.0987 |
| Vacant Lot | 15147 Turlington Avenue | 29-17-105-022-0000 | 0.0987 |

**Home Models**

The *Turlington Avenue Homes* project will consist of three different model homes, all with finishes that can be picked by the homeowner. Each home is targeted towards a specific buyer, single occupant, married couple, or small family. The designs are compact, yet extremely functional with open plan designs and state-of-the-art home automation. They will represent a turning-point in single-family home offerings in the City of Harvey and attract new residents from neighboring areas. The Developer reserves the right to modify the home models as necessary.

Each home is built with new energy efficient materials, integrated energy management devices and an optional 6kw solar system with battery backup.

## EXHIBIT A



**THE PRAIRIE RANCH**

- Style: Ranch
- Square Feet: 1,200
- Stories: 1
- Bedrooms: 3
- Bathrooms: 1.5
- Front Porch: Yes
- Back Porch: No
- Garage: Optional
- Landscaping: Optional
- Foundation: Slab

Estimated Sales Price (base): $168,000





**THE BARCLAY**

- Style: Cape Cod
- Square Feet: 1,315
- Stories: 1.5
- Bedrooms: 3
- Bathrooms: 1.5
- Front Porch: Optional
- Back Porch: None
- Fireplace: Optional
- Garage: Optional
- Landscaping: Optional
- Foundation: Slab
Estimated Sales Price (base): $181,000







## THE SOUTHLAND

- Style: Modern Farmhouse
- Square Feet: 1,926
- Stories: 2
- Bedrooms: 4
- Bathrooms: 2.5
- Front Porch: Yes
- Back Porch: Yes
- Garage: Yes
- Bonus Room: Optional
- Landscaping: Optional
- Foundation: Slab

Estimated Sales Price (base): $248,000

## EXHIBIT B

### Transferee Assumption Agreement

**THIS AGREEMENT**, made as of this 22nd day of December 2025, by, between and among **Turlington Homes, Inc.** ("*Developer*"), Turlington Homes, Inc. ("*Transferee*") and the **CITY OF HARVEY**, an Illinois municipal corporation ("*City*").

### WITNESSETH:

**WHEREAS**, pursuant to that certain [real estate sale contract] [lease] dated November 21, 2025, the Transferee agreed to purchase from Developer certain real property situated in Cook County, Illinois and legally described in Exhibit A attached hereto and by this reference incorporated herein and made a part hereof ("*Property*"); and

**WHEREAS**, following the conveyance of the Property by Developer, the Transferee will be the [legal owner] of the Property; and

**WHEREAS**, as a condition to the conveyance of the Property by Developer and the City require that the Transferee agree to comply with all the terms, requirements and obligations set forth in that certain Redevelopment and Economic Incentive Agreement, dated as of November 21, 2025, and recorded in the Office of the Cook County Recorder on _____, 20__, as Document No. _____, by and between the City and Developer, as amended from time to time ("*Redevelopment Agreement*");

**NOW, THEREFORE**, in consideration of the agreement of Developer to convey the Property to the Transferee and of the City to accept the transfer of obligations as provided herein and to grant the releases granted herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed by, between and among the City, Developer and the Transferee as follows:

1.　**Recitals.** The foregoing recitals are by this reference incorporated herein and made a part hereof as substantive provisions of this Agreement.

2.　**Assumption of Obligations.** The Transferee, on its behalf and on behalf of its successors, assigns, heirs, executors and administrators, hereby agrees, at its sole cost and expense, to comply with all of the terms, requirements and obligations of the Redevelopment Agreement, including all exhibits and attachments thereto, regardless of whether such terms, requirements and obligations are to be performed and provided by, or are imposed upon, Developer or the developer of the Property.

3.　**Assurances of Financial Ability.** Contemporaneously with the Transferee's execution of this Agreement, the Transferee shall, upon the request of the City, provide the City with such reasonable assurances of financial ability to meet the obligations assumed hereunder as the City may, from time to time, require.

4.　**Payment of City Fees and Costs.** In addition to any other costs, payments, fees, charges, contributions or dedications required by this Agreement, the Redevelopment Agreement or by applicable City codes, ordinances, resolutions, rules or regulations, the Transferee shall pay to the City, immediately upon presentation of a written demand or demands therefor, all legal, engineering and other consulting or administrative fees, costs and expenses incurred in connection with the negotiation, preparation, consideration and review of this Agreement.

5.　**Acknowledgement and Release of Transferor.** The City hereby acknowledges its agreement to the Transferee's assumption of the obligation to comply with the terms, requirements and obligations of the Redevelopment Agreement, including all exhibits and attachments thereto, and the City hereby releases Developer from any personal liability for failure to comply with the terms, requirements and obligations of the Redevelopment Agreement.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the day and year first written above.

ATTEST:　　　　　　　　　　　　　　　　　**CITY OF HARVEY**

PERSONAL INFO　　　　　　　　PERSONAL INFO

Deputy City Clerk　　　　　　　　　　　Mayor

**EXHIBIT B**

ATTEST:



Turlington Homes, Inc.

By David Haislip, Director, President and Secretary.

**EXHIBIT B**

ACKNOWLEDGEMENTS

STATE OF ILLINOIS )
) SS.
COUNTY OF COOK )

This instrument was acknowledged before me on _____,

20___, by _____, the Mayor of the **CITY OF HARVEY**, an Illinois municipal corporation,

and by _____, the City Clerk of said municipal corporation.

_____
Signature of Notary

SEAL

My Commission expires:

_____

STATE OF NJ )
) SS.
COUNTY OF Camden )

The foregoing instrument was acknowledged before me on December 22, 2025,

by David Haislip, Director, President and Secretary of **Turlington Homes, Inc.** an Illinois

corporation.

PERSONAL INFO

Signature of Notary

SEAL

My Commission expires:

**Angelita Adames**
NOTARY PUBLIC
STATE OF NEW JERSEY
ID # 50155436
MY COMMISSION EXPIRES March 22, 2026

**EXHIBIT B**

STATE OF NJ )

COUNTY OF CAmden ) ) SS.

The foregoing instrument was acknowledged before me on December 22, 2025, by David Haislip, President of **Turlington Homes, Inc.** and David Haislip, Secretary of said corporation.

PERSONAL INFO

Signature of Notary
SEAL

My Commission expires:

Angelita Adames
NOTARY PUBLIC
STATE OF NEW JERSEY
ID # 50155436
MY COMMISSION EXPIRES March 22, 2026

## EXHIBIT C

### Redevelopment Plan

Pre-Development -       Q4, 2025

Permitting & Zoning     Q1, 2025

Site Work Begins        Q1, 2026

Sales                   Q1, 2026 – Q4 2027

Vertical Construction   Q1, 2026 – Q4 2027

Full Completion         Q4, 2027

*THIS DOCUMENT
PREPARED BY AND
AFTER RECORDING
RETURN TO:*

Megan A. Mack
Ancel Glink, P.C.
140 S. Dearborn Street,
Suite 600
Chicago, IL 60603

*This Space for Recorder's Use Only*

# REDEVELOPMENT AGREEMENT

## BY AND BETWEEN

## CITY OF HARVEY

## AND

## Turlington Homes, Inc.

1

# REDEVELOPMENT AGREEMENT

## BY AND BETWEEN

## CITY OF HARVEY

## AND

## Turlington Homes, Inc.

**THIS REDEVELOPMENT AGREEMENT** *("Agreement")* is made and entered into this 27 day of October , 2025 *("Effective Date"),* by and between the **CITY OF HARVEY,** an Illinois home rule municipality *("City"),* and Turlington Homes, Inc., an Illinois corporation *("Developer").* (For convenience, the City and Developer may be referred to individually as a *"Party"* and collectively as the *"Parties").*

**IN CONSIDERATION OF** the recitals and the mutual covenants and agreements set forth in this Agreement, and pursuant to the City's home rule powers, the Parties agree as follows

**Section 1.** **Recitals.**[1]

A.      The City is a home rule unit of local government by virtue of the provisions of the Illinois Constitution of 1970.

B.      The City is the owner of a certain parcel of real property that is located in the City of Harvey Illinois, referred to as the (*"Redevelopment Properties"), as shown in Exhibit A.*

C.      Global Estate Development and its contractors specialize in the construction of new single family homes throughout the Country.

D.      The City desires to engage the services of the Developer for the rehabilitation of the Redevelopment Properties *("Redevelopment Project").*

E.      The Developer estimates that the Redevelopment Property costs will be approximately $2,124,000 and will generate homeownership.

F.      The City desires to promote new investment as part of its economic development strategy which includes the creation of new housing opportunities for City residents and sources of revenue.

G.      The City is willing to assist the Developer by selling the Redevelopment Property at a discounted sale price in the exercise of the City's home rule powers provided that the Developer agrees to the terms as set forth in this Agreement.

H.      The City and Developer desire that the Property be developed and used solely to promote homeownership, in compliance with this Agreement.

---

[1] All defined terms initially appear in bold and italics and thereafter as capitalized words and phrases throughout this Redevelopment Agreement. They shall have the meanings set forth in the preamble in Section 2 and elsewhere in this Redevelopment Agreement.

2

## Section 2. Definitions.

A. **Definitions.** Whenever used in this Agreement, the following terms shall have the following meanings unless a different meaning is required by the context:

**"Building Code":** Title 15, entitled "Buildings and Construction", of the Municipal Code of Harvey, as amended.

**"Certificate of Occupancy":** a certificate issued by the City planning department in accordance with Section 16-04-270 of the City's Zoning Ordinance.

**"Corporate Authorities":** The Mayor and City Council of the City.

**"Force Majeure":** Strikes, lockouts, acts of nature, or other factors beyond a party's reasonable control and reasonable ability to remedy; provided, however, that Force Majeure shall not include delays caused by weather conditions, unless those conditions are unusually severe or abnormal considering the time of year and the particular location of the Redevelopment Property.

**"Improvements":** All of the public and private improvements and facilities necessary to serve the Redevelopment Property, including without limitation the improvements shown on the Scope of Work, all other storm water detention and retention facilities, water mains, storm sewers, sanitary sewers, streets, lighting, sidewalks, parkways, rough and final grading, trees, sod, seeding, and other landscaping, and all other improvements required pursuant to this Agreement, and the Requirements of Law other than the building(s) and accessory structures.

**"Person":** Any corporation, partnership, individual, joint venture, trust, estate, association, business, enterprise, proprietorship, or other legal entity of any kind, either public or private, and any legal successor, agent, representative, or authorized assign of the above.

**"Property Conveyance Schedule":** The schedule set forth by the City and Developer for the anticipated closing dates for Phase I and Phase 2 of the Redevelopment Properties as identified in **Exhibit C.**

**"Redevelopment Property":** That certain property that will be the site of the Redevelopment Project, which is depicted in **Exhibit A.**

**"Redevelopment Project":** Developer's plans and specifications for the redevelopment of the Redevelopment Property, including but not limited to exterior improvements (e.g., a new roof, a new garage, masonry repair, landscaping), interior improvements (e.g., plumbing, electrical and HVAC improvements), surface improvements (constructing, sealing, and striping a parking lot).

**"Requirements of Law":** All applicable federal, state, and local laws, statutes, codes, ordinances, resolutions, orders, rules, and regulations.

**"Zoning Ordinance":** Title 16, entitled "The Zoning Ordinance of the City of Harvey" of the Municipal Code of Harvey, as amended.

B. Rules of Construction.

1. **Grammatical Usage and Construction.** In construing this Agreement, pronouns include all genders, and the plural includes the singular and vice versa.

2. **Headings.** The headings, titles, and captions in this Agreement have been inserted only for convenience and in no way define, limit, extend, or describe the scope or intent of this Agreement.

3. **Calendar Days.** Unless otherwise provided in this Agreement, any reference in this Agreement to "day" or "days" shall mean calendar days and not business days. If the date for giving of any notice required to be given, or the performance of any obligation, under this Agreement falls on a Saturday, Sunday, or federal holiday, then the notice or obligation may be given or performed on the next business day after that Saturday, Sunday, or federal holiday.

## Section 3. Mutual Assistance.

3

A.    Documents. The Parties agree to take such actions, including the execution and delivery of such documents, instruments, petitions and certifications, as well as the consideration and possible adoption of such ordinances and resolutions, as may be necessary or appropriate, from time to time, to carry out the terms, provisions and intent of this Agreement and to aid and assist each other in carrying out such terms, provisions and intent.

B.    Governmental Approvals. The Parties will cooperate fully with each other in implementing the provisions and terms of this Agreement and in seeking and obtaining from any or all appropriate governmental bodies, whether federal, state, county or local, any required permits, entitlements and approvals for the Redevelopment Project, for the provision of public and private utility services to the Property, and the demolition and clearance of blighted improvements on the Redevelopment Property.

C.    City Approvals. The City will, in accordance with the Requirements of Law and the terms of this Agreement, issue all permits and approvals necessary or desirable for the Redevelopment Project, including, without limitation, demolition, building and other permits and certificates of occupancy, provided that Developer applies and receives approval for all permits and approvals required under applicable City codes, ordinances, standards, rules, and regulations, as the same may be amended from time to time, and other Requirements of Law; provided, further, that the City has the right to withhold any building permit or certificate of occupancy at any time Developer is in violation of, or is not in full compliance with, any term of this Agreement until such time as Developer is in compliance with this Agreement or any violation is cured. The Parties agree to execute all documents and other instruments reasonably required by Developer's lender in connection with the financing of the development and construction of the Redevelopment Project.

### Section 4.    Conveyance of Redevelopment Property.

A.    Conveyance of Redevelopment Property.

1.    Conveyance. The City is the owner of the Property. The City shall convey its interest in the Redevelopment Property to the Developer by a recordable quit claim deed, subject to any and all liens or encumbrances held by the City or others. The Developer shall be responsible for all costs and the preparation of all documents necessary to close the transaction between the City and the Developer and shall be responsible for costs of transfer including City Transfer Stamps, if any, and recoding. The City will use its best efforts to convey fee simple title to the Redevelopment Property as promptly as us reasonably possible, with the timing of the transfer scheduled for be a simultaneous sign-and-close with Developer's closing for construction and acquisition financing. Developer agrees to acquire from the City, absent a Force Majeure Event, the fee simple interest in the Redevelopment Property in "as is, where is" condition together with all privileges, rights and appurtenances.

2.    Due Diligence. Title Insurance and Survey shall be the responsibility of the Developer. The Developer has conducted its due diligence investigation concerning the condition of the improvements upon the Redevelopment Property and will take title to the Redevelopment Property in an "AS IS" condition. Developer has further conducted its due diligence investigation concerning the title to the Redevelopment Property including all liens, taxes and encumbrances and has consulted with an attorney of its choosing concerning the title to the Property and is satisfied with the condition of said title. It shall be Developer's responsibility to remove or take subject to all objectionable liens, taxes and encumbrances, if any, from the title to the Redevelopment Property. THE CITY OF HARVEY MAKES NO WARRANTIES OF ANY KIND CONCERNING THE MERCHANTABILITY OF THE TITLE TO THE PROPERTY OF THE CONDITION OF THE STRUCTURE OR THE STATUS OR PRESENCE OF ANY ENVIRONMENTAL CONTAMINATION (INCLUDING MOLD OR OTHER HAZARDOUS MATERIALS) ON THE REDEVELOPMENT PROPERTY.

3.    Purchase Price. Developer will as the purchase price ("*Purchase Price*") for the Property the sum of Ten Dollars ($10.00). The Purchase Price, when due, will be payable in cash by cashier's or bank check or by wire transfer providing immediately available funds to a City specified account.

4.    Deed and Conveyed Interest. Upon payment of the Purchase Price, the City will convey the Redevelopment Property in the form of a Quit Claim

4

Deed, where the city represents that the title is free from any liens or encumbrances.

5.  Prior to the conveyance of the Redevelopment Property to Developer, Developer shall deliver to the City a recordable re-conveyance warranty deed for the Property. The City shall have the right to record the re-conveyance warranty deed if there is a default by Developer at any time or if Developer cannot or does not complete the Redevelopment Project in accordance with the terms of this Agreement, after a thrity day cure period upon written notice to Turlington Homes. The Developer agrees to hold the City harmless in the event that title to the Redevelopment Property is encumbered by any liens. The City shall return the re-conveyance warranty deed to Developer after the Certificate of Occupancy has been issued.

6.  Incentives. The City agrees, at its sole cost and expense, to reimburse the Developer for costs incurred in connection with the reconstruction of sidewalks located on public property and subject to the City's oversight. Such reimbursement shall be limited to an amount not to exceed Thirty Thousand Dollars ($30,000.00) and shall only be provided for work reasonably detailed in an invoice submitted to the City. Reimbursement shall be made within ninety (90) days following the City's receipt of (i) a completed invoice from the Developer and (ii) certification that the work has been completed in accordance with the applicable standards established by the City's designated engineering consultant and the Harvey Municipal Code. All sidewalk reconstruction work must comply with said standards as a condition precedent to reimbursement.

In addition, the City agrees to waive all utility tap fees otherwise applicable under the Harvey Municipal Code in connection with the redevelopment of the properties identified in this Agreement. Such waiver shall apply to each parcel or section of the redevelopment project as specifically listed in this Agreement, and shall be granted in accordance with the procedures and limitations set forth in the applicable provisions of the Municipal Code.

## Section 5 Redevelopment of Property.

A. General Restrictions. Subject to the particular terms for development set forth in this Agreement, for the Redevelopment Project, except for minor alterations due to site work approved by the City Engineer shall be pursuant to and in accordance with the following:

1.  This Agreement.

2.  The Scope of Work.

3.  The City's Zoning Ordinance.

4.  The City's Building Code.

5.  The Subdivision Code.

6.  The other Requirements of Law.

Unless otherwise provided in this Agreement, in the event of a conflict between or among any of the above plans or documents, the plan or document that provides the greatest control and protection for the City, as determined by the City Engineer, shall control. All of the above plans and documents shall be interpreted so that the duties and requirements imposed by any one of them are cumulative among all of them, unless otherwise provided in this Agreement.

B. Easements. Utility and enforcement easements shall be granted to the City and other governmental bodies and utility services over, on, and across the Property, for the purposes of enforcing applicable laws, making repairs, installing and servicing utilities, and providing public and emergency services.

C. Damage to Public Property. The Developer shall maintain the Redevelopment Property and all streets, sidewalks, and other public property in and adjacent to the Property in a good and clean condition at all times during development of the Redevelopment Property and construction of the Improvements. Further, the Developer shall promptly clean all mud, dirt, or debris deposited on any street, sidewalk, or other public property in or adjacent to the Redevelopment Property by the Developer or any agent of or contractor hired by, or on behalf of, the Developer, and shall repair any damage that may be caused by the activities of the Developer

5

or any agent of or contractor hired by, or on behalf of, the Developer. If, within one hour after the City gives the Developer notice to clean all mud, dirt, or debris deposited on any street, sidewalk, or other public property in or adjacent to the Redevelopment Property by the Developer or any agent of or contractor hired by, or on behalf of, the Developer, the Developer neglects to clean, or undertake with due diligence to clean, the affected public property, then the City shall be entitled to clean, either with its own forces or with contract forces, the affected public property and to recover from the Developer per hour charge based on the City's most currently effective prevailing wage rates, in accordance with the Prevailing Wage Act, 820 ILCS 130/0.10 *et seq.*, multiplied by the number of personnel reasonably required to perform the cleaning.

    D.    Changes in the Scope of Work during Development.

        1.    Minor Adjustments. During the construction and development of the Redevelopment Project, the City Engineer may authorize minor adjustments to any of the Scope of Work when the adjustments are necessary in light of technical or engineering considerations

        2.    Major Adjustments. Any major adjustment to any of the Scope of Work not specifically listed in, or approved pursuant to this Agreement shall be considered to be a major adjustment and shall be granted only after application to, and approval by, the Corporate Authorities, by resolution duly adopted. The Corporate Authorities may, but shall have no obligation to, require that the application for a major adjustment be considered at a public hearing before the Corporate Authorities or other City board or commission as the Corporate Authorities shall require.

## Section 6.    Improvements.

    A.    Developer Duty to Construct Improvements. The Developer shall, at its sole cost and expense, construct and install all of the Improvements on the Property.

    B.    Standards Applicable to Improvements.

        1.    General Standards. All Improvements for the Redevelopment Project shall be designed and constructed pursuant to, and in accordance with the Scope of Work and to the satisfaction of the City Engineer. All work performed on the Improvements shall be conducted in a good and workmanlike manner and in accordance with the schedule established in Section 6.C of this Agreement. All materials used for construction of the Improvements shall be new and of first-rate quality.

        2.    Contract Terms; Prosecution of the Work. The Developer and all of its contractors shall prosecute the work diligently, continuously, in full compliance with, and as required by or pursuant to, this Agreement, until the work is properly completed. Each Developer's contract with a contractor shall provide that the Developer may take over and prosecute the work if the contractor fails to do so in a timely and proper manner.

        3.    Engineering Services. The Developer shall provide, at its sole cost and expense, all engineering services for the design and construction of the Improvements, including without limitation full inspection services of a professional engineer responsible for overseeing the construction of the Improvements if applicable. The Developer shall promptly provide the City with the name of the resident engineer and a telephone number or numbers at which the engineer can be reached at all times.

        4.    City Inspections and Approvals. City representatives shall have the full right, permission, and authority to inspect and approve all work on the Improvements at all times.

        5.    Other Approvals. If the construction and installation of any Improvement require the consent, permission, or approval of any Person, then the Developer shall take all steps required to obtain the required consent, permission, or approval. No work requiring the consent, permission, or approval of any Person shall commence without that prior consent, permission, or approval.

    C.    Schedule for Completion of Improvements. All Improvements for the Redevelopment Project shall be completed and made ready for inspection, approval, and any

6

required acceptance by the City pursuant to the construction schedule approved by the City Engineer. The Developer shall be allowed extensions of time beyond the completion dates set forth in the construction schedule only for delay caused by Force Majeure. The Developer shall, within two days after any unavoidable delay commences and again within two days after the delay terminates, give notice to the City for its review and approval of the delay, the cause for the delay, the period or anticipated period of the delay, and the steps taken by the Developer to mitigate the effects of the delay. Any failure of the Developer to give the required notice shall be deemed a waiver of any right to an extension of time for any the delay.

      D.    Final Inspections and Approvals. When the Developer determines that an Improvement has been properly completed, the Developer shall request final inspection, approval, and, as appropriate, acceptance of the Improvement by the City. The notice and request shall comply with the requirements of the Building Code, and the other Requirements of Law, and shall be given sufficiently in advance to allow the City time to inspect the Improvement and to prepare a punch list of items requiring repair or correction and to allow the Developer time to make all required repairs and corrections prior to the scheduled completion date. The Developer shall promptly make all necessary repairs and corrections as specified on the punch list. The City shall not be required to approve or accept any Improvement until all of the Improvements, including without limitation all punch list items, have been fully and properly completed.

      E.    Issuance of Building and Occupancy Permits. The City shall have the absolute right to withhold any building permit or Certificate of Occupancy at any time the Developer is in violation of, or is not in full compliance with, any term of this Agreement, only after written notice is sent to Turlington Homes and is not cured in a 30 day period.

      F.    Completion of Construction. If the Developer fails to diligently pursue all construction, as required in, or permitted by, Sections 5 and 6 of this Agreement, to completion within the time period prescribed in the building permit or permits issued by the City for the construction, and if the building permit or permits are not renewed within three months after expiration, the Developer shall, within 60 days after notice from the City, remove any partially constructed or partially completed buildings, structures, or improvements from the Property, unless the delay is caused by The City, lender or other government delays. If the Developer fails or refuses to remove the buildings, structures, and Improvements as required, then the City shall have, and is hereby granted, in addition to all other rights afforded to the City in this Agreement and by law, the right, at its option, to demolish and/or remove any of the buildings, structures, and improvements, and the City shall have the right to charge the Developer an amount sufficient to defray the entire cost of the work, including without limitation legal and administrative costs.

## Section 8. Developer's Representations.

      A.    As of the date of execution of this Agreement, Developer is financially solvent, able to pay its debts as they mature, and able to perform the obligations hereunder, and will promptly give written notice to the City of any material adverse change in the financial condition of Developer which would have an adverse effect on the execution, delivery, performance, or enforceability of this Agreement;

      B.    Developer is authorized to do business in, and is in good standing in, the State of Illinois;

      C.    Except for only those representations, statements, or promises expressly contained in this Agreement, no representation, statement, or promise of any kind whatsoever by the City, its officials, agents, or employees has induced Developer to enter into this Agreement or has been relied on by Developer. No proceeding of any kind including, without limitation, litigation or arbitration, whether judicial or administrative, is pending or, to its knowledge, threatened against Developer or contemplated by Developer which would under any circumstance have any material adverse effect on the execution, delivery, performance, or enforceability of this Agreement. As of the date of execution of this Agreement, Developer has not received notice, and does not to its knowledge have a reasonable basis for believing that Developer or any of its corporate officers is the subject of any of the proceedings identified in the following subparts having a material adverse effect on the execution, delivery, performance or enforceability of this Agreement: (i) criminal action, complaint, or investigation pertaining to any felony charge, or (ii) any civil action or claim, predicated on alleged acts of antitrust violations, business fraud, or class discrimination due to race, creed, color, disability, gender, marital status, age, national origin, or religious affiliation.

7

### Section 10  Fees, Dedications, Donations, and Contributions.

A.  Negotiation and Review Fees.  In addition to all other costs, payments, fees, charges, contributions, or dedications required by this Agreement or by the Requirements of Law, Developer will pay to the City upon presentation of itemized bills and costs, immediately after presentation of a written demand or demands for payment, all reasonable legal, engineering, and other consulting or administrative fees, costs, and expenses incurred or accrued in connection with the review and processing of plans for the redevelopment and renovation of the Redevelopment Project, or the demolition and clearance work on the Property and in connection with the negotiation, preparation, consideration, and review of this Agreement. Payment of all fees, costs, and expenses for which demand has been made, but payment has not been received, by the City prior to execution of this Agreement, will be made by a certified or cashier's check or wire transfer contemporaneous with the execution of this Agreement by the City. Further, the Developer agrees that it will continue to be liable for and to pay, immediately after presentation of a written demand or demands for payment, the fees, costs and expenses incurred in connection with any applications, documents, or proposals, whether formal or informal, of whatever kind submitted by Developer during the term of this Agreement in connection with the use, redevelopment, and renovation of the Redevelopment Project and the use, demolition, and clearance of the Property. Further, Developer agrees that it will be liable for and will pay after demand all customary fees, costs, and expenses incurred by the City for publications and recordings required in connection with the above matters.

B.  Other City Fees.  In addition to all other costs, payments, fees, charges, contributions, or dedications required by this Agreement, Developer will pay to the City all application, inspection, and permit fees, all water and sewer general and special connection fees, tap-on fees, charges, and contributions, and all other fees, charges, and contributions pursuant to the Requirements of Law.

### Section 11. Developer's Insurance Requirements; Indemnification of City.

A.  Developer's Risk Prior to Completion.  Prior to completion of the Redevelopment Project, Developer will keep in force at all time builders' risk and liability insurance on a completed value basis, in a non-reporting form, against all risks of physical loss, including collapse, covering the total value of work performed and equipment, supplies and material furnished for the Redevelopment Project (including on-site stored materials), all as to work by Developer. The insurance required under this Subsection 11.A will be issued by companies properly licensed by the State of Illinois and reasonably satisfactory to the City. The insurance required under this Subsection 11.A will name as the City as an additional insured. All such policies will contain a provision that the same will not be canceled or modified without 30 days' prior written notice to the City.

B.  City Review.  Developer acknowledges and agrees that the City is not, and will not be, in any way liable for any damages or injuries that may be sustained as the result of the City's review and approval of any plans for the Redevelopment Project, or demolition and removal of the blighted improvements from the Property, or the issuance of any approvals, permits, certificates, or acceptances for the development or use of the Redevelopment Project, or demolition and removal of the blighted improvements from the Property, and that the City's review and approval of those plans and issuance of those approvals, permits, certificates, or acceptances does not, and shall not, in any way, be deemed to insure Developer, or any of its successors, assigns, tenants, and licensees, or any other Person, against damage or injury of any kind at any time.

C.  City Procedure.  Developer acknowledges and agrees that notices, meetings, and hearings have been properly given and held by the City with respect to the approval of this Agreement and agrees not to challenge the City's approval on the grounds of any procedural infirmity or of any denial of any procedural right.

D.  Indemnity.  Developer agrees to, and does hereby, hold harmless and indemnify the City, all City commissions, boards, public bodies, and all City elected or appointed officials, officers, employees, agents, representatives, engineers, and attorneys (collectively, "*Indemnitees*"), from any and all claims that may be asserted at any time against any of them in connection with (i) the City's review and approval of any plans for the Redevelopment Project or demolition and removal of the blighted improvements from the Property; (ii) the issuance of any approval, permit, certificate, or acceptance for the Redevelopment Project, or demolition and removal of the blighted improvements from the Property; and (iii) the development, construction, maintenance, or use of any portion of the Redevelopment Project, or demolition and removal of the blighted improvements from the Redevelopment Property from Turlington Homes negligence

8

or wilful misconduct provided, however, that the foregoing obligation shall not apply to any negligence or willful misconduct of the Indemnitees.

E.    Defense Expense. Each party shall, and does hereby agree to pay all expenses, including without limitation legal fees and administrative expenses incurred by a party in defending itself with regard to any and all claims referenced in Section 11.D. of this Agreement caused by the other party.

## Section 12.    Nature, Survival, and Transfer of Obligations.

All obligations assumed by Developer under this Agreement will be binding on and inure for the benefit of Developer, on any and all of Developer's successors, and assigns, and on any and all of the respective successor legal or beneficial owners, lessees, or sublessees. To assure that Developer's successors, and assigns, and successor owners, lessees, or sublessees have notice of this Agreement and the obligations created by it, Developer will:

1.    Deposit with the City's Administrator, contemporaneously with the City's approval of this Agreement, any consents or other documents necessary to authorize the City to record this Agreement in the office of the Recorder of Cook County; and

2.    Notify the City in writing at least thirty (30) days prior to any date after which Developer transfers its interest in all or any part of the Redevelopment Project to any Person not a party to this Agreement; and

3.    Incorporate, by reference, this Agreement into any and all real estate sales, lease, or sublease contract to any Person not a party to this Agreement; and

4.    Require, prior to the transfer all or any part of its interests in the Redevelopment Project to any Person not a party to this Agreement, the transferee to execute an enforceable written agreement, in substantially the form attached to this Agreement as **Exhibit B**, agreeing to be bound by this Agreement ("*Transferee Assumption Agreement*"), and to provide the City, after request, with reasonable assurance of the financial ability of the transferee to meet those obligations as the City may require, and cannot be unreasonably withheld.

The City agrees that after a successor becoming bound to the obligation created in the manner provided in this Agreement, the personal liability of Developer will be released and terminated. The failure of Developer to provide the City with a fully executed copy of a Transferee Assumption Agreement, as required above, executed by the transferee and, if requested by the City, before completing the transfer, will result in Developer remaining fully liable for all of its obligations under this Agreement but will not relieve the transferee of its liability for those obligations as a successor to Developer. Under these circumstances, the Developer and transferee will be jointly and severally liable for the obligations unless and until such time as an executed copy of the Transferee Assumption Agreement is delivered to the City.

**Section 13. Term.** This Agreement will be in full force and effect through the earlier of the following: (i) default by the Developer, or (ii) five years following the conveyance of the Property from the City to the Developer, unless renewed, amended or extended by both parties.

**Section 14. Enforcement.** The Parties to this Agreement may, in law or in equity, by suit, action, mandamus, or any other proceeding, including without limitation specific performance, enforce or compel the performance of this Agreement; provided, however, that the Developer agrees that it will not seek, and does not have the right to seek, to recover a judgment for monetary damages against the City, or any of its elected or appointed officials, officers, employees, agents, representatives, engineers, or attorneys, on account of the negotiation, execution, or breach of this Agreement. In addition to every other remedy permitted by law for the enforcement of the terms of this Agreement, the City shall be entitled to withhold the issuance of building permits or certificates of occupancy for any and all buildings and structures within the Redevelopment Property at any time when the Developer has failed or refused to meet fully any of its obligations under this Agreement. In the event of a judicial proceeding brought by one party to this Agreement against the other party to this Agreement pursuant to this Section 14, the prevailing party shall be entitled to reimbursement from the unsuccessful party of all costs and expenses, including without limitation reasonable attorneys' fees, incurred in connection with the judicial proceeding.

## Section 15. General Provisions.

A.    Notice. Any notice or communication required or permitted to be given under this Agreement shall be in writing and shall be delivered (i) personally, (ii) by a reputable overnight

courier, (iii) by certified mail, return receipt requested, and deposited in the U.S. Mail, postage prepaid, (iv) by facsimile, or (v) by electronic internet mail ("*e-mail*"). Facsimile notices shall be deemed valid only to the extent that they are (a) actually received by the individual to whom addressed and (b) followed by delivery of actual notice in the manner described in either (i), (ii), or (iii) above within three business days thereafter at the appropriate address set forth below. E-mail notices shall be deemed valid only to the extent that they are (a) opened by the recipient on a business day at the address set forth below, and (b) followed by delivery of actual notice in the manner described in either (i), (ii), or (iii) above within three business days thereafter at the appropriate address set forth below. Unless otherwise provided in this Agreement, notices shall be deemed received after the first to occur of (a) the date of actual receipt; or (b) the date that is one (1) business day after deposit with an overnight courier as evidenced by a receipt of deposit; or (b) the date that is three (3) business days after deposit in the U.S. mail, as evidenced by a return receipt. By notice complying with the requirements of this Section 15.A, each party to this Agreement shall have the right to change the address or the addressee, or both, for all future notices and communications to them, but no notice of a change of addressee or address shall be effective until actually received.

Notices and communications to the City shall be addressed to, and delivered at, the following address:

> City of Harvey
> 15320 Broadway Avenue
> Harvey, IL 60426
> ATTN: City Administrator
> E-mail: Cdavis@cityofharveyil.gov
> Fax: 708-210-5300

With a copy to:

> Ancel Glink, P.C
> 140 S. Dearborn Street, Suite 600
> Chicago, IL 60603
> ATTN: Megan Mack
> E-mail: mmack@ancelglink.com
> Fax: 312-782-0943

Notices and communications to Developer shall be addressed to, and delivered at, the following address:

> Turlington Homes, Inc.
> P.O Box 219
> Voorhees, NJ 08043
> Attn: David Haislip
> Dhaislip@globalredevelopment.com

B.    Time of the Essence. Time is of the essence in the performance of this Agreement.

C.    Rights Cumulative. Unless expressly provided to the contrary in this Agreement, each and every one of the rights, remedies, and benefits provided by this Agreement shall be cumulative and shall not be exclusive of any other rights, remedies, and benefits allowed by law.

D.    Non-Waiver. The City shall be under no obligation to exercise any of the rights granted to it in this Agreement. The failure of the City to exercise at any time any right granted to the City shall not be deemed or construed to be a waiver of that right, nor shall the failure void or affect the City's right to enforce that right or any other right.

E.    Consents. Unless otherwise provided in this Agreement, whenever the consent, permission, authorization, approval, acknowledgement, or similar indication of assent of any party to this Agreement, or of any duly authorized officer, employee, agent, or representative of any party to this Agreement, is required in this Agreement, the consent, permission, authorization, approval, acknowledgement, or similar indication of assent shall be in writing.

F.    Governing Law. This Agreement shall be governed by, and enforced in accordance with, the internal laws, but not the conflicts of laws rules, of the State of Illinois.

G.    Severability. It is hereby expressed to be the intent of the Parties to this Agreement that should any provision, covenant, agreement, or portion of this Agreement or its application to any Person or property be held invalid by a court of competent jurisdiction, the remaining provisions of this Agreement and the validity, enforceability, and application to any Person or

10

property shall not be impaired thereby, but the remaining provisions shall be interpreted, applied, and enforced so as to achieve, as near as may be, the purpose and intent of this Agreement to the greatest extent permitted by applicable law.

H.    Entire Agreement. This Agreement constitutes the entire agreement between the parties and supersedes any and all prior agreements and negotiations between the parties, whether written or oral, relating to the subject matter of this Agreement.

I.    Interpretation. This Agreement shall be construed without regard to the identity of the party who drafted the various provisions of this Agreement. Moreover, each and every provision of this Agreement shall be construed as though all Parties to this Agreement participated equally in the drafting of this Agreement. As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable to this Agreement.

J.    Exhibits. Exhibits A through C attached to this Agreement are, by this reference, incorporated in, and made a part of this Agreement. In the event of a conflict between an exhibit and the text of this Agreement, the text of this Agreement shall control.

K.    Amendments and Modifications. No amendment or modification to this Agreement shall be effective until it is reduced to writing and approved and executed by all Parties to this Agreement in accordance with all applicable statutory procedures.

L.    Changes in Laws. Unless otherwise provided in this Agreement, any reference to the Requirements of Law shall be deemed to include any modifications of, or amendments to, the Requirements of Law that may occur in the future.

M.    Authority to Execute. The City hereby warrants and represents to Developer that the Persons executing this Agreement on its behalf have been properly authorized to do so by the Corporate Authorities. Developer hereby warrants and represents to the City (i) that it has the full and complete right, power, and authority to enter into this Agreement and to agree to the terms, provisions, and conditions set forth in this Agreement, (ii) that all legal actions needed to authorize the execution, delivery, and performance of this Agreement have been taken, and (iii) that neither the execution of this Agreement nor the performance of the obligations assumed by Developer will (a) result in a breach or default under any agreement to which Developer is a party or (b) to its knowledge, violate any statute, law, restriction, court order, or agreement to which Developer is subject.

N.    No Third-Party Beneficiaries. No claim as a third-party beneficiary under this Agreement by any Person shall be made, or be valid, against the City or Developer.

O.    Recording. Developer will be responsible for the cost of recording this Agreement.

P.    Counterparts. This Agreement may be executed in counterpart, each of which shall constitute an original document, which together shall constitute one and the same instrument.

*[Signature Pages Follow]*

11

IN WITNESS WHEREOF, the Parties have caused this Redevelopment Agreement to be executed by their duly authorized representatives, all on the day and year first above written.

ATTEST:                                                **THE CITY OF HARVEY**, an Illinois home rule municipal corporation

By: [PERSONAL INFO]                  By: [PERSONAL INFO]

Its: City Clerk                                    Its: Mayor

ATTEST:                                            **Turlington Homes, Inc.**, an Illinois Corporation

By:_____           By:_____

Its:_____          Its: Director

12

## EXHIBIT LIST

Exhibit A        Property Legal Description

Exhibit B        Transferee Assumption Agreement

Exhibit C        Redevelopment Project

13

## EXHIBIT A

### PROPERTY REDEVELOPMENT PHASE I LIST

### City Owned Properties

| City Owned Property | Address | PIN | Lot Size |
|---|---|---|---|
| Vacant Property - To Be Demolished | 15100 Turlington Avenue | 29-17-104-020-0000 | 0.0987 |
| Vacant Lot | 15115 Turlington Avenue | 29-17-105-008-0000 | 0.0987 |
| Vacant Lot | 15119 Turlington Avenue | 29-17-105-010-0000 | 0.0987 |
| Vacant Lot | 15120 Turlington Avenue | 29-17-104-028-0000 | 0.0987 |
| Vacant Lot | 15124 Turlington Avenue | 29-17-104-029-0000 | 0.0987 |
| Vacant Lot | 15125 Turlington Avenue | 29-17-105-012-0000 | 0.0987 |
| Vacant Lot | 15127 Turlington Avenue | 29-17-105-013-0000 | 0.0987 |
| Vacant Lot | 15133 Turlington Avenue | 29-17-105-016-0000 | 0.0987 |
| Vacant Lot | 15133 Turlington Avenue | 29-17-105-017-0000 | 0.0987 |
| Vacant Lot | 15147 Turlington Avenue | 29-17-105-022-0000 | 0.0987 |

### Home Models

The *Turlington Avenue Homes* project will consist of three different model homes, all with finishes that can be picked by the homeowner. Each home is targeted towards a specific buyer, single occupant, married couple, or small family. The designs are compact, yet extremely functional with open plan designs and state-of-the-art home automation. They will represent a turning-point in single-family home offerings in the City of Harvey and attract new residents from neighboring areas.

Each home is built with new energy efficient materials, integrated energy management devices and an optional 6kw solar system with battery backup.

**EXHIBIT A**



**THE PRAIRIE RANCH**

- Style: Ranch
- Square Feet: 1,200
- Stories: 1
- Bedrooms: 3
- Bathrooms: 1.5
- Front Porch: Yes
- Back Porch: No
- Garage: Optional
- Landscaping: Optional
- Foundation: Slab

Estimated Sales Price (base): $168,000



## EXHIBIT A



**THE BARCLAY**

- Style: Cape Cod
- Square Feet: 1,315
- Stories: 1.5
- Bedrooms: 3
- Bathrooms: 1.5
- Front Porch: Optional
- Back Porch: None
- Fireplace: Optional
- Garage: Optional
- Landscaping: Optional
- Foundation: Slab

Estimated Sales Price (base):
$181,000





**EXHIBIT A**



## THE SOUTHLAND

- Style: Modern Farmhouse
- Square Feet: 1,926
- Stories: 2
- Bedrooms: 4
- Bathrooms: 2.5
- Front Porch: Yes
- Back Porch: Yes
- Garage: Yes
- Bonus Room: Optional
- Landscaping: Optional
- Foundation: Slab

Estimated Sales Price (base): $248,000

## EXHIBIT B

### Transferee Assumption Agreement

**THIS AGREEMENT**, made as of this _____ day of _____, 20__, by, between and among **Turlington Homes, Inc.** (*"Developer"*), **[TRANSFEREE]** (*"Transferee"*) and the **CITY OF HARVEY**, an Illinois municipal corporation (*"City"*).

#### W I T N E S S E T H:

**WHEREAS**, pursuant to that certain [real estate sale contract] [lease] [sublease] dated _____, 20__, the Transferee agreed to purchase from Developer certain real property situated in Cook County, Illinois and legally described in Exhibit A attached hereto and by this reference incorporated herein and made a part hereof (*"Property"*); and

**WHEREAS**, following the conveyance of the Property by Developer, the Transferee will be the [legal owner] [lessee] of the Property; and

**WHEREAS**, as a condition to the conveyance of the Property by Developer and the City require that the Transferee agree to comply with all the terms, requirements and obligations set forth in that certain Redevelopment and Economic Incentive Agreement, dated as of _____, 20__, and recorded in the Office of the Cook County Recorder on _____, 20__, as Document No. _____, by and between the City and Developer, as amended from time to time (*"Redevelopment Agreement"*);

**NOW, THEREFORE**, in consideration of the agreement of Developer to convey the Property to the Transferee and of the City to accept the transfer of obligations as provided herein and to grant the releases granted herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed by, between and among the City, Developer and the Transferee as follows:

1.　　**Recitals**. The foregoing recitals are by this reference incorporated herein and made a part hereof as substantive provisions of this Agreement.

2.　　**Assumption of Obligations**. The Transferee, on its behalf and on behalf of its successors, assigns, heirs, executors and administrators, hereby agrees, at its sole cost and expense, to comply with all of the terms, requirements and obligations of the Redevelopment Agreement, including all exhibits and attachments thereto, regardless of whether such terms, requirements and obligations are to be performed and provided by, or are imposed upon, Developer or the developer of the Property.

3.　　**Assurances of Financial Ability**. Contemporaneously with the Transferee's execution of this Agreement, the Transferee shall, upon the request of the City, provide the City with such reasonable assurances of financial ability to meet the obligations assumed hereunder as the City may, from time to time, require.

4.　　**Payment of City Fees and Costs**. In addition to any other costs, payments, fees, charges, contributions or dedications required by this Agreement, the Redevelopment Agreement or by applicable City codes, ordinances, resolutions, rules or regulations, the Transferee shall pay to the City, immediately upon presentation of a written demand or demands therefor, all legal, engineering and other consulting or administrative fees, costs and expenses incurred in connection with the negotiation, preparation, consideration and review of this Agreement.

5.　　**Acknowledgement and Release of Transferor**. The City hereby acknowledges its agreement to the Transferee's assumption of the obligation to comply with the terms, requirements and obligations of the Redevelopment Agreement, including all exhibits and attachments thereto, and the City hereby releases Developer from any personal liability for failure to comply with the terms, requirements and obligations of the Redevelopment Agreement.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the day and year first written above.

ATTEST                                              **CITY OF HARVEY**

_____           _____
City Clerk                                          Mayor

**EXHIBIT B**

ATTEST:                                     **Turlington Homes, Inc.**

_____      _____

ATTEST:                                     **[TRANSFEREE]**

_____      _____

**EXHIBIT B**

<u>**ACKNOWLEDGEMENTS**</u>

STATE OF ILLINOIS )
                  ) SS.
COUNTY OF COOK    )

    This instrument was acknowledged before me on _____,

20___, by _____, the Mayor of the **CITY OF HARVEY**, an Illinois municipal corporation,

and by _____, the City Clerk of said municipal corporation.

_____
Signature of Notary

SEAL

My Commission expires

_____

STATE OF ILLINOIS     )
                      ) SS.
COUNTY OF COOK        )

    The foregoing instrument was acknowledged before me on

_____ 20___, by _____, Director of **Turlington Homes, Inc.** an

Illinois corporation, and _____, Secretary of said corporation.

_____
Signature of Notary

SEAL

My Commission expires

_____

**EXHIBIT B**

STATE OF ILLINOIS    )
                           ) SS.
COUNTY OF COOK    )

        The foregoing instrument was acknowledged before me on

_____ 20___, by _____, President of **[TRANSFEREE]**, and

_____, Secretary of said _____.

_____
Signature of Notary
SEAL

My Commission expires:

_____

**EXHIBIT C**

**Redevelopment Plan**

| | |
|---|---|
| Pre-Development - | Q3, 2025 |
| Permitting & Zoning | Q4, 2025 |
| Site Work Begins | Q1, 2026 |
| Sales | Q1, 2026 – Q4 2027 |
| Vertical Construction | Q1, 2026 – Q4 2027 |
| Full Completion | Q4, 2027 |



### Regular Harvey City Council Meeting
#### October 27, 2025, at 7:00 pm

**Call Meeting to Order: Time 7:16 p.m.**
Quorum Present (6 Present)
**Present**: Mayor Christopher J. Clark, Alderperson Shirley Drewenski, Alderperson Colby Chapman, Alderperson Telanee Smith, Alderperson Tracy Key, Alderperson Tyrone Rogers
**Absent:** Alderperson Dominique Randle-El,
**Non-Voter**: City Clerk Rosa Arambula, Treasurer Aisha Pickett

**Invocation and Pledge of Allegiance**
Alderperson Rogers
**Executive Session: Discussion of Personnel and Litigation matters**
None

**Motion to Add Aldermanic Comment to Agenda and Move Mayoral Comment to Item 4**
Motion by Alderperson Key
Second by Alderperson Chapman
Voting began
Voting Criteria: Majority Vote of Members Present Needed
Results tallied
**Yes**: 2
Alderpersons Chapman and Key
**No**: 3
Alderpersons Drewenski, Smith, Rogers
**Absent**:1
Alderperson Randle-El
**Failed by Majority Vote of Members Present**

**Approval of Minutes: August 25, 2025 (Regular Meeting)**
Motion by Alderperson Smith
Second by Alderperson Drewenski
Alderperson Chapman was recognized
Voting began
Voting Criteria: Majority Vote of Members Present Needed
Results tallied

**Yes**: 3
Alderpersons Drewenski, Smith, Rogers
**No**: 2
Alderpersons Chapman and Key
**Absent:** Alderperson Randle-El,
**Passed by Majority Vote of Members Present**

**Approval of Minutes: August 25, 2025 (Meeting of the Whole)**
Motion by Alderperson Smith
Second by Alderperson Drewenski
Voting began
Voting Criteria: Majority Vote of Members Present Needed
Results tallied
**Yes**: 4
Alderpersons Drewenski, Chapman, Smith, Rogers
**No**: 1
Alderperson Key
**Absent:** Alderperson Randle-El,
**Passed by Majority Vote of Members Present**

**Approval of Minutes: September 22, 2025 (Regular Meeting)**
Motion by Alderperson Smith
Second by Alderperson Rogers
Alderperson Chapman recognized
Voting began
Voting Criteria: Majority Vote of Members Present Needed
Results tallied
**Yes**: 3
Mayor Clark, Alderpersons Smith, Rogers
**No**: 2
Alderpersons Chapman, Key
**Abstain:** Alderperson Drewenski
**Absent:** Alderperson Randle-El,
**Passed by Majority Vote of Members Present**

2

**Approval of Minutes: October 12, 2025 (Special Meeting)**
Motion by Alderperson Drewenski
Second by Alderperson Rogers
Voting began
Voting Criteria: Majority Vote of Members Present Needed
Results tallied
**Yes**: 3
Alderpersons Drewenski, Chapman, Rogers
**No**: 1
Alderperson Key
**Abstain:** Alderperson Smith
**Absent:** Alderperson Randle-El,
**Passed by Majority Vote of Members Present**

**Approval of Minutes: October 16, 2025 (Special Meeting)**
Motion by Alderperson Drewenski
Second by Alderperson Smith
Voting began
Voting Criteria: Majority Vote of Members Present Needed
Results tallied
**Yes**: 3
Alderpersons Drewenski, Smith, Rogers
**No**: 2
Alderpersons Chapman, Key
**Absent:** Alderperson Randle-El
**Passed by Majority Vote of Members Present**

Alderperson Rogers was recognized
**Approval of Bills for Payment: August 25, 2025**
Motion by Alderperson Smith
Second by Alderperson Rogers
Alderperson Chapman was recognized
Alderperson Drewenski was recognized
Alderperson Rogers was recognized
Voting began
Voting Criteria: Majority Vote of Members Present Needed
Results tallied
**Yes**: 3
Alderpersons Drewenski, Smith, Rogers
**No**: 2
Alderpersons Chapman, Key
**Abstain**: 0
**Absent:** 1
Alderperson Randle-El
**Passed By Majority Vote of Members Present**

3

**Approval of Bills for Payment: October 27, 2025**
Motion by Alderperson Smith
Second by Alderperson Rogers
Alderperson Rogers was recognized
Voting began
Voting Criteria: Majority Vote of Members Present Needed
Results tallied
**Yes**: 3
Alderpersons Drewenski, Smith, Rogers
**No**: 2
Alderpersons Chapman, Key
**Abstain**: 0
**Absent:** 1
Alderperson Randle-El
**Passed By Majority Vote of Members Present**

**Motion to Call the Question**
Motion by Alderperson Drewenski
Second by Alderperson Smith
Voting began
Voting Criteria: Majority Vote of Members Present Needed
Results tallied
**Yes**: 3
Alderpersons Drewenski, Smith, Rogers
**No**: 2
Alderpersons Chapman, Key
**Abstain**: 0
**Absent:** 1
Alderperson Randle-El
**Passed By Majority Vote of Members Present**

**Approval of Ordinance(s) and Resolution(s) for the City of Harvey: Old Business- None**
Alderperson Chapman was recognized
**Approval of Ordinance(s) and Resolution(s) for the City of Harvey: B. New Business 1.**

**Resolution # 4016** – A Resolution Approving a Redevelopment Agreement by and between the
City of Harvey and Turlington Homes, Inc.

This Resolution authorizes the redevelopment of City owned properties (Exhibit A) for the
purpose of promoting homeownership and economic development.

Motion by Alderperson Smith
Second by Alderperson Drewenski

4

**Motion to Call the Question**
Motion by Alderperson Smith
Second by Alderperson Drewenski
Voting began
Voting Criteria: Majority Vote of Members Present Needed
Results tallied
**Yes**: 3
Alderpersons Drewenski, Smith, Rogers
**No**: 2
Alderpersons Chapman, Key
**Absent:** 1
Alderperson Randle-El
**Passed By Majority Vote of Members Present**


**Resolution # 4016** – A Resolution Approving a Redevelopment Agreement by and between the City of Harvey and Turlington Homes, Inc.

Voting began
Voting Criteria: Majority Vote of Members Present Needed
Results tallied

**Yes**: 3
Alderpersons Drewenski, Smith, Rogers
**No**: 2
Alderpersons Chapman, Key
**Absent:** 1
Alderperson Randle-El
**Passed By Majority Vote of Members Present**


**Public Comment**
Dianna Love
Amanda A
Glynis James-Watson
Bonnie Rateree
Ryan R. Sinwelski
Mauzkie Ervin
Julian Rucker
Samuel Johnson

**Mayoral Comment**
Mayor Christopher J. Clark

5

**Adjournment**
Motion by Alderperson Drewenski
Second by Alderperson Smith
Voting began
Voting Criteria: Voice Vote
Results tallied
**Passed by Voice Vote**


**Adjourned: Time 8:23 p.m**.

.

_____
**Deputy City Clerk, Liliana Gonzalez**

**After Recording Please**
**Mail to:**
Turlington Homes, Inc.
Attn: David Haislip
P.O. Box 219
Voorhees, NJ 08043

**NAME & ADDRESS OF TAXPAYER:**
Turlington Homes, Inc.
P.O. Box 219
Voorhees, NJ 08043

## WARRANTY DEED

The Grantor: **City of Harvey**, Illinois, an Illinois home rule municipal corporation, 15320 Broadway, Harvey, Illinois 60426, for and in consideration ion of Ten and 00/100 Dollars, and other good and valuable consideration conveys and warrants to Grantee: **Turlington Homes, Inc,** an Illinois corporation any and all interest in the following described real estate situated in the Cook County, Illinois, to wit:

**LOT 24 IN BLOCK 53 IN HARVEY, A SUBDIVISION OF PART OF SECTION 17, TOWNSHIP 36 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.**

Subject to covenants, conditions, restrictions and easements of record and general real estate taxes for the year 2026 and subsequent years.

hereby releasing and waiving all rights under and by virtue of the Homestead Exemption Laws of the State of Illinois.

Permanent Index Number: **29-17-105-022-0000**

Property Address: **15147 Turlington Avenue, Harvey, Illinois 60426**

**IN WITNESS WHEREOF, the undersigned have executed this General Warranty Deed.**

DATED this ___ day of February 2026.

PERSONAL INFO

**THE CITY OF HARVEY, an Illinois home rule municipal corporation**
By: Shirley Drewenski, Mayor Pro Tempore

STATE OF ILLINOIS )
                   )SS
COUNTY OF COOK )

I, the undersigned, a Notary Public, in and for said County and State aforesaid, DO HEREBY CERTIFY, that Mayor Pro Tempore Shirley Drewenski, appeared before me this day in person, and acknowledged that she signed, sealed and delivered the said instrument on behalf of the City of Harvey as her free and voluntary act, for the uses and purposes therein set forth, including the release and waiver of the right of homestead.

Given under my hand and official seal this 18th day of February 2026.

PERSONAL INFO

NOTARY PUBLIC

My Commission expires on _Oct. 13_, 20_27_

**NAME AND ADDRESS OF PREPARER:**

Megan Mack
Ancel Glink
140 S Dearborn, Suite 600
Chicago, Illinois 60603

**COUNTY - ILLINOIS TRANSFER STAMPS:**

EXEMPT PURSUANT TO SECTION 31-45 (e) OF THE REAL ESTATE TRANSFER TAX LAW

_____
Buyer, Seller or Representative

## STATEMENT BY GRANTOR AND GRANTEE

The grantor or his agent affirms that, to the best of his knowledge, the name of the grantor shown on the deed or assignment of beneficial interest in a land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire title to real estate under the laws of the State of Illinois.

Dated February 18, 2026

PERSONAL INFO

Grantor or Agent

SUBSCRIBED and SWORN to before me
this 18 day of February 2026

PERSONAL INFO

NOTARY PUBLIC

OFFICIAL SEAL
LILIANA GONZALEZ
Notary Public State of Illinois
Commission No 897858
My Commission Expires October 13 2027

The grantee or his agent affirms and verifies that the name of the grantee shown on the deed or assignment of beneficial interest in a land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire title to real estate under the laws of the State of Illinois.

Dated February___, 2026

_____
Grantee or Agent

SUBSCRIBED and SWORN to before me
this ___day of February, 2026

_____
NOTARY PUBLIC

Page 3 of 3

**After Recording Please**
**Mail to:**
Turlington Homes, Inc.
Attn: David Haislip
P.O. Box 219
Voorhees, NJ 08043

**NAME & ADDRESS OF TAXPAYER:**
Turlington Homes, Inc.
P.O. Box 219
Voorhees, NJ 08043

## WARRANTY DEED

The Grantor: **City of Harvey**, Illinois, an Illinois home rule municipal corporation, 15320 Broadway, Harvey, Illinois 60426, for and in consideration ion of Ten and 00/100 Dollars, and other good and valuable consideration conveys and warrants to Grantee: **Turlington Homes, Inc**, and Illinois corporation any and all interest in the following described real estate situated in the Cook County, Illinois, to wit:

**LOT 29 IN BLOCK 53 IN HARVEY, A SUBDIVISION OF PART OF SECTION 17, TOWNSHIP 36 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.**

Subject to covenants, conditions, restrictions and easements of record and general real estate taxes for the year 2026 and subsequent years.

hereby releasing and waiving all rights under and by virtue of the Homestead Exemption Laws of the State of Illinois.

Permanent Index Number: **29-17-105-017-0000**

Property Address: **15133 Turlington Avenue, Harvey, Illinois 60426**

**IN WITNESS WHEREOF, the undersigned have executed this General Warranty Deed.**

DATED this ~~18~~ day of February 2026.

PERSONAL INFO

THE CITY OF HARVEY, an Illinois home rule municipal corporation
By: Shirley Drewenski, Mayor Pro Tempore

STATE OF ILLINOIS )
                  )SS
COUNTY OF COOK )

I, the undersigned, a Notary Public, in and for said County and State aforesaid, DO HEREBY CERTIFY, that Mayor Pro Tempore Shirley Drewenski, appeared before me this day in person, and acknowledged that she signed, sealed and delivered the said instrument on behalf of the City of Harvey as her free and voluntary act, for the uses and purposes therein set forth, including the release and waiver of the right of homestead.

Given under my hand and official seal this 13th day of February 2026.

PERSONAL INFO

NOTARY PUBLIC

My Commission expires on Oct. 13 , 2027.

OFFICIAL SEAL
LILIANA GONZALEZ
Notary Public State of Illinois
Commission No 897858
My Commission Expires October 13, 2027

**NAME AND ADDRESS OF PREPARER:**

Megan Mack
Ancel Glink
140 S Dearborn, Suite 600
Chicago, Illinois 60603

**COUNTY - ILLINOIS TRANSFER STAMPS:**

EXEMPT PURSUANT TO SECTION 31-45 (e) OF THE REAL ESTATE TRANSFER TAX LAW

_____
Buyer, Seller or Representative

## STATEMENT BY GRANTOR AND GRANTEE

The grantor or his agent affirms that, to the best of his knowledge, the name of the grantor shown on the deed or assignment of beneficial interest in a land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire title to real estate under the laws of the State of Illinois.

Dated February 18, 2026

**PERSONAL INFO**

Grantor or Agent

SUBSCRIBED and SWORN to before me
this 18 day of February 2026

**PERSONAL INFO**

NOTARY PUBLIC

OFFICIAL SEAL
LILIANA GONZALEZ
Notary Public, State of Illinois
Commission No 897858
My Commission Expires October 13, 2027

The grantee or his agent affirms and verifies that the name of the grantee shown on the deed or assignment of beneficial interest in a land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire title to real estate under the laws of the State of Illinois.

Dated February ___, 2026

Grantee or Agent

SUBSCRIBED and SWORN to before me
this ___ day of February, 2026

NOTARY PUBLIC

**After Recording Please
Mail to:**
Turlington Homes, Inc.
Attn: David Haislip
P.O. Box 219
Voorhees, NJ 08043

**NAME & ADDRESS OF TAXPAYER:**
Turlington Homes, Inc.
P.O. Box 219
Voorhees, NJ 08043

## WARRANTY DEED

The Grantor: **City of Harvey**, Illinois, an Illinois home rule municipal corporation, 15320 Broadway, Harvey, Illinois 60426, for and in consideration ion of Ten and 00/100 Dollars, and other good and valuable consideration conveys and warrants to Grantee: **Turlington Homes, Inc**, and Illinois corporation any and all interest in the following described real estate situated in the Cook County, Illinois, to wit:

**LOTS 30 IN BLOCK 53 IN HARVEY, A SUBDIVISION OF PART OF SECTION 17, TOWNSHIP 36 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.**

Subject to covenants, conditions, restrictions and easements of record and general real estate taxes for the year 2026 and subsequent years.

hereby releasing and waiving all rights under and by virtue of the Homestead Exemption Laws of the State of Illinois.

Permanent Index Number: **29-17-105-016-0000**

Property Address: **15133 Turlington Avenue, Harvey, Illinois 60426**

**IN WITNESS WHEREOF, the undersigned have executed this General Warranty Deed.**

DATED this 18th day of February 2026.

PERSONAL INFO

**THE CITY OF HARVEY, an Illinois home rule municipal corporation**
By: Shirley Drewenski, Mayor Pro Tempore

STATE OF ILLINOIS )
                  )SS
COUNTY OF COOK )

    I, the undersigned, a Notary Public, in and for said County and State aforesaid, DO HEREBY CERTIFY, that Mayor Pro Tempore Shirley Drewenski, appeared before me this day in person, and acknowledged that she signed, sealed and delivered the said instrument on behalf of the City of Harvey as her free and voluntary act, for the uses and purposes therein set forth, including the release and waiver of the right of homestead.

    Given under my hand and official seal this 18th day of February 2026.

PERSONAL INFO

NOTARY PUBLIC

My Commission expires on Oct. 13, 2027

**OFFICIAL SEAL**
LILIANA GONZALEZ
Notary Public, State of Illinois
Commission No. 897858
My Commission Expires October 13, 2027

**NAME AND ADDRESS OF PREPARER:**

Megan Mack
Ancel Glink
140 S Dearborn, Suite 600
Chicago, Illinois 60603

**COUNTY - ILLINOIS TRANSFER STAMPS:**

EXEMPT PURSUANT TO SECTION 31-45 (e) OF THE REAL ESTATE TRANSFER TAX LAW

_____
Buyer, Seller or Representative

Page **2** of **3**

## STATEMENT BY GRANTOR AND GRANTEE

The grantor or his agent affirms that, to the best of his knowledge, the name of the grantor shown on the deed or assignment of beneficial interest in a land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire title to real estate under the laws of the State of Illinois.

Dated February 18, 2026

_____
Grantor or Agent

SUBSCRIBED and SWORN to before me
this ____ day of February 2026

_____
NOTARY PUBLIC

The grantee or his agent affirms and verifies that the name of the grantee shown on the deed or assignment of beneficial interest in a land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire title to real estate under the laws of the State of Illinois.

Dated February ____, 2026

_____
Grantee or Agent

SUBSCRIBED and SWORN to before me
this ____ day of February, 2026

_____
NOTARY PUBLIC

**After Recording Please
Mail to:**
Turlington Homes, Inc.
Attn: David Haislip
P.O. Box 219
Voorhees, NJ 08043

**NAME & ADDRESS OF TAXPAYER:**
Turlington Homes, Inc.
P.O. Box 219
Voorhees, NJ 08043

## WARRANTY DEED

The Grantor: **City of Harvey**, Illinois, an Illinois home rule municipal corporation, 15320 Broadway, Harvey, Illinois 60426, for and in consideration ion of Ten and 00/100 Dollars, and other good and valuable consideration conveys and warrants to Grantee: **Turlington Homes, Inc,** and Illinois corporation any and all interest in the following described real estate situated in the Cook County, Illinois, to wit:

**LOT 33 IN BLOCK 53 IN HARVEY, A SUBDIVISION OF PART OF SECTION 17, TOWNSHIP 36 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.**

Subject to covenants, conditions, restrictions and easements of record and general real estate taxes for the year 2026 and subsequent years.

hereby releasing and waiving all rights under and by virtue of the Homestead Exemption Laws of the State of Illinois.

Permanent Index Number: **29-17-105-013-000**

Property Address: **15127 Turlington Avenue, Harvey, Illinois 60426**

**IN WITNESS WHEREOF, the undersigned have executed this General Warranty Deed.**

DATED this 18th day of February 2026.

PERSONAL INFO

**THE CITY OF HARVEY, an Illinois home rule municipal corporation**
By: Shirley Drewenski, Mayor Pro Tempore

STATE OF ILLINOIS )
                   )SS
COUNTY OF COOK )

I, the undersigned, a Notary Public, in and for said County and State aforesaid, DO HEREBY CERTIFY, that Mayor Pro Tempore Shirley Drewenski, appeared before me this day in person, and acknowledged that she signed, sealed and delivered the said instrument on behalf of the City of Harvey as her free and voluntary act, for the uses and purposes therein set forth, including the release and waiver of the right of homestead.

Given under my hand and official seal this 18th day of February 2026.



PERSONAL INFO

NOTARY PUBLIC

My Commission expires on ___Oct. 13___, 2027

OFFICIAL SEAL
LILIANA GONZALEZ
Notary Public, State of Illinois
Commission No 897858
My Commission Expires October 13, 2027

**NAME AND ADDRESS OF PREPARER:**

Megan Mack
Ancel Glink
140 S Dearborn, Suite 600
Chicago, Illinois 60603

**COUNTY - ILLINOIS TRANSFER STAMPS:**

EXEMPT PURSUANT TO SECTION 31-45 (e) OF THE REAL ESTATE TRANSFER TAX LAW

_____
Buyer, Seller or Representative

## STATEMENT BY GRANTOR AND GRANTEE

The grantor or his agent affirms that, to the best of his knowledge, the name of the grantor shown on the deed or assignment of beneficial interest in a land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire title to real estate under the laws of the State of Illinois.

Dated February ⬛, 2026

⬛ PERSONAL INFO ⬛

Grantor or Agent

SUBSCRIBED and SWORN to before me
this ⬛ day of February 2026

⬛ PERSONAL INFO ⬛

NOTARY PUBLIC

OFFICIAL SEAL
LILIANA GONZALEZ
Notary Public, State of Illinois
Commission No 897858
My Commission Expires October 13. 2027

The grantee or his agent affirms and verifies that the name of the grantee shown on the deed or assignment of beneficial interest in a land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire title to real estate under the laws of the State of Illinois.

Dated February ___, 2026

_____
Grantee or Agent

SUBSCRIBED and SWORN to before me
this ___day of February 2026

_____
NOTARY PUBLIC

Page 3 of 3

**After Recording Please
Mail to:**
Turlington Homes, Inc.
Attn: David Haislip
P.O. Box 219
Voorhees, NJ 08043

**NAME & ADDRESS OF TAXPAYER:**
Turlington Homes, Inc.
P.O. Box 219
Voorhees, NJ 08043

## WARRANTY DEED

The Grantor: **City of Harvey**, Illinois, an Illinois home rule municipal corporation, 15320 Broadway, Harvey, Illinois 60426, for and in consideration ion of Ten and 00/100 Dollars, and other good and valuable consideration conveys and warrants to Grantee: **Turlington Homes, Inc,** and Illinois corporation any and all interest in the following described real estate situated in the Cook County, Illinois, to wit:

**LOT 34 IN BLOCK 53 IN HARVEY, A SUBDIVISION OF PART OF SECTION 17, TOWNSHIP 36 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.**

Subject to covenants, conditions, restrictions and easements of record and general real estate taxes for the year 2026 and subsequent years.

hereby releasing and waiving all rights under and by virtue of the Homestead Exemption Laws of the State of Illinois.

Permanent Index Number: **29-17-105-012-000**

Property Address: **15125 Turlington Avenue, Harvey, Illinois 60426**

**IN WITNESS WHEREOF, the undersigned have executed this General Warranty Deed.**

DATED this 18th day of February 2026.

**PERSONAL INFO**

**THE CITY OF HARVEY, an Illinois home rule municipal corporation**
By: Shirley Drewenski, Mayor Pro Tempore

STATE OF ILLINOIS )
                     )SS
COUNTY OF COOK )

I, the undersigned, a Notary Public, in and for said County and State aforesaid, DO HEREBY CERTIFY, that Mayor Pro Tempore Shirley Drewenski, appeared before me this day in person, and acknowledged that she signed, sealed and delivered the said instrument on behalf of the City of Harvey as her free and voluntary act, for the uses and purposes therein set forth, including the release and waiver of the right of homestead.

Given under my hand and official seal this 18th day of February 2026.

**PERSONAL INFO**

NOTARY PUBLIC

My Commission expires on Oct 13 , 2027.

**OFFICIAL SEAL**
LILIANA GONZALEZ
Notary Public, State of Illinois
Commission No. 897858
My Commission Expires October 13, 2027

**NAME AND ADDRESS OF PREPARER:**

Megan Mack
Ancel Glink
140 S Dearborn, Suite 600
Chicago, Illinois 60603

**COUNTY - ILLINOIS TRANSFER STAMPS:**

EXEMPT PURSUANT TO SECTION 31-45 (e) OF THE REAL ESTATE TRANSFER TAX LAW

_____
Buyer, Seller or Representative

## STATEMENT BY GRANTOR AND GRANTEE

The grantor or his agent affirms that, to the best of his knowledge, the name of the grantor shown on the deed or assignment of beneficial interest in a land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire title to real estate under the laws of the State of Illinois.

Dated February 18, 2026

PERSONAL INFO

Grantor or Agent

SUBSCRIBED and SWORN to before me this 18 day of February 2026

PERSONAL INFO

NOTARY PUBLIC

OFFICIAL SEAL
LILIANA GONZALEZ
Notary Public State of Illinois
Commission No 897858
My Commission Expires October 13, 2027

The grantee or his agent affirms and verifies that the name of the grantee shown on the deed or assignment of beneficial interest in a land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire title to real estate under the laws of the State of Illinois.

Dated February____, 2026

Grantee or Agent

SUBSCRIBED and SWORN to before me this ____day of February, 2026

NOTARY PUBLIC

Page 3 of 3

**After Recording Please Mail to:**
Turlington Homes, Inc.
Attn: David Haislip
P.O. Box 219
Voorhees, NJ 08043

**NAME & ADDRESS OF TAXPAYER:**
Turlington Homes, Inc.
P.O. Box 219
Voorhees, NJ 08043

## WARRANTY DEED

The Grantor: **City of Harvey**, Illinois, an Illinois home rule municipal corporation, 15320 Broadway, Harvey, Illinois 60426, for and in consideration of Ten and 00/100 Dollars, and other good and valuable consideration conveys and warrants to Grantee: **Turlington Homes, Inc**, and Illinois corporation any and all interest in the following described real estate situated in the Cook County, Illinois, to wit:

**LOTS 12 AND 13 IN BLOCK 54 IN HARVEY, A SUBDIVISION OF PART OF SECTION**

**17, TOWNSHIP 36 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN,**

**IN COOK COUNTY, ILLINOIS.**

Subject to covenants, conditions, restrictions and easements of record and general real estate taxes for the year 2026 and subsequent years.

hereby releasing and waiving all rights under and by virtue of the Homestead Exemption Laws of the State of Illinois.

Permanent Index Number: **29-17-104-029-0000**

Property Address: **15124 Turlington Avenue, Harvey, Illinois 60426**

**IN WITNESS WHEREOF, the undersigned have executed this General Warranty Deed.**

Page 1 of 3

DATED this 18 day of January 2026.

PERSONAL INFO

**THE CITY OF HARVEY, an Illinois home rule municipal corporation**
By: Shirley Drewenski, Mayor Pro Tempore

STATE OF ILLINOIS )
                  )SS
COUNTY OF COOK )

I, the undersigned, a Notary Public, in and for said County and State aforesaid, DO HEREBY CERTIFY, that Mayor Pro Tempore Shirley Drewenski, appeared before me this day in person, and acknowledged that she signed, sealed and delivered the said instrument on behalf of the City of Harvey as her free and voluntary act, for the uses and purposes therein set forth, including the release and waiver of the right of homestead.

Given under my hand and official seal this 18 day of February 2026.

PERSONAL INFO

NOTARY PUBLIC

My Commission expires on Oct 13, 2027

OFFICIAL SEAL
LILIANA G ...
Notary Public State of Illinois
Commission No 89768
My Commission Expires October 13 2027

**NAME AND ADDRESS OF PREPARER:**

Megan Mack
Ancel Glink
140 S Dearborn, Suite 600
Chicago, Illinois 60603

**COUNTY - ILLINOIS TRANSFER STAMPS:**

EXEMPT PURSUANT TO SECTION 31-45 (e) OF THE REAL ESTATE TRANSFER TAX LAW

_____
Buyer, Seller or Representative

## STATEMENT BY GRANTOR AND GRANTEE

The grantor or his agent affirms that, to the best of his knowledge, the name of the grantor shown on the deed or assignment of beneficial interest in a land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire title to real estate under the laws of the State of Illinois.

Dated February 1?, 2026

PERSONAL INFO

Grantor or Agent

SUBSCRIBED and SWORN to before me this 18 day of February 2026

PERSONAL INFO

NOTARY PUBLIC

OFFICIAL SEAL
LILIANA GONZALEZ
Notary Public, State of Illinois
Commission Expires 2027

The grantee or his agent affirms and verifies that the name of the grantee shown on the deed or assignment of beneficial interest in a land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire title to real estate under the laws of the State of Illinois.

Dated February ___, 2026

Grantee or Agent

SUBSCRIBED and SWORN to before me this ___ day of February, 2026

NOTARY PUBLIC

Page 3 of 3

**After Recording Please Mail to:**
Turlington Homes, Inc.
Attn: David Haislip
P.O. Box 219
Voorhees, NJ 08043

**NAME & ADDRESS OF TAXPAYER:**
Turlington Homes, Inc.
P.O. Box 219
Voorhees, NJ 08043

## WARRANTY DEED

The Grantor: **City of Harvey**, Illinois, an Illinois home rule municipal corporation, 15320 Broadway, Harvey, Illinois 60426, for and in consideration ion of Ten and 00/100 Dollars, and other good and valuable consideration conveys and warrants to Grantee: **Turlington Homes, Inc,** and Illinois corporation any and all interest in the following described real estate situated in the Cook County, Illinois, to wit:

**LOTS 10 AND 11 IN BLOCK 54 IN HARVEY, A SUBDIVISION OF PART OF SECTION 17, TOWNSHIP 36 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.**

Subject to covenants, conditions, restrictions and easements of record and general real estate taxes for the year 2026 and subsequent years.

hereby releasing and waiving all rights under and by virtue of the Homestead Exemption Laws of the State of Illinois.

Permanent Index Number: **29-17-104-028-0000**

Property Address: **15120 Turlington Avenue, Harvey, Illinois 60426**

**IN WITNESS WHEREOF, the undersigned have executed this General Warranty Deed.**

DATED this 18th day of February 2026.

PERSONAL INFO

**THE CITY OF HARVEY, an Illinois home rule municipal corporation**
By: Shirley Drewenski, Mayor Pro Tempore

STATE OF ILLINOIS )
                  )SS
COUNTY OF COOK )

I, the undersigned, a Notary Public, in and for said County and State aforesaid, DO HEREBY CERTIFY, that Mayor Pro Tempore Shirley Drewenski, appeared before me this day in person, and acknowledged that she signed, sealed and delivered the said instrument on behalf of the City of Harvey as her free and voluntary act, for the uses and purposes therein set forth, including the release and waiver of the right of homestead.

Given under my hand and official seal this 18th day of February 2026.

PERSONAL INFO

NOTARY PUBLIC

My Commission expires on Oct. 13, 2027

**NAME AND ADDRESS OF PREPARER:**

Megan Mack
Ancel Glink
140 S Dearborn, Suite 600
Chicago, Illinois 60603

**COUNTY - ILLINOIS TRANSFER STAMPS:**

EXEMPT PURSUANT TO SECTION 31-45 (e) OF THE REAL ESTATE TRANSFER TAX LAW

_____
Buyer, Seller or Representative

Page 2 of 3

## STATEMENT BY GRANTOR AND GRANTEE

The grantor or his agent affirms that, to the best of his knowledge, the name of the grantor shown on the deed or assignment of beneficial interest in a land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire title to real estate under the laws of the State of Illinois.

Dated February 18, 2026

PERSONAL INFO

Grantor or Agent

SUBSCRIBED and SWORN to before me
this 18 day of February 2026

PERSONAL INFO

NOTARY PUBLIC

OFFICIAL SEAL
LILIANA GONZALEZ
Notary Public State of Illinois
Commission No 897858
My Commission Expires October 13 2027

The grantee or his agent affirms and verifies that the name of the grantee shown on the deed or assignment of beneficial interest in a land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire title to real estate under the laws of the State of Illinois.

Dated February ___, 2026

Grantee or Agent

SUBSCRIBED and SWORN to before me
this ___ day of February, 2026

NOTARY PUBLIC

Page 3 of 3

**After Recording Please
Mail to:**
Turlington Homes, Inc.
Attn: David Haislip
P.O. Box 219
Voorhees, NJ 08043

**NAME & ADDRESS OF TAXPAYER:**
Turlington Homes, Inc.
P.O. Box 219
Voorhees, NJ 08043

## WARRANTY DEED

The Grantor: **City of Harvey**, Illinois, an Illinois home rule municipal corporation, 15320

Broadway, Harvey, Illinois 60426, for and in consideration of Ten and 00/100 Dollars, and other

good and valuable consideration conveys and warrants to Grantee: **Turlington Homes, Inc**, and

Illinois corporation any and all interest in the following described real estate situated in the Cook

County, Illinois, to wit:

> **LOT 37 AND THE NORTH ½ OF LOT 36 IN BLOCK 53 IN HARVEY, A SUBDIVISION**
>
> **OF PART OF SECTION 17, TOWNSHIP 36 NORTH, RANGE 14 EAST OF THE THIRD**
>
> **PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.**
>
> Subject to covenants, conditions, restrictions and easements of record and general
> real estate taxes for the year 2026 and subsequent years.

hereby releasing and waiving all rights under and by virtue of the Homestead Exemption Laws of

the State of Illinois.

Permanent Index Number: **29-17-105-010-0000**

Property Address: **15119 Turlington Avenue, Harvey, Illinois 60426**

**IN WITNESS WHEREOF, the undersigned have executed this General Warranty Deed.**

Page 1 of 3

DATED this 18th day of February 2026.

PERSONAL INFO

**THE CITY OF HARVEY, an Illinois home rule municipal corporation**
By: Shirley Drewenski, Mayor Pro Tempore

STATE OF ILLINOIS )
                  )SS
COUNTY OF COOK )

I, the undersigned, a Notary Public, in and for said County and State aforesaid, DO HEREBY CERTIFY, that Mayor Pro Tempore Shirley Drewenski, appeared before me this day in person, and acknowledged that she signed, sealed and delivered the said instrument on behalf of the City of Harvey as her free and voluntary act, for the uses and purposes therein set forth, including the release and waiver of the right of homestead.

Given under my hand and official seal this 18th day of February 2026.

PERSONAL INFO

NOTARY PUBLIC

My Commission expires on Oct. 13, 2027

OFFICIAL SEAL
LILIANA GONZALEZ
Notary Public, State of Illinois
Commission No 897858
Commission Expires October 13, 2027

**NAME AND ADDRESS OF PREPARER:**

Megan Mack
Ancel Glink
140 S Dearborn, Suite 600
Chicago, Illinois 60603

**COUNTY - ILLINOIS TRANSFER STAMPS:**

EXEMPT PURSUANT TO SECTION 31-45 (e) OF THE REAL ESTATE TRANSFER TAX LAW

_____
Buyer, Seller or Representative

## STATEMENT BY GRANTOR AND GRANTEE

The grantor or his agent affirms that, to the best of his knowledge, the name of the grantor shown on the deed or assignment of beneficial interest in a land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire title to real estate under the laws of the State of Illinois.

Dated February 18, 2026

PERSONAL INFO

Grantor or Agent

SUBSCRIBED and SWORN to before me
this 18 day of February 2026

PERSONAL INFO

NOTARY PUBLIC

OFFICIAL SEAL
LILIANA GONZALEZ
Notary Public, State of Illinois
Commission No 897858
My Commission Expires October 13, 2027

The grantee or his agent affirms and verifies that the name of the grantee shown on the deed or assignment of beneficial interest in a land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire title to real estate under the laws of the State of Illinois.

Dated February___, 2026

Grantee or Agent

SUBSCRIBED and SWORN to before me
this ___day of February, 2026

NOTARY PUBLIC

Page 3 of 3

**After Recording Please
Mail to:**
Turlington Homes, Inc.
Attn: David Haislip
P.O. Box 219
Voorhees, NJ 08043

**NAME & ADDRESS OF TAXPAYER:**
Turlington Homes, Inc.
P.O. Box 219
Voorhees, NJ 08043

## WARRANTY DEED

The Grantor: **City of Harvey**, Illinois, an Illinois home rule municipal corporation, 15320 Broadway, Harvey, Illinois 60426, for and in consideration of Ten and 00/100 Dollars, and other good and valuable consideration conveys and warrants to Grantee: **Turlington Homes, Inc**, and Illinois corporation any and all interest in the following described real estate situated in the Cook County, Illinois, to wit:

**LOT 39 IN BLOCK 53 IN HARVEY, A SUBDIVISION OF THAT PART OF THE EAST 1/2 AND THE NORTHWEST 1/4 IN SECTION 17, TOWNSHIP 36 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.**

Subject to covenants, conditions, restrictions and easements of record and general real estate taxes for the year 2026 and subsequent years.

hereby releasing and waiving all rights under and by virtue of the Homestead Exemption Laws of the State of Illinois.

Permanent Index Number: **29-17-105-008-0000**

Property Address: **15115 Turlington Avenue, Harvey, Illinois 60426**

**IN WITNESS WHEREOF, the undersigned have executed this General Warranty Deed.**

DATED this 18th day of January 2026.

PERSONAL INFO

**THE CITY OF HARVEY, an Illinois home rule municipal corporation**
By: Shirley Drewenski, Mayor Pro Tempore

STATE OF ILLINOIS )
　　　　　　　　　　)SS
COUNTY OF COOK  )

I, the undersigned, a Notary Public, in and for said County and State aforesaid, DO HEREBY CERTIFY, that Mayor Pro Tempore Shirley Drewenski, appeared before me this day in person, and acknowledged that she signed, sealed and delivered the said instrument on behalf of the City of Harvey as her free and voluntary act, for the uses and purposes therein set forth, including the release and waiver of the right of homestead.

Given under my hand and official seal this 18th day of February 2026.

PERSONAL INFO

NOTARY PUBLIC

My Commission expires on Oct. 13 , 20 27

**NAME AND ADDRESS OF PREPARER:**

Megan Mack
Ancel Glink
140 S Dearborn, Suite 600
Chicago, Illinois 60603

**COUNTY - ILLINOIS TRANSFER STAMPS:**

EXEMPT PURSUANT TO SECTION 31-45 (e) OF THE REAL ESTATE TRANSFER TAX LAW

_____
Buyer, Seller or Representative

## STATEMENT BY GRANTOR AND GRANTEE

The grantor or his agent affirms that, to the best of his knowledge, the name of the grantor shown on the deed or assignment of beneficial interest in a land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire title to real estate under the laws of the State of Illinois.

Dated February 18, 2026

PERSONAL INFO

Grantor of Agent

SUBSCRIBED and SWORN to before me this 18 day of February 2026

PERSONAL INFO

NOTARY PUBLIC

OFFICIAL SEAL
LILIANA GONZALEZ
Notary Public State of Illinois
Commission No 897858
My Commission Expires October 13 2027

The grantee or his agent affirms and verifies that the name of the grantee shown on the deed or assignment of beneficial interest in a land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire title to real estate under the laws of the State of Illinois.

Dated February ___, 2026

_____
Grantee or Agent

SUBSCRIBED and SWORN to before me this ___day of February, 2026

_____
NOTARY PUBLIC

Page 3 of 3

After Recording Please
**Mail to:**
Turlington Homes, Inc.
Attn: David Haislip
P.O. Box 219
Voorhees, NJ 08043

**NAME & ADDRESS OF TAXPAYER:**
Turlington Homes, Inc.
P.O. Box 219
Voorhees, NJ 08043

## WARRANTY DEED

The Grantor: **City of Harvey**, Illinois, an Illinois home rule municipal corporation, 15320 Broadway, Harvey, Illinois 60426, for and in consideration of **Ten** and 00/100 Dollars, and other good and valuable consideration conveys and warrants to Grantee: **Turlington Homes, Inc,** and Illinois corporation any and all interest in the following described real estate situated in the Cook County, Illinois, to wit:

**LOT 1 IN BLOCK 54 IN HARVEY SUBDIVISION IN THE NORTHWEST 1/4 OF SECTION 17, TOWNSHIP 36 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.**

Subject to covenants, conditions, restrictions and easements of record and general real estate taxes for the year 2026 and subsequent years.

hereby releasing and waiving all rights under and by virtue of the Homestead Exemption Laws of the State of Illinois.

Permanent Index Number: **29-17-104-020-0000**

Property Address: **15100 Turlington Avenue, Harvey, Illinois 60426**

**IN WITNESS WHEREOF, the undersigned have executed this General Warranty Deed.**

DATED this 18th day of February 2026.

▮▮▮▮▮▮▮ PERSONAL INFO ▮▮▮▮▮▮▮

**THE CITY OF HARVEY, an Illinois home rule municipal corporation**
By: Shirley Drewenski, Mayor Pro Tempore

STATE OF ILLINOIS )
                 )SS
COUNTY OF COOK )

I, the undersigned, a Notary Public, in and for said County and State aforesaid, DO HEREBY CERTIFY, that Mayor Pro Tempore Shirley Drewenski, appeared before me this day in person, and acknowledged that she signed, sealed and delivered the said instrument on behalf of the City of Harvey as her free and voluntary act, for the uses and purposes therein set forth, including the release and waiver of the right of homestead.

Given under my hand and official seal this 18th day of February 2026.

▮▮▮▮▮▮▮ PERSONAL INFO ▮▮▮▮▮▮▮

NOTARY PUBLIC

My Commission expires on Oct. 13 , 2027.

OFFICIAL SEAL
LILIANA GONZALEZ
Notary Public. State of Illinois
Commission No. 897858
My Commission Expires October 13, 2027

**NAME AND ADDRESS OF PREPARER:**

Megan Mack
Ancel Glink
140 S Dearborn, Suite 600
Chicago, Illinois 60603

**COUNTY - ILLINOIS TRANSFER STAMPS:**

EXEMPT PURSUANT TO SECTION 31-45 (e) OF THE REAL ESTATE TRANSFER TAX LAW

_____
Buyer, Seller or Representative

## STATEMENT BY GRANTOR AND GRANTEE

The grantor or his agent affirms that, to the best of his knowledge, the name of the grantor shown on the deed or assignment of beneficial interest in a land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire title to real estate under the laws of the State of Illinois.

Dated February 18, 2026

**PERSONAL INFO**

Grantor or Agent

SUBSCRIBED and SWORN to before me
this 18 day of February 2026

**PERSONAL INFO**

NOTARY PUBLIC

OFFICIAL SEAL
LILIANA GONZALEZ
Notary Public State of Illinois
Commission No. 897858
My Commission Expires October 13, 2027

The grantee or his agent affirms and verifies that the name of the grantee shown on the deed or assignment of beneficial interest in a land trust is either a natural person, an Illinois corporation or foreign corporation authorized to do business or acquire and hold title to real estate in Illinois, a partnership authorized to do business or acquire and hold title to real estate in Illinois, or other entity recognized as a person and authorized to do business or acquire title to real estate under the laws of the State of Illinois.

Dated February ___, 2026

Grantee or Agent

SUBSCRIBED and SWORN to before me
this ___ day of February, 2026

NOTARY PUBLIC

Page 3 of 3



# Mayor Christopher J. Clark
## CITY OF HARVEY COUNCIL MEETING
### Monday, October 27, 2025 – Time 7:00 P.M.

**AGENDA**

1. Call Meeting to Order

2. Roll Call of Council Members

3. Invocation and Pledge of Allegiance

4. Executive Session: Discussion of Personnel and Litigation Matters

5. Return to open session

6. Approval of Minutes

   A.      August 25, 2025 (regular meeting)
   B.      August 25, 2025 (meeting of the whole)
   C.      September 22, 2025 (regular meeting)
   D.      October 12, 2025 (special meeting)
   E.      October 16, 2025 (special meeting))

7. Approval of Bills

   A.      August 25, 2025
   B.      October 27, 2025

8. Approval of Ordinance(s) and Resolution(s) for the city of Harvey

   A.      Old Business

   B.      New Business

   1)   Resolution No. _____:   A resolution approving a redevelopment agreement by and between the City of Harvey and Turlington Homes, Inc.

   This resolution authorizes the redevelopment of City owned properties (Exhibit A) for the purpose of promoting homeownership and economic development .

9. Public Comment

10. Mayoral Comment

11. Adjournment

# Redaction Log

Total Number of Redactions in Document: 50

## Redaction Reasons by Page

| Page | Reason | Description | Occurrences |
|---|---|---|---|
| 12 | PERSONAL INFO | The Specified Records constitute "personal information," the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. § 7(1)(c) | 4 |
| 18 | PERSONAL INFO | The Specified Records constitute "personal information," the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. § 7(1)(c) | 2 |
| 19 | PERSONAL INFO | The Specified Records constitute "personal information," the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. § 7(1)(c) | 2 |
| 20 | PERSONAL INFO | The Specified Records constitute "personal information," the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. § 7(1)(c) | 1 |
| 21 | PERSONAL INFO | The Specified Records constitute "personal information," the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. § 7(1)(c) | 1 |
| 34 | PERSONAL INFO | The Specified Records constitute "personal information," the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. § 7(1)(c) | 2 |
| 52 | PERSONAL INFO | The Specified Records constitute "personal information," the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. § 7(1)(c) | 2 |
| 53 | PERSONAL INFO | The Specified Records constitute "personal information," the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. § 7(1)(c) | 2 |
| 55 | PERSONAL INFO | The Specified Records constitute "personal information," the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. § 7(1)(c) | 2 |
| 56 | PERSONAL INFO | The Specified Records constitute "personal information," the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. § 7(1)(c) | 2 |

# Redaction Log

| Page | Reason | Description | Occurrences |
|---|---|---|---|
| 58 | PERSONAL INFO | The Specified Records constitute "personal information," the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. § 7(1)(c) | 2 |
| 61 | PERSONAL INFO | The Specified Records constitute "personal information," the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. § 7(1)(c) | 2 |
| 62 | PERSONAL INFO | The Specified Records constitute "personal information," the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. § 7(1)(c) | 2 |
| 64 | PERSONAL INFO | The Specified Records constitute "personal information," the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. § 7(1)(c) | 2 |
| 65 | PERSONAL INFO | The Specified Records constitute "personal information," the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. § 7(1)(c) | 2 |
| 67 | PERSONAL INFO | The Specified Records constitute "personal information," the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. § 7(1)(c) | 2 |
| 68 | PERSONAL INFO | The Specified Records constitute "personal information," the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. § 7(1)(c) | 2 |
| 70 | PERSONAL INFO | The Specified Records constitute "personal information," the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. § 7(1)(c) | 2 |
| 71 | PERSONAL INFO | The Specified Records constitute "personal information," the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. § 7(1)(c) | 2 |
| 73 | PERSONAL INFO | The Specified Records constitute "personal information," the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. § 7(1)(c) | 2 |
| 74 | PERSONAL INFO | The Specified Records constitute "personal information," the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. § 7(1)(c) | 2 |

# Redaction Log

| Page | Reason | Description | Occurrences |
|------|--------|-------------|-------------|
| 76 | PERSONAL INFO | The Specified Records constitute "personal information," the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. § 7(1)(c) | 2 |
| 77 | PERSONAL INFO | The Specified Records constitute "personal information," the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. § 7(1)(c) | 2 |
| 79 | PERSONAL INFO | The Specified Records constitute "personal information," the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. § 7(1)(c) | 2 |
| 80 | PERSONAL INFO | The Specified Records constitute "personal information," the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. § 7(1)(c) | 2 |

# Redaction Log

## Redaction Reasons by Exemption

| Reason | Description | Pages (Count) |
|---|---|---|
| PERSONAL INFO | The Specified Records constitute "personal information," the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. § 7(1)(c) | 12(4)<br>18(2)<br>19(2)<br>20(1)<br>21(1)<br>34(2)<br>52(2)<br>53(2)<br>55(2)<br>56(2)<br>58(2)<br>61(2)<br>62(2)<br>64(2)<br>65(2)<br>67(2)<br>68(2)<br>70(2)<br>71(2)<br>73(2)<br>74(2)<br>76(2)<br>77(2)<br>79(2)<br>80(2) |



# CITY OF HARVEY ILLINOIS

## Mayor Christopher J. Clark
### CITY OF HARVEY COUNCIL MEETING
Monday, October 27, 2025 – Time 7:00 P.M.

### AGENDA

1. Call Meeting to Order

2. Roll Call of Council Members

3. Invocation and Pledge of Allegiance

4. Executive Session: Discussion of Personnel and Litigation Matters

5. Return to open session

6. Approval of Minutes

    A.    August 25, 2025 (regular meeting)
    B.    August 25, 2025 (meeting of the whole)
    C.    September 22, 2025 (regular meeting)
    D.    October 12, 2025 (special meeting)
    E.    October 16, 2025 (special meeting))

7. Approval of Bills

    A.    October 27, 2025

8. Approval of Ordinance(s) and Resolution(s) for the city of Harvey

    A.    Old Business

    B.    New Business

        1)  Resolution No. _____:  A resolution approving a redevelopment agreement by and between the City of Harvey and Turlington Homes, Inc.

           This resolution authorizes the redevelopment of City owned properties (Exhibit A) for the purpose of promoting homeownership and economic development .

9. Public Comment

10. Mayoral Comment

11. Adjournment



turlington homes



**Alderwoman Colby Chapman - 2nd Ward Harvey Illinois**

Oct 28, 2025 · 🌐

I VOTED NO, Regarding Agenda Item 8(B)(1), the redevelopment agreement with Turlington Homes.

I have serious concerns about the lack of transparency in the sale of public land. The agreement lists 9 City-owned parcels along 151st and Turlington Avenue in Exhibit A, but nowhere in this packet are the sale prices disclosed.

There are also no appraisals included to determine the fair market value of the land we are transferring.

At the same time, the agreement clearly states that the City will sell these properties at a "discounted sale price" yet that discount and its justification are not shown anywhere in this packet. We are also provided the future sales prices of the homes $168,000, $181,000, and $248,000.



7/7/26, 1:09 AM
Harvey approves redevelopment agreement with LLC associated with attorney saddled with complaints over real estate litigation – H…

Ex. K1

# HARVEY WORLD HERALD

ADVERTISEMENT



# Harvey approves redevelopment agreement with LLC associated with attorney saddled with complaints over real estate litigation

Turlington Homes will redevelop 10 city-owned properties along 151st St. and Turlington Ave., with sale prices ranging from $168,000 to $248,000.

BY MAUREEN DUNNE  •  **POLITICS**  •  NOVEMBER 10, 2025





Watch the Harvey City Council meeting on October 27, 2025. HWH / Justin Osby

Julian Rucker walked into the City Council meeting on Oct. 27 with $350,000 in his pocket to invest in homes in Harvey. But after the council approved a deal with a new property developer, he's threatened to walk out the door and put his money elsewhere.



Ex. K1

Rucker said he had been in talks with Harvey's economic development department in August to acquire city-owned homes for him to restore and sell. He obtained $150,000 in credit for the project and underwent the city's financial verification process. But, in September, his line of communication with the city went cold. His calls and emails have since gone unanswered.

Rucker arrived at Monday's meeting to ask what was going on with his application after weeks of crickets. That night, City Council approved an ordinance to sell city-owned property to an unknown developer called Turlington Homes. Turlington Homes has a primitive website with nothing beside a landing page. According to state records, it was established on Oct. 2. Its affiliated agent is John C. Norkus, a Park Ridge-based attorney with the DeBlasio Law Group.

Turlington Homes will acquire 10 city-owned properties along 151st St. and Turlington Ave. to redevelop. Homes will sell between $168,000 to $248,000, according to the ordinance. Construction will begin in 2026 and wrap in 2027.

"We don't know their connection to Harvey," Amanda Askew, a community member present at the meeting, told the HWH. "They have no documented evidence of economic or community development, not just in Harvey, but the entire Southland, or, heck, even the state of Illinois."

Norkus is also affiliated with Chi City Legal, which provides litigation support for landlords and property managers. Yelp reviews show some were less than pleased with Norkus' services. A common accusation is that Norkus allegedly took money for services but could not be reached by clients thereafter, rated 1.7 out of five stars on the site.

"Do not hire John Norkus. He will dissappear leaving with very painful scars. Get someone reliable. Have 5 eviction cases and he is nowhere to be fo[und]," wrote one user. In another comment: "I sent him the money owed and he said he would start the process. It is now 3 months later and he is unreachable, I left numerous messages with office staff and voicemails. His phone number is now disconnected…. I have a tenant that is living for free and destructive. Guess he took the money and ran? Horrible and expensive experience."

Norkus did not respond to requests for comment by press time.

Ald. Dominique Randle-El (5th) was absent, and Alds. Tracy Key (4th) and Colby Chapman (2nd) voted against the redevelopment agreement. Alds. Telanee Smith (3rd), Shirley Drewenski (1st) and Tyrone Rogers (6th) voted yes.

ADVERTISEMENT



Askew fears the land sale could lead to displacement of long-term residents. "It's a fire sale, and we know what [comes next]: the G-word; gentrification," Askew said. "We don't want that to happen. It's unfair to us as residents."

As a longtime Harvey resident, Rucker wants first crack at buying up abandoned land and property. "I feel better investing in my own neighborhood than investing in a neighborhood I just have a financial interest in," Rucker said.

Ex. K1



Harvey City Council was on the receiving end of complaints after it approved the sale of 10 city-owned properties to a developer, Turlington Homes. Construction is expected to begin in 2026 and wrap in 2027.

## Official business

At the first meeting of the Harvey City Council since a round of layoffs and furloughing 40 percent of city employees, those hoping for more information on the city's fiscal health left without those items addressed.

Mayor Chris Clark did not directly speak on the financial situation in Harvey. Instead, he used mayoral comment to commend the success of the city's gospel festival, calling upon residents to keep moving forward under the guidance of God.

Left off of the night's agenda was aldermanic comment, a period where alderpersons typically provide ward updates and address the mayor directly. Ald. Chapman entered a motion to amend the agenda and add it. It failed. Mayor Clark refused a request from Ald. Key to speak during public comment.

Alds. Chapman and Key voted against approving a slate of bills lists from the past few weeks. Alds. Drewenski, Rogers, and Smith voted yes; the measure passed.

Chapman objected to paying the bills — including an $8,000 charge for lodging at downtown Chicago's Londonhouse Hotel after a conference — until a financial audit could be completed. "I don't know how we're approving anything tonight, because we have not addressed our financial distress," Chapman said.

Chapman advocated for the council to focus its energy on paying only bills related to the upkeep and public safety of the city amid the financial crisis. Clark retorted that just because the money isn't there doesn't mean the bills stop coming.

"Well, just like in your household, if you run out of money and all these things happen, that don't mean you stay where you are in your household," Clark said. "You're going to make the changes. You going to do what you need to do to tighten up that bill."

346

7/7/26, 1:09 AM                Harvey approves redevelopment agreement with LLC associated with attorney saddled with complaints over real estate litigation – H…

Ex. K1

Help us continue to publish stories like these

We're filling the void after the collapse of local newspapers
decades ago. But we can't do it without reader support.

I'll donate!

## Author



### MAUREEN DUNNE

Maureen Dunne is a civic reporter with the Harvey World Herald. She holds a  journalism degree from DePaul University
('22).

As a lifelong Chicagoan and Chicago Public Schools graduate, her reporting focuses on Chicago's cultures and communities,
city politics and the judicial system. As part of DePaul University's Center for Journalism Excellence and Integrity, she has
reported on Cook County's electronic monitoring system as well as abortion access in Illinois in stories airing on WTTW's
Chicago Tonight.
When not typing furiously into a Google Doc, she's a cello player in an Irish band, bartender, urban gardener and recovering
political organizer. Her work has appeared in Injustice Watch, City Bureau's Documenters program, Vocalo Radio, 14 East
Magazine and the DePaulia.

## Related Articles

Ex. K1



## Residents question Harvey's years-old TIF report

BY AMINA SERGAZINA  ●  **POLITICS**  ●  JUNE 29, 2026

The City Council approved fiscal year 2021 tax increment financing (TIF) reports after officials said the item had to return to the agenda because of a procedural issue, even though the reports had previously been approved by the council.

348

Ex. K1



## Harvey City Hall reopens after HVAC issues

BY DANIEL MITCHELL  •  POLITICS  •  JUNE 21, 2026

An HVAC malfunction at City Hall forced a temporary shuttering of City Hall. Acting mayor Shirley Drewenski took to social media to assure a "quick fix" to a system sorely in need of upgrades.

7/7/26, 1:09 AM

Ex. K1

Harvey approves redevelopment agreement with LLC associated with attorney saddled with complaints over real estate litigation – H...



## Dixmoor using collections and tax liens to crack down on absentee vacant lot owners

BY MATTHEW WARAKOMSKI  ●  **POLITICS**  ●  JUNE 7, 2026

A newly established collection agency, lawsuits, and tax liens will embolden the village to crack down on owners of vacant lots who leave them in poor conditions.

## Subscribe to our newsletter

Enter your email address here...

**Subscribe**

You can unsubscribe from the newsletter at any time. Have a question? Contact us or review our privacy policy for more information.

ADVERTISEMENT

7/7/26, 1:09 AM

Harvey approves redevelopment agreement with LLC associated with attorney saddled with complaints over real estate litigation – H…

Ex. K1



## Latest in Politics and Business



**Residents question Harvey's years-old TIF report**



**Harvey City Hall reopens after HVAC issues**



**Dixmoor using collections and tax liens to crack down on absentee vacant lot owners**

Ex: K1



**'This is now home': S2 Express Grill revives local dining in Ford Heights**



**Harvey youth present plan to address food insecurity and repurpose vacant land**



**Addresses now included in sale of village-owned properties in Dixmoor**

## Support the Harvey World Herald with a monthly donation.

Get the local news you care about.

**SUPPORT LOCAL NEWS**

**HARVEY WORLD HERALD**

Ex. K1

The Harvey World Herald is your trusted news source for in-depth reporting on education, business, public safety, health, politics, and entertainment in the City of Harvey.

The Harvey World Herald is your trusted news source for in-depth reporting on education, business, public safety, health, politics, and entertainment in the City of Harvey.

## Subscribe to our Newsletter. Cancel anytime.

your@address.com            **Subscribe**

## Read us on

  **GOOGLE NEWS**

**CONTACT US**

**STAFF**

**SPONSORSHIP**

**LOGIN**

**EVENT SUBMISSION**

**COMMUNITY ADVISORY BOARD**

**DONOR TRANSPARENCY POLICY**

## SUPPORT US

**PITCH THE HARVEY WORLD HERALD**

  

Copyright © 2026 Harvey World Herald | Powered by Indiegraf Media

Privacy Policy | Subscription Agreement | Terms of Use

.

Ex. K2



**DAILY SOUTHTOWN**

# Harvey symbolically breaks ground on Turlington Homes project, approved before Mayor Christopher Clark's death



Avenue. (Evy Lewis/Daily Southtown)



By **EVY LEWIS** | elewis@chicagotribune.com | Daily Southtown
PUBLISHED: February 27, 2026 at 12:20 PM CST | UPDATED: February 27, 2026 at
12:43 PM CST

Harvey officials came out in frigid weather Feb. 24 for a symbolic
groundbreaking on Turlington Homes, a redevelopment project approved last
year under the late Mayor Christopher Clark.

The Turlington Homes project is one of the only initiatives Harvey has
undertaken since declaring a state of financial distress in October. The
Turlington Homes project was approved at the first City Council meeting after
that declaration, where it was the only item of new business.

Acting Mayor Shirley Drewenski was elected by the City Council Feb. 23 to
serve out the remainder of Clark's term.

"These homes will strengthen our community, support growth and help move
the city forward," Drewenski said at the ground-breaking.



Speakers commemorated the late mayor, praising his drive and vision.



Actor portrayal.

ADVERTISEMENT

John Groff, vice president of Global Real Estate Development, the project's developer, called Clark's vision for Harvey outstanding.

"When we got the call about Harvey, we looked up Harvey, we said, it's a small little borough, let's go out there and let's see what they have to say," Groff said. "Meeting the former mayor, Mayor Clark, was an inspiration, because even though you didn't want to hear what he had to say, he told you."

However, some residents opposed the project, criticizing its suddenness and lack of public input. There was no debate on the proposed development agreement when it was approved, as 3rd Ward Ald. Telanee Smith called the question, bringing the issue to an immediate vote.

Ex. K2



  

Skip Ad

0:13 / 0:30

At that meeting, resident Amanda Askew accused the city of hastily selling off assets while in financial distress.

"It just feels like we're doing a fire sale to some legal friends downtown," Askew said. "We just continue to act like this is a liquidation sale for the city of Harvey."

Another resident, Mauzkie Ervin, argued that because the city appealed for state financial aid, transactions involving city assets like the Turlington Homes agreement should be subject to state approval.

While Harvey has applied for a state takeover of its troubled finances under the Illinois Financially Distressed City Law, the state has yet to take any action.

Ex. K2



A partially collapsed house is visible Tuesday behind a sign for the planned Turlington Homes project on the 15100 block of Turlington Avenye in Harvey. (Evy Lewis/Daily Southtown)

Turlington Homes will acquire 10 unused city-owned properties on the 15100 block of Turlington Avenue in order to construct a development, according to the redevelopment agreement approved by the City Council. Homes will be based off three model plans. A sign advertising the development at the planned site states home prices will start at $180,000.

The redevelopment agreement stated the city was "willing to assist the developer by selling the Redevelopment Property at a discounted sale price," though a final sale price was not specified.

"The document speaks for itself," Groff told the Daily Southtown. "This is a redevelopment project, so they're basically coming to the table, their investment is the land, our investment is building the homes."

The Turlington Homes website state the project requires "municipal support and infrastructure incentives." Groff said that refers to items such as plumbing and electricity, which he doesn't anticipate the project needing much support on.

358

Global Real Estate Development's website also lists projects in New Jersey, Florida, Michigan and Ohio.



Acting Mayor Shirley Drewenski speaks Tuesday at a symbolic groundbreaking on the 15100 block of Turlington Avenue. (Evy Lewis/Daily Southtown)

The developer was connected to Harvey by Jedidiah Brown, an activist in the south suburbs and friend of Clark. Brown participated in the groundbreaking alongside Drewenski, other city officials and the developers.

"(Clark) said that even though the city was declared in distress, it was not desperate," Brown said. "He wanted development in this community that would represent the hope that he held for this city, that it would be independent and just as respected as any other southern suburb, like Flossmoor, Orland Park or Homewood."

The redevelopment agreement estimated the project would be completed in the final quarter of 2027. David Haislip, the president of Global Real Estate Development, said the timeline would depend partially on sales.

"There's been such an interest," Haislip said. "For the most part, this is the first week that the average person knows this is even a project."

Ex. K2

"The response has been so great, we kind of have to go through all of that, because there's a possibility that these will sell out even before building a model home," Haislip said.

The developers said they anticipate being able to begin construction in March. The project still requires permit approval, Haislip said.

**Sign up for the Daily Southtown newsletter:** News updates from the south suburbs delivered twice a week.

| wheaton2004@gmail.com | SIGN UP |
|---|---|

By signing up, you agree to our Terms of Use, Privacy Policy, and to receive emails from Chicago Tribune.

Harvey had development partnerships fall through in the past. Under former Mayor Eric Kellogg, the city lost millions on a scheme to rehabilitate a disused hotel.

More recently, a project to construct community hubs for each of Harvey's six wards has been in limbo, with residents complaining about the blight created by the unfinished construction sites at the most recent City Council meeting.

*elewis@chicagotribune.com*

## MORE FROM OUR NEWSROOM



**Occupants of capsized boat in Lake Geneva that killed 3 children are from Batavia,...**

Monday, July 6



**3 children dead after boat capsizes in Wisconsin's Lake**



### What's in the Illinois Tollway's $26.5 billion construction program?

Sunday, July 5



### Thornton Reservoir nearly full after heavy storms over weekend

Monday, July 6



### World Cup: After his suspension was lifted in scrutinized move, Folarin…

Monday, July 6



### World Cup: Belgium beats United States 4-1 to reach quarterfinals, taking…

Monday, July 6



### George E. Johnson Sr., founder of Johnson Products Company, dies at 99

Monday, July 6



### At least 3 reported dead from Chicago heat wave were South Side residents



**Back for another season, Alex Ovechkin is noncommittal on whether this will be his last**

Monday, July 6



**West Aurora's Warren Flatt plays long game into commitment to West Virginia…**

Monday, July 6



**St. Laurence's Sean Rice goes from mid-major prospect to picking Illinois for football: 'I…**

Monday, July 6



**Chicago Blackhawks in NHL free agency: Goalie prospect Drew Commesso signs a 2-yea…**

Monday, July 6

**SPONSORED CONTENT**



**Restaurants In Homewood With Good Senior Discounts** ↗

BY **COMPARISONS.ORG**

**2026** ›
**February** ›
27